No. 24-13590

# United States Court of Appeals for the Eleventh Circuit

---

DELTONA TRANSFORMER CORPORATION,

*Plaintiff-Appellee,*

v.

THE NOCO COMPANY,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Middle District of Florida, Hon. Carlos E. Mendoza, Case No. 6:19-cv-00308-CEM-LHP

---

## NON-CONFIDENTIAL APPENDIX OF DEFENDANT-APPELLANT THE NOCO COMPANY

---

Meredith M. Wilkes
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
mwilkes@jonesday.com

Anna E. Raimer
JONES DAY
717 Texas Ave., Ste. 3300
Houston, TX 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
aeraimer@jonesday.com

Gregory A. Castanias
Amelia A. DeGory
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
gcastanias@jonesday.com

Kristina K. Cercone
JONES DAY
110 N. Wacker Dr., Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
kcercone@jonesday.com

---

*Counsel for Defendant-Appellant*

# INDEX OF NON-CONFIDENTIAL APPENDIX

| Document | Date Filed | Docket/Tab# |
|---|---|---|
| **VOLUME 1** | | |
| District Court Docket Sheet | N/A | A |
| Complaint | 02/14/2019 | 1 |
| NOCO's Answer, Affirmative Defenses, and Counterclaims | 11/12/2019 | 55 |
| **VOLUME 2** | | |
| DTC's Answer and Affirmative Defenses to NOCO's Counterclaims | 12/03/2019 | 63 |
| Transcript of 07/06/2020 Motions Hearing | 07/22/2020 | 158-7 |
| Joint Final Pretrial Statement | 12/14/2020 | 242 |
| **VOLUME 3** | | |
| Joint Final Pretrial Statement (continued from previous volume) | 12/14/2020 | 242 |
| **VOLUME 4** | | |
| Transcript of 5/12/2021 Telephone Conference | 05/12/2021 | 284 |
| Jury Instructions | 05/25/2021 | 314 |
| Verdict Form | 05/25/2021 | 315 |
| Verdict Form – Punitive Damages | 05/25/2021 | 317 |
| Deposition Designation of S. Heiser (played at trial) | 06/04/2021 | 327-1 |
| Deposition Designation of M. Lombardo (played at trial) | 06/04/2021 | 327-2 |
| Deposition Designation of D. Underhill (played at trial) | 06/04/2021 | 327-3 |
| Deposition Designation of J. Weiner (played at trial) | 06/04/2021 | 327-4 |
| DTC's Motion for Permanent Injunction | 06/17/2021 | 338 |
| **VOLUME 5** | | |
| Trial Transcript of 05/18/2021 (Vol. II) | 06/17/2021 | 341 |
| **VOLUME 6** | | |
| Trial Transcript of 05/19/2021 (Vol. III) | 06/17/2021 | 343 |

| Document | Date Filed | Docket/Tab# |
|---|---|---|
| **VOLUME 7** | | |
| Order Denying Motion to Exclude Expert Testimony of P. Johnson, Granting in Part and Denying in Part Motion to Exclude Expert Testimony of P. Green, Granting in part and Denying in Part Motion to Exclude Expert Testimony of C. Distler | 06/21/2021 | 352-1 |
| Order Granting in Part and Denying in Part Motion to Seal Trial Exhibits | 06/21/2021 | 353 |
| Declaration of Andrew J. Turnier and Exhibits in Support of NOCO's Opposition to DTC's Motion for Permanent Injunction | 07/01/2021 | 367-1 |
| Minute Entry Re Completion of Bench Trial | 07/09/2021 | 381 |
| Trial Transcript of 05/17/2021 (Vol. I) (REDACTED) (originally filed under seal as Dkt. 339) | 08/16/2021 | 399 Pages 1-129 |
| **VOLUME 8** | | |
| Trial Transcript of 05/17/2021 (Vol. I) (continued from previous volume) (REDACTED) (originally filed under seal as Dkt. 339) | 08/16/2021 | 399 Pages 130-261 |
| **VOLUME 9** | | |
| Trial Transcript of 05/20/2021 (Vol. IV) (REDACTED) (originally filed under seal as Dkt. 348) | 08/16/2021 | 400 Pages 1-147 |
| **VOLUME 10** | | |
| Trial Transcript of 05/20/2021 (Vol. IV) (continued from previous volume) (REDACTED) (originally filed under seal as Dkt. 348) | 08/16/2021 | 400 Pages 148-294 |
| **VOLUME 11** | | |
| Trial Transcript of 05/21/2021 (Vol. V) (REDACTED) (originally filed under seal as Dkt. 354) | 08/16/2021 | 401 Pages 1-136 |
| **VOLUME 12** | | |
| Trial Transcript of 05/21/2021 (Vol. V) (continued from previous volume) (REDACTED) (originally filed under seal as Dkt. 354) | 08/16/2021 | 401 Pages 137-271 |

| Document | Date Filed | Docket/Tab# |
|---|---|---|
| **VOLUME 13** | | |
| Trial Transcript of 05/24/2021 (Vol. VI) (REDACTED) (originally filed under seal as Dkt. 356) | 08/16/2021 | 402 |
| **VOLUME 14** | | |
| Trial Transcript of 05/25/2021 (Vol. VII) (REDACTED) (originally filed under seal as Dkt. 358) | 08/16/2021 | 403 |
| **VOLUME 15** | | |
| Trial Transcript of 07/09/2021 (Vol. VIII) (REDACTED) (originally filed under seal as Dkt. 386) | 08/23/2021 | 405 |
| **VOLUME 16** | | |
| Order Denying NOCO's Motions for Judgment as a Matter of Law | 03/30/2022 | 410 |
| Order on Disgorgement and Granting in Part and Denying in Part DTC's Motion for Permanent Injunction | 09/29/2023 | 423 |
| Deltran's Response in Opposition to NOCO's Renewed Motion for Judgment as a Matter of Law | 11/13/2023 | 436 |
| NOCO's 50(b) Motion for Judgment as a Matter of Law (re-filed without redactions in the district court) | 11/21/2023 | 440 |
| Order Denying NOCO's Renewed Motion for Judgment as a Matter of Law | 09/30/2024 | 458 |
| Corrected Second Amended Final Judgment | 10/23/2024 | 464 |
| TRIAL EXHIBIT DX-71 | | DX-71 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-111 | | DX-111 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-118 | | DX-118 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-120 | | DX-120 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-255 | | DX-255 |
| TRIAL EXHIBIT DX-272 | | DX-272 |
| TRIAL EXHIBIT DX-275D | | DX-275D |
| TRIAL EXHIBIT DX-275E | | DX-275E |

| Document | Date Filed | Docket/Tab# |
|---|---|---|
| TRIAL EXHIBIT DX-275I | | DX-275I |
| TRIAL EXHIBIT DX-275L | | DX-275L |
| **VOLUME 17** | | |
| TRIAL EXHIBIT DX-308 | | DX-308 |
| TRIAL EXHIBIT DX-308A | | DX-308A |
| TRIAL EXHIBIT DX-308B | | DX-308B |
| TRIAL EXHIBIT DX-308C | | DX-308C |
| TRIAL EXHIBIT DX-308D | | DX-308D |
| TRIAL EXHIBIT DX-308E | | DX-308E |
| TRIAL EXHIBIT DX-308F | | DX-308F |
| TRIAL EXHIBIT DX-308G | | DX-308G |
| **VOLUME 18** | | |
| TRIAL EXHIBIT DX-308H | | DX-308H |
| TRIAL EXHIBIT DX-308I | | DX-308I |
| TRIAL EXHIBIT DX-308J | | DX-308J |
| TRIAL EXHIBIT DX 308K | | DX 308K |
| TRIAL EXHIBIT DX-308L | | DX-308L |
| TRIAL EXHIBIT DX-308M | | DX-308M |
| TRIAL EXHIBIT DX-308N | | DX-308N |
| TRIAL EXHIBIT DX-308O | | DX-308O |
| TRIAL EXHIBIT DX-308P | | DX-308P |
| TRIAL EXHIBIT DX-308Q | | DX-308Q |
| TRIAL EXHIBIT DX-308R | | DX-308R |
| TRIAL EXHIBIT DX-308S | | DX-308S |
| TRIAL EXHIBIT DX-308T | | DX-308T |
| TRIAL EXHIBIT DX-308U | | DX-308U |
| TRIAL EXHIBIT DX-308V | | DX-308V |
| TRIAL EXHIBIT DX-308W | | DX-308W |
| TRIAL EXHIBIT DX-308X | | DX-308X |
| **VOLUME 19** | | |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-462 | | DX-462 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-478 | | DX-478 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-484 | | DX-484 |
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-499 | | DX-499 |

| Document | Date Filed | Docket/Tab# |
|---|---|---|
| TRIAL EXHIBIT (FILED UNDER SEAL) DX-520 | | DX-520 |
| TRIAL EXHIBIT DX-546 | | DX-546 |
| TRIAL EXHIBIT DX-547 | | DX-547 |
| TRIAL EXHIBIT PX-2A | | PX-2A |
| TRIAL EXHIBIT PX-2B | | PX-2B |
| TRIAL EXHIBIT PX-2E | | PX-2E |
| TRIAL EXHIBIT PX-3A | | PX-3A |
| TRIAL EXHIBIT (FILED UNDER SEAL) PX-5 | | PX-5 |
| TRIAL EXHIBIT PX-51 | | PX-51 |
| TRIAL EXHIBIT PX-54 | | PX-54 |
| TRIAL EXHIBIT PX-55A | | PX-55A |
| TRIAL EXHIBIT PX-55B | | PX-55B |
| TRIAL EXHIBIT PX-56A | | PX-56A |
| **VOLUME 20** | | |
| TRIAL EXHIBIT PX-56B | | PX-56B |
| TRIAL EXHIBIT PX-57A | | PX-57A |
| TRIAL EXHIBIT PX-57B | | PX-57B |
| TRIAL EXHIBIT PX-58A | | PX-58A |
| TRIAL EXHIBIT PX-58B | | PX-58B |
| TRIAL EXHIBIT PX-59A | | PX-59A |
| TRIAL EXHIBIT PX-59B | | PX-59B |
| TRIAL EXHIBIT PX-60A | | PX-60A |
| TRIAL EXHIBIT PX-61A | | PX-61A |
| TRIAL EXHIBIT PX-61C | | PX-61C |
| TRIAL EXHIBIT PX-61D | | PX-61D |
| TRIAL EXHIBIT PX-61F | | PX-61F |
| TRIAL EXHIBIT PX-61G | | PX-61G |
| TRIAL EXHIBIT PX-62A | | PX-62A |
| TRIAL EXHIBIT PX-62C | | PX-62C |
| TRIAL EXHIBIT PX-138 | | PX-138 |
| TRIAL EXHIBIT PX-139 | | PX-139 |
| TRIAL EXHIBIT PX-144D | | PX-144D |
| TRIAL EXHIBIT PX-144E | | PX-144E |
| TRIAL EXHIBIT PX-144F | | PX-144F |
| TRIAL EXHIBIT PX-144G | | PX-144G |
| TRIAL EXHIBIT PX-144X | | PX-144X |

| Document | Date Filed | Docket/Tab# |
|---|---|---|
| TRIAL EXHIBIT PX-147 (FILED UNDER SEAL) | | PX-147 |
| TRIAL EXHIBIT PX-162A | | PX-162A |
| TRIAL EXHIBIT PX-189 | | PX-189 |
| TRIAL EXHIBIT PX-205 | | PX-205 |
| TRIAL EXHIBIT PX-206 | | PX-206 |
| TRIAL EXHIBIT PX-230 | | PX-230 |
| TRIAL EXHIBIT PX-237 | | PX-237 |
| TRIAL EXHIBIT PX-239 | | PX-239 |

**Dkt.410**
**Order Denying NOCO's Motion for Judgment as a Matter of Law**
**3/30/2022**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DELTONA TRANSFORMER
CORPORATION,**

**Plaintiff,**

v.                                          **Case No.  6:19-cv-308-CEM-LHP**

**THE NOCO COMPANY,**

**Defendant.**
_____/

### ORDER

THIS CAUSE is before the Court on Defendant's Motion for Judgment as a Matter of Law on Common Law Trademark Infringement ("First Motion," Doc. 300), Defendant's Motion for Judgment as a Matter of Law on Failure to Show Consumer Harm Under FDUTPA ("Second Motion," Doc. 301), Defendant's Motion for Judgment as a Matter of Law on Liability on Counts 1 through 4 ("Third Motion," Doc. 302), and Defendant's Motion for Judgment as a Matter of Law on No Actual Damages ("Fourth Motion," Doc. 303) (collectively, "Motions"). As set forth below, the Motions will be denied.

### I.    BACKGROUND

Plaintiff is the owner of various trademarks, including the marks BATTERY TENDER and DELTRAN BATTERY TENDER ("Plaintiff's Marks"). (*See*

*generally* Pl.'s Trial Ex. 1A, Doc. 318-1; Pl.'s Trial Ex. 1B, Doc. 318-2; Pl.'s Trial Ex. 1E, Doc. 318-3). This case arises from Defendant's infringement of Plaintiff's Marks. At trial, Plaintiff presented evidence that throughout the relevant time period, Defendant intentionally infringed Plaintiff's Marks by engaging in a campaign to confuse customers. At the conclusion of trial, the jury found in favor of Plaintiff on its Lanham Act claims, common law trademark claim, and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim. (*See generally* Verdict, Doc. 315). The jury further awarded actual damages. (*Id.* at 4).[1] Defendant now moves for judgment as a matter of law on four separate bases.

## II.    LEGAL STANDARD

The Court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "[J]udgment as a matter of law after the verdict may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 739 (11th Cir. 1995) (quotation omitted). In ruling on such a motion, the Court "must draw all reasonable

---

[1] The jury also awarded Plaintiff punitive damages, but those are not at issue here. (*See generally* Punitive Damages Verdict, Doc. 317).

inferences in favor of the nonmoving party." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 1193 (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

### III.   ANALYSIS

**A.     First Motion—Common Law Trademark Infringement (Doc. 300)**

Defendant asserts that under common law, it is Plaintiff's burden to establish that its marks are not generic and that Plaintiff has failed to do so. Defendant cites— without a pincite or explanation—five of its exhibits. (Doc. 300 at 3). All of these exhibits are email correspondence between various retailers and Plaintiff where the retailers are referring to Plaintiff's products and use the term "battery tender" without capitalizing the term. (Def.'s Trial Ex. 111, Doc. 319-12, at 2; Def.'s Trial Ex. 118, Doc. 319-16, at 2; Def.'s Trial Ex. 120, Doc. 319-17, at 3; Def.'s Trial Ex. 255, Doc. 319-32, at 5; Def.'s Trial Ex. 462, Doc. 319-131, at 1. *But see* Doc. 319-17 at 2 (within the same email chain capitalizing the term "Battery Tender" and using it in a manner to specifically describe Plaintiff's product)). First, Defendant has not explained why using Plaintiff's Mark without capital letters, indicates that the usage

is generic. (*See* Doc. 318-1 at 2; Doc. 318-2 at 2; Doc. 318-3 at 2 (indicating that Plaintiff's Marks "consist[] of standard characters without claim to any particular font, style, size, or color")). Moreover, when the emails are read in context—a retailer discussing carrying Plaintiff's specific products—these exhibits are just as likely to show that the uncapitalized term "battery tender" is used to refer specifically to Plaintiff's products, rather than in a generic manner. Additionally, Plaintiff offered an abundance of evidence at trial establishing that the term "battery tender" had not become generic. Defendant's First Motion will be denied.

## B. Second Motion—Consumer Harm under FDUTPA (Doc. 301)

Defendant next argues that it is entitled to judgment on the FDUTPA claim because Plaintiff failed to establish any harm to consumers. FDUTPA makes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." Fla. Stat. § 501.204(1). "A deceptive act is one which is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017) (quotation omitted). And, "an unfair practice is one which causes substantial injury to a consumer which the consumer could not have reasonably avoided and which is not outweighed by countervailing benefits to the consumer or to competition." *Id.* (citing *Porsche Cars N. Am., Inc., v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA

2014)). "Importantly, an act is not deceptive and a practice is not unfair unless a consumer was actually aggrieved by the act or practice." *Id.* (citing *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000)); *Env't Mfg. Sols., LLC v. Fluid Grp. Ltd.,* No. 6:18-cv-156-Orl-40KRS, 2018 U.S. Dist. LEXIS 131382, at *51 (M.D. Fla. May 9, 2018). Therefore, "[w]hile an entity does not have to be a consumer to bring a FDUTPA claim, it still must prove the elements of the claim, including an injury to a consumer." *Stewart Ag., Inc. v. Arrigo Enters.*, 266 So. 3d 207, 212 (Fla. 4th DCA 2019) (citation omitted); *see also Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015); *Sandshaker Lounge & Package Store LLC v. RKR Beverage Inc.*, No. 3:17-cv-00686-MCR-CJK, 2018 U.S. Dist. LEXIS 224519, at *16 (N.D. Fla. Sep. 27, 2018) ("While the 2001 amendment expanded the class of plaintiffs eligible to bring an action for damages, it did not modify the requirement that the plaintiff allege facts plausibly suggesting consumer injury or detriment in order to state a claim.").

Defendant's argument is premised on the assumption that the injury from its deceptive acts and unfair practices must have been suffered by the consumers of Plaintiff's and Defendant's products. But, Defendant cites no authority for such a proposition. Instead, Plaintiff clearly falls within the definition of "consumer" under FDUTPA. Fla. Stat. § 501.203(7) ("'Consumer' means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture;

partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination."). And, as discussed below, Plaintiff established that it—a consumer—suffered actual damages. Accordingly, Defendant has not established that it is entitled to judgment on the FDUTPA claim, and the Second Motion is due to be denied.

### C.    Third Motion—Likelihood of Confusion (Doc. 302)

Defendant next argues that it is entitled to judgment as a matter of law on liability for all of Plaintiff's claims. Specifically, Defendant asserts that Plaintiff failed to provide any evidence of likelihood of confusion. Quite simply, Defendant ignores the record evidence. Plaintiff presented evidence of actual confusion, for example in the form of customer messages, as well as evidence that could lead a reasonable jury to conclude that there was a likelihood of confusion, such as evidence that Defendant engaged in a campaign to intentionally confuse customers. Defendant's Third Motion is due to be denied.

### D.    Fourth Motion—Actual Damages (Doc. 303)

Defendant asserts that it is entitled to judgment as a matter of law because Plaintiff failed to produce any evidence of actual damages. Specifically, Defendant argues that Plaintiff failed to produce at trial any specific financial documentation regarding the monetary value of the brand's goodwill prior to Defendant's infringement and the monetary value of the goodwill after the infringement.

However, Plaintiff's damages need not be "susceptible to precise calculations." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008). Instead, in a situation "where plaintiff's injury 'is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1520 (11th Cir. 1990) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). Plaintiff spent a considerable amount of time at trial establishing the efforts it went through to build goodwill in its brand and the extensive efforts that were taken to restore that goodwill after Defendant's infringement. This evidence is sufficient to support the jury's verdict. *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) ("In measuring harm to goodwill, a jury may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts.").

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Judgment as a Matter of Law on Common Law Trademark Infringement (Doc. 300) is **DENIED**.

2. Defendant's Motion for Judgment as a Matter of Law on Failure to Show Consumer Harm Under FDUTPA (Doc. 301) is **DENIED**.

3. Defendant's Motion for Judgment as a Matter of Law on Liability on Counts 1 through 4 (Doc. 302) is **DENIED**.

4. Defendant's Motion for Judgment as a Matter of Law on No Actual Damages (Doc. 303) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on March 30, 2022.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

# Dkt.423
**Order Granting in Part, Denying in Part Motion for Permanent Injunction**
**9/29/2023**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DELTONA TRANSFORMER
CORPORATION,**

**Plaintiff,**

**v.**                                                          **Case No.  6:19-cv-308-CEM-LHP**

**THE NOCO COMPANY,**

**Defendant.**

_____/

**ORDER**

THIS CAUSE is before the Court on the issue of disgorgement of profits following a jury trial on liability and damages, (*see generally* Min. Entries, Doc. Nos. 294, 296, 299, 305, 310, 311, 313), and a bench trial on disgorgement, (*see generally* Min. Entry, Doc. 381). The parties each submitted proposed findings of fact and conclusions of law. (Def.'s Proposed Order, Doc. 390; Pl.'s Proposed Order, Doc. 392). Plaintiff also filed a Motion for Permanent Injunction (Doc. 338), to which Defendant filed a Response (Doc. 367). As set forth below, Plaintiff will be granted disgorgement of Defendant's profits in the amount of $12,135,943.70, and the Motion for Permanent Injunction will be granted in part and denied in part.

# I.   BACKGROUND

Plaintiff is the owner of various trademarks, including the marks BATTERY TENDER and DELTRAN BATTERY TENDER ("Plaintiff's Marks"). (*See generally* Trademark Registrations, Pl. Exs. 1A, 1B, 1E, Doc. Nos. 318-1, 318-2, 318-3). This case arises from Defendant's infringement of Plaintiff's Marks. At trial, Plaintiff presented evidence that throughout the relevant time period, between 2014 and 2020, Defendant intentionally infringed Plaintiff's Marks by engaging in a campaign to confuse customers and appropriate Plaintiff's goodwill. At the conclusion of trial, the jury found in favor of Plaintiff on its Lanham Act claims, common law trademark claim, and Florida Deceptive and Unfair Trade Practices Act claim. (Verdict, Doc. 315, at 1–5). The jury awarded actual damages in the amount of $1,300,000, (*id.* at 4), and punitive damages in the amount of $5,750,000, (Punitive Damages Verdict Form, Doc. 317, at 1).

The Court then conducted a bench trial on the issue of disgorgement of profits. (*See generally* Min. Entry, Doc. 381). Plaintiff has also moved for the issuance of a permanent injunction. (*See generally* Doc. 338). The Court will address each in turn.

# II.   DISGORGEMENT

Because Plaintiff prevailed on its claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), it is entitled, "subject to the principles of equity, to recover . . . [D]efendant's profits" in addition to the damages awarded by the jury.

15 U.S.C. § 1117(a).[1] However, "disgorgement of a defendant's profits in a trademark infringement case is equitable in nature and does not carry with it a right to a jury trial." *Hard Candy, Ltd. Liab. Co. v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1359 (11th Cir. 2019). Thus, the issue of disgorgement of profits is currently before the Court as the factfinder.[2] The Court must first determine whether Plaintiff has shown entitlement to disgorgement of profits, and if so, the amount of profits that must be disgorged.

"An accounting of a defendant's profits is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *Playnation Play Sys. V. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019). All three categories exist here, but because Defendant's infringement was so blatantly willful, the Court need only address that category.

The Eleventh Circuit has "described a willful violation of a trademark occurring where the infringer was 'knowingly and deliberately cashing in upon the good will of [the infringed].'" *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 903 (11th Cir. 2007) (quoting *Burger King v. Mason*, 855 F.2d 779,

---

[1] There are exemptions that are inapplicable here. 15 U.S.C. § 1117(a) (noting that the statements therein are "subject to the provisions" of 15 U.S.C. §§ 1111 and 1114).

[2] As the Court made clear to the parties at the June 24, 2021 Hearing, (*see generally* Min. Entry, Doc. 361), the bench trial was a continuation of the jury trial and the Court considered all evidence presented in both phases of the trial as the record before it.

781 (11th Cir. 1988)). Here, the evidence of willful infringement is abundant. In 2014 and throughout the ongoing infringement, Plaintiff's Battery Tender brand was well known for its battery chargers and maintainers, particularly within the powersport industry. (*See, e.g.*, Jury Trial Vol. 1 Tr., Doc. 339, at 196 (indicating that Plaintiff was selling over a million battery chargers per year in 2014); Jury Trial Vol. 3 Tr., Doc. 343, at 91 (explaining that based on a brand survey, Plaintiff's brand recognition was extremely strong within the powersport industry); Jury Trial Vol. 4 Tr., Doc. 348, at 151 (acknowledging that Plaintiff "was one of the top brands in the industry" in 2013 and 2014); Jury Trial Vol. 6 Tr., Doc. 356, at 45 (Defendant's President stating that Plaintiff was one of the "biggest competitors in the battery charger space")).

As of January 2014, Defendant was contemplating an advertising strategy using "battery tender" in its marketing and claiming that this phrase was generic. (Jan. 28, 2014 Email, Def. Ex. 19, Doc. 319-3, at 1). Defendant followed through on this strategy, placing advertisements on Amazon.com using Plaintiff's Marks. (Jury Trial Vol. 2 Tr., Doc. 341, at 54–60; *see generally* Amazon Ads., Pl. Exs. 47, 49, 50, 52, Doc. Nos. 318-27, 318-28, 318-29, 318-30). Defendant also strategically used the term battery tender when communicating with customers, representing that Defendant's products were battery tenders despite that term being Plaintiff's protected trademark and Defendant having no affiliation with Plaintiff. (Doc. 341 at

61–63; Heiser Dep., Doc. 327-1, at 12 (Defendant's sales representative explaining that she had told customers that Defendant "sells battery tender products"); Doc. 348 at 154 (Defendant's Vice President of Sales for the Americas stating that he was actively telling customers that Defendant "sells battery tender products")).

These actions were taken even though Defendant knew that Battery Tender was Plaintiff's trademarked brand. Indeed, Defendant's high-ranking executives admitted that they were very familiar with Plaintiff's brand at least by 2014. (Doc. 348 at 151 (Defendant's Vice President of Sales for the Americas acknowledging awareness of Plaintiff's brand in 2013 and 2014); Underhill Dep., Doc. 327-3, at 18 (Defendant's Chief Creative Officer referring to Plaintiff in 2014 by its "Battery Tender" brand and explaining that he "for sure" knew that it was Plaintiff's brand because Plaintiff was one of Defendant's "core competitors" who he knew "very well")). Further, on July 1, 2015, Plaintiff sent the first in a series of cease and desist letters to Defendant, explaining that battery tender was protected by trademarks and demanding that Plaintiff stop improperly using Plaintiff's Marks. (July 1, 2015 Letter, Pl. Ex. 61A, Doc. 318-38, at 1).

Apparently, in light of the potential liability for infringing Plaintiff's Marks, Defendant approached Plaintiff about acquiring the Battery Tender brand. (Sept. 15, 2016 E-mail, Pl. Ex. 62A, Doc. 318-44, at 1; Doc. 327-3 at 17 (explaining that Defendant wanted to acquire companies like Plaintiff to "accelerate [Defendant's]

products on the market by acquiring a company with" established distribution channels, which would be "faster than . . . the long, hard way")). Plaintiff was not interested in being acquired by Defendant. (Doc. 343 at 124–26).

The evidence at trial was clear—Defendant could not convince Plaintiff to sell, so Defendant decided to steal Plaintiff's goodwill while also spreading disinformation within the industry in an attempt to render Plaintiff's Marks invalid as generic to avoid liability for its actions. (*See id.* (describing ongoing efforts by Defendant to acquire Plaintiff that were rejected); Doc. 356 at 76–77 (stating that Defendant attempted to acquire Plaintiff in 2016, 2017, and 2018)). Evidence of Defendant's efforts to render Plaintiff's Marks generic was thoroughly discussed at the jury trial, and the argument that they had become generic—despite Defendant's concerted campaign to make them generic—was soundly rejected by the jury, (*see* Doc. 315 at 1–3), so the Court need not discuss that now. The focus here is on Defendant's continued infringement and the willfulness of that infringement.

Defendant was clearly taking these steps with intention and animus towards Plaintiff. (*See, e.g.*, Feb. 26, 2016 Slack Messages, Pl. Ex. 123, Doc. 318-85, at 4 (Plaintiff's Chief Creative Officer stating that he was "[w]orking on a rendering that will [make] the battery tender pee itself"); Feb. 27, 2017 Slack Messages, Pl. Ex. 128, Doc. 318-89, at 1 (stating that Defendant should include "Fuck Battery Tender" in its advertising); Nov. 12, 2018 Slack Messages, Pl. Ex. 134, Doc. 318-92, at 7–8

(responding to a proposed marketing slogan that used Plaintiff's Marks with "I like that one because it's kind of passive aggressive" and a "joy" emoji and stating "I envision them sending us a nasty note like 'ummm excuse me?!?!'" and a response of a rolling on the floor laughing emoji)).

For example, in 2018, despite having received additional cease and desist communications due to Defendant's ongoing trademark infringement, (July 10, 2018 Letter, Pl. Ex. 61D, Doc. 318-40, at 1–3 (detailing "prior correspondence and communications" regarding these issues, providing screen shots of infringing advertisements, and demanding that Defendant immediately cease using Plaintiff's Marks)), Defendant's marketing team was developing and implementing slogans using "battery tender" at the direction of Defendant's President, Jonathan Nook, (Doc. 318-92 at 5–6 (brainstorming slogan ideas using "tender" and then stating: "I picture J wanting us to refer to 'Battery Tender' in the messaging just like we have for the current ad messaging").[3]

---

[3] At trial Nook attempted to feign ignorance of who "J" was in the previous reference, (Doc. 356 at 120–21), but it is clear that the reference was to his first name, Jonathan. Nook's testimony to the contrary was so astonishingly not credible that the Court even commented on it at the time, outside the presence of the jury, in addressing an objection as to misstatement of testimony. (Id. at 121–22 ("I'm not sure you can misstate someone's testimony that has differed so much. I mean, I'm taking notes on—he's saying things that are inaccurate from what he said on your direct examination. So the reason I'm having trouble with your objection is, I don't know which version of what your client's saying you want me to rule on, in terms of the Plaintiff misleading him. So I don't know. He's given so many versions of his testimony just today. I really don't know—I don't really know where to go with that objection."). See also id. at 120 (stating that there is no one else on Defendant's advertising team whose name begins with "J"); Doc. 327-3 at 19 (Defendant's Chief Creative Officer stating that Nook "writes all the content" for Amazon and is responsible for the product descriptions on Defendant's website).

The infringement went even further in 2019 when Defendant used Plaintiff's Marks in its product descriptions on Amazon.com in the days leading up to Amazon's Prime Day, (Doc. 343 at 69–70, 151–52; Doc. 356 at 136, 138–39),[4] which is one of the biggest sales events of the year for that platform, (Doc. 343 at 38). Not only would including Plaintiff's Marks in the product description drive traffic to Defendant's products, (*id.* at 70), it would save Defendant money because bidding on keywords during Amazon Prime Day is much more expensive, (*id.* at 38).

The above discussion only touches on a portion of the evidence presented demonstrating that Defendant engaged in a systematic plan to infringe Plaintiff's Marks and steal Plaintiff's goodwill; the Court could cite nearly the entire trial transcript.[5] However, further elaboration at this point would be excessive.

---

[4] Nook claimed that these descriptions were a mistake and were voluntarily taken down within twenty-four hours, (Doc. 356 at 136–37), but Plaintiff's representative gave detailed testimony regarding the fourteen separate product descriptions and the process he had to go through to have Amazon remove them, (Doc. 343 at 150–54). Nook's testimony was not based on firsthand knowledge, (Doc. 356 at 136–37), and is not credible.

[5] This includes much of the evidence presented by Defendant, particularly the testimony of Nook, Defendant's President, who was so dishonest and contradictory on the stand that it became apparent that he was attempting to cover up his wrongdoings during his live testimony at trial. (*See, e.g.*, Doc. 356 at 68–71 (testifying regarding his education, where it was pointed out that at various times—most of them under oath—that Nook claimed to have a minor in marketing, a major in marketing, to have graduated in 1999, to have graduated in 2001, and that he could not remember when he graduated); *id.* at 98–101 (claiming that he did not write a particular e-mail and then reluctantly conceding once confronted with evidence that he did); *id.* at 115–19 (claiming that there were no communications with Plaintiff regarding trademarks for a three-year period and, upon being confronted with evidence that Defendant's attorney was in frequent communications with Plaintiff's attorney in an effort to settle the matter, claiming that his attorney did not pass on the settlement discussions to him and then claiming that he could not remember); Jury Trial Vol.

Plaintiff has established that Defendant's actions were willful, and therefore, it is entitled to disgorgement of Defendant's profits.[6] *See Vivid Entm't, Ltd. Liab. Co. v. J&B PB, Ltd. Liab. Co.*, No. 2:13-cv-524-FtM-29DNF, 2015 U.S. Dist. LEXIS 3121, at *6, 16 (M.D. Fla. Jan. 12, 2015) (finding the defendant's infringement to be willful under a related provision where the defendant was "using and imitating the Trademarks in the operation and promotion of" its own business and continued to do so even after receiving a cease and desist letter from the plaintiff); *Tran v. Thu Thi Dinh*, No. 3:10-cv-1142-J-37JBT, 2012 U.S. Dist. LEXIS 201029, at *20 (M.D. Fla. Jan. 5, 2012) (finding under a related provision of 1117(a) that the defendant engaged in "willful and intentional conduct" when the plaintiff knew of the defendant's mark and continued to infringe even after cease and desist letters).

Having concluded that Defendant's infringement was willful, the Court now turns to the issue of calculating Defendant's profits. "In assessing profits the plaintiff

---

7 Tr., Doc. 358, at 120–24 (claiming ignorance of nearly all of Defendant's financials, including claiming to have no idea about Defendant's bank accounts, despite admitting that he makes financial decisions for Defendant and asserting on direct that he was intimately involved all of Defendant's affairs).

[6] To the extent Defendant argues that Plaintiff is not entitled to disgorgement because Plaintiff acted with unclean hands or otherwise inequitably, the Court soundly rejects that assertion. Defendant has desperately tried to paint this litigation as Plaintiff being upset that Defendant was bidding on "battery tender" as a keyword on Amazon.com—something that Defendant asserts Plaintiff has done in its business practices. But, as explained thoroughly above, that is not what this litigation is about; it is about Defendant's systematic infringement of Plaintiff's Marks. Additionally, Defendant's claim that the 2015 cease and desist communications and the perceived resolution of that discrete issue somehow gave Defendant permission to infringe is, quite frankly, absurd.

shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.* This provision "confers broad discretion upon the district court to fashion a remedy and determine the proper relief due an injured party." *Optimum Techs.*, 217 F. App'x at 902.

Plaintiff has offered evidence of Defendant's gross sales of battery chargers from January 1, 2014, through June 30, 2020, which were $64,659,456. (Invoiced Sales, Pl. Ex. 232, Doc. 318-200, at 1; Bench Trial Tr., Doc. 386, at 76).[7] Defendant disputes that these gross sales numbers should be used. Specifically, this total represents Defendant's gross sales for its battery chargers. Defendant argues that this is the incorrect starting place, asserting that this case is only about a narrow set of advertisements on Amazon.com and attempting to limit the breadth of profits to those. However, as discussed above, Defendant's infringement far exceeded this narrow scope. As such, Defendant's argument—and its expert's analysis encompassing that argument—is not persuasive or credible. Thus, Defendant's gross sales numbers for its battery chargers are the correct starting place.

---

[7] Plaintiff also provided estimates for Defendant's gross sales subsequent to the timeline in the document cited above. (*See, e.g.*, Doc. 386 at 98).

However, based on the evidence and arguments presented, the full time period from January 2014 through June 2020 is not appropriate for inclusion in the disgorgement calculation. Plaintiff concedes that the first infringing advertising campaign began on December 11, 2014, (Doc. 386 at 29), but Plaintiff's disgorgement calculations include all of 2014 because the only data Defendant produced on this matter, despite Plaintiff's attempts to obtain more detailed information during discovery, (*see* July 7, 2020 Order, Doc. 138, at 4), is not broken down in any manner—it only has gross sales for the entire year, (Doc. 386 at 29–30). Defendant argues that it would be fundamentally unfair to award profits for the entire year of 2014 when it is clear that the infringement did not begin until the last month of 2014. The Court agrees. And, while the Court has not been given precise calculations, Defendant's Chief Financial Officer testified that battery charger sales do not "change from month to month dramatically" but that "typically the fourth quarter is [Defendant's] best quarter." (*Id.* at 97). Based on this representation, and under the principles of equity within which the Court is operating for disgorgement, it is appropriate to simply divide the 2014 gross sales—$3,614,202, (Doc. 318-200 at 1)—by twelve in order to estimate the gross sales numbers for the infringing period of December 2014. That calculation equates to $301,183.50 for the month of December, the single month during 2014 in which Defendant was infringing.

Defendant also asserts that any disgorgement should only extend, at most, through March 2020 because there is evidence that Defendant stopped infringing by that point. (Doc. 356 at 36–37 (testifying that Defendant had stopped its infringement activities in "March, 2020"); *see also* Doc. 341 at 204 (testifying that Plaintiff had "take[n] back its brand space" "[a]round February, 2020")). While Plaintiff argues that the disgorgement should continue through the date of the bench trial, the evidence Plaintiff relies on is simply the fact that Defendant's Chief Financial Officer—who is not a part of the sales team—was unaware of whether Defendant sent out any guidance to its sales staff with regard to the use of Plaintiff's Marks. (Doc. 386 at 83–84). This is not enough to establish that the infringement was ongoing sufficient to award disgorgement of profits in light of the other evidence on the record. Thus, the disgorgement period will end as of March 2020, and the Court will engage in a similar estimation for this time period as it did for the 2014 gross sales numbers. The gross sales numbers provided for 2020 are only for January 2020 through June 2020—six months totaling $9,974,189, (Doc. 318-200 at 1)—and the disgorgement period is only three of those months, so the Court will divide that amount in half, resulting in $4,987,094.50.

The remaining period of disgorgement is undisputed—the entirety of the years from 2015 through 2019. The gross sales for this period were $51,071,064. Adding this number to the reduced gross sales calculations from 2014 totaling $301,183.50

and from 2020 totaling $4,987,094.50 results in total gross sales of $56,359,342 during the disgorgement period of December 2014 through March 2020.

Since Plaintiff has met its burden of demonstrating Defendant's sales, and the relevant timeframe has been established, it is next Defendant's burden to establish any relevant deductions. Defendant urges the Court to consider a document entitled "The NOCO Company and Subsidiaries Consolidated Statements of Income" (Def. Ex. 46), which purportedly provides percentages for different types of costs and expenses incurred by Defendant. There are many problems with this document. First, it is a summary document and the underlying data was not produced, so there is no way to review the accuracy of the numbers.[8] Second, the document itself is redacted, so there are only percentages, not actual sales numbers. And perhaps most importantly, this document addresses the sales and costs numbers across all of Defendant's business—it is not tailored to Defendant's battery charger sales. (Doc. 386 at 87–90, 121–26). For example, advertising costs relating solely to Defendant's jump starter sales are included in these percentages, (*id.* at 121), as well as liability and property insurance for the company as a whole, (*id.* at 122). "To allow a deduction from gross profits, Defendant must establish that the claimed expenses actually relate to the sale and production of the infringing product." *Burger King*

---

[8] Plaintiff objected to the admission of this document on this basis. But because the Court finds that the document carries no weight in its decision, it will consider the document.

*Corp. v. Pilgrim's Pride Corp.*, 934 F. Supp. 425, 426 (S.D. Fla. 1996) (citing *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 586 (5th Cir. 1980)); [9] *see also Abbott Labs. v. Unlimited Bevs., Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000) (affirming the district court's refusal to deduct costs because "they would have been incurred even without the sale of the prohibited product"). This document fails to provide any usable information as to any relevant deductions.

Defendant also sought to introduce a document purporting to represent deductions taken for sales on Amazon.com. (Amazon Deductions, Def. Ex. 45). Again, there are questions regarding this document's admissibility given that it was created in anticipation of litigation and the underlying information was not disclosed to Plaintiff. Regardless, the document has no utility to this analysis. As noted above, the relevant universe of sales information here is all of Defendant's battery chargers—not only those sold on Amazon.com. Defendant has not provided any information as to what portion of the sales were made on Amazon.com or via some other venue, such as brick and mortar stores or through Defendant's own website. Accordingly, even if the expenses referenced in this document could, theoretically, be deducted, such deductions would only be for products sold on Amazon.com, and the Court has no information as to what portion of the total sales would fall into this

---

[9] Cases decided by the Fifth Circuit prior to October 1, 1981 are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

category. Thus, Defendant has not met its burden to show that the deductions contained in Exhibit 45 should be considered.[10]

At this point, it is worth noting that the Court would be well within the limits of the law to order the disgorgement of all of Defendant's profits from battery chargers from December 2014 through March 2020. However, as explained above, the Court must also act within the principles of equity, and even though Defendant has not provided any specific cost deductions, clearly its gross sales numbers do not represent its profits. Defendant's President testified that its profit margin on sales was approximately thirty-five percent. (Jury Trial Vol. 7 Tr., Doc. 358, at 128). Additionally, the evidence indicates that Defendant did not start infringing on Plaintiff's Marks until December 2014. So, Defendant gets the benefit of the battery charger sales that it had established prior to infringement. In other words, the Court will take thirty-five percent of Defendant's gross sales numbers as Defendant's total profits. It will then reduce those profits each year by Defendant's 2014 annualized profits from the first eleven months of 2014, which based on the evidence before the Court were earned without infringement. These calculations are set forth below and result in a disgorgement of profits of $12,135,943.70.

---

[10] Plaintiff also objected to the admission of Defendant's Exhibits 55 and 56. However, these documents also pertain solely to sales on Amazon.com and, for the same reasons discussed above, do not provide any basis for deductions.

| | Dec. 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Jan.-Mar. 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| Def.'s Gross Battery Charger Sales | $301,183 50 | $5,021,551 00 | $8,197,486 00 | $10,384,780 00 | $12,508,896 00 | $14,958,351 00 | $4,987,094 50 | $56,359,342 00 |
| Def.'s Profit Margin | 35% | 35% | 35% | 35% | 35% | 35% | 35% | N/A |
| Def.'s Gross Battery Charger Profits | $105,414 23 | $1,757,542 85 | $2,869,120 10 | $3,634,673 00 | $4,378,113 60 | $5,235,422 85 | $1,745,483 08 | $19,725,769 70 |
| Def.'s Gross Battery Charger Profits in excess of Def.'s 2014 Annualized Gross Battery Charger Profits | $105,414 23 | $492,571 85 | $1,604,149 10 | $2,369,702 00 | $3,113,142 60 | $3,970,451 85 | $480,512 08 | $12,135,943 70 |

## III.   PERMANENT INJUNCTION

Plaintiff seeks a permanent injunction under 15 U.S.C. § 1116(a).[11] Section 1116(a) gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 43 [15 USCS § 1125]." "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Specifically, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

---

[11] Plaintiff also argues that it is entitled to an injunction under section 495.141(1) of the Florida Statutes. That section is substantively similar to § 1116(a), and because Plaintiff is entitled to an injunction under § 1116(a), the Court need not address any alternative basis.

## A.      Irreparable Harm

Where there has been a "finding of a violation" of, *inter alia*, 15 U.S.C. § 1125(a)—as there has been here—the plaintiff is "entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a). Despite this clear statutory directive, Defendant argues that the presumption should not be applied and Plaintiff should have to make more of a showing of irreparable harm.

First, Defendant argues that the jury did not specify which of Plaintiff's two trademarks Defendant infringed. Defendant is incorrect. The interrogatories on the Verdict Form specifically asked if Plaintiff had demonstrated a likelihood of confusion as to each separate trademark. (Doc. 315 at 3–4). Second, Defendant argues that because Plaintiff did not seek a preliminary injunction in this case, it cannot now seek a permanent injunction because the delay militates against a finding of irreparable harm. The case cited by Plaintiff is discussing the issuance of a *preliminary* injunction and the likelihood of irreparable harm during the relatively short time period before trial. *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355 (S.D. Fla. 2002). Additionally, the presumption of irreparable harm did not apply in that case because Plaintiff did not establish a substantial likelihood of confusion—and therefore did not establish a likelihood of success on the merits. *Id.* at 1354–55; 15 U.S.C. § 1116(a) (noting that the rebuttable presumption applies to "a motion for a preliminary injunction or temporary

restraining order" only where the court finds "likelihood of success on the merits"); *see also Hi-Tech Pharm. v. Dynamic Sports Nutrition*, No. 1:16-cv-949-MHC, 2016 U.S. Dist. LEXIS 199046, at *34 (N.D. Ga. June 2, 2016) (contrasting a request for a permanent injunction with one for a preliminary injunction and recognizing that, unlike a preliminary injunction, "a lack of urgency in filing the injunctive-relief motion may not 'bar a permanent injunction'").

Next, Defendant asserts that Plaintiff suffered no lost sales as a result of Defendant's infringement, which Defendant claims shows that there was no damage to Plaintiff's reputation. Defendant overstates the facts of this case. In the context of a discovery dispute, Plaintiff stipulated that it was not going to seek monetary relief based on a showing of lost sales. (Doc. 138 at 3). This was a litigation strategy, not an admission that there were no lost sales. Further, based on the evidence of actual customer confusion that was presented at trial—evidence that the jury credited—it is clear that Plaintiff's reputation and goodwill was impacted because its brand was being co-mingled with Defendant's products. *See Mixed Fighting All. Promotions, Inc. v. De La Noval*, No. 11-21107-CIV, 2011 U.S. Dist. LEXIS 168032, at *32 (S.D. Fla. Apr. 14, 2011) (indicating that the plaintiff's "loss of control of [its] reputation and the potential for injury to its business and goodwill constitutes irreparable injury").

Finally, Defendant asserts that there is no ongoing infringement to enjoin. While the Court determined in its disgorgement analysis that there was not evidence of ongoing infringement after March 2020, that does not preclude a determination that there is a likelihood of irreparable harm absent an injunction here. Specifically, as laid out in detail above, Defendant has shown that it is willing to intentionally infringe on Plaintiff's Marks and engage in other unscrupulous behavior in its business. Voluntary cessation of such blatant infringement in the face of litigation does not reassure the Court that there is no risk of further infringement in the future. *See F.A.C.E. Trading, Inc. v. Famiano*, No. 8:05-cv-1740-T-23TBM, 2006 U.S. Dist. LEXIS 97715, at *40 (M.D. Fla. Jan. 10, 2006) ("Defendants cannot deny that they acted willfully in this instance, and although they claim they have voluntarily ceased [the infringing activity], the potential for ongoing and recurrent violations exists."); *see also Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents*, 633 F.3d 1297, 1311–12 (11th Cir. 2011) (analyzing whether voluntary cessation of infringing behavior rendered a claim moot and determining that it did not because there were circumstances surrounding the decision to stop infringing that indicated the defendants may do so again).

Accordingly, Plaintiff has met its burden to establish irreparable harm and Defendant has failed to rebut the presumption set forth in § 1116(a).

## B.    Inadequate Remedy at Law

"In trademark infringement actions, injunctive relief is often appropriate because: 1) 'there is no adequate remedy at law to redress infringement and [2)] infringement by its nature causes irreparable harm.'"   *True Mfg. Co. v. Boys*, No. 6:16-cv-634-Orl-37GJK, 2016 U.S. Dist. LEXIS 167687, at *17 (M.D. Fla. Nov. 8, 2016) (quoting *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989)); *BMW of N. Am., Inc. v. Ismail Cuhadar & Cars & More European Car Serv. Ctr.*, No. 6:14-cv-40-Orl-37DAB, 2014 U.S. Dist. LEXIS 191883, at *5 (M.D. Fla. Mar. 12, 2014) (same); *Instant One Media, Inc. v. Ezfauxdecor, LLC*, No. 1:19-cv-00540-WMR, 2022 U.S. Dist. LEXIS 182802, at *6 (N.D. Ga. July 26, 2022) ("In trademark infringement cases, it is generally recognized that there is not adequate remedy at law to redress infringement."). Despite Defendant's attestations to the contrary, there was ample proof of actual confusion and, certainly, likelihood of confusion, based on Defendant's infringement along with Plaintiff's loss of control over its reputation and goodwill. This is sufficient to establish that monetary damages in and of themselves would be inadequate. *Boulan S. Beach Master Ass'n v. Think Props., LLC*, 617 F. App'x 931, 934 (11th Cir. 2015) ("[A] remedy at law for consumer confusion or reputational damage is ordinarily inadequate, given 'the potential difficulty of proof of plaintiff's damages" and "the impairment of intangible values.").

### C.    Balance of Hardships

Defendant's only argument against the balance of hardships involves the scope of the injunction, not the issuance itself. However, the Court only intends to enjoin Defendant from engaging in behaviors that would infringe Plaintiff's Marks, and "enjoining [Defendants] from infringing [Plaintiff's] marks causes them no discernible hardship." *Hill v. Dinges*, No. 3:21-cv-165-MMH-PDB, 2021 U.S. Dist. LEXIS 191736, at \*15 (M.D. Fla. Sep. 13, 2021); *see also Sream, Inc. v. Barakat Food, Inc.*, No. 16-24722-CV, 2017 U.S. Dist. LEXIS 165420, at \*8 (S.D. Fla. Oct. 4, 2017) ("[A] balancing of the hardships clearly favors Plaintiff because Defendant's unauthorized use of the mark was unlawful.").

### D.    Public Interest

As to the last element, "[t]here is nothing to indicate that an injunction here would adversely affect the public interest. Enjoining illegal infringement activity and preventing consumer confusion in the marketplace serves the public interests." *Hidalgo Corp. v. J. Kugel Designs, Inc.*, No. 05-20476-CIV-JORDAN/KLEIN, 2005 U.S. Dist. LEXIS 59188, at \*19 (S.D. Fla. June 9, 2005).

Accordingly, Plaintiff has satisfied its burden to show that it is entitled to a permanent injunction. However, the parties disagree as to the scope of the injunction.

### E.    Scope of the Injunction

#### 1.    *Keywords*

Defendant first objects to the portion of Plaintiff's proposed injunction that would prohibit Defendant from using Plaintiff's Marks "as keywords or search terms . . . to trigger advertisements, messaging, marketing, or the display of any product offered for sale by [Defendant]." (Doc. 338 at 2–3). It is not clear under Eleventh Circuit law that merely purchasing keywords—without some other evidence of consumer confusion—is sufficient to constitute trademark infringement. *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, No. 12-61853-CIV-DIMITROULEAS/S, 2013 U.S. Dist. LEXIS 191404, at *16 (S.D. Fla. Jan. 25, 2013) (explaining that "[c]ourts have considered whether such [keyword] advertising violates trademark law" and that in such an analysis "the central issue is likelihood of confusion" and collecting cases where courts have found a likelihood of consumer confusion and where courts have found no likelihood of consumer confusion, depending on the specific factual use); *see also Playnation*, 924 F.3d at 1167 n.4 (noting that the Eleventh Circuit has "not yet accepted" initial interest confusion "as actionable under the Lanham Act" (citing *Suntree Tech., Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1347 (11th Cir. 2012))); *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 165 F. Supp. 3d 1256, 1268 (S.D. Fla. 2016) (finding that, under the facts of that case, the defendant's purchase of various keywords on Amazon [did] not create [consumer] confusion");

*EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1241 (N.D. Ga. 2014) (explaining that even if initial interest confusion is actionable, there must be a likelihood of confusion, which requires a factual determination based on the specific actions).

Indeed, at trial Plaintiff appeared to tacitly concede that all such uses would not constitute infringement because Plaintiff itself has engaged in this type of advertising, albeit seemingly on a much smaller scale and without the intent to infringe. (Doc. 343 at 45–46). Because it does not appear that every use of keywords in this manner would constitute trademark infringement, the Court is not inclined to issue a blanket injunction as to such actions. Additionally, using or purchasing keywords in a manner that would create a likelihood of consumer confusion is already prohibited by the remainder of the injunction, which broadly prohibits use in a manner that is likely to create such confusion. As such, this specific provision will not be included.

### 2.   *Comparative Advertising*

Defendant asserts that a portion of Plaintiff's proposed injunction would prohibit Defendant from engaging in legal comparative advertising. "[T]he use of a competitor's trademark . . . for purposes of comparative advertising is not trademark infringement as long as the advertisements do not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source,

identity, or sponsorship of the advertiser's product." *Syntex, Inc. v. Interpharm, Inc.*, No. 1:92-CV-03-HTW, 1993 U.S. Dist. LEXIS 10761, at *23 (N.D. Ga. Mar. 18, 1993); *see also Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428 (5th Cir. 2021) (indicating that "legitimate comparative and contextual advertising" would not constitute infringement); *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1148 (9th Cir. 2011) (same). Thus, the Court will narrow the proposed permanent injunction to avoid prohibiting lawful comparative advertising.

### 3.    *Types of Products and Activities*

Defendant takes issue with the proposed permanent injunction extending to what it deems products and activities that were not at issue in this case. Defendant is incorrect regarding what was at issue in this case. But regardless, the evidence of Defendant's systemic plan to infringe on Plaintiff's Marks and steal its goodwill indicates that an injunction tailored to the type of behavior exhibited at trial but including Defendant's entire company is prudent.

### 4.    *Deltran and Tender Terms*

Defendant takes issue with the proposed permanent injunction including "Deltran" and "tender" alone and with prohibiting the use of all terms at issue—i.e., the plural and singular as well as capital and lower case of "battery tender" and "tender"—arguing that it is not consistent with the jury's verdict. Defendant is

incorrect. There was abundant evidence that the use of "tender" on its own was done in a way that caused customer confusion and infringed Plaintiff's Marks. This is true for the lowercase and capital as well as singular and plural versions of the terms at issue. The Court does not need a specific jury finding on this matter—the evidence at trial was clear that these terms were used in a violative manner. Further, while there was not specific evidence that Defendant used "Deltran" on its own, the jury found that Defendant infringed Plaintiff's "Deltran Battery Tender" trademark. (Doc. 315 at 3–4). And Defendant has made abundantly clear by its previous behavior that if it is given any loophole, it will use it to infringe. Thus, these terms will be included in the permanent injunction.

5.   *Related Terms*

Finally, Defendant argues that the proposed terms "battery-related product," "confusingly similar variations," and "misspelling" are not sufficiently precise to identify prohibited conduct. As to battery-related product, the Court disagrees. This term is easily understandable from a commonsense standpoint. Additionally, given that Defendant's business encompasses many different aspects of battery chargers and accessories, (*see* Doc. 354 at 68–69), expanding the prohibition beyond just battery chargers is important. As to the terms "confusingly similar variations" and "misspelling," regardless of whether they are sufficiently precise, the Court finds that the inclusion of those terms is not necessary here. There is no evidence that

Defendant engaged in any kind of infringement involving variations or misspellings of Plaintiff's Marks beyond the terms laid out above.

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff is entitled to disgorgement of Defendant's profits in the amount of $12,135,943.70.

2. Plaintiff's Motion for Permanent Injunction (Doc. 388) is **GRANTED in part** and **DENIED in part.**

3. Defendant as well as its employees, agents, officers, directors, managers, attorneys, successors, affiliates, subsidiaries, and assigns, and all those in active concert and participation with any of the foregoing persons, and entities who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are **PERMANENTLY ENJOINED** from:

   a. selling, marketing, advertising, promoting, or authorizing any third party to sell, market, advertise, or promote Defendant's products including without limitation, its battery chargers, jump starters, and battery-related products, with or using the terms "Battery Tender," "Deltran Battery Tender," "Deltran," or

"Tender" (whether such terms are uppercase, lowercase, capitalized, initial capitalized, singular, or plural, and regardless of font used), except that Defendant is permitted to engage in legal and truthful comparative advertising;

b. making or displaying any statement, representation, or depiction that is likely to lead the public or trade to believe that Defendant's goods and services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected to Plaintiff;

c. using or authorizing any third party to use any false description, false representation, or false designation of origin, or any marks, names, words, symbols, or devices, that falsely associate Defendant's business, goods, and/or services with Plaintiff or tend to do so; and

d. aiding, assisting, or abetting any other individual or entity from doing any act prohibited herein.

4. Plaintiff's Motion for Permanent Injunction is otherwise **DENIED.**

5. The Court retains jurisdiction over the construction, enforcement, and modification of the permanent injunction.

6. Plaintiff's Motion to Schedule a Post-Trial Status Conference (Doc. 417) is **DENIED as moot.**

7. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant in the amount of $19,185,943.70[12] and thereafter close this case.

   **DONE** and **ORDERED** in Orlando, Florida on September 29, 2023.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[12] This amount represents $1,300,000 in actual damages, $5,750,000 in punitive damages, and $12,135,943.70 in disgorgement of profits.

# Dkt.436

## Deltona's Opposition to NOCO's Renewed
## Motion for Judgment as a Matter of Law
## 11/13/2023

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DELTONA TRANSFORMER
CORPORATION, a Florida
Corporation,

      Plaintiff,

v.

                                 Case 6:19-cv-00308-CEM-LHP

THE NOCO COMPANY, an Ohio
corporation.

      Defendant.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN
THE ALTERNATIVE, MOTION FOR NEW TRIAL [ECF 432]**

# TABLE OF CONTENTS

I.	INTRODUCTION ........................................................................................ 1

II.	LEGAL STANDARDS .............................................................................. 3

III.	ARGUMENT .............................................................................................. 5

A.	The Jury Verdict Is Supported By Abundant Evidence At Trial Establishing That The Term "Battery Tender" Had Not Become Generic ............................................................................................... 5

B.	Consumer Harm Is Sufficiently Established For The Jury Verdict On The FDUTPA Claim ....................................................................... 7

C.	Plaintiff Presented Evidence Of Actual Confusion As Well As Evidence Of A Likelihood Of Confusion Sufficient to Support the Jury Verdict ........................................................................................ 9

D.	The Jury Verdict Is Well Supported By Proof of Actual Damages ... 10

E.	The Court Properly Instructed The Jury On False Advertising ........ 12

1.	The Court's false advertising Jury Instruction accurately reflects the law and conforms to the abundant evidence presented at trial. 13

2.	Relief under Rule 50(b) is inappropriate because there was abundant evidence supporting the Jury Verdict on the false advertising claim ................................................................................................. 18

IV.	CONCLUSION ........................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aceto Corp. v. TherapeuticsMD, Inc.*,
   953 F. Supp. 2d 1269 (S.D. Fla. 2013) ........................................................................ 7

*ADT LLC v. Vivint, Inc.*,
   2017 WL 8404330 (S.D. Fla. Nov. 20, 2017) ........................................................... 12

*Aronowitz v. Health-Chem Corp.*,
   513 F.3d 1229 (11th Cir. 2008) .................................................................................. 11

*Berger v. Philip Morris USA, Inc.*,
   185 F.Supp.3d 1324 (M.D. Fla. 2016) .................................................................... 3, 4

*Bostick v. State Farm Mut. Auto. Ins. Co.*,
   314 F.Supp.3d 1265 (M.D. Fla. 2018) ...................................................................... 20

*Chaney v. City of Orlando, Fla.*,
   483 F.3d 1221 (11th Cir. 2007) ............................................................................. 3, 19

*Christopher v. Cutter Lab.*,
   53 F.3d 1184 (11th Cir. 1995) ............................................................................ 12, 13

*Cleveland v. Home Shopping Network, Inc.*,
   369 F.3d 1189 (11th Cir. 2004) ................................................................................. 10

*Cote v. Philip Morris USA, Inc.*,
   400 F.Supp.3d 1295 (M.D. Fla. 2019) ........................................................................ 4

*Dudley v. Wal–Mart Stores, Inc.*,
   166 F.3d 1317 (11th Cir. 1999) ............................................................................... 4, 5

*Fields v. Dep't of Juvenile Justice*,
   712 F. App'x 934 (11th Cir. 2017) ............................................................................ 13

*Frehling Enters. v. Int'l Select Grp., Inc.*,
   192 F.3d 1330 (11th Cir. 1999) ................................................................................... 6

*Furmanite Am., Inc. v. T.D. Williamson, Inc.*,
   506 F.Supp.2d 1134 (M.D. Fla. 2007) ........................................................................ 8

ii

*Hewitt v. B.F. Goodrich Co.*,
    732 F.2d 1554 (11th Cir. 1984) ........................................................................ 5, 20

*Hill Dermaceuticals, Inc. v. Anthem, Inc.*,
    228 F.Supp.3d 1292 (M.D. Fla. 2017)............................................................... 7

*Howard Johnson Co., Inc. v. Khimani*,
    892 F.2d 1512 (11th Cir. 1990) ......................................................................... 11

*Jimenez v. Gov't Emps. Ins. Co.*,
    2015 WL 12844296 (M.D. Fla. Apr. 28, 2015) ....................................... 19

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
    299 F.3d 1242 (11th Cir. 2002) ............................................. 13, 14, 16, 17

*Johnson Enters. of Jacksonville, Inc. v. FPL Grp, Inc.*,
    162 F.3d 1290 (11th Cir. 1998) ........................................................................ 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................................ 18

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*,
    267 F.3d 1183 (11th Cir. 2001) .................................................................... 4, 20

*Middlebrooks v. Hillcrest Foods, Inc.*,
    256 F.3d 1241 (11th Cir. 2001) .......................................................................... 4

*Minks v. Polaris Indus., Inc.*,
    2007 WL 1452906 (M.D. Fla. May 15, 2007) ........................................... 20

*Mixed Fighting All. Promotions, Inc. v. de la Noval*,
    2011 WL 13223714 (S.D. Fla. Apr. 14, 2011).................................... 13, 18

*NACM Tampa, Inc. v. Sunray Notices, Inc.*,
    2017 WL 2209970 (M.D. Fla. Feb. 8, 2017)............................................. 8

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. All Am. Freight, Inc.*,
    197 F. Supp. 3d 1376 (S.D. Fla. 2016) ..................................................... 4, 5

*Nelson v. Mead Johnson Nutrition Co.*,
    270 F.R.D. 689 (S.D. Fla. 2010) ..................................................................... 9

*Osmose, Inc. v. Viance, LLC,*
    612 F.3d 1298 (11th Cir. 2010) ................................................................ 14

*Platinum Prop. Investor Network, Inc. v. Sells,*
    2023 WL 7144676 (S.D. Fla. Sept. 18, 2023) ....................................... 12

*Progressive Emu Inc. v. Nutrition & Fitness Inc.,*
    787 F. App'x. 549 (11th Cir. 2019) .......................................................... 5

*Rodriguez v. Farm Stores Grocery, Inc.,*
    518 F.3d 1259 (11th Cir. 2008) ............................................................ 3, 4

*Samples v. City of Atlanta,*
    916 F.2d 1548 (11th Cir. 1990) ............................................................... 13

*Seaberg v. Steak N' Shake Operations, Inc.,*
    154 F.Supp.3d 1294 (M.D. Fla. 2015) ..................................................... 3

*Sovereign Military Hospitaller Order v. Fla. Priory of Knights*
    *Hospitallers,*
    702 F.3d 1279 (11th Cir. 2012) .............................................................. 16

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931) .................................................................................. 11

*United States v. Martinez,*
    486 F.3d 1239 (11th Cir. 2007) .............................................................. 13

*Wajcman v. Inv. Corp. of Palm Beach,*
    2009 WL 10667881 (S.D. Fla. Sept. 11, 2009) ..................................... 10

**Statutes**

Fla. Stat. § 501.203(7) ................................................................................. 8

Fla. Stat. § 501.204(1) ................................................................................. 7

**Other Authorities**

Rule 50, Fed. R. Civ. P ......................................................................... *passim*

Rule 59, Fed. R. Civ. P ......................................................................... *passim*

iv

## I.      INTRODUCTION

Plaintiff Deltona Transformer Corporation ("DTC" or "Plaintiff") files its Opposition to Defendant The NOCO Company's ("NOCO" or "Defendant") Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial (ECF 432).

Plaintiff is the owner of various trademarks, including the marks BATTERY TENDER and DELTRAN BATTERY TENDER ("Plaintiff's Marks"). (*See generally* PX-1A[1]; PX-1B; PX-1E).  This case arises from Defendant's willful infringement of Plaintiff's Marks. Defendant's infringement was not an isolated event or inadvertent. Rather, "[a]t trial, Plaintiff presented evidence that throughout the relevant time period, between 2014 and 2020, Defendant intentionally infringed Plaintiff's Marks by engaging in a campaign to confuse customers and appropriate Plaintiff's goodwill … the evidence of willful infringement is abundant." ECF 423 at 2, 4.

Indeed, the facts presented at trial proved, among other things, that Defendant "strategically used the term battery tender when communicating with customers, representing that Defendant's products were battery tenders despite that term being Plaintiff's protected trademark and Defendant having no affiliation with Plaintiff." ECF 423 at 4. Defendant's egregious "actions were taken

---

[1] All of Plaintiff's exhibits, which are marked with the "PX-" prefix, are available at ECF 318.

even though Defendant knew that Battery Tender was Plaintiff's trademarked brand … [i]ndeed, Defendant's high-ranking executives admitted they were very familiar with Plaintiff's brand at least by 2014." ECF 423 at 5.

"The evidence at trial was clear—Defendant could not convince Plaintiff to sell, so Defendant decided to steal Plaintiff's goodwill while also spreading disinformation within the industry in an attempt to render Plaintiff's Marks invalid as generic to avoid liability for its actions." ECF 423 at 6. Also, "based on the evidence of actual customer confusion that was presented at trial—evidence that the jury credited—it is clear that Plaintiff's reputation and goodwill was impacted because its brand was being co-mingled with Defendant's products." ECF 423 at 18.

The jury considered the parties' evidence at trial, including the flawed survey offered by Defendant, and decided which evidence was most persuasive and which witnesses' testimonies were credible. The jury decided Defendant willfully infringed Plaintiff's marks and found in favor of Plaintiff on its Lanham Act claims, common-law trademark claim, and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim. *See generally* Verdict, ECF 315. The jury further awarded actual, and punitive damages to Plaintiff. ECF 315 at 4; ECF 317.

The jury had a legally sufficient evidentiary basis to enter a verdict in favor of Plaintiff on all claims, rejecting Defendant's affirmative defense and finding that

Plaintiff suffered actual damages and that Defendant's conduct was willful. *See* ECF 410.  Additionally, the Court's jury instructions and verdict form accurately reflect the law applicable to the facts of the case.  Defendant cannot show that this Court erred, much less that any alleged error was sufficiently prejudicial to warrant a new trial.

Defendant cannot show it is entitled to relief under either Rule 50 or Rule 59.  Indeed, nothing has changed since the Court denied Defendant's substantially similar motion at trial.  The jury's verdict should not be disturbed, and Defendant's motion should be denied.

## II.    LEGAL STANDARDS

Under the Rule 50(b) standard, "a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Berger v. Philip Morris USA, Inc.*, 185 F. Supp. 3d 1324, 1329 (M.D. Fla. 2016) (quoting *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007)). To that end, "the issue is not whether the evidence was sufficient for the losing party to have won, but whether the evidence was sufficient for it to have lost." *Id.* (quoting *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1265 (11th Cir. 2008)).  And "a district court should grant a Rule 50(b) motion 'only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict.'" *Seaberg v. Steak N' Shake Operations, Inc.*, 154 F. Supp. 3d 1294, 1297-98 (M.D. Fla. 2015) (quoting

*Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001).

Faced with a Rule 50(b) motion, the Court "draw[s] all reasonable inferences in favor of the nonmoving party," and "'must disregard all evidence favorable to the moving party that the jury is not required to believe … giving credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Berger*, 185 F. Supp. 3d at 1329 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000)). Further, "the jury's verdict must remain intact 'if there is evidence from which the jury ... reasonably could have resolved the matter the way it did.'" *Cote v. Philip Morris USA, Inc.*, 400 F. Supp. 3d 1295, 1312 (M.D. Fla. 2019) (quoting *Rodriguez*, 518 F.3d at 1264).

With respect to Rule 59, "[a]s with a Rule 50(b) motion, the Court must not simply substitute its judgment for that of the jury in deciding whether to grant a motion under Rule 59, but rather, may grant a new trial only if the verdict is 'against the great—not merely the greater—weight of the evidence.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. All Am. Freight, Inc.*, 197 F. Supp. 3d 1376, 1381 (S.D. Fla. 2016) (citing *Dudley v. Wal–Mart Stores, Inc.*, 166 F.3d 1317, 1320 n.3 (11th Cir. 1999)); *see also Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) ("Because it is critical that a judge does not merely substitute his

judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.'") (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)).[2]

## III.   ARGUMENT

### A.   The Jury Verdict Is Supported By Abundant Evidence At Trial Establishing That The Term "Battery Tender" Had Not Become Generic

Defendant asserts that under common law, it is Plaintiff's burden to establish that its marks are not generic and that Plaintiff failed to do so.  Defendant further asserts that Defendant's evidence of genericness was sufficient to meet Defendant's burden of proof with respect to Plaintiff's federal trademark claims. Defendant is wrong on all counts.

First, it is Defendant's burden to have established its affirmative defense. *See e.g.*, Jury Instruction, ECF 314 at 26.   Additionally, Defendant merely cites to a purported advertisement by Plaintiff, keyword lists, and a handful of exhibits showing email correspondence where Plaintiff and Plaintiff's products are referred to using the term "battery tender" without capitalizing the term.

---

[2] "Motions for new trial based on erroneous and prejudicial jury instructions. . . are reviewed for abuse of discretion." *Progressive Emu Inc. v. Nutrition & Fitness Inc.*, 787 F. App'x. 549, 558 (11th Cir. 2019).  Additionally, "because a 'less stringent standard applies to a motion for a new trial than to a motion for a judgment as a matter of law,' the failure to meet the Rule 59 standard is fatal to the Rule 50(b) standard." *Nat'l Union Fire Ins.*, 197 F. Supp. 3d at 1381 (quoting *Dudley*, 166 F.3d at 1320 n.3).

However, as the Court previously held, "Defendant has not explained why using Plaintiff's Mark without capital letters, indicates that the usage is generic," particularly where the Plaintiff's registrations "consist[] of standard characters without claim to any particular font, style, size, or color". ECF 410 at 3-4 (citing PX-1A, PX-1B, PX-1E). Moreover, when the emails are read in context—a retailer discussing carrying Plaintiff's specific products—these exhibits just as likely showed that the uncapitalized term "battery tender" was not used generically, but instead referred specifically to Plaintiff's products. *See id.*

Further, the jury was not required to believe the survey proffered by Defendant, particularly when that survey had significant deficiencies (*see e.g.,* ECF 356 at 175:6-21; 180:22-195:13)[3] and was discredited by the abundant evidence at trial establishing that the phrase "Battery Tender" had not become generic. Specifically, Plaintiff offered many examples of Defendant using "Battery Tender" and "battery tender" in a source indicating manner to refer to Plaintiff's products (*e.g.,* PX-62C, PX-62M, PX-65, PX-67, PX-68, PX-74, and PX-85) and of customers using "Battery Tender" and "battery tender" in a source indicating manner to refer to Plaintiff and its products (*e.g.,* PX-74, PX-78, PX-80, PX-81, PX-83, PX-304 at message dated Feb. 11, 2016, and ECF 319-3 (DX-19)). Defendant's motion seeking

---

[3] Further, the Eleventh Circuit does not rely heavily on survey evidence. *Frehling Enters. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1341 n.5 (11th Cir. 1999) (finding lack of survey evidence was not dispositive).

a redo of its affirmative defense on genericness should be denied.

**B.    Consumer Harm Is Sufficiently Established For The Jury Verdict On The FDUTPA Claim**

Defendant next argues that it was entitled to judgment on the FDUTPA claim because Plaintiff failed to establish any harm to consumers. Not so.

FDUTPA makes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." Fla. Stat. § 501.204(1). "A deceptive act is one which is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017) (quotation omitted). Also, "an unfair practice is one which causes substantial injury to a consumer which the consumer could not have reasonably avoided and which is not outweighed by countervailing benefits to the consumer or to competition." *Id.* (citing *Porsche Cars N. Am., Inc., v. Diamond,* 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014)).

"On its face, the FDUTPA statute seeks '[t]o protect the consuming public and *legitimate business enterprises* from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1287 (S.D. Fla. 2013) (quoting Fla. Statute § 501.202(2) (emphasis in original)) (finding plaintiff properly alleged claim for violation of FDUTPA, even

though it is not a "consumer", because plaintiff is a "legitimate business enterprise", which is one of two independent groups contemplated under amended §501.211).[4]

As the Court previously held, Defendant's argument reads into the statute a requirement that the injury from Defendant's deceptive acts and unfair practices must have been suffered specifically by the consumers of Plaintiff's and Defendant's products.  But Defendant cites no authority for such a narrow reading of the statute's text.  Instead, the plain language of the FDUTPA clearly includes Plaintiff within the definition of "consumer" under. Fla. Stat. § 501.203(7) ("'Consumer' means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.").  And, as discussed below, Plaintiff established that it suffered actual damages.

Further, "a party asserting a deceptive trade practice claim need not show

---

[4] *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1146 (M.D. Fla. 2007) ("FDUTPA was amended in 2001, and the amendment replaced the word 'consumer' with the word 'person' … '[w]ith the deletion of consumer transaction from FDUTPA, it would seem that such business entity *consumers* could sue for damages from outlawed acts and practices in ordinary business transactions without regard to whether the claimant was acting in the capacity of consuming goods or services.'") (quoting *Beacon Prop. Mgt., Inc. v. PNR, Inc.*, 890 So.2d 274, 278 (Fla 4th DCA 2004) (emphasis in original)); *see also NACM Tampa, Inc. v. Sunray Notices, Inc.*, 2017 WL 2209970, at *7 (M.D. Fla. Feb. 8, 2017) ("Although FDUPTA is commonly recognized as a statute used to protect consumers, the plaintiffs point out that it also *expressly* protects 'legitimate business enterprises' . . . .") (emphasis added).

actual reliance on the representation or omission at issue." *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 (S.D. Fla. 2010) (quoting *State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l. Inc.*, 869 So.2d 592, 598 (Fla. 1st DCA 2004)). Indeed, "in a FDUTPA action the question is not whether the plaintiff *actually* relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Id.* (internal quotation and citation omitted). Nonetheless, here there was indeed significant evidence that millions of customers saw the ads. *See e.g.,* PX-237. And, Defendant surely would not have spent, and then continued to spend, significant money to run its infringing and false advertisements if the deception did not influence purchasing decisions. *See e.g., id.*; ECF 343 at 31:12-32:1.

Plaintiff, as a legitimate business enterprise, is expressly protected under the FDUTPA statute. Accordingly, Defendant has not established that it is entitled to disturb the findings of its liability on Plaintiff's FDUTPA claim.

### C. Plaintiff Presented Evidence Of Actual Confusion As Well As Evidence Of A Likelihood Of Confusion Sufficient to Support the Jury Verdict

Defendant next argues that it was entitled to judgment as a matter of law on liability for *all* of Plaintiff's claims. Specifically, Defendant asserts that Plaintiff's mark is not valid and that Plaintiff failed to provide any evidence of likelihood of confusion. Not so. Here, Plaintiff's federally registered and incontestable

trademarks are not only presumptively valid, but they are also *conclusively* valid. And the jury rejected Defendant's affirmative defense that alleged that the trademark had become generic.[5] *See* Jury Verdict, ECF 315 at 1. Plaintiff also presented significant evidence that could (and did) lead a reasonable jury to conclude that there was a likelihood of confusion. For example, Plaintiff presented evidence that Defendant engaged in a campaign to intentionally confuse customers. Plaintiff even presented evidence of actual confusion. *See e.g.*, PX-14, PX-147, PX-162A, PX-189; PX-132 and ECF 343 at 161:21-163:18.[6] Accordingly, Defendant has not established that it is entitled to a judgment overturning the jury's findings of liability on all claims.

## D. The Jury Verdict Is Well Supported By Proof of Actual Damages

Defendant seeks judgment as a matter of law because it claims that Plaintiff purportedly failed to produce any evidence of actual damages. Specifically, Defendant argues that Plaintiff failed to produce at trial any financial

---

[5] Although Defendant would have it do so, a court may not usurp the jury's authority over factual determinations. *See e.g.*, *Wajcman v. Inv. Corp. of Palm Beach*, 2009 WL 10667881, at *3 (S.D. Fla. Sept. 11, 2009). "As the Eleventh Circuit has noted, 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *See id.* (quoting *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)).

[6] *See also* ECF 423 at 20-25 (finding "there was ample proof of actual confusion and, certainly, likelihood of confusion, based on Defendant's infringement along with Plaintiff's loss of control over its reputation and goodwill" and "[t]here was abundant evidence that the use of 'tender' on its own was done in a way that caused customer confusion and infringed Plaintiff's Marks. This is true for the lowercase and capital as well as singular and plural versions of the terms at issue … the evidence at trial was clear that these terms were used in a violative manner.")

documentation regarding the specific monetary value of the brand's goodwill prior to Defendant's infringement and the specific monetary value of the goodwill after the infringement. However, Plaintiff's damages need not be "susceptible to precise calculations." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008). Instead, "where plaintiff's injury 'is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1520 (11th Cir. 1990) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

At trial, Plaintiff extensively established the efforts it took to build goodwill in its brand[7] and the considerable efforts that Plaintiff was forced to take to restore that goodwill after Defendant's infringement and false advertising.  *See e.g.*, PX-44; ECF 343 at 149:11-15; 161:2-20; 162:20-163:18.  Courts have previously held that evidence of advertising expenditures was sufficient to support the jury's verdict.

---

[7] *See e.g.,* ECF 339 at 184, 187:10-13 (Plaintiff's founder and CEO testified about the extent of advertising conducted over for the brand spanning over thirty years, including 20-25 shows, consumer shows, and trade shows a year and magazines, TV shows, and sponsorships); ECF 341 at 44:22-45:4, 46:18-48:11 (director of marketing for Plaintiff's brand testified about digital marketing channels and race sponsorships and partnerships, stating that "[t]ime and time again at trade shows or race events, we will – we will have customers come up, and they've said, if your logo – if the Battery Tender logo is not on it, I won't buy it.  I don't care if it's a jump starter, I don't care if it's a battery charger, your brand is what I want"); *see also* PX-078 (Defendant's director of sales stated in written communications that "I understand that a lot of consumers see "Battery Tender" and think to buy that unit because it is a house hold name.")

*See ADT LLC v. Vivint, Inc.*, 2017 WL 8404330, at *7 (S.D. Fla. Nov. 20, 2017) (finding evidence of money spent each year to build and protect trademarks and brand is evidence as to amount of damages based on loss to reputation and goodwill); *Platinum Prop. Investor Network, Inc. v. Sells*, 2023 WL 7144676, at *20 (S.D. Fla. Sept. 18, 2023) ("Expenditures on advertising and marketing are well known to be relevant to a damages determination of loss of goodwill and reputational damages.") (internal quotation omitted).

### E.     The Court Properly Instructed The Jury On False Advertising

Defendant lastly asserts that the jury was improperly instructed on a false advertising claim. This is incorrect. Plaintiff's Complaint put Defendant on notice of claims specifically arising from Defendant's "violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)," which provides liability for false advertising in commercial advertising or promotion. ECF 1 ¶ 69; *see also id.* at 14-15 (alleging Defendant engaged in false or misleading statements in its advertisements). Additionally, Plaintiff adduced in discovery and produced at trial irrefutable evidence that Defendant engaged in false advertising.  In recognition of this, the Court's false advertising jury instruction gave "the jury a clear and concise statement of the law applicable to the facts of the case." *Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1194 (11th Cir. 1995).  There is no basis to overturn the jury's verdict on Plaintiff's false advertising claim, rendered at the end of a seven-

day trial.[8]

As described below, under either the Rule 50 or Rule 59 standard, Defendant has failed to show it was entitled to relief based on allegedly improper jury instructions on Plaintiff's false advertising claim. The jury had not only a reasonable – but an ample – evidentiary basis to find Defendant engaged in false advertising.  The jury's verdict, therefore, should not be disturbed.

> **1.    The Court's false advertising Jury Instruction accurately reflects the law and conforms to the abundant evidence presented at trial.**

There was a substantial factual basis for the Court to instruct the jury on Plaintiff's false advertising claim, because Plaintiff established every element of its claim with evidence including injury from Defendant's action.[9] Plaintiff specifically introduced evidence at trial establishing each of the five elements necessary to recover for false advertising under the Lanham Act: (1) Defendant's

---

[8] As the Eleventh Circuit has recognized, "[j]ury instructions must be put in context … consider[ing] the allegations of the complaint, the evidence presented, and the arguments of counsel when determining whether the jury understood the issues or was misled." *Christopher*, 53 F.3d at 1190-91. The Court had "broad discretion in formulating jury instructions, so long as the charge as a whole accurately reflects the law and the facts." *United States v. Martinez*, 486 F.3d 1239, 1244 n.2 (11th Cir. 2007); *Fields v. Dep't of Juvenile Justice*, 712 F. App'x 934, 936 (11th Cir. 2017) ("A trial court is given wide discretion as to the style and working of jury instructions.") (quoting *Samples v. City of Atlanta*, 916 F.2d 1548, 1550 (11th Cir. 1990)). And "[a] district court errs [only] if there is no basis in the record for the instruction given." *Id.*

[9] *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (listing elements of a false advertising claim under the Lanham Act); *see also Mixed Fighting All. Promotions, Inc. v. de la Noval*, 2011 WL 13223714, at *11 (S.D. Fla. Apr. 14, 2011) (recognizing that the plaintiff's "loss of control of [its] reputation and the potential for injury to its business and goodwill constitutes irreparable injury").

ads were false or misleading, (2) Defendant's ads deceived, or had the capacity to deceive, consumers, (3) Defendant's deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) Plaintiff was — or is likely to be — injured because of the false advertising. *See Johnson & Johnson*, 299 F.3d at 1247.

Plaintiff introduced ample evidence establishing the first element of its false advertising claim.  That element is "satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (quoting *Johnson & Johnson*, 299 F.3d at 1247). Here, there were a number of literally false advertisements.  For example, Defendant engaged in rampant false advertising on Amazon.  Defendant used false advertising in willfully infringing Plaintiff's Marks in an effort to drive consumer traffic to and to refer to Defendant's own products. In addition, Defendant falsely advertised to customers that "it takes five separate models from Battery Tender to equal one of ours." *See* PX-065. And Defendant tried to undermine the value of Plaintiff's Marks by falsely asserting that "'a battery tender' is a maintainer for your batteries to keep them from losing charge while they're connected to the battery." PX-138 (chat statement from Defendant's representative).

Furthermore, in June 2015, Defendant used Plaintiff's Marks and

confusingly similar variations of the Marks "as a keyword to trigger Defendant's targeted advertising on Amazon's website," and "Defendant launched an advertisement containing a variation of Plaintiff's Marks, namely, 'TENDER'." ECF 1 ¶ 30; *see also* PX-047 (printout of Defendant's advertisement from Amazon). Despite receiving a cease and desist letter about the June 2015 advertisement, "Defendant launched another almost identical advertising campaign using the Infringing Marks to again draw attention and traffic to Defendant's battery charger products." ECF 1 ¶ 35. The new ad was virtually identical to "the prior ad, but worse, added a reference to Defendant's brand 'Defendant' at the top." *Id.*; *see also* PX-052 (copy of Defendant's advertisement dated October 21, 2015). Then, rather than stopping its illegal behavior, Defendant doubled down and became even more brazen by "revis[ing] its advertising campaign" in what Defendant claimed was a "comparative advertisement." ECF 1 ¶ 37; *see also* PX-050 (copy of Defendant's deceptive comparative advertisement); PX-055A (copy of Defendant's advertisement using Plaintiff's Marks in product description of NOCO Genius G4 battery charger). Defendant continued to run similar advertisements, even though they contained false statements and misrepresentation. *See e.g.,* PX-56A, PX-57A, PX-58A, PX-59A, PX-60A, PX-227A,

PX-231J, PX-231Y.[10]

As to the second element, that was also supported by substantial evidence. Plaintiff proved that Defendant's "statements deceived, or had the capacity to deceive, consumers." *Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1294 (11th Cir. 2012). For literally false advertising, like those here, deception or capacity to deceive is presumed. *See Johnson & Johnson*, 299 F.3d at 1247. Nonetheless, at trial, Plaintiff affirmatively proved that Defendant's advertisements had the capacity to deceive consumers. For example, Defendant's ads used keyword advertising and based upon the context and placement of the unlabeled advertisement (with no reference to Defendant's own brand), which drew traffic to Defendant's own products by using Plaintiff's goodwill and distinction to mislead consumers concerning the features and capabilities of Plaintiff's battery charger products. *See, e.g.*, PX-047. And by using Plaintiff's full "BATTERY TENDER" mark, and variations thereof, in connection with purported comparative advertisements, (*e.g.*, PX-050), Defendant could and did deceive consumers (*e.g.*, PX-138, PX-237; *see also* ECF 423 at 18.).

As to the third element, "[t]o succeed on a claim of false advertising, the

---

[10] *See also* PX-54, PX-75, ECF 327, Ex. A at 75:9-11 (Defendant's customer support lead testified concerning advertising that Defendant sells Battery Tender products); ECF 348 at 154:18-21 (Defendant's vice president of sales testified concerning advertising Defendant sells battery tender products).

plaintiff must establish that 'the defendant's deception is likely to influence the purchasing decision.'" *Johnson & Johnson*, 299 F.3d at 1250. At trial, Plaintiff presented extensive evidence (including the advertisements above) and testimony showing that Defendant's advertisements influenced the purchasing decisions of the consumers exposed to Defendant's deceptive advertisements. "[B]ased on the evidence of actual customer confusion that was presented at trial—evidence that the jury credited—it is clear that Plaintiff's reputation and goodwill was impacted because its brand was being co-mingled with Defendant's products." ECF 423 at 18. Indeed, if the deception wasn't likely to influence purchasing decisions, why would Defendant have spent so much money to run its infringing and false advertisements. *See* PX-237 (showing Defendant's "average cost of sales (ACOS)" for ads in excess of 50%, 100% and even 200% in some instances). Thus, this factor was sufficiently proven at trial.

As to the fourth element, it is indisputable that Defendant's actions in launching digital advertisements and communicating nationwide with customers affected interstate commerce.

And as to the fifth element, causation for false advertising under the Lanham Act is established by "show[ing] economic or reputational injury flowing directly from the deception wrought by the defendant's advertising" which "occurs when deception of consumers causes them to withhold trade from the

plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Here, Defendant received ill-gotten gains by engaging in false advertising that diverted purchasers away from Plaintiff and towards Defendant's competing products. Indeed, in addition to the actual and punitive damages awarded by the jury, the Court ordered disgorgement of Defendant's profits in the amount of $12,135,943.70.  Plaintiff's injuries, including "loss of control of [its] reputation and the potential for injury to its business and goodwill constitutes irreparable injury," were proven at trial and credited by the jury. *See Mixed Fighting*, 2011 WL 13223714, at *32.

In sum, Plaintiff established each element necessary to prevail on its false advertising claim. The jury's verdict on Plaintiff's false advertising claim therefore was not only reasonable, it was the only logical outcome from Plaintiff's fulsome trial presentation of Defendant's willful infringement.

### 2. Relief under Rule 50(b) is inappropriate because there was abundant evidence supporting the Jury Verdict on the false advertising claim.

Rule 50(b) permits a court to enter JMOL only "when there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue." *Jimenez v. Gov't Emps. Ins. Co.*, 2015 WL 12844296, at *2 (M.D. Fla. Apr. 28, 2015). Moreover, "in ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess

whether that verdict is supported by sufficient evidence." *Chaney*, 483 F.3d at 1227.

Defendant cannot meet its substantial Rule 50(b) burden.  As the Court already ruled, "[t]he evidence at trial was clear—Defendant could not convince Plaintiff to sell, so Defendant decided to steal Plaintiff's goodwill while also spreading disinformation within the industry in an attempt to render Plaintiff's Marks invalid as generic to avoid liability for its actions." ECF 423 at 6. Plaintiff's robust trial presentation proved that Defendant—despite knowledge of Plaintiff's trademarks and receipt of multiple cease and desist letters—engaged in a multiyear false advertising campaign that included "developing and implementing slogans using 'battery tender' and us[ing] Plaintiff's Marks in [Defendant's] product descriptions on Amazon.com … to drive traffic to Defendant's products". ECF 423 at 7-8. The ample evidence supporting Defendant's liability stems from Defendant's own brazen campaign.

The jury considered and rightly rejected Defendant's purported evidence. This included the jury's rejection of the testimony of Defendant's President, Jonathan Nook—an "astonishingly not credible" witness "who was so dishonest and contradictory on the stand that it became apparent that he was attempting to cover up his wrongdoings during his live testimony at trial." *Id.* at 7-8, n.3 and 4.

Furthermore, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—

weight of the evidence." *Bostick v. State Farm Mut. Auto. Ins. Co.*, 314 F. Supp. 3d 1265, 1271 (M.D. Fla. 2018) (quoting *Lipphardt*, 267 F.3d at 1186).   Additionally, "[t]he Court should only grant a new trial if the verdict will result in a miscarriage of justice." *Id.*[11]  Here, all the credible record evidence supported the jury's verdict on the false advertising claim. The jury held Defendant responsible for its conduct, and Defendant's argument that there was insufficient evidence to support the jury's false advertising verdict should be rejected.

## IV.   CONCLUSION

For these reasons, Plaintiff respectfully asks the Court to deny Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a New Trial, in its entirety.

---

[11] Courts in this district are "mindful of the Eleventh Circuit's warning that 'the trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow' and is limited to 'protect[ing] against manifest injustice in the jury's verdict.'" *Bostick v. State Farm Mut. Auto. Ins. Co.*, 314 F. Supp. 3d 1265, 1272 (M.D. Fla. 2018) (quoting *Hewitt*, 732 F.2d at 1556); *see also Minks v. Polaris Indus., Inc.*, 2007 WL 1452906, at *2 (M.D. Fla. May 15, 2007) ("The trial court may grant a motion for a new trial under Rule 59 if it believes the verdict rendered by the jury was contrary to the great-and not merely the greater-weight of the evidence.").

Dated:  November 13, 2023        Respectfully submitted,

**FOX ROTHSCHILD LLP**

*/s/ Patricia M. Flanagan*
Patricia M. Flanagan
Florida Bar No. 58592
Alex L. Braunstein
Florida Bar No. 98289
Megan A. McNamara
Florida Bar No. 112636
777 South Flagler Drive
Suite 1700, West Tower
West Palm Beach, FL 33401
Tel.: (561) 804-4477
Fax: (561) 835-9602
Email: pflanagan@foxrothschild.com
Email: abraunstein@foxrothschild.com
Email: mmcnamara@foxrothschild.com

 Dominique J. Carroll
*(pro hac vice)*
997 Lenox Drive
Lawrenceville, NJ 08648
Tel: (609) 895-6706
Fax: (609) 896-1469
Email: djcarroll@foxrothschild.com

*Counsel for Plaintiff*
*Deltona Transformer Corporation*

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 13, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

*/s/ Patricia M. Flanagan*
Patricia M. Flanagan

# Dkt.440

## NOCO's 50(b) Motion for Judgment as a Matter of Law
## 11/21/2023

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DELTONA TRANSFORMER
CORPORATION, a Florida
Corporation,

               Plaintiff,

     v.

THE NOCO COMPANY, an Ohio
Corporation,

             Defendant.

Case   No.   6:19-cv-308-CEM-LHP

**DEFENDANT THE NOCO COMPANY'S RENEWED MOTION FOR**
**JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE,**
**<u>MOTION FOR NEW TRIAL</u>**

# TABLE OF CONTENTS

**Page**

I.      BACKGROUND ........................................................................................... 1

II.     LEGAL STANDARDS ................................................................................ 1

III.    ARGUMENT................................................................................................ 3

    A.      The Alleged BATTERY TENDER Mark Is Generic; Plaintiff's
Common Law Trademark Infringement Claim Necessarily
Fails ................................................................................................... 3

    B.      Plaintiff Failed To Show Consumer Harm Under The FDUTPA ....... 8

    C.      Plaintiff Failed to Prove Essential Elements of Its Trademark-
Infringement Claims; All of Plaintiff's Claims Necessarily Fail...... 10

    D.      No Actual Damages Proven................................................................ 18

    E.      The Jury Was Improperly Instructed on a False-Advertising
Claim that Deltona Never Asserted................................................... 21

IV.     CONCLUSION.......................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

### CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) ......................................................................... 13

*Abel v. Dubberly*,
  210 F.3d 1334 (11th Cir. 2000) .......................................................................... 2

*Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's
  Found. Of Am., Inc.*,
  307 F. Supp. 3d 260 (S.D.N.Y. 2018) ............................................................... 13

*Anti-Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*,
  684 F.2d 1316 (9th Cir. 1982) ............................................................................ 3

*Black Diamond Land Mgmt. LLC v. Twin Pines Coal Inc.*,
  707 F. App'x 576 (11th Cir. 2017) .................................................................... 22

*BPI Sports, LLC v. Labdoor, Inc.*,
  No. 15-62212, 2016 WL 739652 (S.D. Fla. Feb. 25, 2016) .............................. 20

*Car Body Lab Inc. v. Lithia Motors, Inc.*, No. 21-cv-21484, 2021 WL
  2658693, at *3 (S.D. Fla. June 22, 2021) ........................................................ 10

*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm
  Beach County, Inc.*,
  169 So. 3d 164 (Fla. App. 4th Dist. 2015) .................................................. 8, 10

*Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*,
  270 F. Supp. 3d 1340 (S.D. Fla. 2017) ............................................................ 20

*CEMEX Constr. Materials Florida, LLC v. Armstrong World Indus.,
  Inc.*,
  No. 16-186, 2018 WL 905752 (M.D. Fla. Feb. 15, 2018) .................................. 8

*Cleveland v. Home Shopping Network, Inc.*,
  369 F.3d 1189 (11th Cir. 2004) .......................................................................... 2

## TABLE OF AUTHORITIES
(continued)

Page

*Deltona Transformer Corporation, v. The NOCO Company*,
   No. 6:19-CV-308-CEM-LHP, 2023 WL 6376363 (M.D. Fla. Sept.
   29, 2023) ................................................................................ 13, 26

*Diversified Mgmt. Sols., Inc. v. Control Sys. Rsch., Inc.*,
   No. 15-81062, 2016 WL 4256916 (S.D. Fla. May 16, 2016) ............................20

*Donchez v. Coors Brewing C*o.,
   392 F.3d 1211 (10th Cir. 2004) ........................................................ 5

*Env't Mfg. Sols., LLC v. Fluid Group, Ltd.*,
   No. 18-156, 2018 WL 3635112 (M.D. Fla. May 9, 2018), *affirmed
   & adopted*, 2018 WL 6264836 (M.D. Fla. Nov. 30, 2018) ................................ 8

*Essence Comm., Inc. v. Singh Ind., Inc.*,
   703 F. Supp. 261 (S.D.N.Y. 1988) .....................................................15

*Filipino Yellow Pages, Inc. v. Asian J. Pubs., Inc.*,
   198 F.3d 1143 (9th Cir. 1999) ........................................................ 3

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
   830 F.3d 1242 (11th Cir. 2016) ............................................... 10, 15, 16

*Fla. Virtual Sch. v. K12, Inc.*,
   No. 6:20-CV-2354-GAP-EJK, 2023 WL 6294569 (M.D. Fla. Sept.
   5, 2023)...............................................................................15

*Gift of Learning Found., Inc. v. TGC, Inc.*,
   329 F.3d 792 (11th Cir. 2003) .................................................... 7, 11

*Globalaw Ltd. v. Carmon & Carmon L. Off.*,
   452 F. Supp. 2d 1 (D.D.C. 2006) ...................................................... 6

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
   921 F.3d 1343 (11th Cir. 2019)....................................................... 16

*Hoop Culture, Inc. v. Gap Inc.*,
   648 F. App'x 981 (11th Cir. 2016) ....................................................10

**TABLE OF AUTHORITIES**
(continued)

Page

*Howard Johnson Co., Inc. v. Khimani,*
  892 F.2d 1512 (11th Cir. 1990).......................................................................... 19

*J-B Weld Co., LLC v. Gorilla Glue Co.,*
  978 F.3d 778 (11th Cir. 2020) ........................................................................ 24

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.,*
  299 F.3d 1242 (11th Cir. 2002)................................................................ 23, 24

*Knights Armament Co. v. Optimal Sys. Tech., Inc.,*
  654 F.3d 1179 (11th Cir. 2011) ........................................................................ 3

*Krupa v. Platinum Plus, LLC,*
  No. 16-3189, 2017 WL 1050222 (M.D. Fla. Mar. 20, 2017) ............................ 20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014)......................................................................................... 22

*Lipphardt v. Durango Steakhouse of Brandon, Inc.,*
  267 F.3d 1183 (11th Cir. 2001)........................................................................ 2

*Mee Indus. v. Dow Chem. Co.,*
  608 F.3d 1202 (11th Cir. 2010) ...................................................................... 19

*Meth Lab Cleanup, LLC v. Bio Clean, Inc.,*
  205 F. Supp. 3d 1243 (W.D. Wash. 2016) ........................................................ 7

*Multi Time Mach., Inc. v. Amazon.com, Inc.,*
  804 F.3d 930 (9th Cir. 2015) .......................................................................... 13

*Nartron Corp. v. STMicroelectronics, Inc.,*
  305 F.3d 397 (6th Cir. 2002) ........................................................................... 4

*Natural Answers, Inc. v. SmithKline Beecham Corp.,*
  529 F.3d 1325 (11th Cir. 2008)................................................................17, 23

*Noel v. Terrace of St. Cloud, LLC,*
  212 F. Supp. 3d 1193 (M.D. Fla. 2016) ............................................................ 2

**TABLE OF AUTHORITIES**
(continued)

Page

*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*,
496 F.3d 1231 (11th Cir. 2007) ........................................................ 19

*Outdoor Kids, Inc. v. Parris Mfg. Co.*,
385 F. App'x 992 (Fed. Cir. 2010) .................................................17

*Pilates, Inc. v. Current Concepts, Inc.*,
120 F. Supp. 2d 286 (S.D.N.Y. 2000) ....................................... 3, 6, 7

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
55 F. Supp. 2d 1070 (C.D. Cal. 1999), *aff'd*, 202 F.3d 278 (9th Cir.
1999) ...................................................................................15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ................................................................ 2

*Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*,
210 F.3d 278 (5th Cir. 2000).....................................................11

*Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*,
542 F. Supp. 3d 371 (W.D.N.C. 2021), *appeal dismissed*, No. 21-
1758, 2021 WL 6330712 (4th Cir. Aug. 31, 2021).......................... 5, 7

*South Broward Hosp. Dist. v. Elap Servs., LLP*,
No. 20-61007, 2023 WL 6547748 (S.D. Fla. Sept. 30, 2023) ........................... 9

*St. Elien v. All Cty. Env't Servs., Inc.*,
991 F.3d 1197 (11th Cir. 2021) ........................................... 2

*Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*,
266 So. 3d 207 (Fla. App. 4th Dist. 2019) ........................................ 8

*Suntree Techs., Inc. v. EcoSense Int'l, Inc.*,
802 F. Supp. 2d 1273 (M.D. Fla. 2011), *aff'd*, 693 F.3d 1338 (11th
Cir. 2012) ................................................................. 14, 17

**TABLE OF AUTHORITIES**
(continued)

Page

*Synergy Real Est. of SW Fla., Inc. v. Premier Prop. Mgmt. of SW Fla., LLC,*
578 F. App'x 959 (11th Cir. 2014) .................................................................. 22

*Tana v. Dantanna's,*
611 F.3d 767, 779 (11th Cir. 2010) ................................................................. 16

*TocMail, Inc. v. Microsoft Corp.,*
67 F.4th 1255 (11th Cir. 2023) ........................................................................ 23

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
505 U.S. 763 (1992) ............................................................................................ 3

*USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC,*
165 F. Supp. 3d 1256 (S.D. Fla. 2016) ........................................................... 14

*Welding Servs., Inc. v. Forman,*
509 F.3d 1351 (11th Cir. 2007) ......................................................................... 3

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,*
419 F.3d 925 (9th Cir. 2005) ............................................................................. 4

**STATUTES**

15 U.S.C. § 1125 ..................................................................................... *passim*

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50 .................................................................................. *passim*

Fed. R. Civ. P. 59 ............................................................................... 1, 2, 18, 25

Defendant The NOCO Company (NOCO) moves for judgment as a matter of law (JMOL) under Fed. R. Civ. P. 50(b), and, alternatively, for a new trial under Rule 59(a).

## I.    <u>BACKGROUND</u>

During the first seven days of trial, Plaintiff (Deltona) and NOCO each presented evidence to demonstrate or defend against the claims in this action, namely, that NOCO allegedly infringed on trademarks owned by Deltona.  At the end of Deltona's case-in-chief, NOCO made four motions for JMOL under Rule 50(a).  Dkt. 348, at 65:9–67:13; Motions for Judgment as a Matter of Law [ECF Nos. 300–303].   NOCO showed that Deltona failed to demonstrate: (1) its "BATTERY TENDER" mark was not generic; (2) the consumer harm required by the Florida Unfair and Deceptive Trade Practices Act (FDUTPA); (3) the essential elements of trademark infringement; and (4) actual monetary damages supporting any claim set forth by Deltona.  On March 30, 2022, the Court issued a written order denying these Motions.  Dkt. 410.  NOCO made a fifth Rule 50(a) JMOL motion, *ore tenus*, on Deltona's false-advertising claim, Dkt. 356, at 221-224; Dkt. 358, at 5:8-17; 6:5-21, 110:2-112:9; that motion has never been ruled upon by the Court.

Now that the Court has entered judgment, Dkt. 424, NOCO moves for JMOL under Rule 50(b) and, alternatively, for a new trial under Rule 59.

## II.    <u>LEGAL STANDARDS</u>

**Rule 50.**  A party is entitled to JMOL if a "'reasonable jury would not have

a legally sufficient evidentiary basis to find for the [opposing] party on that issue.'" *St. Elien v. All Cty. Env't Servs., Inc.*, 991 F.3d 1197, 1199 (11th Cir. 2021) (quoting Rule 50(a)(1)). The verdict-winner is entitled to all fair factual inferences, and the court reviews all the record evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192-93 (11th Cir. 2004). Still, a non-movant "must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts," *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000), and a court "should give credence to . . . that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151.

**Rule 59.** "A district court may grant a new trial for a variety of reasons, including when the verdict is against the great weight of the evidence, the damages awarded by the jury are excessive, the court erred in admitting or excluding evidence or in instructing the jury on the law, or other circumstances resulted in a patently unfair trial." *Noel v. Terrace of St. Cloud, LLC*, 212 F. Supp. 3d 1193, 1203–04 (M.D. Fla. 2016) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). A court should grant a new trial where "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of the verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (citations omitted).

## III.   __ARGUMENT__

### A.   __The Alleged BATTERY TENDER Mark Is Generic; Plaintiff's Common Law Trademark Infringement Claim Necessarily Fails__

Trademarks are only available to "distinctive" marks; "generic" terms are incapable of trademark protection. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992). A term is generic if it [1] refers to "a particular genus or class of which an individual article or service is but a member," or [2] "is the term by which the product or service itself is commonly known." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007) (concluding "welding services" was generic and "not protectable"); *see also Knights Armament Co. v. Optimal Sys. Tech., Inc.*, 654 F.3d 1179, 1189 (11th Cir. 2011) (affirming "night sight" was a "generic term used in the sniper community to refer to the genus of goods that enable a sniper to observe or acquire a target at night").

In determining whether a term is generic, courts consider several types of evidence: "(1) dictionary definitions; (2) generic use of the term by competitors and other persons in the trade; (3) plaintiff's own generic use; (4) generic use in the media; and (5) consumer surveys." *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 297 (S.D.N.Y. 2000) (holding PILATES marks for services and equipment generic); *see also Filipino Yellow Pages, Inc. v. Asian J. Pubs., Inc.*, 198 F.3d 1143, 1145, 1150-51 (9th Cir. 1999) (affirming finding that FILIPINO YELLOW PAGES was generic where record included, among other things, plaintiff's "own generic use of the term" and "generic usage by the media"); *Anti-Monopoly, Inc. v.*

*Gen. Mills Fun Grp., Inc.*, 684 F.2d 1316, 1323, 1326 (9th Cir. 1982) ("Monopoly" held to be generic as applied to a board game where the "principal evidence in the case was in the form of consumer surveys").

NOCO introduced these very types of evidence at trial, demonstrating that a "battery tender" refers to a particular genus or class of goods (i.e., a kind of battery charging device).[1]   *See, e.g.*, DX-71; DX-111; DX-118; DX-120; DX-255; DX-462; Dkt. 348, at 218:13-19, 223:7-11; DX-275D; DX-275E; DX-275I; DX-275L; DX-478; DX-484; DX-499; Dkt. 343, at 46:8-21; DX-546, at 50, 55.   Deltona never rebutted this evidence.   NOCO's evidence of genericness was also sufficient to meet NOCO's burden of proof with respect to Deltona's federal trademark claims.   *See, e.g., Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 405 (6th Cir. 2002) (finding defendant "sufficiently carried its burden of demonstrating" that the federally registered mark "smart power" was generic where defendant put in evidence of generic use by third parties and those in the industry and no survey or dictionary evidence was introduced).

In particular, no reasonable jury could conclude that "battery tender" is non-generic in the face of NOCO's *uncontroverted* survey evidence.   NOCO's survey expert, Philip Johnson, testified *without contradiction* that in a survey of 558

---

[1] Caselaw suggests that a plaintiff asserting a common-law trademark infringement claim bears the burden of proof that the mark is not generic when a defendant raises the defense of genericness. *See, e.g., Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005) (holding the "district court correctly allocated the burden of proof to plaintiff" on an unregistered trademark claim).   However, even if NOCO bears the burden of proof of demonstrating the marks are invalid, the evidence introduced at the trial shows that burden was met.

respondents, "78 percent said that they believed Battery Tender is a type of product," *i.e.*, a generic term,[2] and not an indication of the product's source or origin.  *See* Dkt. 348, at 218:13-19, 223:7-11.  Survey results far lower than 78% have proven genericness in other cases.  *See, e.g.*, *Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp. 3d 371, 403 (W.D.N.C. 2021) (survey showing 47.8% out of 400 respondents associated PRETZEL CRISPS with "more than one company" supported "a finding that PRETZEL CRISPS is a generic mark"), *appeal dismissed*, No. 21-1758, 2021 WL 6330712 (4th Cir. Aug. 31, 2021); *see also Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (finding term "beerman" generic where 75.9% of the 200 survey respondents recognized the term as a "common or generic name").

Deltona did not proffer its own survey—as trademark owners typically do when faced with a genericness claim backed by a survey—so NOCO's evidence on this point stands alone.  *See, e.g.*, 2 McCarthy on Trademarks & Unfair Competition § 12:14 (5th ed.) ("Consumer surveys have become almost de rigueur in litigation over genericness.").  Deltona's failure to rebut NOCO's genericness survey with its own survey strongly supports the conclusion that the term "battery

---

[2] At trial, the Court ruled, over NOCO's objection, that NOCO's genericness survey expert could not use the term "generic" and could only testify that "the results of the survey show[ed] that the Battery Tender is a type of product and not a brand."  Dkt. 348, at 188:14-199:1.  This ruling prevented NOCO's expert from properly stating the conclusion of the survey results in the standard way such evidence is presented; survey experts are permitted to testify on the ultimate factual issue of genericness.  *See, e.g.*, 4 McCarthy on Trademarks & Unfair Competition § 23:2.75 (5th ed.) ("The usual and accepted method of admitting expert testimony on the ultimate factual issue of likelihood of confusion is for the expert to design and have conducted a survey of customers of that product or service.").  The unfair prejudice that flowed from this restriction supports NOCO's request for a new trial.

tender" is generic, such that no reasonable jury could have found otherwise. *See, e.g.*, *Globalaw Ltd. v. Carmon & Carmon L. Off.*, 452 F. Supp. 2d 1, 33 (D.D.C. 2006) (finding unrebutted opinions and conclusions of defendants' expert who conducted a survey "support[ed] categorizing 'GLOBALAW' as a generic term").

The record is replete with other evidence that "battery tender" is generic, including testimony and documents showing that Deltona itself, as well as non-party retailers seeking to do business with Deltona, used this term generically. Start with Deltona. Deltona published advertisements on Amazon in which it advertised its product as "The only battery tender," with the words "battery tender" appearing in lowercase. *See* DX-71. And Deltona's Deltran affiliate purchased the keywords "battery tender" *with other brand names*—such as "Black & Decker" (Dkt. 343, at 46:8-21), "Honda," "Harley," and even "NOCO"—in order to promote Deltran's "battery tender" products on Amazon.com. In other words, a consumer searching for a "NOCO battery tender" product on Amazon would be presented with a Deltran product as a purchase option in these search results. Dkt. 343, at 46:8-21; DX-546, at 50, 55; DX-547, at 34, 39; PX-60A, at 2, 7. Deltona's "own generic use of its marks supports a finding of genericness." *Pilates, Inc.*, 120 F. Supp. 2d at 299-300 (evidence showing that "plaintiff and its predecessors . . . have used the word Pilates in a generic sense" weighed "in favor of genericness").

And then there are the retailers. DX-111, at 2, contains an email from a retailer to Deltran stating "I was very impressed by the battery tenders and jump starters that you offer." Appearing side-by-side with the similarly uncapitalized

generic product category "jump starters," "battery tenders" here likewise represents a generic category of devices "that you offer," suggesting that other companies, too, offer devices within those generic categories. Other emails from retailers are to the same effect. *See, e.g.*, DX-120, at 3 ("Since the expo, I've had some great conversations with sales and Parts personnel educating and showcasing your battery tenders and Mobile battery wireless monitor[.]"); DX-462, at 1 ("Lots of our customers ask about adding a battery tender to there [*sic*] exotic cars, we are a full services dealership."). These generic usages by "persons in the trade weighs strongly in favor of genericness." *Pilates, Inc.*, 120 F. Supp. 2d at 298-99. *See also, e.g.*, *Snyder's Lance, Inc.*, 542 F. Supp. 3d at 389 (evidence that "third parties involved believed 'pretzel crisps' was a commonly understood generic term" supported court's finding that "pretzel crisps" was a generic name).

In sum, Deltona failed to sufficiently show non-genericness, regardless of whether it bore the burden of proof, and the evidence of genericness that NOCO put into the record is so overwhelming that no reasonable jury could conclude anything other than that "battery tender" is a generic term. *Meth Lab Cleanup, LLC v. Bio Clean, Inc.*, 205 F. Supp. 3d 1243, 1252 (W.D. Wash. 2016) (finding "no reasonable jury" could conclude that the phrase "meth lab cleanup" is not generic in light of the defendant's evidence). And because "battery tender" is generic for a kind of battery charger, there can be no likelihood of confusion for *either* the state-law claim *or* the federal claim, as discussed *infra* Section III.C. *See Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 801 (11th Cir. 2003)

("[C]onfusion . . . is irrelevant unless the mark is protectible in the first instance."). Accordingly, the Court should enter JMOL on Deltona's common-law trademark infringement claim.

### B. Plaintiff Failed To Show Consumer Harm Under The FDUTPA

The Court denied NOCO's Rule 50(a) motion on consumer harm because it determined that Deltona was a "consumer" under FDUTPA, and therefore held that Deltona's own alleged damages were sufficient to support a claim under that act. Dkt. 410 at 5. This ruling, however, inadequately captured the meaning of the statute. "While an entity does not have to be a consumer to have standing to bring a FDUTPA claim, it still must prove the elements of the claim, *including an injury to a consumer*." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 212 (Fla. App. 4th Dist. 2019) (emphasis added). *See also Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 169 (Fla. App. 4th Dist. 2015) (emphasizing requirement of consumer injury); *Env't Mfg. Sols., LLC v. Fluid Group, Ltd.*, No. 18-156, 2018 WL 3635112, at *16 (M.D. Fla. May 9, 2018), *affirmed & adopted*, 2018 WL 6264836 (M.D. Fla. Nov. 30, 2018) ("Although competitors may bring FDUTPA claims for damages, the 2001 amendment did not wholly eliminate the need for *consumer injury*." (emphasis added)); *CEMEX Constr. Materials Florida, LLC v. Armstrong World Indus., Inc.*, No. 16-186, 2018 WL 905752, at *15 (M.D. Fla. Feb. 15, 2018) ("That an entity other than a consumer can bring a FDUTPA claim does not mean, however, that '[h]arm to consumers is not required' as suggested by [the defendant] . . . .").

Deltona's FDUTPA case, which was premised on the same kind of "consumer confusion" allegations that underlay its trademark claims, failed on this latter requirement, for it showed no "injury to a consumer" under the Act.  Deltona did not claim, and could not have claimed, that Deltona itself was confused and therefore harmed by NOCO's actions.  This failure is therefore "fatal" to Deltona's FDUTPA claim.  *South Broward Hosp. Dist. v. Elap Servs., LLP*, No. 20-61007, 2023 WL 6547748, at *9 (S.D. Fla. Sept. 30, 2023).

Despite months of pretrial discovery, and seven days of trial, Deltona presented evidence of only a single interaction with only one customer:  The Director of Advertising of Deltran Operations USA, Inc. testified about a second-hand experience with a customer who allegedly called Deltona to relay its shopping experience with NOCO.  Dkt. 341, 60:12–62:21.  Notably absent from this testimony, however, was any indication that the customer was harmed.  Indeed, the customer admittedly recognized that the product NOCO was selling was not a Deltona product.  *Id.* ("They called in to us, us meaning Deltran Battery Tender, and told us of their experience.  And they said, well, that's not the battery tender charger I was looking for.").

The remaining evidence Deltona presented at trial was based entirely on Deltona's speculative testimony about the *possibility* of consumer confusion.  *See e.g.*, *id.* at 80:25–81:3, 90:4-15; *see also* Dkt. 343, at 138:8-9; 140:22-141:7.  This is entirely insufficient to satisfy its burden as matter of law because it is unsupported by any evidence demonstrating that consumers were *actually*

confused (or *likely* confused) by NOCO's advertisements. *Cf. Car Body Lab Inc. v. Lithia Motors, Inc.*, No. 21-cv-21484, 2021 WL 2658693, at *3 (S.D. Fla. June 22, 2021) (stating that the challenged conduct has "caused consumer confusion[,]" alone, was conclusory and did not plausibly state a claim under FDUTPA); *see also infra* Section II.C.   The statute required Deltona to show an actual "injury or detriment to consumers," *Caribbean Cruise Line*, 169 So. 3d at 169, but it made no such showing.   NOCO is therefore entitled to JMOL on Deltona's FDUTPA claim.

### C.   Plaintiff Failed to Prove Essential Elements of Its Trademark-Infringement Claims; All of Plaintiff's Claims Necessarily Fail

To prevail on its claims for trademark infringement, Deltona had to prove that: "(1) it possesses a valid mark; (2) [NOCO] used the mark in commerce in connection with the sale or advertising of goods . . . in a manner likely to confuse consumers." *Hoop Culture, Inc. v. Gap Inc.*, 648 F. App'x 981, 983 (11th Cir. 2016); *see also* Dkt. 314, at 13, 17 (Jury Instructions).   In considering likelihood of confusion, the strength of plaintiff's mark and the evidence of actual confusion "are the most important" factors.   *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255, 1265 (11th Cir. 2016) (finding no likelihood of confusion where "the two most important factors—evidence of actual confusion and the strength of the mark—d[id] not" weigh in favor of a likelihood of confusion). Deltona's infringement claims fail because Deltona failed to show the elements of its claim.   No reasonable jury could have reached a contrary verdict.

***First***, Deltona has no valid mark and cannot succeed on any of its claims.

As noted above (*supra* III.A), its alleged marks are generic as a matter of law—both as a matter of Florida common law and as a matter of federal trademark law, where Deltona relied on its registrations of "BATTERY TENDER" and "DELTRAN BATTERY TENDER" for a presumption of validity.  If an alleged mark is not "protectible in the first instance," the "confusion that plaintiff claims exists is irrelevant."  *Gift of Learning Found., Inc.*, 329 F.3d at 802 (finding "no need to engage in an analysis of likelihood of confusion" where plaintiff's alleged mark DRIVE PITCH & PUTT was found "merely descriptive" and not protectible); *Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 279 (5th Cir. 2000) (reversing lower court's judgment and dismissing all infringement claims because "[a] trademark cannot be infringed by the generic term for the product it designates" even where "consumers are confused by a competitor's use of a generic term").  Thus, because Deltona's mark is not protectible, no reasonable jury could find a likelihood of confusion.

**Second**, even if the alleged mark were not generic, none of the evidence Deltona introduced at trial proves that NOCO used "battery tender" and "tender" in a manner likely to cause consumer confusion.[3]  Indeed, neither of the types of "uses" of the marks at issue—as keywords or in NOCO-labelled advertising on

---

[3] Deltona presented no evidence at trial that NOCO used the DELTRAN BATTERY TENDER trademark.  Similarly, there was no trial evidence that Deltran owns any rights to the term "tender," standing alone.

Amazon.com—result in likely consumer confusion.[4]   And notably, Deltona submitted no consumer survey evidence, the prototypical way of proving consumer confusion in trademark cases, to demonstrate that either type of use actually did, or was likely to, confuse customers.

With respect to the first type of alleged use, keyword use, Deltona challenged NOCO's purchase of keyword search terms through the Amazon auction bidding process that included Deltona's alleged trademark "battery tender" and the term "tender."   Dkt. 341, at 54:10-55:7; Dkt. 348, at 170:12-172:23.[5]   Specifically, a consumer who typed "battery tender" into the search bar on Amazon.com may have seen NOCO-branded products, among many other brands of battery chargers offered on Amazon.   DX-520.

As for the NOCO Amazon advertisements at issue, they fall into two categories: (1) those that were displayed as the result of keyword purchases by NOCO that included the terms "tender" or "battery tender," but do not actually include those terms within the text of the advertisements (PX-237; DX-520)[6]; and (2) those that feature the visible display of the term "battery tender" used generically within a NOCO advertisement as a kind of battery charger.   Specifically,

---

[4] There was no trial evidence that NOCO used "Battery Tender"—or any of Deltona's other trademarks—on any product, any packaging, or any other website.   *See* Dkt. 341, at 73:16-74:4; Dkt. 343, at 43:25–44:14, 61:4-18; Dkt. 386, at 23:18-25:9.

[5] Keyword searching on the Amazon platform is used to generate relevant content for users, to help consumers find products.   Dkt. 341, at 194:16-19; Dkt. 343, at 41:4-11, 50:14-19, 63:14-64:9. Keywords are those words that are typed into a search bar on the Amazon platform to trigger results for various products.   Dkt. 341, at 177:4-7; Dkt. 343, at 49:20-50:2.

[6] The evidence at trial showed that there were 30 ads that fell into this category.   PX-237.

these advertisements consisted of 24 Sponsored Brand ads, 7 Battery Maintainer ads, and 14 product descriptions that featured the visible display of "battery tender" (in lower case) in fine print below a NOCO-branded battery charger product on the Amazon.com site (DX-308A–DX-308X; PX-51; PX-230; PX-54; PX-55A–PX-60A).

With respect to both keyword purchases and the first category of Amazon advertisements (*i.e.*, those that did not include the alleged marks in a visible manner), this Court has already acknowledged that "[i]t is not clear under Eleventh Circuit law that merely purchasing keywords—without some other evidence of consumer confusion—is sufficient to constitute trademark infringement" and that "at trial [Deltona] appeared to tacitly concede that all such uses would not constitute infringement because [Deltona] itself has engaged in this type of advertising." *Deltona Transformer Corporation, v. The NOCO Company*, No. 6:19-CV-308-CEM-LHP, 2023 WL 6376363, at *9 (M.D. Fla. Sept. 29, 2023) (collecting cases). Indeed, "[v]irtually no court has held that, on its own, a defendant's purchase of a plaintiff's mark as a keyword term is sufficient for liability." *Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's Found. Of Am., Inc.*, 307 F. Supp. 3d 260, 284 (S.D.N.Y. 2018); *see also Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936-40 (9th Cir. 2015) (finding Amazon.com was permitted to use trademarked search term to direct consumers to competing products where search results were "clearly labeled and accompanied by photographs"); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242

(10th Cir. 2013) (affirming district court ruling that "use of the Challenged Keywords, divorced from the text of the resulting ads, could not result in a likelihood of confusion"); *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 165 F. Supp. 3d 1256, 1266 (S.D. Fla. 2016) (finding defendant's purchase of various keywords on Amazon.com did not create confusion and plaintiff "point[ed] to no case indicating that the simple purchase of advertising keywords, without more, may constitute initial interest confusion").

Furthermore, the confusion from any advertising that results from keyword use is properly evaluated under a theory called "initial interest confusion." 5 McCarthy on Trademarks and Unfair Competition § 25A:7 (5th ed. 2021). But that "is not actionable confusion in the Eleventh Circuit." *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1283 (M.D. Fla. 2011), *aff'd*, 693 F.3d 1338 (11th Cir. 2012). Accordingly, under Eleventh Circuit jurisprudence, keyword searches alone cannot be trademark infringement. *See, e.g.*, *USA Nutraceuticals*, 165 F. Supp. 3d at 1266 (declining to adopt "yet-to-be-recognized legal theory" of initial interest confusion, but noting that, even if it were a viable cause of action, the purchase of keywords alone does not establish such confusion). Thus, no reasonable jury could find infringement based on NOCO's mere usage of the alleged "battery tender" mark as a keyword.

As for the second category of advertisements, which included the visible display of the term used in a generic manner (either within text in a NOCO advertisement or in the fine-print product descriptions), Deltona did not

14

demonstrate that consumers were likely to be confused by these advertisements. For example, the Sponsored Brand ads featured various NOCO products identified prominently by NOCO's logo, NOCO's registered trademarks, and NOCO product names, such that there is no question that NOCO was the source of the products. PX-144D–PX-144G.  And again, Deltona tendered no survey evidence whatsoever to demonstrate any consumer was confused by these ads.

Deltona's purported evidence could not lead a reasonable jury to conclude there was a likelihood of consumer confusion, particularly in view of the dearth of actual confusion evidence, which is one of the "most important" factors in assessing likelihood of confusion in the Eleventh Circuit.  *Fla. Int'l Univ. Bd. Of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255, 1264 (11th Cir. 2016).  On this score, Deltona's trial evidence was missing:  It proffered just one (or, generously, two) consumer messages that it contends could be read to suggest a lack of consumer clarity as to the source of NOCO's battery tender devices—neither of which are tied to any of the allegedly infringing uses on Amazon.  *See* PX-147; PX-138 (showing customer understanding "Battery Tender" is a "different brand" from NOCO).  In the absence of actual confusion evidence, the typical proxy for demonstrating a likelihood of confusion is a survey, which, tellingly, Deltona also did not have.[7]  *See, e.g.*, *Fla. Virtual Sch. v. K12, Inc.*, No. 6:20-CV-2354-GAP-EJK,

---

[7] Many courts would find that Deltona's failure to proffer a survey to show likely confusion warrants a presumption that any such survey would have been unfavorable.  *See, e.g.*, *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999) (noting plaintiff's failure to provide a survey "warrants a presumption that the results would have been unfavorable"), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *Essence Comm., Inc. v. Singh Ind., Inc.*, 703 F.

2023 WL 6294569, at *7 (M.D. Fla. Sept. 5, 2023) ("[W]ith its limited proof of actual confusion, the Court finds it odd that Plaintiff conducted no statistical survey to measure the likelihood of confusion, which is typical in cases like this."). Based on the evidence—or lack thereof—no reasonable jury could make a likelihood-of-confusion finding. *See Fla. Int'l Univ. Bd. Of Trustees*, 830 F.3d at 1264 (finding "two instances of alleged actual consumer confusion" were "insufficient evidence of actual confusion to weigh in favor of finding a likelihood of confusion"); *Tana v. Dantanna's*, 611 F.3d 767, 779 (11th Cir. 2010) (determining single affidavit averring confusion, even if believed, was "so minimal as to be practically insignificant" and "no reasonable jury would conclude" that the only other evidence, consisting of "an inquiry by only two customers of a possible connection between the [parties]," demonstrated "actual confusion").

Deltona's failure to come forward with confusion evidence at trial is especially significant because NOCO's alleged infringements took place over a several-year-long period, starting as early as December 2014 and ending as late as March 2020. *See* PX-61A; PX-61D; PX-61F; Dkt. 343, at 68:3-6, 130:5-132:4; Dkt. 354, at 218:7-219:18; Dkt. 356, at 29:16-30:6, 36:18-37:4; Dkt. 341, at 204:18-21; Dkt. 423, at 15.  Thus, there was "enough opportunity for confusion to make the absence of any evidence significant." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) (lack of evidence of actual confusion was

---

Supp. 261, 269 (S.D.N.Y. 1988) ("[F]ailure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown.").

"significant" given consumers' extensive exposure to the marks and ample opportunities for confusion).

The other "most important" likelihood of confusion factor—"strength of the allegedly infringed mark"—similarly demonstrates no likelihood of consumer confusion. Because "battery tender" is generic, no reasonable jury could find that the strength-of-the-mark factor favored Deltona. Deltona has even conceded its alleged mark is conceptually weak, as its trademark registration for "BATTERY TENDER" (PX-1A) includes a claim of acquired distinctiveness pursuant to Section 2(f) of the Lanham Act and a disclaimer of the word "BATTERY." *See*, e.g., *Outdoor Kids, Inc. v. Parris Mfg. Co.*, 385 F. App'x 992, 994 (Fed. Cir. 2010) (amendment of application to Section 2(f) and disclaimer of "KIDS" in OUTDOOR KIDS was an "admi[ssion] that the OUTDOOR KIDS mark is not an inherently distinctive mark and that the words are merely descriptive of its goods, with the word 'KIDS' being generic"). Accordingly, because Deltona has no valid mark, and NOCO did not use the alleged mark in a manner likely to cause confusion, no reasonable jury could find NOCO liable for trademark infringement. And as Deltona's Lanham Act, common-law trademark infringement and FDUTPA claim are all governed by the same test, they rise and fall together. *See, e.g.*, *Suntree Techs., Inc.*, 693 F.3d at 1345 (affirming district court's conclusion that "the legal analysis is the same" for "violations of the Lanham Act, FDUTPA, and Florida state common law for infringement and unfair competition"); *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008) ("[Plaintiff's]

17

claim for a violation of the Florida Deceptive and Unfair Trade Practices Act rises or falls on the success of its trademark infringement and false advertising claims"). Furthermore, because Deltona's trademark infringement claims fail, there can be no willful trademark infringement.

Finally, should the Court deny NOCO's Rule 50(b) Motion on Deltona's failure to prove essential elements of its trademark infringement claims, the Court should order a new trial on these claims under Rule 59(a) because monetary damages flowed from erroneous jury instructions to which NOCO objected. Dkt. 314, at 13-15; Dkt. 315, at 3-4; Dkt. 356, at 212:25-216:21, 219:23-220:7, 231:2-24. Specifically, the jury was instructed to consider whether NOCO's use of the terms "Tender(s)" and "tender(s)"—generic terms for which Deltona proffered no evidence of trademark rights or registrations, and which were never used by NOCO in a standalone context—was likely to cause confusion with Deltona's trademarks. *See id.* No reasonable jury could find NOCO's use of these terms in a generic manner as the name of a device that tends batteries is likely to cause confusion, yet damages may have been awarded on that basis.[8]

### D.    No Actual Damages Proven

As stipulated to by Deltona and determined by the Court, its monetary damages are limited to its efforts in rebuilding its reputation goodwill. *See* July 6, 2020 Hearing Tr. 92:7–8 & 96:20–24 ("[Deltona is] not pursuing a lost profits

---

[8] Because of the wording of the jury instructions, it is unclear which use the jury found to cause a likelihood of confusion with Deltona's trademarks.

damages–actual damages theory here."); Order on Def.'s Mot. Summary Judgment [ECF No. 269] at p. 38 ("[T]o the extent Defendant argues that Plaintiff cannot recoup the money [Deltona] spent on advertising, it is correct."). "A loss of goodwill claim compensates for harm to the value of the business as an ongoing concern and involves complex financial calculations, both before and after the infringement suit." *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1222 (11th Cir. 2010).

However, to recover these alleged damages, Deltona needed to *prove* that it suffered actual damages. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (affirming grant of JMOL to defendant). It didn't. Nowhere in the record did Deltona provide a computation of alleged goodwill damages, which the law required it to do. *Id.* (finding that the district court did not abuse its discretion by rebuffing plaintiff's effort to introduce goodwill damages after initial disclosures, "especially in light of [plaintiff's] failure to ever present the *required* computation of alleged good will damages and the complexity of the financial calculations that would have *required* expert testimony") (emphasis added)).[9]

---

[9] In denying NOCO's Rule 50(a) JMOL Motion, the Court determined that Deltona was not required to show the extent of its alleged damages with any sort of specificity. Dkt. 410 at 7. But approximation is allowable only where a plaintiff shows that its damages are of a nature that do not allow the amount to be ascertained with greater certainty. *See, e.g.*, *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1520 (11th Cir. 1990) (citation and internal quotations omitted) ("[W]here plaintiff's injury is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). Here, nothing in the record even suggests that Deltona was damaged at all, let alone that its goodwill damages were not capable of ascertainment.

Indeed, Deltona did not present any evidence indicating that it—and not nonparties Deltran Operations USA, Inc. or Deltran USA, LLC (collectively, "Deltran")—incurred (or would incur) any monetary loss in rebuilding its brand as a result of the challenged conduct. *See, e.g.*, Dkt. 343, at 170:21–171:5, 173:4–174:10, 178:19–21. And even if Deltona could rely on the monetary losses allegedly suffered by Deltran to support its claim of lost goodwill, Deltona failed to provide any computation or approximation of expenses directly attributable to NOCO's alleged infringement. *See* Dkt. 348, at 47:21–48:24, 49:2–50:9.

Similarly, Deltona had to prove actual damages to recover under FDUTPA. *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017). However, unlike the damages afforded under the Lanham Act, "FDUTPA 'actual damages' do not include consequential damages." *Diversified Mgmt. Sols., Inc. v. Control Sys. Rsch., Inc.*, No. 15-81062, 2016 WL 4256916, at *5 (S.D. Fla. May 16, 2016). Thus, Deltona cannot recover for harm to goodwill and reputation or other "stigma damages" under FDUTPA. *See Casa Dimitri*, 270 F. Supp. 3d at 1352 (dismissing FDUTPA claim where plaintiff's "harmed goodwill" damage theory was consequential and "expressly not recoverable under the FDUTPA"); *Krupa v. Platinum Plus, LLC*, No. 16-3189, 2017 WL 1050222, at *7 (M.D. Fla. Mar. 20, 2017) (same); *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212, 2016 WL 739652, at *6 (S.D. Fla. Feb. 25, 2016) (dismissing FDUTPA claim where plaintiff's allegations of "competitive harm, diverted or lost sales, and harm to the goodwill and reputation" of plaintiff were improper consequential damages).

### E.    The Jury Was Improperly Instructed on a False-Advertising Claim that Deltona Never Asserted

Deltona never asserted a false-advertising claim, yet the jury was instructed on—and found NOCO liable for—false advertising, and included its liability finding as part of the damages award.  Dkt. 314, Instruction Nos. 14-15, at 24-25; Dkt. 315, at 4, ¶¶ 7-8.  NOCO is thus entitled to JMOL on Deltona's false-advertising claim, and at least a new trial on the other claims.

Deltona's Complaint pleaded "unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)" as Count II.  Compl., Dkt. 1, at 14-15, ¶ 69.  Nowhere did Deltona plead liability for false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Nor did the Final Pretrial Statement include false advertising—it described Deltona's Count II as a "false designation of origin and unfair competition" claim for "violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)."  *See* Dkt. 242, at 2, ¶ 2; Dkt. 356, at 222:1-7.

Yet, despite the fact that discovery and trial proceeded on that claim as pleaded, the Court held that because Deltona "cited the relevant section that encompasses false advertising" (*i.e.*, 15 U.S.C. § 1125(a)) and pleaded that NOCO's unauthorized use of the infringing marks in commerce constituted a "misleading description and representation of fact," NOCO was "on sufficient notice of [Deltona's] false advertising claim" and allowed Jury Instruction Nos. 14-15 concerning false advertising.  Dkt. 356, at 9:1-11; Dkt. 314, at 24-25; Dkt. 358, at 3:10-5:7.  NOCO objected to including false advertising in the Jury Instructions

and Verdict, and to the fact that the "evidence presented in this case cannot support a claim for false advertising," on which ground NOCO moved *ore tenus* for JMOL, pursuant to "Rule 50(a)." Dkt. 356, at 221-224, 231:25-232:10; Dkt. 358, at 5:8-17; 6:5-21, 110:2-112:9. While the Court stated that NOCO's Rule 50(a) Motion on false advertising was "more than adequately preserved . . . for any future scrutiny" (Dkt. 356, at 224:7-15; Dkt. 358, at 112:3-9), the Court's Order denying NOCO's Rule 50(a) motions (Dkt. 410) did not address NOCO's false-advertising motion.

Unfair competition and false advertising are "distinct bases" for liability under Section 43(a) of the Lanham Act. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014); *see also Synergy Real Est. of SW Fla., Inc. v. Premier Prop. Mgmt. of SW Fla., LLC*, 578 F. App'x 959, 961 (11th Cir. 2014) ("The Lanham Act, 15 U.S.C. § 1125(a), sets forth two distinct claims of unfair trade practices: unfair competition under subsection 1125(a)(1)(A) and false advertising under subsection 1125(a)(1)(B)."). They are so distinct, in fact, that the Eleventh Circuit requires them to be pleaded clearly and distinctly. Thus, where a complaint "does not specify which type of Lanham Act claim Plaintiff purports to bring," the "Lanham Act claims" may be "doom[ed]." *See Black Diamond Land Mgmt. LLC v. Twin Pines Coal Inc.*, 707 F. App'x 576, 579 (11th Cir. 2017) (affirming dismissal); *Synergy Real Est. of SW Fla., Inc.*, 578 F. App'x at 961-62 (affirming dismissal of complaint for "unfair trade practices in violation of the Lanham Act" under "15 U.S.C. § 1125(a)" where complaint was "not clear" regarding the "type of unfair trade practices claim they were seeking to bring").

To start, NOCO was never put on notice of any false-advertising claim.  The only theory for liability under Section 43(a) of the Lanham Act that Deltona ever articulated was "unfair competition and false designation of origin."  Dkt. 1, at 14-15, ¶ 69; Dkt. 242, at 2, ¶ 2; Dkt. 356, at 222:1-7.  To succeed on a false-advertising claim, Deltona needed to plead (and eventually prove at trial) that (1) NOCO's "ads . . . were false or misleading"; (2) "the ads deceived, or had the capacity to deceive, consumers"; (3) "the deception had a material effect on purchasing decisions"; (4) "the misrepresented product or service affects interstate commerce"; and (5) Deltona "has been—or is likely to be—injured as a result of the false advertising." *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002); *see also* Dkt. 314, at 24.

Moreover, Deltona did not establish that it had standing to pursue a false-advertising claim.  It did not plead or prove any injury resulting from false advertising, nor did Deltona show a causal link between any injury and a NOCO advertisement, each of which are necessary elements of standing to assert a false-advertising claim, as well as to succeed on a such a claim.  Dkt. 1, at 14-15; Dkt. 242, at 2, ¶ 2.  *See, e.g.*, *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1264, 1266 (11th Cir. 2023) (holding no reasonable jury could find plaintiff suffered an injury where it presented only "speculation about what consumers may or may not have done absent [defendant's] advertising that those consumers may or may not have seen"); *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1331-1333

(11th Cir. 2008) (finding false-advertising claim failed where plaintiff "lack[ed] a direct injury").

On the merits, Deltona neither pleaded nor proved how the use of the alleged Deltona marks *in NOCO's advertising* was a "false or misleading" description or representation of fact that *misrepresents the nature, qualities, or geographic origin* of NOCO's goods or those of another person, as required by Section 43(a)(1)(B) of the Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(B); *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247; *see also* Dkt. 1, at 14-15; Dkt. 242, at 2, ¶ 2. Instead, it only pleaded that the purported "misleading description and representation of fact" was "*likely to cause confusion, mistake, or deception as to the affiliation, connection, or association*," which is part of a Section 43(a)(1)(A) claim. *See* Dkt. 1, at 14-15, ¶¶ 67-68; 15 U.S.C. § 1125(a)(1)(A).

Finally, Deltona neither pleaded nor proved that the ads deceived consumers or that such "deception had a material effect on purchasing decisions." *See Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247, 1252 (finding no false advertising where plaintiff did not show that defendant's use of the term "eye doctor" instead of "eye care practitioner" had "any effect on consumer behavior"); *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 797, 799 (11th Cir. 2020) (dismissing false-advertising claim and noting "even demonstrably false statements that are irrelevant to consumer purchasing decisions are immaterial and cannot be the basis for a false advertising claim"); Dkt. 1, at 14-15; Dkt. 242, at 2, ¶ 2.

Accordingly, because no reasonable jury could find NOCO liable for false advertising (nor award damages on that basis), the Court should order JMOL on this claim.  Moreover, because the jury did not parse out its damages award to indicate which damages were awarded based on NOCO's alleged false advertising, to the extent that the Court denies or only partially grants NOCO's Rule 50(b) Motion, the Court should order a new trial on all claims under Rule 59(a).  Dkt. 315, at 4, ¶¶ 7-8.

## IV.   <u>CONCLUSION</u>

The Court should grant JMOL.  Alternatively, it should order a new trial.

Dated: October 30, 2023                    Respectfully submitted,

By: *<u>/s/ Michelle Hogan</u>*
        Michelle Hogan
        Florida Bar No. 1010992
        JONES DAY
        600 Brickell Avenue, Suite 3300
        Miami, FL 33131
        mhogan@jonesday.com
        Telephone: (305) 714-9700
        Facsimile: (305) 714-9799

        Meredith M. Wilkes (Admitted *Pro Hac Vice*)
        JONES DAY
        901 Lakeside Ave. E
        Cleveland, OH 44114
        mwilkes@jonesday.com
        Telephone: (216) 586-3939
        Facsimile: (216) 579-0212

        Kristina K. Cercone (Admitted *Pro Hac Vice*)

JONES DAY
77 W. Wacker, Suite 3500
Chicago, IL 60601
kcercone@jonesday.com
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Gregory A. Castanias (Admitted *Pro Hac Vice*)
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
gcastanias@jonesday.com
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

*Attorneys for Defendant*
*The NOCO Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 30, 2023 the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, and that it is being served this date on all counsel of record via transmission of Notices of Electronic Filing generated by the CM/ECF system.

<u>/s/ Michelle Hogan</u>
Michelle Hogan

*Attorney for Defendant*

27

# Dkt.458

**Order Denying Renewed Motion for Judgment as a Matter of Law**
**9/30/2024**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DELTONA TRANSFORMER
CORPORATION,**

**Plaintiff,**

**v.**                                        **Case No.  6:19-cv-308-CEM-LHP**

**THE NOCO COMPANY,**

**Defendant.**

_____/

**ORDER**

THIS CAUSE is before the Court on Defendant's Renewed Motion for

Judgment as a Matter of Law, or in the Alternative, Motion for New Trial

("Defendant's Motion," Doc. 440), to which Plaintiff filed a Response (Doc. 436).[1]

This cause is also before the Court on Plaintiff's Motion to Award Prejudgment and

Postjudgment Interest and Enhanced Damages ("Plaintiff's Motion," Doc. 431), to

which Defendant filed a Response (Doc. 439). For the reasons set forth below,

Defendant's Motion will be denied and Plaintiff's Motion will be granted in part and

denied in part.

---

[1] The original version of Defendant's Motion is filed at docket entry 432. The renewed
version merely removed redactions, but is substantively the same.

# I.   BACKGROUND

Plaintiff is the owner of various trademarks, including the marks BATTERY TENDER and DELTRAN BATTERY TENDER ("Plaintiff's Marks"). (*See generally* Pl.'s Trial Exs. 1A, 1B, 1E, Doc. Nos. 318-1, 318-2, 318-3). This case arises from Defendant's infringement of Plaintiff's Marks. At trial, Plaintiff presented evidence that throughout the relevant time period, Defendant intentionally infringed Plaintiff's Marks by engaging in a campaign to confuse customers. At the conclusion of trial, the jury found in favor of Plaintiff on its Lanham Act claims, its common law trademark claim, and on its Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim. (*See generally* Verdict, Doc. 315). The jury awarded Plaintiff $1,300,000 in actual damages, (*id.* at 4), and $5,750,000 in punitive damages, (Punitive Damages Verdict, Doc. 317, at 1). Defendant then filed four Motions for Judgment as a Matter of Law (Doc. Nos. 300–303), which the Court denied, (First JMOL Order, Doc. 410, at 7–8). The Court then determined that Plaintiff was entitled to disgorgement of Defendant's profits in the amount of $12,135,943.70. (Disgorgement Order, Doc. 423, at 26). Judgement was entered against Defendant in the amount of $19,185,943.70. (Judgment, Doc. 424, at 1).

Defendant has now renewed its arguments for judgment as a matter of law, or alternatively, it asserts that it is entitled to a new trial. Plaintiff, on the other hand,

asks the Court to award pre- and postjudgment interest along with enhanced damages. Each motion will be addressed in turn.

## II.   DEFENDANT'S MOTION

### A.   Judgment as a Matter of Law

Defendant first argues that it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

#### 1.   *Legal Standard*

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under 50(a)]." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quotation omitted). "Thus, as with motions under Rule 50(a), the question before a district court confronting a renewed Rule 50(b) motion is whether the evidence is 'legally sufficient . . . to find for the party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)). "[J]udgment as a matter of law after the verdict may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 739 (11th Cir. 1995) (quotation omitted). In ruling on such a motion, the Court "must draw all reasonable inferences in favor of the nonmoving party." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004). "'Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.* at 1193 (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

### 2. *Analysis*

#### a. Florida Deceptive and Unfair Trade Practices Act: Consumer Harm

Defendant's argument that it is entitled to judgment as a matter of law on Plaintiff's FDUTPA claim because Plaintiff failed to present evidence of consumer harm was fully addressed in the Court's First JMOL Order (Doc. 410 at 4–6), which is incorporated herein by reference. Defendant is not entitled to judgment as a matter of law on this issue.

#### b. Generic

Similarly, the Court already addressed Defendant's argument that it is entitled to judgment as a matter of law on Plaintiff's claims because Plaintiff's trademarks are generic in its First JMOL Order (Doc. 410 at 3–4), and that analysis is incorporated herein by reference. In addition, Defendant argues that no reasonable jury could find that the trademarks were non-generic in the face of the

uncontroverted survey evidence that Defendant presented through its expert Philip Johnson. However, on cross-examination Plaintiff's counsel aptly challenged the credibility and reliability of Johnson's survey such that a reasonable jury was free to disregard it. (Trial Tr. Vol. 4, Doc. 348, at 225–35); *see also Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) (approving a jury instruction that advised the jury, inter alia: "[I]f you should conclude that the reasons given in support of the opinion of the expert are not sound, or that the opinion is not supported by the evidence, then you may disregard the opinion of any expert totally."); Eleventh Circuit Pattern Jury Instruction 3.6.1 ("As with any other witness's testimony, you must decide for yourself whether to rely upon the [expert's] opinion."). The jury's finding that Plaintiff's trademarks were not generic is amply supported by the evidence presented at trial. Defendant is not entitled to judgment as a matter of law on this issue.

c.    Trademark Claims: Elements

Next, Defendant asserts that Plaintiff failed to prove the elements of trademark infringement. To succeed on its claim for trademark infringement, Plaintiff was required to prove the following elements: "(1) [Plaintiff possesses] a valid mark; (2) [Defendant] used the mark in commerce in connection with the sale or advertising of goods; and (3) [Defendant] used the mark in a manner likely to confuse consumers." *Hoop Culture, Inc. v. Gap Inc.*, 648 F. App'x 981, 983 (11th Cir. 2016) (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218

(11th Cir. 2008)). Defendant asserts that it is entitled to judgment as a matter of law because Plaintiff did not prove elements one and three.

As to element one—a valid mark—Defendant repeats its arguments that Plaintiff's mark is generic. That argument is rejected for the same reasons stated above. As to element three, Defendant argues that there was insufficient evidence for a reasonable jury to find likelihood of confusion. Not only was there sufficient evidence to find likelihood of confusion, Plaintiff presented evidence of actual consumer confusion. (*See, e.g.*, Pl. Ex. 147, Doc. 318-115, at 1–2 (email from a customer to Plaintiff asking for pricing on Defendant's product and calling it a "battery tender"); Pl. Ex. 162A, Doc. 318-116, at 1 (email from a customer to Defendant asking about Plaintiff's product)). Plaintiff also presented evidence that Defendant used Plaintiff's trademark "battery tender" when referring to its products. (*See, e.g.*, Pl. Ex. 132, Doc. 318-90, at 4). This is just a sampling of the evidence presented at trial. There was more than sufficient evidence to support the jury's finding of a likelihood of confusion. Defendant is not entitled to judgment as a matter of law on this issue.

### 3. *Actual Damages*

Finally, Defendant argues that it is entitled to judgment as a matter of law because Plaintiff failed to establish any actual damages. These arguments have also

been addressed by the Court, (Doc. 410 at 6–8), and are rejected for the same reasons set forth therein.

### 4.   *False Advertising*

Defendant makes several arguments regarding Plaintiff's false advertising claim. First, Defendant asserts that the claim should not have been submitted to the jury because it was not properly pleaded. The Court thoroughly addressed this issue in an Order it read into the record during trial, (Doc. 356 at 4–9), which it incorporates herein by reference.

Second, Defendant argues that Plaintiff does not have standing[2] to bring a false advertising claim. Without elaboration, Defendant summarily states that Plaintiff has failed to prove that the false advertising caused Plaintiff any injury, citing two cases—*Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325 (11th Cir. 2008), and *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255 (11th Cir. 2023). But those cases are readily distinguishable. In *TocMail*, the plaintiff was

---

[2] It is unclear whether Defendant is referring to Article III standing or the outdated concept of "prudential standing"—i.e., meeting the requirements under the statute to bring a cause of action thereunder. *See D.H. Pace Co. v. OGD Equip. Co.*, 78 F.4th 1286, 1292 n.5 (11th Cir. 2023) (explaining that prudential standing is "a doctrine that the Supreme Court has deemed a 'misnomer' because it is 'not derived from Article III'" and that the more appropriate inquiry is simply whether the plaintiff "has a cause of action under the statute" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 128 (2014)). As noted in the text, Defendant's argument is summary without elaboration, and one of the cases cited refers to both prudential and constitutional standing, *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1260–61, 1263 (11th Cir. 2023), while the other only discusses prudential standing, *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330–32 (11th Cir. 2008). Regardless, because Plaintiff has proven that Defendant's false advertising caused it damages, both are satisfied.

a relatively new company that had no reputation to speak of and had not made a single sale of its product; thus, its claim for damages due to lost potential sales was wholly speculative and insufficient to support a claim for false advertising. 67 F.4th at 1263. Similarly, the plaintiff in *Natural Answers* claimed that there was false advertising that impacted its product, but at the time of the alleged false advertising, the plaintiff "was not selling or promoting [the product]" and therefore could not "claim to have suffered lost sales, lost market share, or increased promotional costs." 529 F.3d at 1332.

Such is not the case here. Plaintiff produced ample evidence that it was actively selling its Battery Tender products and that due to Defendant's actions, it suffered reputational damages and incurred increased promotional costs. Plaintiff certainly has standing to bring its false advertising claim and sufficiently proved causation and damages.

Defendant also asserts that Plaintiff failed to prove several elements of the false advertisement claim. The elements of a false advertising claim under the Lanham Act are as follows: "(1) a false or misleading advertisement (2) that deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been, or is likely to be, injured by the false advertising." *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 796 (11th Cir.

2020). Defendant asserts that Plaintiff failed to prove the first three elements. However, Defendant does not address any of the actual evidence presented at trial— it only references Plaintiff's pleadings. At this point, to show entitlement to judgment as a matter of law, Defendant must address the actual evidence. Defendant has not met its burden here.

## B.    New Trial

Defendant argues in the alternative that it is entitled to a new trial. After a jury trial, a district court may grant a request for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "When ruling on a motion for a new trial, a trial judge must determine if in his opinion, the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice." *Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 923 (11th Cir. 1991) (citations and quotations omitted). Additionally, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.*

Defendant renews objections made to several jury instructions, (Doc. 440 at 18), and the Court's rulings on those objections are incorporated herein by reference, (Doc. 356 at 212–16; 220; 231). These objections do not provide a basis for a new trial. Defendant also argues that it is entitled to a new trial on its false advertising claim, but Defendant makes no specific arguments as to why it would be entitled to

such relief. Instead, Defendant simply refers to its arguments made in requesting judgment as a matter of law. And, as explained above, those are summary arguments that do not provide a basis for relief. To be clear, the weight of the evidence supports the jury's verdict in this case. Vacating that verdict would be a miscarriage of justice; not the other way around. Defendant is not entitled to a new trial.

### III.   PLAINTIFF'S MOTION

Plaintiff moves for an award of enhanced damages and pre- and postjudgment interest. Defendant does not dispute that Plaintiff, as the prevailing party, is entitled to postjudgment interest. *See* 28 U.S.C. § 1961. Thus, the Court will only address the requests for enhanced damages and prejudgment interest.

### A.   Prejudgment Interest

Plaintiff asserts that it is entitled to prejudgment interest under the Lanham Act, 15 U.S.C. § 1117(a). That provision sets forth various remedies for the trademark violations at issue here, including "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Id.* It also permits the Court to enhance damages "according to the circumstances of the case" as well as award attorney fees "in exceptional cases." *Id.* Section 1117(a), however, does not mention an award of prejudgment interest. In contrast, § 1117(b) addresses damages for use of a counterfeit mark—which is not at issue here—and that provision explicitly states that "the court may award prejudgment interest." This

juxtaposition has led to a circuit split regarding whether prejudgment interest is permitted under § 1117(a).

The Third Circuit succinctly explained the view that prejudgment interest is not permitted under § 1117(a): "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' Applying this principle, because § 1117(b) allows courts to award prejudgment interest and § 1117(a) does not provide for prejudgment interest, prejudgment interest is unavailable under § 1117(a).'" *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 225 (3d Cir. 2021) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Using the same rationale, the Fourth Circuit similarly determined that prejudgment interest was not provided for under § 1117(a). *Ga.-Pac. Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 722 (4th Cir. 2015). However, it did "not categorically foreclose an award of prejudgment interest under § 1117(a) as an element of a damages award in a trademark infringement case" because "one's loss of the use of a particular sum of money over a period of time causes damage, for which the law generally allows an award of prejudgment interest." *Id.* It also appears that the Ninth Circuit would agree with the Fourth and Third Circuits. *See Moscow Distillery Cristall v. Pepsico, Inc.*, 141 F.3d 1177 (9th Cir. 1998) ("Prejudgment interest is available under the Lanham Act only for counterfeiting."); *Y.Y.G.M. SA*

*v. Redbubble, Inc.*, 75 F.4th 995, 1007–08 (9th Cir. 2023) (applying a similar analysis to determine prejudgment interest is unavailable under § 1117(c)).

The Seventh and Tenth Circuits take an opposing view. While acknowledging that "the statute makes no reference to prejudgment interest," the Seventh Circuit relied on "federal common law[, which] authorizes the award of such interest in appropriate cases to victims of violations of federal law." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). Indeed, the Seventh Circuit went so far as "to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations." *Id.* The Tenth Circuit came to the same conclusion. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000) ("[I]n the federal context, this Court has adopted a preference, if not a presumption, for prejudgment interest.").

Finally, the Second Circuit falls somewhere in between, stating: "Although Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990). The Second Circuit did not explain its rationale of an "exceptional cases" requirement. *Id.* But it appears to stem from *Duplate Corp. v. Triplex Safety Glass Co.*, 298 U.S. 448, 459 (1936). *Two Wheel Corp.*, 918 F.2d at 1064 (citing *Champion Spark Plug Co. v. Sanders*, 108 F. Supp. 674 (E.D.N.Y. 1952), which in turn cites

*John B. Stetson Co. v. Stephen L. Stetson Co.*, 58 F. Supp. 586, 596 (S.D.N.Y. 1944), which in turn cites *Duplate*). *Duplate* was a 1936 Supreme Court case addressing patent infringement. 298 U.S. at 449–50. There, the Supreme Court indicated that, typically, interest should only run from the date of the damages award, not from the date of infringement; then the Court noted in that case "[t]here [we]re no exceptional circumstances justifying a departure from what is at least the general rule." *Id.* at 459.

"The Eleventh Circuit has not squarely addressed the availability of prejudgment interest in a non-counterfeiting case." *Glock, Inc. v. Wuster*, No. 1:14-cv-00568-AT, 2020 U.S. Dist. LEXIS 258321, at *26 (N.D. Ga. Sep. 15, 2020). The only opinion available from the Eleventh Circuit on the matter is *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1568 (11th Cir. 1986).[3] There, the plaintiff was awarded trademark infringement damages based on actual damages incurred, including advertising costs to restore the plaintiff's reputation. *Id.* at 1564. After affirming the damages award, the *Ramada* Court summarily concluded: "the district court did not abuse its discretion in . . . awarding prelitigation interest." *Id.* at 1568. It did not elaborate on its decision or specifically address the availability of prejudgment interest under § 1117(a). Based on *Ramada*, however, this Court must

---

[3] Plaintiff also cites *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161 (11th Cir. 1994), but that case involved § 1117(b) and contained no analysis as to whether prejudgment interest was available under § 1117(a). *Id.* at 1183.

conclude that the Eleventh Circuit, at a minimum, would not follow the Third Circuit's determination that prejudgment interest is per se not available thereunder. However, the approach in *Ramada* is consistent with all of the other Circuit's approaches.[4]

Obviously, *Ramada* would be consistent with the lenient standards adopted by the Seventh and Tenth Circuits. It is also consistent with the Fourth Circuit approach because the underlying award in *Ramada* was for damages incurred by the Plaintiff, not for disgorgement of profits by the defendant. Additionally, in *Ramada* there was an award of attorney's fees, *id.* at 1563, 1568, which requires a finding that it was an "exceptional case[ ]," 15 U.S.C. § 1117(a). As such, an award of prejudgment interest would not violate the Second Circuit's approach. *Am. Honda Motor Co.*, 918 F.2d at 1064.

Nevertheless, this Court does not find the Second Circuit's approach consistent with the Eleventh Circuit's general precedent regarding prejudgment interest. Generally, in the Eleventh Circuit "awards of prejudgment interest are equitable remedies, to be awarded or not awarded in the district court's sound discretion." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d

---

[4] The district court in *Glock* relied on *Ramada* to determine that the Eleventh Circuit would not follow the Fourth Circuit's approach, 2020 U.S. Dist. LEXIS 258321 at *27, but it misconstrued that approach. As noted above, the Fourth Circuit did not foreclose the possibility of a prejudgment interest as part of a damages award. *von Drehle Corp.*, 781 F.3d at 722.

1434, 1446 (11th Cir. 1998) *overruled on other grounds by Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 890 (11th Cir. 2023). Moreover, given that the Second Circuit's approach seems to stem from a questionable application of a 1936 patent case, the Court does not find it particularly persuasive.

Therefore, the Court is left with the Seventh and Tenth Circuits' approach—a preference, if not a presumption, for awarding prejudgment interest—and the Fourth Circuit's approach—permitting prejudgment interest to be awarded on actual damages but not disgorgement of profits. However, it is not necessary to determine which approach is correct at this juncture. In the Eleventh Circuit, "prejudgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his." *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 710 (11th Cir. 2005) (quoting *Indus. Risk Insurers*, 141 F.3d at 1446–47). And both the award of prejudgment interest and the relevant remedies under the Lanham Act for trademark infringement are subject to the principles of equity. *Indus. Risk Insurers*, 141 F.3d at 1446. ("[A]wards of prejudgment interest are equitable remedies"); 15 U.S.C. § 1117(a) (noting that all of the enumerated remedies were "subject to the principles of equity").

Because Plaintiff did not seek to recoup its own lost profits in this case but instead damages arising from its efforts to remediate its reputation and recoup its customer goodwill, it appears that prejudgment interest on the award of actual

damages determined by the jury is all that is necessary to make Plaintiff whole for the loss of use of its funds during the relevant timeframe. To award prejudgment interest on the disgorgement of Defendant's profits would put Plaintiff in a better position than they would have been had the infringement not occurred, making the award a punishment to Defendant rather than compensation to Plaintiff, which is prohibited. *In re Int'l Admin. Servs., Inc.*, 408 F.3d at 710; *see Gov't Emples. Ins. Co. v. KJ Chiropractic Ctr. LLC*, No. 6:12-cv-1138-Orl-40DCI, 2017 U.S. Dist. LEXIS 214397, at *33 (M.D. Fla. Nov. 2, 2017) (explaining that the court had previously denied the plaintiffs' request for prejudgment interest under the federal RICO statute because the plaintiffs had already been fully compensated by the trebling of damages and prejudgment interest "would place [the p]laintiffs in a better economic position than they would have otherwise occupied").

Now the Court is left with the issues of when the prejudgment interest should begin and what rate to use. For the award of actual damages, Plaintiff requests that the Court award prejudgment interest starting on November 25, 2019, because all harm would have accrued by that date. (Doc. 431 at 8 & n.5).[5] Defendant does not object to the use of this date, and it appears reasonable. As to the interest rate, Plaintiff argues that the rate referenced in § 1117(b) for prejudgment interest in

---

[5] Plaintiff requested different dates for the disgorgement award, but because the Court declines to award prejudgment interest on that sum, it need not address those arguments.

counterfeiting cases should be used, while Defendant argues that it should be the fifty-two week United States Treasury bond rate, which is the rate used for postjudgment interest. 28 U.S.C. § 1961(a).

"In the absence of a controlling statute, the choice of a rate at which to set the amount of prejudgment interest is . . . within the discretion of a federal court." *In re Int'l Admin. Servs., Inc.*, 408 F.3d at 710. "That decision is 'usually guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest.'" *Id.* (quoting *Indus. Risk Insurers*, 141 F.3d at 1447. However, "[b]ecause district courts have discretion in determining pre-judgment interest rates, . . . district courts are not required to use [the post-judgment interest rates] in computing such interest." *Smith v. Am. Int'l Life Assur. Co. of N.Y.*, 50 F.3d 956, 958 (11th Cir. 1995).

Moreover, other courts have advocated for using the bank prime loan rate in these types of circumstances. *See Gorenstein Enters.*, 874 F.2d at 436 (stating in a trademark infringement case that "[f]or the future, we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate. That is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default"). And there is Eleventh

Circuit precedent to adopt such a viewpoint. *Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.*, 338 F.3d 1276, 1280 (11th Cir. 2003) (applying the prime rate and relying on *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999) (unless the rate is statutorily defined, the district court is bound to award prime interest rate, anything other will be an abuse of discretion) and *The Ohio River Co. v. Peavey Co.*, 731 F.2d 547, 549 (8th Cir. 1984) (the interest should be the average prime rate during the relevant period of injury)); *Pierce Mfg. v. E-One, Inc.*, No. 8:18-cv-617-TPB-TGW, 2022 U.S. Dist. LEXIS 28112, at *5 (M.D. Fla. Feb. 16, 2022) (explaining in a patent infringement case that "[t]he commercial prime rate 'appears to be the most common indicia used in calculating prejudgment interest.'" (quoting *Golden Voice Tech. & Training, L.L.C. v. Rockwell Elec. Com. Corp.*, No. 6:01-cv-01036, 2004 U.S. Dist. LEXIS 22064, at *20 (M.D. Fla. Jan. 30, 2004)).

Thus, because the rate cited by Plaintiff has no logical tie to the current claims at issue and because the rate cited by Defendant is insufficient to adequately compensate Plaintiff, the Court finds that the bank prime loan rate is instead appropriate. Additionally, Plaintiff requests that the interest be compounded annually based on a variable interest rate, which Defendant does not address. The

Court finds this request reasonable. The pre-judgment interest rate calculations are as follows:[6]

| Year | Principle | Rate | Interest | Daily Rate | Days | Total |
|------|-----------|------|----------|------------|------|-------|
| 2019 | 1,300,000.00 | 4.75% | 61,750.00 | 169.18 | 36 | 6,090.48 |
| 2020 | 1,306,090.48 | 4.75% | 62,039.30 | 169.97 | 365 | 62,039.05 |
| 2021 | 1,368,129.53 | 3.25% | 44,464.21 | 121.82 | 365 | 44,464.30 |
| 2022 | 1,412,593.83 | 3.25% | 45,909.30 | 125.78 | 365 | 45,909.70 |
| 2023 | 1,458,503.53 | 7.50% | 109,387.76 | 299.69 | 365 | 109,386.85 |
| 2024 | 1,567,890.38 | 8.50% | 133,270.68 | 365.13 | 274 | 100,045.62 |
| Total | | | | | | 367,936.00 |

### B.    Enhanced Damages

Finally, Plaintiff argues that it is entitled to enhanced damages. Section 1117(a) states in relevant part: "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." "Such an award is discretionary, but it may not be punitive, and must be based on a showing of actual harm." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1183 (11th Cir. 1994). Plaintiff rightfully points to the underhanded and inequitable behavior of Defendant. However, the economic impact of that behavior has already been addressed by the disgorgement award. There can be no real argument at this point that Plaintiff has not been fully compensated. As such, any enhancement of damages would be for

---

[6] The prime rate data for the calculations herein were obtained from the Data Download Program and Federal Reserve Economic Data Partnership with the Federal Reserve Bank of St. Louis. https://fred.stlouisfed.org/series/DPRIME; *see also* Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/data/data-download-fred-information.htm.

punishment and not compensation, which is prohibited. Thus, this request will be denied.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial (Doc. 440) is **DENIED**.

2.  Plaintiff's Motion to Award Prejudgment and Postjudgment Interest and Enhanced Damages (Doc. 431) is **GRANTED in part** and **DENIED in part**.

    a.  Plaintiff is awarded $367,936.00 in prejudgment interest

    b.  Plaintiff is awarded postjudgment interest at the statutory rate.

    c.  The Clerk is directed to enter an amended final judgment in accordance with the Court's ruling.

    d.  The Motion is otherwise **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on September 30, 2024.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

# CourtAlert® Case Management

**From:** cmecf_flmd_notification@flmd.uscourts.gov
**Sent:** 9/30/2024 2:58:04 PM
**To:** cmecf_flmd_notices@flmd.uscourts.gov
**Subject:** Activity in Case 6:19-cv-00308-CEM-LHP Deltona Transformer Corporation v. The Noco Company Order on Motion to Alter Judgment

---

**This Message Is From an External Sender**

If you are concerned about the message's content, highlight the email in your inbox and click "Report Suspicious" in the Outlook ribbon -or- contact 6Help.

Report Suspicious

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Middle District of Florida

## Notice of Electronic Filing

The following transaction was entered on 9/30/2024 at 2:56 PM EDT and filed on 9/30/2024
**Case Name:** Deltona Transformer Corporation v. The Noco Company
**Case Number:** 6:19-cv-00308-CEM-LHP
**Filer:**
**WARNING: CASE CLOSED on 09/30/2023**
**Document Number:** 458

**Docket Text:**
**It is ORDERED and ADJUDGED that Defendant's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial (Doc. [440]) is DENIED. Plaintiff's Motion to Award Prejudgment and Postjudgment Interest and Enhanced Damages (Doc. [431]) is GRANTED in part and DENIED in part. Plaintiff is awarded $367,936.00 in prejudgment interest. Plaintiff is awarded postjudgment interest at the statutory rate. The Clerk is directed to enter an amended final judgment in accordance with the Court's ruling. The Motion is otherwise DENIED. Signed by Judge Carlos E. Mendoza on 9/30/2024. (ALL)**

**6:19-cv-00308-CEM-LHP Notice has been electronically mailed to:**

Patricia M Flanagan    pflanagan@shutts.com, 6696192420@filings.docketbird.com, ADomenico@shutts.com, JCapobianco@shutts.com, JTillman@shutts.com

Meredith M Wilkes    mwilkes@jonesday.com, courtalert@jonesday.com, mmisitigh@jonesday.com

Megan Anne McNamara (Terminated)    mmcnamara@foxrothschild.com, bhutson@foxrothschild.com, bonita-hutson-2861@ecf.pacerpro.com, megan-mcnamara-8958@ecf.pacerpro.com, ralbert@foxrothschild.com

Alex Louis Braunstein (Terminated)    abraunstein@foxrothschild.com, jcapobianco@foxrothschild.com

Maia Sevilla-Sharon    maia.sevilla-sharon@lockelord.com, Autodocket@lockelord.com, irene.rabba@lockelord.com, tina.sullivan@lockelord.com

Grant Edward Lavelle Schnell    gschnell@jonesday.com, CourtAlert@jonesday.com, asayer@jonesday.com

Jodi-Ann Tillman    jtillman@shutts.com, Esinclair@shutts.com

Dominique J. Carroll (Terminated)    djcarroll@foxrothschild.com, dominique-carroll-5958@ecf.pacerpro.com, dominique.james.carroll@gmail.com

Gregory A Castanias    gcastanias@jonesday.com, courtalert@jonesday.com

Kristina K. Cercone    kcercone@jonesday.com, clsullivan@jonesday.com

**6:19-cv-00308-CEM-LHP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1069447731 [Date=9/30/2024] [FileNumber=24876886-0] [8c3fabd723fa2f775f2fec230e7fbf19ae98355274954d6c26f4357fc4c2286c98 29e2c62ce4818c296cc7a7ea5e12104937ff71a373cff726fb39074412c909]]

**Dkt.464**
Corrected Second Amended Judgment
10/23/2024

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DELTONA TRANSFORMER**
**CORPORATION,**

                    **Plaintiff,**

v.                                                    **Case No: 6:19-cv-308-CEM-LHP**

**THE NOCO COMPANY,**

                    **Defendant.**
_____

### CORRECTED SECOND AMENDED JUDGMENT IN A CIVIL CASE

**Decision by Court.**    This action came before the Court and a decision has been rendered.

        **IT IS ORDERED AND ADJUDGED** that a judgment is entered in favor of Plaintiff and

against Defendant in the amount of $19,553,879.70--which constitutes $19,185,943.70 in damages

and $367,936.00 in prejudgment interest--as well as awarding Plaintiff post-judgment interest at

the statutory rate.

Date: October 23, 2024

                                        ELIZABETH M. WARREN,
                                        CLERK

                                        s/RPB, Deputy Clerk

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

    (b)  **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5**: The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule**: Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.  **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

    (a)  **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)  **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)  **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)  **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)  **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.  **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4.  **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

## CourtAlert® Case Management

**From:** cmecf_flmd_notification@flmd.uscourts.gov
**Sent:** 10/23/2024 9:56:43 AM
**To:** cmecf_flmd_notices@flmd.uscourts.gov
**Subject:** Activity in Case 6:19-cv-00308-CEM-LHP Deltona Transformer Corporation v. The Noco Company Judgment

---

**This Message Is From an External Sender**

If you are concerned about the message's content, highlight the email in your inbox and click "Report Suspicious" in the Outlook ribbon -or- contact 6Help.

Report Suspicious

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Middle District of Florida

## Notice of Electronic Filing

The following transaction was entered on 10/23/2024 at 9:55 AM EDT and filed on 10/23/2024
**Case Name:** Deltona Transformer Corporation v. The Noco Company
**Case Number:** 6:19-cv-00308-CEM-LHP
**Filer:**
**WARNING: CASE CLOSED on 09/30/2023**
**Document Number:** 464

**Docket Text:**
**CORRECTED SECOND AMENDED JUDGMENT in favor of Deltona Transformer Corporation against The Noco Company. ( Signed by Deputy Clerk) (RPB)**

**6:19-cv-00308-CEM-LHP Notice has been electronically mailed to:**

Patricia M Flanagan    pflanagan@shutts.com, 6696192420@filings.docketbird.com, ADomenico@shutts.com, JCapobianco@shutts.com, JTillman@shutts.com

Meredith M Wilkes    mwilkes@jonesday.com, courtalert@jonesday.com, mmisitigh@jonesday.com

Megan Anne McNamara (Terminated)    mmcnamara@foxrothschild.com, bhutson@foxrothschild.com, bonita-hutson-2861@ecf.pacerpro.com, megan-mcnamara-8958@ecf.pacerpro.com, ralbert@foxrothschild.com

Alex Louis Braunstein (Terminated)    abraunstein@foxrothschild.com, jcapobianco@foxrothschild.com

Maia Sevilla-Sharon    maia.sevilla-sharon@lockelord.com, Autodocket@lockelord.com, irene.rabba@lockelord.com, tina.sullivan@lockelord.com

Grant Edward Lavelle Schnell    gschnell@jonesday.com, CourtAlert@jonesday.com, asayer@jonesday.com

Jodi-Ann Tillman    jtillman@shutts.com, Esinclair@shutts.com

Dominique J. Carroll (Terminated)    djcarroll@foxrothschild.com, dominique-carroll-5958@ecf.pacerpro.com, dominique.james.carroll@gmail.com

Gregory A Castanias    gcastanias@jonesday.com, courtalert@jonesday.com

Kristina K. Cercone    kcercone@jonesday.com, clsullivan@jonesday.com

**6:19-cv-00308-CEM-LHP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1069447731 [Date=10/23/2024] [FileNumber=24950808
-0] [7dd6eb4b1d12724b555e786cb2dbb7360794999c8f1c7e841473ae96a6a179270
8e19ab5c86336ed04b07a3ec97637233001a6a3e8c554d4384171a7daa8e942]]

**DX-071**

# Exhibit C







Amazon Advertisement

**FILED UNDER SEAL**

**DX-111**

**FILED UNDER SEAL**

**DX-118**

**FILED UNDER SEAL**

**DX-120**

**FILED UNDER SEAL**

**DX-255**

**DX-272**

U.S. District Court
Middle District of Florida
**DEFENDANT'S EXHIBIT**
Exhibit Number: **DX272**
Case Number:
6:19-cv-00368-CEM-LRB

v.

Date Identified:
Date Admitted:

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**     77/096420

**MARK:** BATTERY TENDER

**CORRESPONDENT ADDRESS:**
EDWARD M. LIVINGSTON
963 TRAIL TERRACE DRIVE
NAPLES, FL 34103-2329

## *77096420*

**RESPOND TO THIS ACTION:**
http://www.uspto.gov/teas/eTEASpageD.htm

**GENERAL TRADEMARK INFORMATION:**
http://www.uspto.gov/main/trademarks.htm

**APPLICANT:**     Deltona Transformer Corporation

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
00-4605
**CORRESPONDENT E-MAIL ADDRESS:**

# OFFICE ACTION

TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE ISSUE/MAILING DATE.

**ISSUE/MAILING DATE**:

This letter confirms Applicant's response filed August 17, 2007.  For the reasons set forth below, the refusal under Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1) based on the mark's inherent descriptive nature is now made **FINAL**.  37 C.F.R. §2.64(a).

### Refusal-Merely Descriptive

Initially, the examiner notes that a mark is merely descriptive under Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1), if it describes an ingredient, quality, characteristic, function, feature, purpose or use of the relevant goods.  *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987); *In re Bed & Breakfast Registry*, 791 F.2d 157, 229 USPQ 818 (Fed. Cir. 1986); *In re MetPath Inc.*, 223 USPQ 88 (TTAB 1984); *In re Bright-Crest, Ltd.*, 204 USPQ 591 (TTAB 1979); TMEP §1209.01(b).
In this regard, the proposed mark BATTERY TENDER are terms of art used by others in the battery industry to reference battery chargers and related devices.  Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); TMEP §§1209 *et seq.*
Applicant argues that the mark is not descriptive because the term "tender" has multiple meanings.  Therefore, according to Applicant, when the word "tender" is used with battery chargers "a purchaser or prospective customer would have to use some degree of thought or imagination to understand that [its] BATTERY TENDER allows a person to charge a battery."  However, descriptiveness is considered in relation to the relevant goods.  The fact that a term may have different meanings in other contexts is not controlling on the question of descriptiveness.  *In re Chopper Industries*, 222 USPQ 258 (TTAB 1984); *In re Bright-Crest, Ltd.*, 204 USPQ 591 (TTAB 1979); *In re Champion International Corp.*, 183 USPQ 318 (TTAB 1974); TMEP §1209.03(e).

In this case, the examiner has established a prima facie case demonstrating the descriptive nature of the proposed mark through the use of Internet printouts attached to the previous Action showing common use by others in the battery industry.  For example, the examiner attached several Internet printouts and a Lexis-Nexis article showing common use of the terms "battery charger", and variants thereof, in connection with battery charging devices.  Applicant does not contest the existence of such descriptive use' rather, it merely stated that it has used the mark for over sixteen years and spends $500,000 per year in advertising the mark in addition to explaining that it has send cease and desist letters to third parties  advising them of "improper use of [its mark]."

However, inasmuch as several third parties are using the words BATTERY TENDER to describe battery chargers and related products, the examiner must maintain the stated refusal until there is legal resolution that substantiates Applicant's claim as owner of the mark.  In this regard, the examiner hereby attaches more sample Internet printouts and Lexis-Nexis articles showing use of the words "tender" and "Battery Tender" with battery chargers and related products.  While some of these articles show pictures of Applicant's product, the descriptive use of the words reinforces the public's perception and understanding of these descriptive words.

**DTC0000267**

Printouts of articles downloaded from the Internet are admissible as evidence of information available to the general public, and of the way in which a term is being used by the public. TMEP §710.01(b). *In re Total Quality Group Inc.*, 51 USPQ2d 1474, 1475-76 (TTAB 1999); *Raccioppi v. Apogee Inc.*, 47 USPQ2d 1368, 1370-1 (TTAB 1998).

Finally, one of the main reasons for not protecting descriptive marks is to prevent the owner of a mark from inhibiting competition in the sale of particular goods. As noted by the attached Internet printouts and Lexis-Nexis articles, competitors within the battery industry need to use the terms BATTERY CHARGERS to describe battery chargers and battery tending products. This thus enables businesses and competitors to have the freedom to use common descriptive language when merely describing their own goods to the public in advertising and marketing materials. *In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215 (C.C.P.A. 1978); *In re Colonial Stores, Inc.*, 394 F.2d 549, 157 USPQ 382, 383 (C.C.P.A. 1968); *Armour & Co. v. Organon Inc.*, 245 F.2d 495, 114 USPQ 334, 337 (C.C.P.A. 1957); *In re Styleclick.com Inc.*, 58 USPQ2d 1523, 1526-1527 (TTAB 2001); *In re Styleclick.com Inc.*, 57 USPQ2d 1445, 1448 (TTAB 2000).

Based on the foregoing remarks, because the proposed mark, BATTERY TENDER, is merely descriptive as applied to the "battery charger" listed in the application, the refusal to register under Trademark Act Section 2(e)(1), is made **FINAL**.

### Proper Response to Final Action

If applicant fails to respond to this final action within six months of the mailing date, the application will be abandoned. 15 U.S.C. §1062(b); 37 C.F.R. §2.65(a). Applicant may respond to this final action by:

(1) submitting a response that fully satisfies all outstanding requirements, if feasible (37 C.F.R. §2.64(a)); and/or

(2) filing an appeal to the Trademark Trial and Appeal Board, with an appeal fee of $100 per class (37 C.F.R. §§2.6(a)(18) and 2.64(a); TMEP §§715.01 and 1501 *et seq.*; TBMP Chapter 1200).

In certain circumstances, a petition to the Director may be filed to review a final action that is limited to procedural issues, pursuant to 37 C.F.R. §2.63(b)(2). 37 C.F.R. §2.64(a). *See* 37 C.F.R. §2.146(b), TMEP §1704, and TBMP Chapter 1201.05 for an explanation of petitionable matters. The petition fee is $100. 37 C.F.R. §2.6(a)(15).

### Miscellaneous

If applicant has questions about its application or needs assistance in responding to this Office action, please telephone the assigned trademark examining attorney directly at the number below.

/David Yontef/
Trademark Attorney Advisor
Law Office 105
(571) 272-8274

**RESPOND TO THIS ACTION:** If there are any questions about the Office action, please contact the assigned examining attorney. A response to this Office action should be filed using the form available at http://www.uspto.gov/teas/eTEASpageD.htm. If notification of this Office action was received via e-mail, no response using this form may be filed for 72 hours after receipt of the notification. **Do not attempt to respond by e-mail as the USPTO does not accept e-mailed responses.**

If responding by paper mail, please include the following information: the application serial number, the mark, the filing date and the name, title/position, telephone number and e-mail address of the person signing the response. Please use the following address: Commissioner for Trademarks, P.O. Box 1451, Alexandria, VA 22313-1451.

**STATUS CHECK:** Check the status of the application at least once every six months from the initial filing date using the USPTO Trademark Applications and Registrations Retrieval (TARR) online system at http://tarr.uspto.gov. When conducting an online status check, print and maintain a copy of the complete TARR screen. If the status of your application has not changed for more than six months, please contact the assigned examining attorney.

**DTC0000268**

DTC0000269

This is G o o g l e's cache of http://www.essortment.com/hobbies/storemotorcycle_skcx.htm as retrieved on Sep 22, 2007 05:04:16 GMT.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?q=cache:bG6xsTnnGfoJ:www.essortment.com/hobbies/storemotorcycle_skcx.htm+%
22use+a+tender%22+battery&hl=en&ct=clnk&cd=7&gl=us

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **use a tender battery**



# How to store your motorcycle during winter

This article gives step-by-step instructions on how to put your motorcycle up for the season.

**Battery Tender**
Find Battery Tender Junior, Plus, Multi & Waterproof. Free
Shipping!
www.motorcycle-superstore.com

**Battery Tender Chargers**
Fast, free 1-2 day delivery! Guaranteed lower prices.
www.jegs.com

**MotoMummy**
Free Shipping, Incredible Pricing Battery Tender
www.motomummy.com

**Buy GEL battery 51913 BMW**
Save on batteries for ATV, jet-ski, motorcycle, scooter,
snowmobile.
www.dvoltbatteries.com

Ads by Google

Motorcycling isn't a winter activity. Yes, there are the brave and foolhardy who try riding through the winter
in places like Maine or Alaska, but for most of us winter means an end to our motorcycling season.

This article will give you step-by-step instructions on how to put your motorcycle up for the season. Storing

DTC0000270

your bike improperly could have disastrous effect, especially for those who live in areas with harsh environmental changes. Remember to perform a thorough safety check at the beginning of every season to ensure you bike has not sustained damage through the winter. Take special note of your tires, which may have become dry rotted depending on the care you took when you put your machine into storage.

First, clean and wax your machine. Inspect your bike for any loose nuts or bolts as you wash it and replace any parts that seem damaged. Use a good quality hand wax to help cut down on damage that might occur to your bike due to atmospheric changes. Use a leather cleaner / preserved on your seat and rubber hoses, but do not apply any to the tires.

Clean and lube or wax your chain, making sure to de-gunk it where it has collected road debris throughout your season. Be sure to apply wax or lube to your entire chain. Lube and wax act as a water repellent and help protect your chain through damp and cold weather. For this same reason it's a good idea to lube all pivots and apply a thin coat of oil or WD40 on chrome to prevent moisture from eating away at your bike's precious metals and use a quality lubricate on your cables and switchgears.

Put your bike on its center stand to get as much weight as possible off your tires. Place blocks of wood between your tire and the ground, especially if your machine is being stored out-of-doors. You may also want to spray your fork lowers with WD40 or Marvel Mystery Oil to help prevent rot on your fork seals.

Ads by Google

Solar Battery Tender
Battery Tester
Portable Power Tender
Battery Acid

It's a good idea to replace your oil and filter when you put your bike up, since most oils have a shelf life. Keep in mind that you will be changing your oil again in the early spring, so it's not necessary to use the most costly oil available.

Top off your gas tank and turn your petcock in the off position. Use a gas stabilizer in your tank and drain your carburetors of any gas that might be in the bowl. Usually there are Philip head screws at the bottom of your bowl with a nipple that has a hose attached to it. If for some reason you cannot reach the screws, run your bike with the petcock off until you use up all the gas in the carburetors.

Plug your exhaust to discourage vermin from nesting in them through the winter and take care to make sure there are no holes through which mice and other critters can burrow their way into your air box and damage your seat.

Remove the spark plugs and fill each cylinder with a teaspoon of Marvel Mystery Oil or two-stroke oil. Screw the plugs back in hand tight and don't attach your plug wires to remind you to change the plugs first thing in the spring. You may want to kick the bike over with the kill switch engaged to spread the oil throughout the cylinders.

Remove your battery to store in a warm climate or use a tender to keep a trickle charge on it throughout the season. Keep an eye on the electrode levels in each battery cell and fill them if they grow low.

Use a breathable cover even if you store your bike in your garage or basement. Try to operate your controls

DTC0000271

This is G o o g l e's cache of http://evoluzione.net/battery_tender.htm as retrieved on Aug 14, 2007 13:56:59 GMT.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?q=cache:yNc8SiAm6VoJ:evoluzione.net/battery_tender.htm+%22battery+tender%22&hl=en&ct=clnk&cd=185&gl=us

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **battery tender**



# battery tender

## battery chargers

battery tender plus
12 volts/1.25 amps

price: $57

PayPal
US ORDER

more info

DTC0000272



four bank battery tender charging station
4 x 12 volts/1.25 amps

price: $238

more info

five bank battery tender charging station
5 x 12 volts/2 amps

price: $508

more info

ten bank battery tender charging station
10 x 12 volts/2 amps

price: $627

more info

**DTC0000273**



This is G o o g l e's cache of http://www.rmh-d.com/service/winterize.php as retrieved on Oct 13, 2007 00:48:12 GMT.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?q=cache:Q7WehI9Bv9kJ:www.rmh-
d.com/service/winterize.php+battery+tenders&hl=en&ct=clnk&cd=26&gl=us

Google is neither affiliated with the authors of this page nor responsible for its content.

These search terms have been highlighted: **battery** **tenders**

# ROCKY MOUNTAIN HARLEY-DAVIDSON

## Winterize Your Motorcycle

If you plan to store your motorcycle during the winter months, it is essential that you take a few extra precautions to ensure that your motorcycle is running the way you remember the following spring. These simple steps will keep your motorcycle running in tip-top shape and protect your investment for years to come.

Gasoline

DTC0000274

## Battery

Remove your **battery** or attach a **battery** tending unit to it. When it is not being used on a regular basis, a **battery** will gradually lose its charge. Security systems and stereos are also certain to drain your **battery**. The easiest way to prevent this is to leave your **battery** in your motorcycle, attach a **battery** tender to your **battery**, and plug the **battery** tender into a standard power outlet.

The **battery** tender is a "smart" charger — it turns itself on and off as needed so that your **battery** never overcharges. It comes in two sizes: the **Standard Battery** Tender (part number 99863-01) and the **Battery** Tender Jr. (part number 94554-98). If you own more than one motorcycle, there's no need to purchase multiple **battery tenders** ... simply pick up an additional **Battery** Tender Harness (part number 94624-97A) and plug each **battery** in as needed.

# Tires

Inflate your tires to their proper level. Underinflated tires can hasten the appearance of flat spots in your tires, shortening their usable life. You should also readjust your bike several times a month, parking it in a different spot on its tires each time. This will also help ward off flat spots. If storing your motorcycle with all weight off its tires is possible this is the best solution of all.

Keep your tires out of direct sunlight. Rubber is sensitive to ultraviolet light, and prolonged exposure to UV light will cause your tires to crack, split, and become less pliable. This condition is known as "dry rot", and it can cause premature tire failure.

# Painted Surfaces and Chrome

Clean your motorcycle thouroughly. Start when the engine is cool, and carefully remove all road grime, grease, tar, stains, and bugs from all painted surfaces, chromed parts, fork seals, and wheels. Make sure you use good quality cleaners, like Harley-Davidson® Sunwash (part number 94559-98), Bug Remover (part number 94657-98), and Wheel & Tire Cleaner (part number 94658-98). Dry your motorcycle thoroughly, and then apply either Harley Glaze (part number 99701-84) or Harley Gloss (part number 94627-98) to all painted and exposed metal surfaces. This will protect your finish from color fade caused by UV light.

# Storage

DTC0000275

This is **G o o g l e**'s cache of http://www.autogeek.net/btppt.html as retrieved on Oct 14, 2007 10:32:13 GMT.
**G o o g l e**'s cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?q=cache:uVJa65V-
3sJ:www.autogeek.net/btppt.html+battery+tenders&hl=en&ct=clnk&cd=50&gl=us

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **battery** **tenders**



CALL TOLL FREE 1.800.869.3011

**Welcome to Autogeek!**
Sign In or Create An Account

At Autogeek, We are car care!

HOME     FORUM     BLOG     CUSTOMER SERVICE     CONTACT US     VIEW SHOPPING CART

**THE AUTOGEEK NEWSLETTER**
Stay informed about new
developments and get exclusive
sales and discounts on
Autogeek products!

Enter Email Address     GO!

More Info     Privacy Policy

**SHOP AUTOGEEK**

▸ Shop By Brand
▸ What's New
▸ Car Care Kits
▸ SPECIAL VALUES
▸ Porter Cable 7424 with FREE Bonus Products!
▸ Car Buffers, Polishers & Pads
▸ Car Care Products &

SHOP BY BRAND   -- Select --   SEARCH AUTOGEEK   FIND IT!

Home > SPECIAL VALUES > Battery Tender > Portable Power Tender

**Portable Power Tender**

**Switch between 2.5 and a full 5 amps output!**

Deltran sells several different **battery** chargers and **tenders** with
an output of 2 amps or less. These are excellent for gradually
charging 12 V batteries in recreational vehicles and maintaining
that voltage. But these chargers take longer to charge a car
**battery** because that **battery** needs a stronger current to get it
running. Generally a jumpstarter produces cranking amps, which
are suitable for cars and trucks, but too powerful for smaller
batteries. With the **Portable Power Tender Battery** Tender,
you're getting a **battery** charger and tender whose output is low
enough for small batteries or high enough to charge a car **battery**

in a reasonable time

DTC0000276

This is the html version of the file http://www.patcoelectronics.com/PDF/150.pdf
G o o g l e automatically generates html versions of documents as we crawl the web.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:AE0IKkDm5e8J:www.patcoelectronics.com/PDF/150.pdf+battery+tenders&hl=en&ct=clnk&cd=89&gl=us

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **battery tenders**

*INTELI TENDER 150*

The *INTELI TENDER* Model 150 is a battery
charger/tender with two key characteristics. First, the
*IntelliTender* output is temperature compensated. Since the
output of a lead acid battery changes as temperature changes,
it is vital that the output of the battery tender match these
characteristics. Second, the *IntelliTender* is a three state
float charger, as required to properly maintain any lead-acid
battery. Note: A float charger without continuous temperature
compensation will damage a battery. The three modes of
operation are:

    1. Bulk Charge Mode - Used when the battery
        has been discharged. This mode replaces 80%
        of the charge to the battery.

    2. Absorption Mode - A tapering current,
        replacing the final 20% of the charge to the
        battery

DTC0000277

**battery**

3. Float Mode - This mode maintains the **battery**'s electrolyte at the ideal specific gravity
regardless of the temperature of the **battery**. This weatherproofs the **battery**, eliminating
freezing and boil-off. It also prevents plate oxidation and sulfation.

The following two graphs illustrate how these functions are accomplished. The Model 150 actually becomes three unique
instruments, depending on the charge stored and the temperature of the **battery**. The first curve, **Figure 1**, shows the current from the
Model 150 as it brings a 20 Amp Hour **battery** from full discharge to full charge. The second curve, **Figure 2**, shows the voltage
measured at the **battery**'s terminals. Because the Model 150 has versions for several different voltage batteries, the data is given in
"Volts per Cell". To obtain the **battery** voltage, multiply the number of cells times the voltage given in **Figure 2**. For instance, a
twelve volt **battery** has six cells, so its Float Voltage would be 6 times 2.35 volts per cell, or 14.05 Volts

During the first six hours of the charge cycle, the Model 150
supplies to the **battery** a constant current of 1.5 Amperes. As
the **battery** reaches 80% of its capacity, the Model 150
changes to a constant voltage source, providing a tapering
current during the stage of charging that would be generating
increasing amounts of gas if the constant current were still
applied. Once the current to the **battery** reaches a pre-
programmed value, compensated for temperature, the Model
150 changes to its final mode of operation, that of a float
charger



**FIGURE 2**

The management of the current flowing to the **battery** during
this process is critical if the process of energy storage is to be
optimized. Once the charge stored reaches the eighty percent
level, gas produced by charging increases. During the
Absorption Mode, the current tapers, generating a slower
increase in voltage for the same time interval. Finally, when
the **battery** is fully charged, the current ceases for a brief time
and the voltage falls to the Float Voltage. These critical break
points, ending Bulk Charge, ending Absorption Charge, and
Float Voltage are all temperature compensated, permitting



**FIGURE 1**

**DTC0000278**

| | | |
|---|---|---|
| H1F0009 | CD3009 | 510200 |
| HTR3811 | CD3811 | 510300 |
| H3011 | CD3030 | 516300 |
| H3013 | CD3038 | 516400 |

**2-10**

Please refer to the UN
for the latest updates

---

## LAWN MOWERS, RIDING MOWERS, AND STRING TRIMMERS

### *BATTERY* TENDER ☐

Use these fully automatic **battery tenders** to keep your **battery** in top condition
during the off-season. **Battery** Tender Plus (12Volt 1.25Amp Indoor) and
Waterproof 800 (12 Volt 800 mA Indoor/Outdoor).

**Order from Parts Division**

| description | Honda code part number | |
|---|---|---|
| **BATTERY** TENDER PLUS | 4769089 | 31670-HPE-000 |
| WATERPROOF 800 TENDER | 7866510 | 32670-HPE-800 |

Order additional Quick Connect Cables and 25' Extension Cords

**Order from Parts Division**

| description | Honda code part number | |
|---|---|---|
| Quick Connect Cable | 7460256 | 41670-HPE-000 |
| 25' EXT CORD 4-PACK | 7868441 | 51670-HPE-004 |

**DTC0000279**

### Initial Activation of New Batteries is Critical

Here's a tip for the next time you buy an ATV. Tell the dealer that before you take ownership of the ATV you want the new **battery** to be trickle charged for at least 8-10 hours at between 1 and 3 amps (depending on **battery** size) on a charger designed specifically for powersports vehicle batteries—not a car **battery** charger. If the dealer makes comments like "The quad can charge the **battery**. Just take it out for a drive when you get it home" or "The **battery** is charged when you pour new acid into it" or "We use a rapid-charger, it'll only take an hour and the **battery** will be ready" tell the dealer you are not satisfied with his answer and insist on a proper trickle charge on a "smart" charger before the **battery** is ever put into service.

Tests I have performed indicate that a **battery** can lose substantial capacity, permanently, if it is not properly activated. You will miss that capacity if you ever have to start your ATV on a cold day to plow snow or when you are winching your way across a long swamp. Time must be allowed for the electrolyte to soak into the fiberglass matting thoroughly before a charging voltage is applied. In addition, both proper voltage and current must be administered for the **battery** to be properly activated. That is why a "smart" charger designed for AGM batteries must be utilized for the initial charge. Models I recommend include the Yuasa Smart-Shot 1.5 Amp charger, the Christie chargers that have been mandated to Honda's dealers and Tecmate models that are mandated at some Yamaha dealerships. These chargers have all been developed specifically for AGM **battery** technologies. They will charge the **battery** at the right current and voltage if they are utilized correctly by the technician who is doing the set-up. Low-current **battery** **tenders**, typically in the 900 mA range, are not adequate for the initial activation of the **battery**. They are fine for maintaining the **battery** once it is in service.

The best dealerships constantly anticipate which batteries are going to be installed in their ATVs and keep a supply of batteries charging at all times. AGM batteries that are put on a smart trickle charger can be charged for months, as needed, with no damage to them. An advantage of the Christie and Tecmate chargers is that they have a de-sulfating feature that really works. A **battery** that has discharged and sulfated can usually be brought back to at least 90% of its original capacity after it has been put on a de-sulfating charge cycle.

### What is sulfation and de-sulfation?

Without getting too technical, sulfation is a permanent, hard coating of lead sulfate on the **battery** plates. Areas of the plates that are covered with hard sulfate become useless. It is similar to cholesterol slowly clogging the arteries near one's heart—you often don't know there's a problem until it's too late. As sulfation builds up, the batteries capacity shrinks. It is like a gas tank getting smaller and smaller. When enough of the lead plates are covered with sulfate, the **battery** will no longer be able to store, and therefore, release enough current to turn over the engine.

Complex **battery** chargers are available that can apply a de-sulfating voltage cycle to the **battery**. These chargers are expensive and usually only purchased by dealerships. It takes a higher than normal voltage to break down the sulfate and re-combine the sulfur ions back into the electrolyte as acid. When the process begins to work, as evidenced by increased current

DTC0000280

be parked for more than a month, take your fully-charged **battery** off of the
ATV completely and store it in a cool, dark place.

#### #3 Using tap water to fill conventional batteries

It really is true that you shouldn't use tap water to "top off" a conventional
**battery**. This is because of minerals in the tap water. Ever heard of e-
coating? It uses electrical current to deposit molecules of paint. The same
process occurs in a **battery** if there are minerals present in the electrolyte.
As current flows through the **battery** the iron molecules from your tap water
get built up into a little formation that looks like a stalagmite in a cave. When
this spike is long enough to short a positive and negative plate together, your
**battery** life will be finished. In addition, minerals can build up in the bottom of
the **battery** like scale in the bottom of a toilet tank. When the mineral scale
in the bottom of the **battery** shorts a positive and negative plate together,
the **battery** will never work properly again. Unless you like buying a new
**battery** every year, use distilled water to top off the **battery** electrolyte.

#### #4 Using a car **battery** charger to charge an AGM **battery**

The weight and size of the **battery** are not an issue on cars like it is on an
ATV, so AGM technology is non-existent in the automotive world. Therefore
chargers made for car batteries are not designed for the AGM **battery** on
your quad. You should use a charger and/or maintainer specifically made for
AGM technology if your ATV is equipped with this type of **battery**. AGM
batteries have a higher specific-gravity acid, and need a higher voltage to
charge them than car batteries do. Also—some car **battery** chargers will not
taper or "trickle" down the current as the **battery** charges. This will cause
the **battery** to lose electrolyte by evaporating it through the safety valve.
Since you do not and should not add water to an AGM **battery**, the
electrolyte that the car charger cooks off is gone forever, with a resulting
loss in **battery** capacity. **Battery tenders** made for AGM batteries have
come down in price. Buy and use a 900 milliamp **battery** tender and you
should save your self the cost of it several times over by prolonging your
**battery** life. Good brands for this type of tender are—Yuasa, Midtronics and
**Battery** Tender.

#### #5 Thinking that "Sealed" means "Maintenance Free"

A car **battery** called "maintenance-free" can be treated as such. No **battery**
on an ATV should ever be considered maintenance-free. Because of the fact
that ATVs have weaker charging systems than cars, and are left parked for
months at a time (unlike most cars) a sealed **battery** will usually require some
maintenance charging. The same is true for the other power toys in your
garage from boats to motorcycles.

#### The Future Of Batteries

In many other industries, the future of batteries is already here. New vehicle
powerplants have created a need for new types of energy storage. For
example Nickel-Metal Hydride and Lithium-ion batteries are in use on hybrid
electric automobiles. Hybrids use an ICE (internal combustion engine) plus
electric motors. Either one is utilized to move the vehicle depending on which
one is most efficient for the operating conditions. The electric motors require
enormous power to move the vehicle or perform any other "by-wire"
functions. More energy can be stored in a **battery** at a high voltage than a
low one, so new batteries were developed that meet this need.

DTC0000281

This is Google's cache of http://faq.f650.com/FAQs/BatteryFAQ.htm as retrieved on Sep 14, 2007 18:43:34 GMT.
Google's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:pEqFH_vg6JYJ:faq.f650.com/FAQs/BatteryFM.htm+tender+site:http://faq.f650.com/FAQs/BatteryFAQ.htm&hl=en&ct=clnk&cd=1&gl=us

Google is neither affiliated with the authors of this page nor responsible for its content.

These search terms have been highlighted: **tender**

# The Battery FAQ

*By Hombre sin Nombre, Flash #412*
*Compiled & edited by Kristian #562*
*Updated by Scott, ID #1244*
*Please read the Disclaimer before attempting any work in this FAQ.*
*Last Updated: 13 June 2007, by Winter #1935*

- Introduction
- Battery List / Battery Selection Questions
  - Unsealed Batteries
  - Sealed Batteries
  - Battery Selection Questions:
    - Terminal Semantics – Which side is RIGHT and Which is LEFT?
    - Are the reversed terminals on some Batteries hard to rectify?
    - Is the battery ground on the positive or negative side?
    - Is putting a SEALED Battery in Sideways (Stand it on End) OK?
    - What CRITERIA should I be looking for in a battery for the F?
    - What is AGM and how is that different from Maintenance Free?
    - Is BMW installing AGM batteries in newer (2004 onwards) F650s?
    - BatteryWeb Misc
    - What about Walmart batteries?
    - How reliable are AGM batteries?
    - Has anyone heard of or used BigCrank Batteries?
- Modifications and Installation
  - Battery Removal – Disconnecting and Reconnecting
  - Fitting a Westco in a Classic
  - GS/Dakar Tray Modifications
    - Any problems with the oil reservoir melting the side of the battery?
  - Hawker (SBS8 and PC310) Sealed Battery
    - Odessey PC310
    - Has anyone had luck installing the SBS 8 in a 2002 GS
    - Does the adapter just fill the extra space, or is it also needed to make the electrical connections work?

DTC0000282

- Does the adapter just till the extra space, or is it also needed to make the electrical connections work?
  - o Ends / Yuasa Sealed Battery
  - o GS Charging Access
  - o GS Battery Drain Tube
  - o Hooking **Tender** to Alternator or Battery
  - o Alternative CS Batteries
- General Questions
  - o Battery Maintenance
    - My Battery seems to be low on water. What shall I fill it with?
    - What about that Acid in a Bottle? IF a battery is low on water, why can't battery acid be added instead of water?
    - How do I put water in those Tiny Holes?
    - Can I add water with the battery still connected?
    - While doing my routine 1000 mile battery top off, I was surprised to find several cells almost dry. This is unusual. Whats happening?
    - What about more details of Battery Maintenance?
    - What about the Battery Overflow Tube?
    - Can you (safely) add water to a charging battery?
    - How do I clean up acid spills?
    - GS battery check - can it really be that difficult?
    - How do I remove the battery from my CS?
    - Should I grease the battery terminals?
    - What if I overfill my battery?
  - o Battery Charging
    - I bought a new battery. I need to charge it up. What current should I use?
    - Can I charge it through the Accessory Plug?
    - How long should it normally take to charge the battery on a Battery **Tender**?
    - I fiddle with electronics. Is there a Battery charger schematic anywhere?
    - My Battery Water is always Low. I suspect the VR is overcharging the System. Is there a solution?
    - Can I start a Motorbike with a Flat Battery using a Car Battery?
    - Adding water to battery. I noticed my battery ('99F) was near the low line. Should I ride for an hour, or so, to charge up the newly diluted battery acid, or can the bike sit overnight or for a day or two?
    - How do I use a Voltmeter?
    - Do you have any more information on the F's Charging system?
    - What is best way to make Battery Charging Access?
    - Do I have to disconnect any battery wires to charge it?
    - Can I jump start my bike?
    - Is it okay to charge the battery on a GS/Dakar/CS bike (with an FI computer)?
    - Does an AGM battery need a battery **tender**?
    - Do I need to remove the little caps off the cells when charging the battery?
    - Battery never fully charged?
    - Can the battery system handle a 500mA AA battery charger?
    - Can I charge my iPod overnight from the bike?
  - o Battery Tenders
  - o Battery Problems
    - Is it true to say the Voltage Regulator (VR) will be stressed and eventually fail if the battery is not kept topped up?
    - Is the converse also true that a failing VR will empty the battery?
    - Can I disconnect the battery while the bike is running?
    - When I try to start my bike there is a Tic Tic Tic sound coming from the Solenoid, (Large Round Object just Rear of the Battery)
    - My bike will not start. When I turn the key to the on position, there is a buzzing sound.

**DTC0000283**

- - I'm having problems starting the bike. Could it be the Battery?
  - My ABS light came on while riding and stayed on. Now the bike won't start!
  - Stalling, difficulty starting and hesitation when applying generous throttle?
  - Can a battery get too weak to start after only 12 days of non use except for a quick 10 sec. start to move to from the driveway to garage?
  - If I've allowed my Battery to Drain Water/Get Low (Due to e.g. VR Problems, Poor Maintenance), will it ever fully recover?
  - Ever heard of a sudden battery failure? Sudden Battery Death? Battery Suddenly Died?
  - Pop! Smoke! Dead Dakar! - (battery area - anybody had it happen?)
  - Is it possible for a brand new battery to go bad, or might there be another reason like a short somewhere?
  - My bike is dead (no headlight, brakelight etc), but multimeter shows the battery is good.
  - What are the normal voltages of the battery?
  - Battery life when riding short distances?
  - Can a battery **tender** "boil off" a wet cell battery?
  - What would cause the battery to bulge?
  - Do I need to do the Flay to keep my new battery in good condition?
  - Can I remove my battery while the bike is running?
  - GS clock reads funny when inserting a new battery?
  - o Getting Home With a Dead Battery
  - o Battery Life
  - o EDTA
  - o External Battery Links
  - o Battery Guages? See the Aftermarket Voltmeter FAQ

For other related FAQs:

- Classic (and some GS) Hard Starting Poor Running FAQ

- GS specific Hard Starting / Poor Running FAQ

- Electrical Misc FAQ

---

## INTRODUCTION

Batteries are our friends. The design engineers cleverly put the battery right behind the hot engine and catalytic converter (on the Classic); and above the engine and next to the oil reservoir (on the GS). Toasty batteries are prone to drying out, so please check your 12 volt friend often, especially in the summer. It also noted that a dry battery is causing voltage regulators to go bad. Another good reason to check them often before they not only get the regulator but perhaps also the alternator.

### I'm Confused! My Battery Has Died. What Should I get?

This is the short version of the FAQ... You can get a OEM replacement from most online battery sites, or most places that store a good variety of batteries. Just look for the **YB12AL-A** battery.

Many people also replace their OEM battery with an Absorbed Glass Matt (AGM) battery. There are two problems with the OEM battery. Firstly you need to check the water level regularly, and this can be a pain (especially on the GS/Dakar models). Secondly if you drop your bike, or the overflow tube comes loose, there is a chance acid will spill over parts of the bike and cause more problems.

The tables at the top of this FAQ list alternative batteries, and the experiences people have had with them. You will

**DTC0000284**

also fine for each battery it tells you any specific modifications you may need to make.

### Drop-In AGM is now available

BikeBatts in the US now offer a drop-in AGM battery - in other words no modifications to the bike are required. You will want to call Tim to ask for the battery. Unfortunately BikeBatts will not tell anyone where they get the battery (other than China), so we can not identify a supplier for other countries. We have no further details on this battery.

Note: This is not a YB12AL-A2 AGM battery, and it is not clear if it is an AGM battery or not (it may be a SLA). There is very little information on the specs of this battery.

See http://www.bikebatts.com/product_info.php/products_id/31

This battery should fit in all F650 models including Classic, GS, Dakar and CS models. It is unknown what battery the G650X uses.

### Warning: Check and Re-check the +ve and -ve Terminals

When connecting a new battery, check and then recheck your battery terminals for the **positive** and **negative** polarities. Make sure they are around the right way. This is what happens when you don't:

*I am so stoopid. I hadn't started my 02 GS in months, so the battery was dead. Went and got one that fit, came home, griped about German over-engineering the entire time I spent undoing all the stupid torx screws, and then fitted the new battery. 1,2 seconds after I connected it, smoke started pouring from the wiring harness. I freaked out and grabbed the fire extinguisher and gave it a squeeze. An anemic little trickle came out even though the gauge read full. Do I get to watch my bike burn to the ground?*

*After a few minutes, the smoke had stopped and I grabbed the screwdriver and disconnected the battery. It was then that I realized that the - and + terminals were on different sides from the stock battery. In one fell swoop, I turned my $6000 dollar motorcycle into a worthless pile of parts. I cried, I screamed dirty words at the heavens, I prayed to wake up from a nightmare. But here I am. With a 2002 F650 GS with less than 10k miles with a melted wiring harness. I am sure I killed the ignition too. OMG. It's something I have to have the dealer work on, and it's probably going to cost me upwards of a grand. Perhaps I should just sell it for parts. Sad*

*Moral of the Story: Check THREE TIMES before connecting the battery. And get your fire extinguisher re-charged TODAY! Do as I say, not as I do!* **clown shoes**

## BATTERY LIST / BATTERY SPECIFIC QUESTIONS

This section contains a list of batteries with links to any modifications you may need to perform to fit the battery to your bike. There are also some questions that are specific to batteries only, and are not directly related to the F650.

**Note 1:** The 12AL-A is a common battery size and can be bought many other places than the dealership.

**Note 2:** For each battery, the top row are mm in Length, Width, Height and kgs in Weight, and the bottom row are inchs/lbs. All batteries listed are 12V.

**Note 3:** Amp/hr (AH) represents the total power stored within the battery; CCA represents the ability to start an engine under low temperature conditions (you could also view this as how much power can be delivered in a very short period of time).

### UNSEALED BATTERIES

DTC0000285

| Battery | Dimensions (LxWxH) | | | Wgt | AH | CCA | Classic? | GS? | Other |
|---|---|---|---|---|---|---|---|---|---|
| Yuasa Yumicron YB12AL-A | 134 5.3125 | 80 3.1875 | 160 6.3125 | 3.1 6.8 | 12 | 165 | OEM | OEM | $34 + shipping from tireexpress.com BMW Part # 61212346420 |
| Yuasa Yumicron YB12AL-A2 | (OEM Alternative) | | | | | | | | Post Connection has an Add on Clamp, but it can be used no Problem - k.) |
| Battery Web UB12AL-A | 138 5.4330 | 81 3.1890 | 163 6.4173 | ? ? | 12 | 165 | YES? | YES? | A conventional "spillable" battery requiring dry shipment. Acid may be purchased locally (i.e. Sears stock #44000 @ $2.50). |
| Japan Storage Battery CM12AZ-3A-1 | (OEM Alternative) | | | | | | | | |
| Furukawa Battery FB12AL-A | (OEM Alternative) | | | | | | | | |
| AC Delco DB12AL-A | (OEM Alternative) | | | | | | | | |
| Magna Power CB12AL-AFP | (OEM Alternative) | | | | | | | | Autozone for about $52 before taxes |
| Interstate Cycle-Tron YB12AL-A | (OEM Alternative) | | | | | | | | |
| Dikamaster BB12AL-A | (OEM Alternative) | | | | | | | | |

## SEALED BATTERIES

| Battery | Dimensions (LxWxH) | | | Wgt | AH | CCA | Classic? | GS? | Other |
|---|---|---|---|---|---|---|---|---|---|
| **Absorbed Glass Matt (AGM)** | | | | | | | | | |
| Westco Battery 12V14L-B | 135 5.3 | 89 3.5 | 167 6.6 | ? 12 | 14 | 190 | Tray Mods | Tray Mods | See CG Battery Deal! $50 + shipping from Batteryweb |
| Batteryweb STX14-A2 | 135 5.3 | 89 3.5 | 168 6.6 | ? 9 | 12 | 200 | Tray Mods | Tray Mods | Will fit but can be tight in a GS |
| CNE model CDTX14AIL | 135 5.3125 | 89 3.5 | 167 6.5625 | ? ? | ? | ? | ? | Tray Mods | Chang Nan Battery |
| Deka PowerSport ETX15L | 134 5.3 | 90 3.5 | 166 6.6 | 5.0 11 | 14 | 190 | ? | Tray Mods | BatteryWorld (Australia) Sometimes labeled BigCrank |
| Yuasa YTX14AHL BS | 134 5.3 | 89 3.5 | 166 6.6 | 3.5 7.7 | 12 | 210 | ? | Tray mods (method 3) | ? |
| **Sealed Lead Acid (SLA)** | | | | | | | | | |
| Hawker SBS8 (VRSLA) | 138 5.4 | 86 3.4 | 103 4.1 | 2.7 5.9 | / | 180 | Hawker | Hawker | $85 + shipping from: Batterymart.com Battery Web Enersys Reserve Power (Powersafe) Call U.S. Energy systems, INC, 1-800-562-5028, Ask for Darlene (19 Nov 2004) Possibly no longer available. See the Odyssey PC310 for alternative. |
| PowerSafe | (See the Odyssey PC310) | | | | | | | | |

DTC0000286

| SBS8 (VRSLA) | (See the Odyssey PC310) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Hawker Odyssey PC310 | 135 5.43 | 90 3.39 | 100 3.98 | ? 5.9 | 7 | 100 | See Comments | See Comments | This is most likely the alterative to the SBS8. If anyone can confirm this that would be appreciated |
| Exido/Yuasa YTX12-BS GRT | 132 5.1 | 86 3.4 | 152 6.0 | ? 8 | 10 | 180 | Not Recommended | NO? | A YTX12L-BS would be a better choice, if has the terminals that would fit best. (Around the right-way) See discount motorcycle battery (Remove Tray AND Reverse Terminals) |
| Interstate CYTX14AHL-BS | Rebranded Yuasa battery. It fits the classic shelf with the rubber bootie and goes for about $75 | | | | | | | | |
| Interstate YTX12-BS | (OEM Alternative) I replaced my original battery (bought the bike 2/13/97) with an Interstate YTX12-BS for $70 in July before taking my 7K trip. The only way it would fit was on its end and after removing the rubber box liner, and the wires will just reach. The battery does, as mentioned above, hold a charge MUCH better. Since returning from my trip on 9/20, I have ridden the bike twice - about 3-4 weeks between rides, and when I put the smart Charger on it day before yesterday, the needle flickered once it was apparently fully charged. This was, incidentally, the only battery my dealer could find at that time that would fit. Hal #15 | | | | | | | | |
| Hawker Odyssey PC545MJ | DOES NOT FIT! | | | | | | | | |
| Hawker Odyssey PC680 | ??? Prob does not fit | | | | | | | | |

## BATTERY SELECTION QUESTIONS

**Here is a tip:** A good place to compare battery designations, sizes and configurations is in the JC Whitney catalog (http://www.jcwhitney.com). Their battery section covers this in great detail. Once you know the battery codes that will fit your bike, you can go battery surfing, as I believe that they all use the same codes (such as YB12AL-A). The 12 is the battery amp hour rating. I believe the Y may indicate a motorcycle battery and the rest of the code describes size, terminal location and vent tube location. *Richard #230, Pacifica*

### Terminal Semantics - Which is RIGHT and which is LEFT?

- The terminals are viewed as left or right when looking at the battery BEFORE IT IS INSTALLED. When you look at the "front" of the battery, the label faces you and the terminals are toward the edge with the label, the "front." Looking at the battery in this configuration, one terminal is to YOUR LEFT and one to YOUR RIGHT. This is the common way to speak of battery terminal configuration. Not installed, where the front may face the left, right, front, or rear of the vehicle, or even be up or down in case of a sealed battery. Positive is on the right for both the Classic AND the GS. *Flash #412*

### Are the reversed terminals on some Batteries hard to rectify?

- The reversed terminals aren't too bad - the negative/ground cable is plenty long enough to make the stretch, but I'd look at making an extension or something for the positive cable. Or just replace the heavy positive cable to the starter solenoid with something 4-6" longer so as not to stress the battery lug. I don't like stressing the lugs with the heavy cables, and the positive is a minor problem

### Is the battery ground on the positive or negative side?

The negative terminal of the battery in an F650 is connected to the chassis and therefore called "ground." *Flash 412 (CO)*

### Is putting a SEALED Battery in Sideways (Stand it on End) OK?

- As per some of the battery models, I do NOT advise placing the battery sideways - they do have (sealed) vents, and they WILL leak if overcharged. I've used too many of the larger MF car batteries in boats and generators to believe that they are completely leak-proof. Superior, but not perfect. **NEVER put**
in a NON SEALED Battery Sideways

in a NON-SEALED Battery Sideways.

## OK thats a great list but I cant find any of those in my home town. What CRITERIA should I be looking for in a battery for the F?

There seems to be some confusion about batteries that fit the F. I have a list of batteries someone posted, but I don't know for sure if they are suitable. Well, you can't beat a good Yuasa! Criteria should be:

- **Voltage:** 12 volts. Obvious, but they do make 6v batteries. For a bike that seems to have a higher VR output of 15v, a gel-cell that tolerates higher charging voltages might be nice if you could find one that fits. (Think of things in terms of water pipes - volts is like pressure in psi, amperage is like the size of the pipe. You can have little pipes with high pressure, or big pipes with lower pressure. You can make the same level of power (watts) with either combo of pipes, if you vary the parameters).

- **Amperage/capacity:** OEM is 12 amp/hours. With no kick-start, at least 10 a/hrs would be needed. You could substitute smaller in an emergency in sub-Saharan Africa, but not recommended. Larger capacity (if you can find one that will fit in the compartment) is just fine - like having a bigger gas tank. Smaller capacity means fewer starts in reserve, more strain/wear on the battery with each start, and shorter overall life. A 2 a/hr battery probably won't even click the starter once.

- **Physical dimensions/size:** Obviously if it won't fit in the compartment, then... and if it's too small it will rattle (which is BAD for a wet cell battery) and should be shimmed or braced to prevent movement, especially on the wires and terminals, or wear/cracking on the plastic case - that IS acid you know!. Smaller size usually means lower capacity also. This parameter and the next ones are the tough ones for substitutes.

- **Terminal Orientation:** Left side negative, right side positive. Sometimes hard to find. You could move the harness wires, but they are heavy and stiff and usually not long enough - changing them usually requires more modification. But it can be done. For world travellers, it's a good modification to do before starting out.

- **Vent/overflow drain orientation:** Not critical, can be modified by moving the drain hose, but if you see what happens to your bike when the battery burps hot acid, quite important.

## What is AGM and how is that different from Maintenance Free? *Flash #412*

Flash Dear Sir Thank you for your email

Wet Cell (flooded), Gel Cell, and Absorbed Glass Mat (AGM) are various versions of the lead acid battery. The wet cell comes in 2 styles; serviceable, and maintenance free. Both are filled with electrolyte and I prefer one that I can add water to and check the specific gravity of the electrolyte with a hydrometer. The Gel-Cell and the AGM batteries are specialty batteries that typically cost twice as much as a premium wet cell. However they store very well and do not tend to sulfate as easily as wet cell. There is no chance of a hydrogen gas explosion or corrosion using these batteries. Most Gel-Cell and some AGM batteries require a special charging rate, especially the deep cycle models. I personally feel that careful consideration should be given to the AGM battery technology for applications such as Marine, RV, Classic and Performance cars just to name a few. If you don't use or operate your equipment daily, which can lead premature battery failure; or depend on top-notch battery performance then spend the extra money. Gel-Cell batteries still are being sold but the AGM batteries are replacing them in many cases.

There is a little confusion about AGM batteries because different manufactures call them different names. A couple popular ones are regulated valve, and dry cell batteries. In most cases AGM batteries will give double the life span and many more deep cycles than wet cell battery. I hope I have answered your question. We have in stock the YB12AL-A.

Sincerely, Jose. *Batteryweb*

## Is BMW installing sealed batteries in all bikes after 2003?

I think I read somewhere that BMW is now installing sealed batteries in their 2003 bikes. If this is also true for the new F650's, will the GS battery fit the

DTC0000288

I think I read somewhere that BMW is now installing sealed batteries in their 2003 bikes. If this is also true for the new F650's, will the GS battery fit the Funduro? BMW batteries are expensive, but I'll bet they are less than Hawker. It might be worth checking into. *Richard #230*.

- No, this is not true for the new F650s. The 2003 and 2004/05 models come with the same unsealed Yuasa battery.

**Various Battery Web Misc Comments**

- Here is some info from Batteryweb.com on Sealed Batteries: NOTE! When Flash TELEPHONED to order and told them he was with a BMW he got free shipping and a possible discount. This may no longer be the case. Hello there, I just checked out the FAQs for batteries and in the sealed batteries section it says you get free shipping from Battery web. I just placed an order with them for my 99 F650 for a sealed STX14L-A2 Sealed MF 12 12 5.3 3.5 6.6 8 $59.00 at http://www.batteryweb.com and could not get a discount or free shipping. They told me that that promotion is for two specific batteries only and neither is for F650 models. They both are for R11XX R series BMWs. I thought I would let you guys know. *John*

- **Flash: Q:** Here is my problem... in the BMW F650, the battery is close to the muffler with catalytic converter. The voltage regulator is cheap and runs VERY high. 14.75V is considered normal. The sense for the v-reg goes up through the key-switch and so sometimes it runs even higher. All this adds up to needing to add water to the stock battery every 500 miles. That just plain sucks. So... considering I have a 12AL-A stock, with about a quarter inch to spare if I remove the rubber piece, which maintenance free or AGM do you recommend as a substitute? Thanks again!

   Batteryweb. A: I think that we (have the) battery you've (been) fantasizing about! Please see link below for the STX14L-A2, Sincerely, *Jose, Batteryweb*

- **Opinion on Battery Web:** Have ordered twice from them. Delivery/accuracy was fine both times, normal shipping was included in their price (rush is big $$$ due to the weight). Too early to tell how long they'll last. Just be sure to click on the BMW discount link, otherwise the $$$ is quite a bit higher.

**What about Walmart Batteries?**

If so how did it work out for you and is it lasting. They sell one for 27.95 and that sounds like a good price, but I just wanted to know if anyone else had gone that route. Later, *Dirty*

- You can buy to try and return it later. *artyom66*

- I've bought a car battery there. It's OK so far.They didn't have a cycle battery to fit my 99F650 last year when I needed it. I got one at Interstate battery, about $44 if I remember correctly. Do they have batterys for the F bikes now? *DaveJ#888*

- IIRC, Richard's had good luck with WalMart or other such batteries. Don't know if it's urban legend or not, but I've heard there are only a couple of factories that make batteries, and ALL the companies buy them from the same place and have their labels put on them. I'm sure WestCo, Optima, and a few others make their own, but with regular wet acid batts, I'm certain there's not much difference between a DieHard, an Interstate, or a WalMart. *illearl #476*

- Yep, that's where I get the battery for my Classic. I picked out their most plentiful model that would fit and modified my bike to accept it. Makes it easy and replacements are always available. *Shank*

- I have a Walmart battery sitting on my floor at home: maybe I bought the wrong one, but this one has the posts reversed from the OEM, as is the vent tube. Besides the vent tube, I seem unable to get the wires to fit in this backwards position, so I'm taking it back. Meanwile, I bought an exact copy of the OEM from a local battery shop for $37. *Scott, #1244*

**How reliable are AGM batteries?**

- AGM batteries are generally fairly reliable. However all batteries do require maintenance of some sort, and all batteries should be regularly inspected. AGM batteries are probably a better choice for the F650 since it can be a pain to check the levels of your battery every week. They have also been tested and used in many applications for many years now. So yes, AGM batteries are reliable - but remember it still needs maintenance. And a quality battery **tender**

DTC0000289

is a good idea.

### Has anyone heard of or used BigCrank batteries?

- These appear to be a re-labeled Deka PowerSports battery. The ETX15L has been fitted to an 04 model GS using the tray mods mentioned in the modifications section below.

---

This section is focused on procedures to modify your bike for different batteries. Check the battery lists to see what batteries you could you, and click on the link to see the modifications required. There are also a few other modifications related to drain tubes.

### BATTERY REMOVAL - DISCONNECTING AND RECONNECTING

*Supertech, Brian#179, Andy #982,*

- Always. Yes Always disconnect the negative terminal first and ALWAYS, when reconnecting, connect the positive first. ANY Battery, Bike or Car.

- You connect the positive terminal first so that if you slip when connecting the negative terminal, and touch your wrench (or screwdriver, or STEEL WATCH, so remove it (ed) whatever you're using) between the terminal and the frame, you don't arc-weld your wrench to the battery, to the frame, etc.

- If you connected the negative terminal first, then slipped and touched the positive terminal and the frame with your wrench, you'd complete a circuit (a short circuit - no resistance) and sparks would fly.

- For the GS, the manual says. Disconnecting the battery clears all entries (such as errors, adaptations) from the BMS control unit memory. The loss of the adaptations may sometimes lead to engine performance being temporarily impaired when the engine is restarted. The BMS restores the lost adaptations itself over the following operating hours. Switch on the ignition. Open the throttle once or twice fully with the engine off. Motronic registers the throttle valve position. Installation is the reverse of the removal procedure. Pay particular attention to the following. Caution: Connect the positive battery terminal first, then the negative terminal.

- Also for the GS. The FI programme only learns about air density etc. by trial and error. It is not heuristic, it follows a mathematical model. Opening the throttle three times before firing up the engine just tells the ECU the max and min throttle positions taking care of stretch in the throttle cable and other bits that change over time. It also tells the ECU to start from a factory set of parameters that are almost certain to get the system running. Normally it stores the last settings and assumes the air density, fuel rating, throttle positions etc, is the same as last time. It uses this as its first guess and fine tunes from there. If it does not have this info, it will resort to the original settings or a back up mode. Typically the engine will run rich to protect itself in this case and in a get you home mode may be so rich it will soot the plugs defeating its own attempts to get the right mixture. The battery is designed to be removed. If the engine is OK you don't really need the error memory. This memory is just a list of fault codes. The only thing you need to do is give three twists on the throttle when you reconnect and maybe clean the air filter and plugs. *Andy #982.*

- You also have to disconnect the Drain Tube, which just slides off the Nipple at the SIDE of the Battery. This is not a problem on Maintenance-Free Sealed Batteries, as they do not have a drain tube.



**DTC0000290**



Here is the GS Battery, exposed

**Q. Can I access the GS Battery without removing the RHS AND Centre Panels?**
Sure. See the GS Fairing FAQ.

## FITTING A WESTCO IN A CLASSIC

- Westco Sealed Batteries: 12V14L-B is the correct Westco battery number.

- Westco's sealed battery for a CB750 Honda or a 900 Kawa will fit right in the F650 box if you don't use the tray the stock battery sits in and are willing to bend your cables around a bit. Its also 190 amps as opposed to about 160 for the stock I believe. *Mike.*

- The (SEALED) Westco Battery is their **12V14L-B**. Installation takes only a few minutes and no modifications are necessary other than getting rid of the plastic tray the stock battery sits in. See http://www.batteryweb.com/motorcyclepanasonic.cfm That's only a few bucks more than the stock wet Yuasa. I've seen this Westco battery recommended for the KLR-650, so it should be plenty tough enough for the F. Dimensions are 5 5/16 x 3 1/2 x 6 9/16, which is about a 1/4 inch beyond the stock battery width and height-wise. I've measured it out and it looks like there's plenty of room to fit it. Per the FAQ, it appears that others have successfully made this switch. Specs are 12 volt, 14 amp/hr, 190 CCA. Price was $65.95 minus 10% because I ordered a charger too (finally). *T-boy #456.*

- I also finally put the Westco in my bike. Like T-Boy said, loose the sleeve. You may want to run a wrap or two of duck around it though. If you call a dealer and their looking it up based on the F650 because you don't remember the model number, they won't find one. Tell them to look for the one that KLR 650 uses. I've had a 14 amp battery in the bike since Redmond. I've noticed the lights on bike seem stronger and my riding partners tell me that my tail light doesn't flicker like it use to. I also think that extra 2 amp will come in handy on cold days and do a better job of running the heated grips and what ever is plugged into the accessory socket. *Johnathan #143.*

- Based on the specs, the Westco weighs over 5 lbs. more. At present no-one knows if over the long-term the bracket in the F can hold the heavier battery. Here are the full specs on both. *Mason #631*

- I ordered what I was told was a Westco/Panasonic battery from www.batteryweb.com. Received a **Universal X14L-BS** (ref. 12V14L-B); Measurements & Terminal Configuration seemed OK, so I installed it. Fit fine until I put the left side bodywork back on... the bottom screw was tight, and when I got it tightened properly, could see that the top front corner of the battery was pushing the side-cover out just a bit (the plastic post with the rubber tip that used to press against the frame rail under the seat is now ~1/16 away. Not a big distance, but something is definitely interfering between the two, it's getting bent/warped/stressed, and I'm sure vibration & miles will make SOMETHING worse. Had to trim the top part of the battery hold down piece, as the new battery is about 1/2" taller, bending it over the top also bowed it out. I trimmed it so it doesn't go completely over the top. The big problem was with the battery terminals. I had to run the negative post bolt through the top mount instead of side mount, and make sure NO wires routed between the battery and side cover. Had to remove the plastic cover from the + connector, reroute that wire (after adjusting the other end that connects to what I am assuming is a relay), and straighten the connector that bolts to the + battery terminal. After all that, the sidecover went on just like in the old days. the bottom bolt part of the sidecover rests against the frame/clip, so I no longer need to crank down on the bolt (flexing the sidecover) to bring it up against the frame/clip. No duct tape on my battery...not sure if the vibration will kill the battery first, or if the glue on the duct tape might plasticize the battery case first. Still pondering a plan C alternative. *Marty #436*

- **12V14L-B is the right Westco battery number.** I'm assuming you dumped the plastic tray the stock Yuasa sat in. If not, do so. The plastic post w/ the rubber tip should stay put if you push it back in. If not, it should once the battery is back on. If you haven't done so, you may want to cut the top hook part to the cover that holds the battery in place. This isn't necessary, but I cut mine at the bend at the top and that seemed to give me an extra bit of wiggle room for the plastic side panel. As far as the bottom screw being tight, that's better than loose isn't it? I haven't found any disadvantages to the Westco Battery yet. No modifications were necessary to fit it other than simply not using the battery tray. If you go w/ the Westco you may want to cut off the top hook part of the outside plate that keeps the battery in place (trim it at the curve), but, like I said, it's not necessary. *T-boy #456. (Wash., DC)*

DTC0000291

- How did you attach the cable to the post? These posts work both horizontally and vertically. Mine hit until I switched the cable to the top of the post with the bolt running down. That bought me a bit more clearance on the side cover. One reason mine is so tight is that after removing the stock plastic sock, I wanted some vibration protection so I fitted a piece of thin closed cell foam under and behind the battery. *Alan #442*

- If you decide to go for a Westco (Panasonic, they're the same thing re-branded), give www.batteryweb.com a try, but call their 800 number. I succeeded in getting a discount and free shipping by telling them I was in a BMW club. *Alan #442*

## GS/DAKAR TRAY MODIFICATIONS

Fitting alternative batteries in the GS/Dakar is a little harder. There is not much spare space where the battery is, so you can try one of these modifications. There are two basic methods. The most common is to re-drill the holes in the metal tray. An alternative is to bend the metal tray.

### Method 1 *(by BradG#1002)*

Here is some information on converting from an OEM Yuasa battery to a Westco 12V14L-B in a 2001 GS.

- After trying to find a good deal on a Hawker SBS8 I gave up and went with a Westco AGM type battery. It was available at my local motorcycle accessory retailer, Road Rider, San Jose, CA. Here are some points to keep in mind if you decide to go this route.

- At Road Rider the Westco was called a 12V14L-A2 not a 12V14L-B. I was told the -B referred to vent location which is meaningless in the case of a sealed battery. I did confirm the outside dimensions are the same. The price is right. RR charged me $57 + tax.

- The OEM Yuasa in my bike measures 3.12 from front to back. The new Westco measured 3.5. The FAQ mentions someone installing a Westco successfully in a GS (2001+). It mentions a tight fit. I was unable to squeeze the new one in. The new battery is also taller but there is enough room to accommodate it at the top (well sort of, see below).

- I went to work trying find a way to get an extra .375" of space. The battery well is wider at the bottom (front to back). The air box angles forward as it goes up. I removed the rubber pad on the front face of the air box and loosened things up but still there was no way.

- I ended up making a new bracket to replace the one that holds the battery up. There was some space available at the front between the support bracket and the plastic air dam (firewall like thing). The new bracket uses that space and thus adds about a .25" more room for the battery on the front side.

- It all went back together and JUST fits. I have no idea how this could be done without a new bracket. I suppose bikes can vary in tolerances or the air boxes vary from bike to bike. So beware, the Westco may NOT quite fit your bike.

- As for weight the Westco is about 11.5 pounds vs. the Yuasa's 9 pounds. I shed just under a half pound with my new aluminum bracket (the OEM is steel). Net gain about 2 pounds.

- The battery leads worked with no problem. Here are a couple of pics of the bracket and new battery installed.

 

New bracket is the gray piece                    New Westco installed

- Unlike the Classic, the GS does NOT have a plastic tray to ditch. Not sure how Joe #1065 got his to fit. Until I made a new bracket to hold the battery it would not sit flat on the bottom. (Perhaps install a shim to fit the base?. ed) The battery would have been tilted slightly and thus resting only on one bottom edge. I also had to loosen/move the air box to get it in.

DTC0000292

edge. I also had to loosen/move the air box to get it in.

- In my opinion, if you want a clean, easy, installation, go with the the Hawker SBS8 and the TT bracket.
- YMMV but I wanted others to know that this battery may not fit in a 2001 or later GS model. The space BMW provides is tight. bg, 2001 F650GS

## Method 2 (by Scott, ID #1244)

Here is some information on converting from an OEM Yuasa-compatible battery to a Westco or other AGM (12V14L-B compatible) battery in a 2002 GS Dakar. While some users claim the "maintenace-free" battery will fit in a GS battery slot, I found mine would not: the OEM battery fits snug as it is, and the AGM is wider by 5/16 inch (Length and height are of no concern. For the record, my AGM battery is a CNB model CBTX14AHL. It measures 5 5/16L x 6 9/16H x 3 1/2W. The OEM measured 5 3/16L x 6 5/16H x 3 1/16W.)



Looking at the situation, it seemed to me that a guy/gal could remove the metal bracket that the battery sits on, and by drilling new holes, essentially slide the vertical part of the bracket forward. This would make the width of the battery chamber wider. See below image, green arrows point to red dots that are the new holes (one hole is hidden from view):

1. Remove seat. Remove the center tank panel, and the right side panel. Remove the battery (negative terminal first).

2. Remove the two lower airbox screws (the ones that are located below the front part of the seat). Remove airbox and let it hang to the right side. I also removed a hose from the bottom of the airbox, to make it easier to get to the bottom side of it. This may or may not be necessary. Place a rag in the throttle housing opening to keep stuff from falling into it. (You WILL drop something in there if you skip this step).

3. Using a torx driver, remove the screw from the plastic relay cover. Remove relay cover.

4. Using a socket, remove the two nuts that hold the metal bracket near the plastic relay cover.

5. Using an allen wrench, remove the screws (part number 8 in the diagram) that hold the plastic battery tray to the bracket. You'll find that the nuts (part 11) are spot-welded(?) to the metal bracket. Place the bracket in a vice, and using a chisel and a hammer, knock off the two forward nuts (leave the rear alone as you will not use this anymore).

6.

Measure the difference in battery widths. My new AGM was about 5/16" wider. Alternatively, if your OEM battery does not completely fill the battery slot (i.e., there is slack room), set the new AGM battery in the slot and note how much room is needed to make it fit (as shown in the photo to the right; photo and idea courtesy of fellow Dakar rider dmemt #1464):



Measure the difference in battery widths. My new AGM was about 5/16" wider. Alternatively, if your OEM battery does not completely fill the battery slot (i.e., there is slack room), set the new AGM battery in the slot and note how much room is needed to make it fit (as shown in the photo to the right; photo and idea courtesy of fellow Dakar rider dmemt #1464):



Using some loctite and lock washers, re-attach the plastic tray to the bracket using the new holes. Notice that the rear-most hole is useless now, so you will be using just the two forward allen screws and nuts (unless you want to run a screw through the edge of the plastic tray; I figured 2 screws is enough)

**DTC0000293**

7.



I didn't actually confirm this, but visually it seemed that the upper part of the metal bracket will now extend INTO the plastic relay housing on the right side: the whole thing is now shifted forward almost 1/2 inch, and it was almost touching the housing before this operation. Given that assumption, I trimmed away the lower part of the plastic cover, cutting along the line shown below (I carefully used a bandsaw, a pair of wire cutters, etc. might also work just as well, and would be safer.)

Alternatively, you could also cut off 1/2" or so from the upper ends of the metal bracket, through the old bolt holes; I preferred to leave them intact. (see "feedback" below; dmemt's method didn't require modifying the relay cover as he didn't shift the bracket as far as I did).

8. Now that the bracket is re-attached to the airbox, remove the rag from the throttle housing, and re-install airbox to the throttle. Notice the snorkle end of the airbox needs to slip into a small hole near the headlight. Also, If you removed that hose from the bottom of the airbox, plug it back in before installing.

9.



As you install the airbox back onto the throttle, the two new holes in the upper part of the bracket will be slipping into place over the mounting bolts. Notice that your rubber battery retaining strap needs to be installed at this time: the metal clip it hangs onto will now be pushed forward against the bike frame, and cannot be installed later! (on the upside, it will never again come undone the next time remove the battery!) Notice the new gap along the forward edge of the tray bottom: this is the new width you just created for your new battery! Install the two lower airbox bolts. Install the plastic relay cover.

10



Install the new battery, positive terminal first. The negative battery cable on my bike did not fit the battery very well, so using a round file file I enlarged the copper hole a little. After a minute of filing it slipped right into place.

11. Install right side tank panel and center panel. Install seat. Set the clock and take your battery for a ride!

Start to finish, I spent 1-2 hours working on this. The AGM seems to run almost 0.5 volts higher than my OEM wet-cell. Also, it has about 30% more cold cranking amps: (about 215cca vs 165cca.) My bike now starts much faster than it ever did with the OEM-type wet-cell batteries. And as a bonus, I don't have to worry about checking water levels every week! *Scott, ID, #1244*

### Method 3 *(by dmemt, #1464)*

Just thought I'd do a quick post on how I fit a Yuasa YTX14AHL-B2 into my battered Dakar. Basically, I just drilled all 5 of the stock bracket holes 1/4" back from the originals, ground a bit off the front right bracket tab for clearance, and flattened the front hold-down tab a bit.

A few tips:

1. The nuts on the bottom of the bracket are epoxied on. I "broke" them loose with an 11mm box wrench and a hammer.

2. A drill press would have been helpful, since the new holes overlap the old holes by a couple 32nds. I wound up with something more like slots when I was finished butchering the plate, but it still seems to be solid.

3. To flatten the front hold-down tab, I hooked the strap over the tab, then hammered it vertical. It still comes on and off, but I wouldn't want to "fish" it on now. I'm not sure if there is room for the thin airbox foam rubber pad that the back of the stock battery rests against. I'd removed mine earlier while trying to figure out what would work, and there may be room to leave it in there.

4. Top panel clearance seems to be fine. The battery/oil tank/airbox assembly is still "floating" above the frame on the right side. There doesn't seem to be as

**DTC0000294**

...top plastic structure circuit is a break, the is amps to ballast a few seconds), it is biasing there is no space in an edge that there is no fit cause it is as much battery vibration isolation as stock, but hopefully the new battery can take it. I'll have to check for contact wear after I do some off-roading, but I don't anticipate any problems.

Note: In TWO instances the YTX14AHL-BS has been installed with minimal changes:

- On a 2002 GS: the Yuasa YTX14AHL-BS will fit into a GS without modification, other than removing the foam-tape at the back of the battery compartment intended to keep the smaller stock battery from vibrating. It's a very tight fit, and it'll take a few minutes to figure out the right angle before it pops in there, but it works, and the terminals are in the reversed BMW-style position. *McGuireV10*

- I read all the pages and pages of stuff in FAQ on putting a maintenance free battery in my 2003 F650GS Dakar. I was prepared for redrilling, cutting and bending on the battery bracket. It turned out to be a NON EVENT!    To be safe, I bought a spare battery holder from BMW to hack up. P/N 13-71-2-343-567. A whole $7.56 with a discount. While I had all that stuff ripped out, I did the BMW heated grip kit and the power outlet. Now that was a bunch of messing around! Then I looked closely at the new battery bracket...it looked odd. Sure enough, the new one had different dimensions of the two tabs that bolt the bracket to the crossmember. it makes the right side of the battery about 5mm farther forward than the other bracket on the bike. Then I removed the little foam pad on the front of the air box that touches the battery. Replaced it with a 1mm thick tire patch for the battery to rub against instead of the airbox. While I was at it I opened up the snorkle to the airbox. Everything slipped together just as nice as anything! No bending, no nothing! *Ed@Ford*

### Method 4 *(by billmallin, #1629)*

1. I read Scott's post about installing his battery in his GS and ordered myself one. I installed it today while doing my 12,000-mile service. So, I was fully prepared to do the modification like Scott did, but when I got to looking at it closely, it was about 1/4" too wide, but it appeared it would go in there.

2. It looked as if the bottom of the tray was wide enough, but the top was a bit too tight. So I simply took a mallet and bent the metal tray with a few strategically placed hits (see arrows in diagram).



3. Hint 1: I took out the bracket and removed the plastic part bolted to the bottom (you know, that plastic deal that holds the snorkel to the air box).

4. With a piece of wood under the bracket on the floor and rubber mallet in my hand, I kept tapping it until the battery fit. Tap it, try it. Hit it, try it. Smack the crap out if it, try it. And so on until it fit.

### Feedback

- I can confirm the F650 and F650GS take the same (OEM'ed) battery, and yes the Westco Battery (sealed) 12V14L-B does fit into both bikes. It is a TIGHT fit but works fine with no modifications, period. The battery is 5-6 lbs heavier, 5-10% bigger in overall size, but again, it fits! *Joe#1065*

- Have a Westco, sealed, in one of my Hondas. Excellent! The only battery I have that gets the Battery Tender hooked up once every 3 months. My others are on every day. Starting to think the Westco needs no maintainer even with minimal use. It just works! *Art 884*

### Any problems with the oil reservoir melting the side of the battery?

(Assuming outright melting isn't an issue, is there still any reason to think the lack of space around the larger batteries might cause heating problems for the

**DTC0000295**

(crosstalking outrigger meaning that's an issue, is there still any reason to think the lack of space around the larger batteries might cause heating problems for the battery?) *Dano PDX #1164*

- Not sure which is worse... next to the oil tank (FI) or on top of the muffler crossover pipe (Classic). *Marty #436*

- The length of the AGM is the same as the OEM wet-cell, so the AGM has the same kind of contact with the heat shield as the OEM ... wouldn't expect any melting(?) *Scott #1244*

## HAWKER (SBS8 AND PC310) SEALED BATTERY

- Some people have reported difficulty getting SBS8 batteries. An alternative appears to be the Hawker Odyssey PC310 (see below)

- You can also try the more expensive Hawker battery, http://www.touratech.de/english/products/enter.html (David H Park runs the Hawker battery in both his Rallye and Adventure F650GS based bikes.) This is a picture of the Hawker battery installed in the F650GS/Dakar/Rallye. Hawker SBS. Notice that there is an additional brace as the battery is not as tall as the standard battery. No acid drips to worry about with this battery and you have more cold cranking amperage. The Hawker SBS has a 15 year lifespan at Float and a 2 year minimum shelf life (both at 20C). It's a much better battery for shock and vibration which is why it's used for off-road applications. The battery type is the SBS not the Odyssey. The product has a two year warranty.

   Touratech part #, 130-0001, 239 Dm Battery
   130-0004 19.90 Dm - F650GS adapter (no F650 adapter at present). *David H Park. #711*

- The specs indicate that the Odyssey should provide superior starting power than the Westco, however, whether the additional 30 CCA's is important seems unclear to me. By contrast, as the Westco holds more total power, the Westco should provide a little more of a cushion to run lots of electric gadgets at the same time without running down, however whether this 7.7% margin over the Hawker is material is also unclear. Both have clear advantages over the stock battery. However, I would conclude that as the Westco is much less expensive, the Westco would appear to be the better value. Other considerations: Both the Hawker and the Westco are supposed to be very durable and more vibration resistant than standard batteries, and both are also supposed to be better at holding a charge when unused. However I don't have any information to determine which might be better in these respects. Both should be better than the stock battery. *Mason #631*

- Brad, I've recently gone through the same search as you regarding the Hawker batteries, with the same somewhat confusing results. It's unclear to me what the differences are between the Hawker SBS 8m sold by Touratech, and the Hawker Odyssey, available through several sources as you point out. I'm referring to differences in technology, etc , not sizes. Is there anyone who can help clarify this point? Thanks. *Mike #926 Calif.*

- The Hawker SBS8 sold by Touratech isn't one of the "official" batteries marketed by Hawker/Invensys as "automotive" but it's perfect for the F650GS/Dakar. It's smaller and lighter than the other "compatible" batteries. Touratech has an adapter plate for this which works great. There is no real difference in technology. I spent quite some time with the techs at the Indy Dealer Show from Hawker talking about this application. They were fine with the SBS8 and intrigued that it was spec'd. It's just not "shown" here in the US due to a product management decision (or lack thereof). Otherwise it's fine. I've got this in both my bikes and love it. *davidhpark711*

- The SBS8 is not typically sold as a "motorcycle" or "automotive" battery so Hawker and distributors don't know about it. It's a "telco" battery used for standby systems. Touratech chose this because it fit the power/weight requirements of the Rallye bike and in Europe the SBS8 is more readily available without the specialized marketing of the "automotive" Hawkers. I've had a hard time getting replacement or extra SBS8s here through distribution. That being said, it's been a fine battery and a bit smaller/lighter than the stock (need to use the Touratech mounting plate). *davidhpark711*

- If the battery goes open circuit, while the engine is running, its the same as pulling a battery cable off the battery on your car, while it is running, sometimes a recipe for an electrical disaster :-( IF you want avoid the potential for these problems, the best bet is a Hawker/Odyssey etc AGM (Absorbed Glass Mat) battery, they are NOT SLA batteries!. They are used in aircraft etc and are very reliable, and fortunately available in many sizes ....probably to fit our bikes: As I have always said, a battery is a consumable, you get 12 months out of it, and its bonus time from then on :-) *Jack, F650GS, Queensland, Australia.*

- I had the same problems, after dropping it a couple times my battery tray and engine cover started eating away so I got the Hawker battery. No trouble to

DTC0000296

- I had the same problems, after dropping it a couple times my battery tray and engine cover started eating away so I got the Hawker battery. No trouble to install. The battery is smaller then the stock and requires a little 'extension' to install but no big deal. I've had it in there for about 6 months now with no problems. I think I got it off of the Touratech website, but they seam to be having some problems right now so I can't give a specific link. http://www.touratech-usa.com/shop/BMW_F650GS lasso, http://www.hepi.com/default.htm *Stumby 01GS (VA)*

- When the battery comes, you will find it is the same size as your original battery, except it is a little shorter. You will also note that the battery post aren't just like normal motorcycle batteries - they are smaller and they stick straight up. To fit the battery in the space on your bike, you will need to make/buy a spacer(s). Touratech makes a spacer intended for this application. I decided to make spacers for the top and the bottom, effectively lowering the top top the battery, so that the battery cables would be an easy fit over the battery posts. I made my bottom spacer out of cardboard and covered it with fiberglass tape (don't use the styrofoam that the battery is packed in, strofoam might not tolerate the heat of the engine and the oil tank - it melts). The bottom spacer is ~1 1/4" thick. I did use the styrofoam that came with the battery (packing) to make a block to go over the top of the battery, between the battery and the factory rubber retaining strap. This piece is actually two different shaped blocks, glued together and covered with clingwrap and fiberglass tape. I have 0 miles on this mod so I can't guarantee that the spacers will work as good as what you can buy from Touratech. I am planning on a 200 miles test this weekend :o) *andy112652 #1481*

## Odessey PC 310

- It appears the SBS8 is no longer available, and the most common recommended alternative is the PC310. More reports on its long term usage are welcome. *Wintar #1935*

- I've had a PC310 for over a year now and it has been faultless. I believe it is a replacement for the SBS8 I read somewhere. The only hiccup I have had was when I drained the battery totally (long story - my fault) I couldn't jump start it so I had to take it home and put it on the Optimate overnight. Since then I've not had a problem with it. I give it a trickle charge once a week or once a fortnight if I feel it needs it (I have a Signal Dynamics battery minder thing fitted to tell me how the system is charging) and the freedom from worrying about cell levels is worth the extra money. I've had no trouble in cold weather (my bike lives outside) and I reckon if it did get cold enough for the battery to fail, it's probably fate telling me it's too cold and dangerous to ride anyway. *brassmonkey001*

- After looking back at the photo of the Hawker SB8 on the Tech FAQ site, I believe the Odessey PC 310 is the same battery but made to be sold in the US. They are both made by the EnerSys Corp. and this one is identical but much easier to find. *Rocketman*

**Has anyone had luck installing the SBS 8 in a 2002 GS (looking through the forums it looks like artyom66 did in 2003)? If so how were you able to do it?** *apostate #1618*

- Cr*p, I can't copy my image off my ETK disc not from the Max union fiche. Here's the link for the battery tray which has a locating tab for the wet cell battery which must be cut off to allow the longer SBS8 to fit. [ Here is an image of the SBS8 and the battery tray (thanks to GSWayne) ]

- Here's how to do it:
  1. Pull the right side faux tank panel off
  2. Then pull the air snorkel off by undoing the two screws that hold the C shaped mating piece which holds the air snorkel and air box together at the air filter port.
  3. Once you've got the air snorkel off, you'll need to unscrew the battery tray (3 screws I believe and pull it out. This is all easy as pie so far.
  4. I used a Dremel to grind the plastic off but a bench grinder or a hacksaw would work fine as well. The material will have a tendency to melt if you grind too fast or too hard so don't worry about dorking up the precious and coveted virginal German plastic (imported from Romania or Bulgaria or some other cheap place junor EU country).
  5. Once you've ground down the locating tab down to flush with the bottom of the battery tray, just reverse the removal and you're battery will slide right in snug as a bug in a rug.
  6. The TT adapter is worth the wait if you run a lot of accessoreis because it give you an alternate site to attach those wires. It helps to clean things up a quite a bit in the R&R process, too, without having to unhook your main power to the bike. Key, IYAM. *NothingClever #1441*

**For those of you running the Hawker with the Touratech adapter: Does the adapter just fill the extra space, or is it also needed to make the**

DTC0000297

For those of you running the Hawker with the Touratech adapter: Does the adapter just fill the extra space, or is it also needed to make the **electrical connections work? In other words, would running a Hawker with a home-made adapter be a decent option?** *Dano PDX #1163*

- You could probably make something to provide the same functionality. I think a couple of people that were waiting for the adapters did. The Touratech adapter does make it a little easier to connect to since it provides longer terminals and relocates them a bit which makes getting things hooked to them a little easier I would imagine (having not tried to hook it up before the adapter arrived). *apostate #1618*.

## EXIDE / YUASA SEALED BATTERY

- I have a Yuasa YTX12-BS that I replaced my 4 1/2 year old original in my ST 6/01 prior to making 7K coast-coast trip. The only way to get it to fit was to remove the rubber battery box liner, and **stand it on end (the TERMINALS ARE REVERSED, but the cables still reach)**. I have had it in for 15 months and have never looked at it, have let the bike sit for as long as 3 months, and it holds a charge, seemingly, almost forever. The only one I personally have used that is any better is the Odyssey in my Ural - after sitting for 7 months, cranked strongly and immediately. Look for an AGM (absorbed glass mat) battery. Zero maintenance. *Hal #15, Clakr OR*

- I found a **Yuasa YTX12-BS GRT** Maintenance Free Battery at http://www.discountmotorcyclebattery.com/grt.html (go figger). 800/654-0565 $47 + $8 s&h = $55. Dimensions are 6.000" x 3.4375" x 5.125", 1.2A 180CCA And **the TERMINALS ARE REVERSED**, which I don't see as all that much of a problem since once you get it IN the bike, you never f*** with it again. Stock is 6.3175" x 3.1875" x 5.3125", so the rubber deal probably needs to go. I haven't measured the battery BOX yet to see if this will fit. Probably do that tomorrow night. Flash #412. **NOTE!** When Flash TELEPHONED to order and told them he was with a BMW he got free shipping and a possible discount. **This may no longer be the case**: *Hello there, I just checked out the FAQs for batteries and in the sealed batteries section it says you get free shipping from Battery web. I just placed an order with them for my 99 F650 for a sealed STX14L-A2 Sealed MF 12 12 5.3 3.5 6.6 8 $59.00 at http://www.batteryweb.com and could not get a discount or free shipping. They told me that that promotion is for two specific batteries only and neither is for F650 models. They both are for R11XX R series BMWs. I thought I would let you guys know. John*

- Exide Yuasa **NP12-14R**, 14 amp/hr, 164 CCA. Dimensions 5 5/16 x 3 3/16 x 6 5/16. The dimensions seem to indicate it will fit with the plastic sleeve, contrary to the FAQ info on the Westco battery which is apparently larger. *Cathy983 Halifax.*

- If they list a **Yuasa YTX12L-BS**, it has the terminals that would fit best. *Todd#389*

## GS CHARGING ACCESS

- Note: On 2004 and later model GSs, you do not need to create charging access. Under the seat (near the fuse box) is a positive terminal, and on the oil filter cover is a negative terminal.

- There is a wonderful charging unit that is neat and tidy and can be left on permanently. I have one for my F650 It is an "OPTIMATE" the leads are left permanently connected to the bike usually by cable ties to the frame. The optimate charges initially at 14V until the battery is up to about 12v then it switches to trickle charge. Once fully charged it switches itself off. Thereafter it turns itself on regularly to check the charge, if needed it will top up , if not it turns off again. My other bike is a Honda VFR750 which stays in the garage over the bad winter weather, and when the F650 isn't being charged the VFr is connected permanently and I have done that for 4 years now. There is another similar device called an "ACCUMATE" does the same thing. MTP and MPS in the UK sell them. *Alan*

- Thanks to everyone for their hints and tips. Last night I bought some 10-gauge wire, 10-gauge spade connectors (insulated), and some small battery clips. Some heat-shrink tubing and plastic cable housing (the spiral stuff you wrap around wires to protect and tidy up with) finished it off. I ran the positive wire down to the seat area and patched in a fuse, then routed the wire back up to the battery and out the front of the tank (blue wire is for the accessory light fuse). I learned with the lighting fuse that it makes lots of sense to put the fuse where you can get to it easily (update: I removed the 20A fuse as it always blows when jump starting. This may or may not be a good idea in the long run, but for now I'm jumping without a fuse, and so far, no troubles.) This isn't

DTC0000298

rocket science, but I'm including photos of the operation just in case it is helpful to anyone.



The resulting pigtail hides down low in front of the tank (both "+" and "-" wires). I had a spare connector, so I plugged it into the "+" connector to guarantee the unmated metal spade didn't touch any metal on the bike (despite being insulated, the spade "could" touch metal when left unmated). When needed I can just pull them up as shown.

I then made a set of mini jumper cables with the left-over parts (or "Barbie" cables as my wife says).  I think I'm now ready for winter. *Scott, ID #1244.*

- You can find clips that will handle a goodly amount of current. Watch your wire size, AND the type of insulation. The insulation on Mega-Speaker wire (large gauge) melts pretty easy. Unfortunately, most decent gauge wire is really stiff and hard to pack. There are some commercially made booster cables for motorcycles (I've seen them for sale at rallies). The problem with using the accessory outlet is the fuse. It will blow if you exceed its limit, and the battery will charge no more until you realize the fuse is toast and replace it (a 15 amp car battery charger will do this, likely jumping it through the outlet as well).

- I bought a battery **tender** when I picked up my bike...temperatures here are already into the teens at night and my garage is not insulated... colder than a witches t**t in a brass brazier. The dealer told me very confidently I wouldn't have to worry about the water level in the batter-go figure. I found the battery **tender** (Yuasa) quite a bit cheaper at a local shop than at the dealer, but it doesn't have all the cool little connectors that come with the BMW version (it has some pigtail connectors, accessory outlet connector and one that looks like the thing you use for a Gerbing heated vest connector) *Runaway #1259 (CO)*

- I usually commute with my bike 3-4 times a week. It is a 20 minute drive. 10 min highway and 10 min city. I installed heated grips last Friday, so I don't know how that will end up. But before that I have had no problems with the battery for the last 2 years since I bought it (used). I store the bike outside and today it was 7-8 degrees above zero (Celsius). I'll keep an eye on the battery when I start using the heated grips. *Spakur #1117.*

- If you have a BMW accessory outlet and want to charge the battery while it remains hooked up to the bike, I would say no. (I do it all of the time with my bikes.) However, I have never had to charge a fully discharged battery while the bike. When you hook up the charger that thing is really going to bubble for a long time (maybe over a day) while it is charging. It is also going to generate a fair amount of hydrogen gas while it is charging. I would be concerned about acid leaking out of the overflow tube or gas accumulating under the tank (do you have a GS? Is that where they hide the battery now?). There will probably not be a problem, but removing the battery would insure that nothing happens and will allow you to top off the battery water when the charging is completed. *Richard #230: 1997 Funduro*

- I usually just plug the **tender** into the accessories outlet, but like Richard said, that's for maintenance rather than charging a completely empty battery. *Runaway #1259 (CO). '03 black F650GSA.*

- I have done the same left the parking lamp on and it drained my battery. Do you have a classic or later year model? For my classic I used the little fused adapter that came with the **tender**. Permanently installed this allows you to just plug in the charger when ever you think its necessary by just undoing the seat to access the little cord. *Will in CA*

- Having seen lead-acid batteries explode while being charged at other than trickle currents, I would recommend removing the battery to a safer location if you are going to use an external charger with high charging current (e.g., 1 -2 amps initial). *Teddco*

**GS BATTERY DRAIN TUBE**

DTC0000299

There is a little tube that runs from and overflow outlet on the right side near the top of the battery (F650GS, but classic also has this tube)). Is there supposed to be a small hose clamp on this? (Mine has no hose clamp) The tube either slipped off the battery by itself or the BMW tech who did my 6k service forgot to put it back on (while he was busy mis-routing my throttle cable and stripping threads). The result being a fair amount of battery acid leak on to the negative wiring harness and a few other places. I did some good off-road riding, and that's when the leak happened. Normally the overflow tube would carry the acid down under the frame and safely away. So, do you see a little hose clamp on there?

- Mine has fallen off several times of its own accord. Using a ziptie will keep it firmly in place. In my case, can't blame this one on anything but the nature of the beast and a less-than-optimal design. *Gerry #931*

- I've used a tiny nylon tie wrap to secure the tube, or in extreme cases, used super glue - which makes it NOT removable, must be cut off. *Todd #389*

- On my 7/2000 GS I use a small ziplock, but another problem was the way the drain hose used to be routed down the side of the battery, between it and the air cleaner housing. It was badly pinched, and didn't appear to be able to let any fumes or pressure out. I finally cut it out of the way & ran a new one toward the front of the battery, across the top of the terminals to the LHS of the bike, and then down and to the rear. Once the clear tube got down toward the rear of the cylinder head, I joined a piece of the small bore black poly pipe that you use for micro garden irrigation, and ran it back & down near the Centrestand. The poly tube is good because it is harder for it to get pinched. *Fitzy from OZ*

- On a US Classic you can use one of the "extra" clamps from the cannister assembly. From my cannister I have used the extra clamps for the battery vent tube and for an inline fuel filter. *Chris in Santa Cruz, CA #782*

- This picture shows the battery tray, and the drain tube in its "normal" position *Winter #1935*

### HOOKING <mark>TENDER</mark> TO ALTERNATOR OR BATTERY?

- "new to me bike" (97ST) came with battery <mark>tender</mark> hooked up already (gel battery - yay!). when i follow the wiring, they've hooked the pigtails up to the alternator, not the battery terminals. is that correct?? better?

  reason i was looking ... i want to put on harness for gerbing jacket liner. i have adapter from warm n safe for sae to coax. thought it'd be neater to only have one cable coming out - and just switch out adapter when i want to charge battery.

  so here's my question - does it make a difference where pigtails are attached (alternator vs battery terminals)? am i less likely to drain the battery itself with the 'lectrics if i hook up to alternator? nb - bike has heated grips and piaa lights - yes - i know - don't run 'em all at once and get a voltmeter.

  what are folks opinions on the "best practices" here? *ishtardnce #1549*

- If I understand what you're saying, the Battery <mark>Tender</mark> pigtail is connected to two of the three yellow wires.

  If so, that is frickin' STUPID. The ONLY benefit of that is that it is impossible to reverse the polarity. But the connector is KEY, which makes doing that REALLY difficuly anyway. The battery will never charge sufficiently through the diode drops in the voltage regulator, ESPECIALLY if it really is a GEL battery (as opposed to an AGM that the uninformed often call "gel cells" because they are ignorant of the differences).

  Do not ever RUN any accessory off the "Battery <mark>Tender</mark>" connector until you move it to the battery. SHEESH! Some people don't know which end of a soldering iron gets hot and operate with one on the wiring anyway. Good luck sorting it all out. There is a Classic wiring diagram in the FAQ. *Flash #412*

- hey flash - my bad. i gave you wrong info. on closer inspection, the battery <mark>tender</mark> pigtail had the positive end hooked up to the solenoid (?!) and negative going to ground on the frame. weird? i thought so... removed, and replaced with warm n safe's battery harness. will use adapter for battery charging. *ishtardnce #1549*

**DTC0000300**

- That actually makes sense. The big wire from the positive battery terminal goes to the solenoid. So as long as it was hooked to the battery side of the solenoid, it WAS hooked straight to battery hot. The battery ground is the same point, electrically, as the frame. Nothing wrong with that.

  Yes there is possible corrosion at all connections. But connecting to the solenoid and frame ground make less of a mechanical problem at the battery terminal bolts, especially if there are other accessories hooked up there. *Flash #412*

## ALTERATIVE CS BATTERIES

- Please see the note at the top of this FAQ about the Drop-In AGM battery. This is the only known AGM battery available for the CS models.

---

## GENERAL QUESTIONS

Finally, this section contains all the other questions about batteries. So if your question is not about batteries only, and is not about modifying your bike for a new battery, your question should be answered here.

## BATTERY MAINTENANCE

This bike will EAT your battery unless you check the level of the electrolyte frequently. Check it at LEAST monthly. Some try to remember to check it after every few tanks full of gas. EDTA can make a battery last forever IF you keep the electrolyte level up.

### My Battery seems to be low on water. What shall I fill it with?

- Distilled water. And If your battery was low on water, you had better check the voltage regulator output and also check the specific gravity of the battery cells. You may have a bad cell and need to replace the battery, before it takes out your Voltage Regulator.

### What about that Acid in a Bottle? If a battery is low on water, why can't battery acid be added instead of water?

- Well you could use that too. BUT... The battery companies say not to do it, maybe they are just trying to sell more batteries. You add distilled water to the battery because once it is filled initially with acid the particles that make up the acid are always in the battery. The only thing that boils off is water so that is all you add back. Put in EDTA if you want more juice.

### How do I put water in those Tiny Holes?

- Recycle a translucent plastic fuel filter. Cut off one at the widest part and voila ! A funnel just the right size.

### Can I add water with the battery still connected?

- No, you do not need to disconnect the battery to top the cells up with distilled water. However it is fairly hard to see how much water is in the battery without disconnecting it and removing it from the bike.

### While doing my routine 1000 mile battery top off, I was surprised to find several cells almost dry. This is unusual. Whats happening?

- Do an electrical check, in case your voltage regulator is over charging. Refer the Voltage Rectifier FAQ for typical values. Some bikes' lighting circuit turns

**DTC0000301**

- Do an electrical check, in case your voltage regulator is over charging. Check the *Voltage Regulator FAQ* for typical values. Some bikes' ignition circuits run on a second coil in the alternator. In your salt air environment, try cleaning every connection and ground. If that don't get it ... you're likely due for a rectalifrier / regulator.

## What about more details of Battery Maintenance?

- There's some really good detailed discussion in: "Everything you never wanted to know about batteries."

- Here's an article on MC batteries worth reading: http://www.mcnews.com/articles/battery.htm

- A FAQ on MC battery care here: http://www.ryderworld.com/faq/trans/faq_motorcycle.html. http://www.bmwmotorrad.co.za/workshop/battery1.html *(Ian #1062)*

- Great Information: http://www.gsbattery.com/MB/index.html

## What about the Battery Overflow Tube?

- Always put it it on. Otherwise In between the frame and the swing arm is a plastic washer and between the bushing and the swing arm is a foam rubber seal. A leaky battery vent tube dripped acid onto the washer and seal and basically ate through them. I never felt any problems but found this when I took it apart. *Mark #403*

- Have you ever watched a battery as it sits on a charger? As the charge is applied to the plates, the acid/water mix bubbles up. This type of charging goes on every time you ride from the alternator. There is a build-up of gas inside the battery and if no vent, the battery can swell. Also, some water/acid mix will occasionally come out the vent from this gas release. The tip over is also a culprit, but really not the primary reason for the vent hose. A blocked off vent is worse than a removed tube though. The main thing is to have the vent tube so that it is not blocked/pinched closed. Gel Cells don't need this because of the Gel as opposed to water/acid mix. The Gel does not give off the gas/bubbling effect like the water/acid mix. Thus no pressure problems with a Gel Cell. *Clar #673*

- Had a terrible situation happen last night to my pride and joy., I'm sick! Went for a ride down a dirt road on my 02 F650 GS Dakar with 2300 miles on it. Got home in the garage and saw a small pool of what looked like water under the machine. Upon closer inspection I saw the wet spots all over the fine finish on the right and left side of the engine cases. You know the gray powder coat on each side of the engine heads and cylinders. I go to wipe the wet stuff off thinking its radiator water. Instead I discover its battery acid. It quickly takes a lot of I the finish off by beautiful metal surfaces. I open the tank area where the battery is to see the overflow tube has fallen off the fitting. Must of been the bumpy dirt road. My work dress pants are shot and a pair of shoes get trashed from particles of acid. Its not massive damage but lines of corrosion running down what once was pristine finishes. My tube barely reached the fitting. I had to pull it with some pliers to give it some slack so it would easily fit. I think that was the problem along with a too full of battery I'm sure. Bad combination. *Biggums*

- This sounds like clearly a warranty issue here. No BMW doesn't put a clamp on this hose. None is needed. When properly installed there is no problem. Even if the hose is not connected , which I have seen a few times, no major mess is made. Sounds like the battery was over filled and the vent tube was left off. I would return to the purchase dealer with a smile on my face and suggest perhaps a mistake was made here and that perhaps they should make it right and they should. Remember the smile, maybe some Krispy Kreams and they should make it as good as new. Clearly a mistake has been made here. If that doesn't work find a new dealer. If the vent tube on your bike is not long enough most likely it is not routed properly. There are several ways these things come routed from the factory. You might try a different route. Be careful one route causes the tube to be pinched by the air snorkle. But even then no leakage occurs if the battery isn't overfilled. *StuporXtech #1130 01 Dakar Or*

- I had a similar event, but the reason the acid came out was because I dropped the bike in the dirt. BMW replaced the small electrical component cover on the right side under warranty. I put a tie-wrap on the vent tube and washed everything with baking soda (had to re-wrap the negative battery cable). I disagree with the previous post that this bike doesn't need the tie-wrap. My vent tube was barely long enough to go on the battery, so vibration probably knocked it off. I suppose you could argue you are not supposed to drop the bike, and the acid would not come out otherwise, but on a really rough, steep dirt road it may happen. There are closed-cell gel batteries on the market too. *Rod, CO 02GS*

DTC0000302

- The acid from my battery nearly ate a hole through my engine cover. Now I have a sealed Hawker batter :) No more worries. *Stumby (DC) '01GS*

- The vent tube on my 99 came off on it's own, and when I dropped the bike at one point, acid spilled and trashed the finish on my silver paint too (I've since had the frame replaced for a different reason). I disagree that the tube doesn't need a clip...either a clip, or a tighter fitting hose. mine pushed on and pulled off way too easily. I've since also gone with a sealed battery. *Mark #403*

## The terminals on the GS come loose easily. Is this normal?

- In off-roading the bikes I definitely have found a few times the loose connections in the batteries which cause 'mystery' starting problems. It's a PITA because the covers have to come off, but fixable/avoidable nonetheless. *DHP #711*

  This battery problem is very common. If you look at the design of the cables that go to the battery you will see that they have a lever effect on the fasteners to the side that vibration causes them to loosen. Bad design. I am sure BMW has seen this problem because all the new bikes coming through have lock washers taped to the top of the battery as an after thought. I have installed these lock-washers on my bike and it has cured the problem. *Stuportech*

## What's the Story with the squashed GS Battery Vent Tube? How do I fix that?

- I have noticed on many of the F650 G/S and Dakar that Battery Vent Tube is TOTALLY CRUSHED FLAT by the air intake nozzle OUT OF THE BOX. Another example of the tight quality control used when producing these fine bikes. If you own one of these you might wish to check this problem has been corrected by the person who maintained your motorcycle. With the location of this battery I wouldn't think battery leakage would be good. If someone over fills the battery when new with pinched vent tube. BIG MESS. I have found that if you reroute the vent tube under the wiring harness and slightly to the front of the motorcycle this problem can be taken care of. *Stuportech*

## What do I do if the battery terminals break?

When replacing the battery, both terminals partially broke. As I applied fairly normal torque to both bolts (lubed with dielectric grease, a little tighter than hand-tight), a side of the circle that the bolt goes through opened up. In other words, the "O" that the bolt goes through on the battery now looks like a "C." What's with that?

- That can happen if someone only did up ONE side with a screwdriver or spanner, without holding the nut on the other side. Know exactly the story. Happens if you use the "V" the nut sits in alone to hold the Nut. **HOLD the nut WITH a spanner.**

## Is there any way to check for a DEAD Cell?

- There is a way you can check this VERY carefully, take off the cosmetic plastic so you can see the battery, remove ALL battery cell filler caps. IF you have glasses, yep those things that some of us need to see with :-) They are for protection. Otherwise, WEAR GOGGLES!. Turn on key, hit starter, while looking at water level in battery cells. IF one cell bubbles profusely when battery is under load AND the others don't, THEN that cell is a dud. The battery voltage would sag badly under load at the same time. Vibration usually is the cause of cell failure like this. In doing the "cell bubbles check" be VERY careful. It Can spray out of the cell under SOME circumstances. *Jack, GS, Oz.*

## Can you (safely) add water to a charging battery?

- Batteries contain sulfuric acid. Charging batteries generate hydrogen. One teeny-weeny spark (even static) could easily ignite the hydrogen inside the battery, causing it to explode (with sulfuric acid spraying everywhere). I wouldn't consider that safe. *Marty #436*

## How do I clean up acid spills?

- First make sure you protect yourself. Rubber gloves and eye protection are a good idea. Mix some baking soda and water (1 pound baking soda to 1 gallon water), add this to the acid spill to neutralize it. Check for damage to the bike, the acid may have dripped down onto other parts of the bike.

DTC0000303

gallon water) - add this to the acid spill to neutralize it. Check for damage to the bike - the acid may have dripped down onto other parts of the bike.

## GS battery check - can it really be that difficult?

I can't find this in the FAQs so perhaps someone can help me out. Is there a way to check the fluid level in an '05 GS battery without a) having to remove at least two pieces of cowling and b) remove the battery from the bike? I tried shining a torch through the battery to check the fluid level but without success. In theory there is no need for me to check the levels right now because the bike has just had its first service - but I wouldn't want to rely on the workmanship - see comment below re brake pedal. *Lep*

- Buy a sealed battery.   (that's what I did). *billmallin #1629*

- To get at the battery you only need to undo the six bolts holding the centre panel. There is sufficient flexibility in the soft plastic side panels to simply spring the tabs out of the centre panel, with a gentle bit of wiggling. You don't even need to take off the oil-tank cap. *Trevor #999*

## How do I remove the battery from my CS?

1. To remove the battery from the Scarver is not fun. You have to remove the left "fence" (the left thingie you need when you lock a helmet to the bike, using the "spider"). You have to remove the left large side of the bike, the plastic, and you have to loosen the left flasher.

2. Pull off the rubber belt on the battery, remove -screw, lift the battery up and remove the +screw, and ta-daaa the battery is out! Keep an eye on the breath hoose, and put it back where it was when you put the new battery in.

3. To put the battery in is even less fun, and do not do this outside on gravel, because I guess you are going to loose screws, and it is easier to find them inside!

4. I bought one of those magnetic thingies that look like an antenna, to pick up small metal parts, I needed it when I had the battery out last year! And you need a low blood pressure, and some time, for this job. *Liv, Norway*

## Should I grease the battery terminals?

- Yes. Use an anti-corrosive gel, or petroleum jelly (any automotive store has it). Don't use just any ole grease. This will assist in getting long, uniform performance out of your battery. Also, make sure you tighten the connections well.

- A commonly available alternative is Vaseline.

- Another name used is a "dielectric grease"

## What if I overfill my battery?

- When you add water to a wet battery cell, you are adding water. When you remove liquid from a wet battery cell you are removing water and electrolyte. This will reduce the charge capacity of the battery. Just leave it   and the battery will sort itself out.

## BATTERY CHARGING

**Note: For Quick Direct Access to the Terminals** see the GS Fairing FAQ. Many Charge through the Accessory Plug, but read cautions below

## I bought a new battery. I need to charge it up. What current should I use?

- The rule of thumb for charging a battery, particularly for the first time, is NEVER to use a current that exceeds 1/10 of the ampere/hour rating. I shouldnt

DTC0000304

- The rule of thumb for charging a battery, particularly for the first time, is NEVER to use a current that exceeds 1/10 of the ampere/hour rating. I shouldnt imagine it is over 25 AH, if that. What this would mean if it IS that high, is that charging at 2.5A would be a FAST charge, not a trickle charge. For a 250AH car battery, 2.5A is a trickle charge, not for a motorcycle battery.

### Can I charge it through the Accessory Plug?

- Maintaining/trickle charging the battery through the accessory plug is OK, but not full charging, unless you have a small enough charger - and make SURE you use a small charger, less than 2 amps.

### How long should it normally take to charge the battery on a Battery Tender?

- For a New battery 10-15 hours on a Trickle Charge. Fill the NEW BATTERY, delivered dry, with Battery Acid, not distilled water, that's for topping up. Don't put e.g. a 6 amp Car Charger on it. You'll fry it. Use a nice slow trickle Charge 600mA e.g. Don't forget to put Acid in. Otherwise, you'll fry it

### I fiddle with electronics. Is there a Battery charger schematic anywhere?

- For those interested in burning solder, here is a link to a 3 amp battery charger/float charger circuit and instructions.
  http://www.uoguelph.ca/~antoon/circ/lader.htm (Northwest). And for those electronically-minded riders, look at this home-brew charge minder
  http://www.electronic-circuits-diagrams.com/carsimages/carsckt1.shtml *(Ian #1062)*

### My Battery Water is always Low. I suspect the VR is overcharging the System. Is there a solution?

- Yes there is. See first the VR FAQ, then have a look at the Flaying the VR FAQ.

### Can I start a Motorbike with a Flat Battery using a Car Battery?

- Yes, however it is HIGHLY recommended you connect the car battery with jumper cables, while the car is not running and then starting the bike. Running the car, when starting the bike, could damage the bike's electrical system. Using the car to charge the bike's battery could damage the battery, because the car's charging system will put out many more charging amps than the small bike battery will accept in its dead condition, possibly leading to overheating and a ruined battery. It could also lead to voltage spikes could take out the VR or BMS at the very least. A reverse polarity hook up would definitely zap the machine.

### Adding water to battery. I noticed my battery ('99F) was near the low line. Should I ride for an hour, or so, to charge up the newly diluted battery acid, or can the bike sit overnight or for a day or two?

- If the battery was fairly strong before replenishing with distilled water a few days should not matter. *Art #884.*

### How do I use a Voltmeter?

- See the How do I test it section in the VR FAQ.

### Do you have any more information on the F's Charging system?

- See the Electrical Misc FAQs - DC Electrical Basics

### What is best way to make Battery Charging Access?
### Do I have to disconnect any battery wires to charge it?
### Can I jump-start my bike (without removing the faux tank)?

**DTC0000305**

- On 2004 models there are *remote* battery terminals. The positive (+) terminal is under the seat next to the fuse box - there should be a small red sticker above the terminal, and a black cover on the terminal. The negative (-) terminal is the *strange* bolt on the oil filter *cover* (RHS).

- If you have an earlier model, you may need to do something like GS Charging Access. It is not advisable to use the accessory socket to jump-start the bike the wires for the accessory socket are not designed to carry enough current. The accessory socket is okay for charging as most small chargers only deliver a few amps.

### Is it okay to charge the battery on a GS/Dakar/CS bike (with an FI computer)?

- I wouldn't expect a problem... as long as you're using a "smart" charger of the correct size. The "dumb" wall-wart style could boil the water out of the battery if left connected for long periods of time. *Marty #436*

### Does an AGM need a battery tender?

- If you buy an AGM type seriously consider investing in a good temperature sensing, automatic, AGM compatible charger to maintain it. I read a good article in the Dec. issue of Ocean Navigator about maintaining AGM batteries. They will probably have the article on their web site in a couple of months. The gist is that AGM batteries commonly fail before they should because they are not properly charged. UNDERCHARGING and overcharging are equally bad.

  What is not clear is whether our GS charging systems are getting the AGM batteries to a full charge. The article implies that many automotive (engine driven) charging systems do not charge batteries much beyond 80-90%. The AGM supposedly needs the full 100% charge to keep it healthy. This is true for a conventional flooded cell battery but they tolerate undercharging longer before failing.

  AGM batteries are capable of being charged more quickly then flooded cell types which is more of a benefit to boaters than motorcyclists. Too fast of a charge can only happen during the last 20% of charge which is why conventional chargers are inappropriate.

  The article mentions Gel type batteries as well but only in passing. It sounds like many of the principals are the same. *bg #1002*

### Do I need to remove the little caps off the cells when charging the battery? (When I was a kid, I remember watching my dad charge his car battery and he always took the little caps off the cells when charging) *Fizz*

- My dad used to do the same, but then he had an ancient charger that used to make the electrolyte boil. As long as you don't put more than say 2 amps through your fine not 'unscrewing-the-caps', but it's wise to check the battery from time-to-time anyway. *Trevor #999*

### Battery never fully charged?

- If you have left your battery on a recharger of some sort for more than the recommended number of hours, and the charger indicates the battery is still not fully charged, you probably need to replace your battery. Of course before you do that, check for high resistance connections (i.e. breaks in the wires connecting to the battery terminals).

### Can the battery system handle a 500mA AA battery charger?

- 500 mA = 0.5A
  0.5A * 12V (nominal) = 6 Watts
  This is less than one heated grip draws.

- Just don't leave it connected for days!

**DTC0000306**

**Can I charge my iPod overnight from the bike?**

- Most likely yes - your iPod has a very low draw. Just do not let it connected for days!

## BATTERY TENDERS

- Motorcycle batteries are not very durable parts and need **tender** care. The most likely thing to have happened is that your battery is discharged and needs to be charged on a small battery charger. A full charged battery will go flat within 3 months, if it is not charged occasionally by riding the bike or by using a battery charger. Do not use a charger that is rated at more than 1.5 amps. It will take at least a full day to fully charge your battery, if it is completely dead. If you do not have a charger, buy a "smart" charger that will taper the charge as the battery charge rises and then turn itself off when the battery is fully charged. Don't forget to check the battery cables to make sure that they are tight to the battery and clean any white deposits that may be near the battery with water and a brush and coat the terminals with a light grease. Sometimes batteries can fail due to an internal mechanical short or due to deposits that accumulate on their bottoms, but this is unlikely (although not unknown) with a new battery. *Richard#230.*

- I like the Deltran Battery **Tender** (BT) better than the Yuasa Charger but it's really a matter of personal preference. A great article on motorcycle batteries is on the Yuasa web site at: http://www.yuasabatteries.com/motor_battery.asp They both switch between PEAK and FLOAT conditions which either pumps the battery up or maintains it at full charge. Either one you'll want to charge then disconnect not leave it in otherwise the battery will sulfate. I run gel type sealed batteries which reduce/eliminate this potential problem. I prefer the Deltran as you can get a portable travel version and/or an international travel version. While you can equip these with the BMW accessory plug I always put the direct connect leads on the battery and use these for the hook-up. *David H Park. #711*

- I've got 4 bikes in the garage, tightly wedged away so I can just SQUEEZE the minivan in there during the winter months (I hate scraping windshields). I bought 4 of the cheapie 1/2 - 1 amp "wall-warts" type battery chargers from J. C. Whitney. When I put the bikes away for the fall (minimum 3 months during the winter), I plug one charger into each bike. If I were to leave them all plugged in all the time, the batteries would fry (which is why the "**Tender**" was invented). What I do is to plug all the "wall warts" into a power strip, and run an extension cord from the power strip to the garage door opener light. I installed one of those little adapters that allows you to take power off at the light socket. That way the battery chargers will only be on when the garage door opener light is on (usually a 10 minute delay every time the door opens or closes). Between my wife and myself coming and going, the bikes get about 40 minutes of charging per day. Seems to be about right. This approach saves (1)battery removal (2)remembering to plug it in and unplug in a timely manner (3)shuffling one battery **Tender** among 3 bikes in the cold (the 4th is 6V) (4)the expense of owning 4 battery tenders. Downside is lots of cords strung across the garage (definitely not UL-approved!), but not a problem since nobody spends any time there in the dead of winter. We'll see how this system works with the new AGM battery this winter. *Marty #436*

- I have a Battery **Tender** for bike batteries and a bigger charger (somewhere) for cage batteries. What is it that the **Tender** supposedly does or does not do that is not good for sealed batteries? I mean ... the charging system on the BIKE doesn't know the difference. The upper limit of the charging system SPECIFICATION for the F650 is 14.75 V. So much for a sealed battery's sensitive self. And if your VR needs flaying, the battery might see 15.5 V. *Flash 412 (CO)*

- I use a Battery **Tender** Plus. So far, so good, no problems. *DaveJ#888*

- My Battery **Tender** Plus works fine on the (easily accessible) sealed battery that came with my Yamaha YZ1. *Richard #230*

- It occurred to me that **Tender** might have a web site, and indeed they do. Not sure why I want the "Plus" model, but I do see the "Jr" model works for lead-acid OR sealed. Below is some info:

  OK, this is the deal on sealed batteries and "regular" chargers. The **Tender** web site provides further info on the "Plus" model. Sounds like my BMW dealer, and the battery shop, are misinformed after all. "NOTE: In recent years, the Sealed, GRT (Gas Recombinant Technology), AGM (Absorbed Glass Matte), Lead-Acid battery has enjoyed widespread acceptance in a variety of applications traditionally dominated by flooded battery technology. The Battery **Tender** Plus battery charger circuitry provides a superior configuration to accommodate the more demanding recharge requirements of this superior

DTC0000307

battery technology. Although the original Battery **Tender** battery charger will recharge AGM batteries, the full recharge time is longer than with the Battery **Tender** Plus battery charger. This is because of the different implementation of the absorption charge mode between these two chargers." Those differences are spelled out in detail in other documents on the website. See Utility / Frequently Asked Questions.

The main (practical) difference between the **Tender** "Jr" and the "Plus" is that the Plus will charge the AGM's faster than the Jr. It will also charge an un-sealed battery about 4 hours faster (6 vs. 10 hours to initial peak of 14.4v). It is always interesting to read the manufacturer's data sheets, then talk to a dealer to see just how much they don't know about the product. Today I heard the following:

1. HD dealer: "The only difference between the "Plus" and the "Jr" is that the Plus will shut off when done, while the Jr will run forever: " NOT! Both slip into a float/maintenance mode.
2. BMW dealer: "The **Tender** brand will not work on a sealed battery." WRONG, wrong, wrong.
3. Battery specialty shop: "Off-the-shelf Tenders will not work with sealed batteries because they have excessive voltage (greater than 13.8v); OUR version of Tenders have a SPECIAL CHIP added to them at the factory that keeps the voltage below 13.8v for sealed batteries." WOW, good one . . .

I bought a copy of the "Jr" tonight and as I type this note it's merrily charging away. Or, at least the little red light is on! *Scott, ID #1244*.

- Apparently (See the Battery FAQ for more details) Sealed AGM Batteries have a HIGHER charging capacity than Unsealed ones. So anyone with VR/Overcharging problems will be better off with one of those, on a **Tender**, even a cheap one with no limiter .... ;-)

- 14.4V is the usual design limit for 12V vehicle systems, at 14.8V the charging turns into electrolysis, and wrecks the battery. A battery that can't handle 14.4V shouldn't be in your bike, but there are plenty of sealed batteries suitable. *nakaD*.

- Battery/Charger Tester. This weekend I received the Harbor Freight Tools Battery and Charger Tester that I ordered on sale for $20. It took two weeks and I mailed my order in. This thing is fairly substantial and consists of a voltmeter mounted to a large vented steel box in which are some very heavy wires about a quarter-inch thick that apparently are designed to get hot, like a toaster oven. Two large battery clamps are attached to the side of the box. You attach the big clamps to your little motorcycle battery (this thing is designed for car batteries), read the voltage and flip a switch for 10 seconds. This places a 50 amp load on the battery and heats the internal wires. You then read the voltage again and if it is in the green, your battery is OK. If not, there is some sort of problem. To check the charging system, you just connect the clamps to the battery while the engine is running and read the voltage (no wire heating this time). If it is between 13 and 15 volts your charging system is OK. Not too high-tech, but it seems to be worth $20 (or even the normal retail price of $28). It uses a real meter, none of that fancy digital stuff here. *Richard #230: 1997 Funduro, 2002 R1150R, 2002 Yamaha YZ1, 1993 Honda CB750-Pacifica, CA, USA*

- The BMW shop here pushes the "Accumate" charger for $59, claiming it works for lead acid OR sealed batteries; this is why I DON'T want to buy the **Tender**, according to them. But I was thinking I could spend less than $59 for on a 1-2A charger. I just called a local battery shop and it turns out that maybe the dealer could be right after all. The battery shop guy said they have the **Tender** for $30, but that I can buy one for under $20 somewhere else. The difference (I think I got this straight): Deltran, who makes the **Tender** for Hawker, will put a limiting chip inside the **Tender** for a few extra dollars. This chip limits the output to 13.8v, which is the cap for a sealed battery. A "regular" **Tender** will cutoff at 14.5-15v, which is OK for a lead-acid battery. He said the sealed battery is VERY sensitive to excess voltage. I don't know if I'll ever buy a sealed battery, but maybe I'll bite on the modified **Tender** that works either way, just in case I get tired of checking water levels. *Scott, ID #1244*

- I have a Battery **Tender** for bike batteries and a bigger charger/ for cage batteries. What is it that the **Tender** supposedly does or does not do that is not good for sealed batteries? I mean ... the charging system on the BIKE doesn't know the difference. *Flash 412 (CO)*

- I use a Battery **Tender** Plus. So far, so good, no problems. *Dave J#888*

- My Battery **Tender** Plus works fine on the (easily accessible) sealed battery that came with my Yamaha YZ1. *Richard #230*

- It occurred to me that **Tender** might have a web site, and indeed they do. Not sure why I want the "Plus" model, but I do see the "Jr" model works for lead-acid OR sealed. See http://www.batterytender.com/ They Note: NOTE: In recent years, the Sealed, GRT (Gas Recombinant Technology), AGM (Absorbed Glass Matte), Lead-Acid battery has enjoyed widespread acceptance in a variety of applications traditionally dominated by flooded battery technology. The Battery **Tender** Plus battery charger circuitry provides a superior configuration to accommodate the more demanding recharge

**DTC0000308**

technology. The Battery **Tender** Plus battery charger circuitry provides a superior configuration to accommodate the more demanding recharge requirements of this superior battery technology. Although the original Battery **Tender** battery charger will recharge AGM batteries, the full recharge time is longer than with the Battery **Tender** Plus battery charger. This is because of the different implementation of the absorption charge mode between these two chargers. Those differences are spelled out in detail in other documents on the website. Cheers, *Scott, ID '02 Dakar*

- Battery Charger Optimate III - On board http://www.accumate.co.uk/jj010003.html. *stream2003*

- I don't have any knowledge or experience with the charger OPTIMATE III, however, I do have a "BATTERY **TENDER**" charger. I have used on a '86 Honda V65 Magna, '01 R1150GS, '02 K1200LT, and it has worked fine. I will be picking up my new F650GS Dakar this weekend and plan on using it on that bike as well. The 1150GS and K12 were charge through their accessory outlet plugs that came standard on the bikes. On my new F650GS Dakar, I'm having two accessory plugs installed for heated vests for me and my wife when she rides along, and will use one of them when the bike is parked in the garage to keep the 'BATTERY **TENDER**' plugged into. All have been connected to the charger while still connected in the bike without adverse effect. The 'Battery **Tender**' and probably the OPTIMATE III as well, are made to produce a 'trickle' charge with a sensing circuit internal to the charger that will keep just enough charge on the battery to keep it at peak charge. Once the charger senses a full charge status on the battery it will just sit there in a monitoring mode until the battery voltage drops, then will start a trickle charge to regain the battery. Input to the 'BATTERY **TENDER**' charger is 120VAC @ 60Hz, 24W. Output is 12VDC @ 750mA. This model of the 'BATTERY **TENDER**' is very small, resembling the type of transformer you plug into a wall outlet to power up such items as a answering machine/phone. So really nice for packing along, or storing. Your OPTIMATE shouldn't be a problem at all. Have connected the accessory plug on the right side (Bank), and it is connected directly to the battery. *Blue '03 F650GS Dakar, Washington State.*

- I also use the Battery **Tender**, I connected a Gerbing heated clothing plug directly to the battery, when not being ridden, I plug in the **tender**. The Gerbing plug wire is fused with a 15w fuse accessible on the 650 gs. *billbotoo*

- I use the original Optimate on my Moto Guzzi and the Optimate III for my CS. I merely plug them in at the end of every ride and forget them. Often, I leave one or both bikes without using them. The 'battery conditioners', as they are known, have worked without problem for many years now on a variety of bikes and there does not seem to be a disadvantage as far as I can see. I keep an eye on battery water level but this has never fluctuated. The batteries are kept in tip-top condition and allow first-press starting (or first kick for the Guzzi ...) every time. This was especially useful when I had the R100R and needed a reliable, early winter morning no-fuss start. I recommend the Optimate III without hesitation for the F650 range, based on my own experience. *Keith, chejtkeeje*

- Have used an Optimate for years on XS1100, R100RS, XT500 (kick start but always started first kick - yeah first kick!), R45, DR350, R1100RT, Dakar - all without problem and especially good in the winter when the bikes are cold and need a healthy battery (especially the R100RS). Have two leads for mine, one with the 'cigarette lighter plug' for the socket on the Dakar and one with 'crocodile clips' for the DR. Plug them in and leave them. *Mike, London, UK -- '02 Dakar -- '98 DR350. Essex Dakar*

- Many of us have wondered how long it takes to charge up a battery, particularly when it is in the bike. We have also wondered how much juice is grabbed from the alternator to charge up the battery. I lifted this response from the R1150R web site, and while it discusses the R-bike and its 700 watt alternator and 19 amp battery, it is still interesting. I don't know if the information is correct, but it sounds right to me: No amount of charging or riding the bike will bring that battery back 100% from it's impending certain death. It's too late for that scenario. It didn't die, it was murdered. If it's just a month of on the centerstand, the time to full charge should be about 1 hour of continuous running. Unlike battery chargers that have a fixed low output, the Beemer's alternator will maintain 14 volts from the start. On a "low" battery, that associates with a 10---15 AMP charge for the first few minutes. Then the batteries Amperage draw slowly tapers off to 2 or 3 Amps, after 20 minutes, as the battery's charge deficit is replaced. To achieve 100%, a lot of time is required, as the closer you get to 100%, the slower the percentage approaches 100%. All the while, the voltage regulator maintains 14.0 Volts no matter what RPM. The 50R 's alternator is so powerful (YEAAAH!!!), you'll get at least a 10 Amp charge at an idle, if your battery is pretty low, as soon as you come down with the start lever. In this infrequent riding season for everyone in the Northern Hemisphere, use your bikes running time wisely. Put the longest part of the ride at the end if possible. Never start your bike to move it 30 ft (9.1M) to the garage/shed, only to let it sit for a week++. That practice traumatizes batteries. Ride it to it's final stop the first time -or- push it there. Most of the battery sites have excellent FAQ sections on battery care. Try this: www.yuasabatteries.com/faqs.asp. *Richard #230*

- The original Battery **Tender** (now discontinued) was designed for wet cell lead batteries and is not adequate for AGM of Gell Batteries. The AGM model which is the Battery **Tender** Plus works with AGM and with the original wet cell batteries that come with the F650. The Hawker battery is an AGM

DTC0000309

which is the Battery *Tender* Plus works with AGM and with the original wet cell batteries that come with the F650. The Hawker battery is an AGM Battery. To follow up RE: Battery Tenders the following was e-mail sent to me when I inquired about the proper Battery *Tender* to use.

*"The Battery Tender Plus was made in two models. Part # 021-0156 is the one made for gel batteries which BMW installs in its motorcycles. Part # 021-0128 is the model for AGM batteries which Harley installs in their bikes. The gel model charges a little slower and lower and if you use the gel model on the AGM batteries then you might not get a full charge. If you use the AGM model on the gel you may damage the battery.*

It is true that the part number is not displayed on the Deltran Battery *Tender* or the BMW version of the Battery *tender*. However the one for gell cells has "Gell Cell" printed o the front of the case. The Battery *Tender* Plus is the one for AGM Batteries. The Battery *Tender* Plus that has for "Gel Cells" printed on the front of the case is the the one for Gell Cells. the BMW charger for gell cells also has "Gell Cell" clearly displayed on the front. do not use the original Battery *tender* on the AGM battery. The original will not bring an AGM battery up to full charge. *Hunkystuff*

## BATTERY PROBLEMS

**Is it true to say the Voltage Regulator (VR) will be stressed and eventually fail if the battery is not kept topped up? For more information on the Voltage Regulator, see the Voltage Rectifier FAQ.**

- Eventually? - sure. But considering that we don't know exactly how our VR (we should probably call it a VRR or RR - UFO -unidentified frying object, whatever) is designed or exactly what is inside it, it's hard to say exactly. What you say would be very true of a more conventional VR, which varies the alternator output by controlling what it does (with an exciter, field windings, brushes, more complex parts). As far as I can tell, our VRR/alternator set-up is different than most systems – I think our alternator runs full out (100% output) all the time (bad for gas mileage) into the VRR. The VRR decides what to do with the power - send some of it out (or all of it out) into the battery and bike system, or send the excess power into an internal resistor (which burns it off as heat), OR possibly (internally) disconnecting one of the yellow alternator wires I can't say that a low fluid battery is good, or indifferent, for our VR. I'm sure it must stress something somewhere in the VR and wiring system. I just don't know exactly what/how. Obviously completely dry is bad, but that's an extreme.

**Is the converse also true that a failing VR will empty the battery?**

- Summary: depends. :-) If the VR (RR, VRR, whatever) fails into high output mode, absolutely yes. But it is a complex unit and could probably fail for several different reasons, so it could also fail low, undercharging, or fail dead. Possibly it could fail high, boil out the battery, and then burn out and fail dead. I suspect that one reason for our low battery water occurrence is that many of the VR's charge too high - like mine at ~15volts. That's not necessarily a real failure, probably just crappy Quality Control. For some once a week riders on short trips, 15v might be just fine. For high mileage riders trying to make 1000 mile trips each week, that would be bad overcharging for the battery.

**Can I disconnect the battery while the bike is running?**

- One thing for sure, in almost all solid state (Transistorised) VR charging systems, if you remove or disconnect the battery while the system is running, you almost always ruin something expensive in the VR! Don't ever do it intentionally in your car.

**When I try to start my bike IS the Tic Tic Tic sound coming from the Solenoid, (Large Round Object just Rear of the Battery on the Airfilter Cover with two big red wires coming out of it) symptomatic of a Flat Battery?**

- Yup. It's the solenoid trying to close, and not quite having enough voltage to stay closed. It cycles back and forth when it doesn't have the voltage. Not good for the contacts either, can arc and overheat, melt a few things if you do it too much. See also the Noise 8 in the Strange Noises FAQ.

**My bike will not start. When I turn the key to the on position, there is a buzzing sound... Turned the key off, no buzzing, turn it back on without touching anything and it is back. Push the starter button and the buzzing stops and the lights dim.**

DTC0000310

touching anything and it is back. Push the starter button and the buzzing stops and the lights dim.

- What does your Voltage Meter read when trying to start (starter button mashed)? Read voltage directly from battery terminals. Then read voltage between starter motor and ground while trying to start. Remove the cables from battery and clean them up. Reinstall and try again. Watch VM. The above will probably tell you a lot.

  It's possible (kind'a long shot) that the low voltage from the first attempt has welded or otherwise bunged up the contacts in the circuit. More likely, the buzzing sound you hear is the relay not getting enough juice to stay closed, turning it into a buzzer. *jetdocs550 #1546*

- First, check the battery. Second, toss the battery. Third, replace it with a new one. Or just skip to step three. *SScratch #1082*

- Solution. Well, off to buy a new battery. Tested battery with key off, 12V no problem. With key on dropped to 4V. With started pressed it dropped to 3V. Could have sworn I tested it with key on last night and got 11.9V but it was late...

### I'm having problems starting the bike. Could it be the Battery?

- Check your battery water level. If it is down, you may have a battery with a bad cell. If the battery is not replaced, it might take out the voltage regulator. Check the cells with a hydrometer and check the voltage across the battery terminals with a volt meter. All cells should have an equal charge and voltage should be limited to about 14.5. If one or two cells have a low specific gravity, replace the battery. If the voltage is higher than 14.5 volts with the engine running, you may have a bad regulator or stator and not replacing it may even cook a new battery. A battery with dead cells could most certainly cause it to stall out at idle. A battery with dead cells is flaky at best, and if there is not enough voltage to operate the ignition system, the engine quits running. You are also not doing your charging system any good by operating on a near-dead battery.

- [After chain replacement on a 97 F650ST] Might be worth looking to see if the countershaft cover "pinched" the ignition ground wire that comes down alongside the oil filter cover. I have to assume that the cover was removed and replaced to change out the chain. Also, LOOK at the battery water level, check the battery connections, and don't forget to check the position of the "engine cut off switch." *Marty #436*

- See also the Hard Starting and Poor Running FAQ.

### My ABS light came on while riding and stayed on. Now the bike won't start!

- If your ABS light comes on while riding, it can be due to battery problems. The ABS system requires a certain ammount of power to operate. If there is not enough, it switches itself off. If you are riding in cold weather, and / or have lots of accessories and your toaster plugged into your bike, try switching a few things off and ride for a little before stopping. Otherwise you may not be able to start the bike after turning it off. If you can not start the bike, check the battery levels, and pop it on the **tender** (assuming your at home).

### Stalling, difficulty starting and hesitation when applying generous throttle?

- If you are having any of these problems, check both battery terminals for a good solid connection. *amos*

  Also check the battery terminals themselves - in rare cases there may be bad internal connections. Also check the GS Hard Starting FAQ, the Custom Fixes for S&S and Hard Starting and Poor Running FAQ.

### Can a battery get too weak to start after only 12 days of non use except for a quick 10 sec. start to move to from the driveway to garage?

I ask cause I just came back from a quick night ride. I haven't been riding and was wired. Figured I was due a short ride before I went to bed. Anyway my bike wouldn't start. It kept cranking but wouldn't catch. I left it for about 10 seconds then tried it again and it finally turned over. They way it sounded when it turned over is like like it was almost at the brink of turning over then it just caught. Sorry I can't explain it any better. Oh yeah. The bike is only 3 months old. That is why I am surprised. Should a battery **tender** be purchased in my near future?

DTC0000311

- If you have an alarm running 12 days may be enough to drain the system. The short run takes a chunk out of the stored power, the alarm drains a bit more and the battery won't give any current. I doubt this should be the case. Turning but lack of spark is an ignition rather than battery problem. A flat battery will either click the starter relay and do nothing or turn the engine lethargically until it dies. Check the battery voltage (engine off) flat (11.8 ish), charged (12.5 ish) and engine running (14 max). Given the age of the machine, I'd say BMW owe you a battery and maybe a voltage regulator. If they change the VR you want a battery too. If they change the battery, check the date of production and get them to give at least a 12 month warranty for your bikes use (they may try and call it a consumable and not cough up when the VR boils its fluid). Battery tenders are great, but you need to be careful still. Get the **tender** and a timer plug. Use the timer plug so the **tender** only comes on 1 day a week. If you leave the **tender** plugged and powered, it will hold the battery at 12 volts plus rather than cycling low and high. A "trained" battery will then fail to push a current without this higher voltage. *Andy Leeds UK #082*

- I agree with most of the comments (not sure about warranty coverage - good luck), but one aspect was not covered. You say the bike/battery is only 3 months old, and the bike was parked for 12 days. The 12 days parking shouldn't be too bad as long as the bike was above freezing (and it's summer, right?), but how often or how many miles did the bike run in the previous 3 months? If it was a new battery, most likely undercharged by the dealer (as others have pointed out), and you only had 900 miles of charge time in the 3 months of ownership, and then parked it for 12 days...likely the battery was not well charged to begin with. If you started it up slowly, with the headlight on for a minute before starting (as you have to do to cycle the computer), the headlight is a large drain on the already weak battery. If I had to start the bike with a weak battery, I think I'd try to reach up and unplug the headlight before starting, it might give you a little extra juice. (Not sure how difficult it is to reach the GS headlight plug, but it's easy on the Classic.) Yes, I realize (on the GS, unlike the Classic) the headlight relay cuts out while actually starting, but I think not while the bike is waking up while you cycle the computer. That could be 30-60 seconds of drain on a weak battery. Do not drain the battery and recharge it - lead acid batteries do not do well under those conditions, you are thinking of NiCad batteries that must be cycles up and down. Different animal. A battery **tender** will help. *Todd #389*

### If I've allowed my Battery to Drain Water/Get Low (Due to e.g. VR Problems, Poor Maintenance), will it ever fully recover?

- Keep an eye on your battery, even if everything else checks out OK (you DO need to the check the voltages) keep in mind that you have just brutalized your battery and it will never fully recover, so expect to have to keep a closer watch on it. *Todd #380*

- Once you've let a battery go flatline, you've seriously reduced the life of the battery. Follow that up with 2 or 3 weeks to croak all over again, and you're set. *Sadisor #1444*

### Ever heard of a sudden battery failure? Sudden Battery Death? Battery Suddenly Died?

- Yup. My R80G/S started up just fine one morning using the electric starter. At lunchtime, I went to run a couple of errands. Three stops and three starts with no problems. Sitting at a stoplight, idling, it burped and died. Refused to crank. Pushed it over to the side of the road to trouble shoot. Eventually, I figured out that I had neglected the battery too long. Topped it up with some distilled water. Roll started the bike. Had to roll start it at work, too. Got it home and found that a cell was D-E-A-D. *Flash #412*

- I am in Mulhouse, France and yesterday I had my first breakdown. Yesterday I was riding on the Autobahn in Germany when I after several stops stopped for gas (the third time that day). I turned off the ignition switch and filled her up. After I had paid the gas, the bike wouldn't start at all. The neutral and oil light on the dash board didn't light at all. A friendly German helped me to start the bike by using starting cables and we connected his car battery to mine. The bike started right away. When the bike was at idling one could see that there was no power in the battery, since the neutral green light and the front head light was rising and falling in strength. I continued another 200Km to my destination. When I arrived at the destination I had still no power in the battery. The bike is performing as usual except for the starting problems

Some facts

1. The battery is new and has only been used for 10 days or so. The water level is at the high mark.
2. The VR tested OK last week. It tested about 14.1V at 1500 and 3000rpm.
3. Yesterday I drove at high speeds ~130km/h for long periods ~700Km. I used my Aftermarket heated grips a lot. I used it many times in the start-up mode (60W, max time 5 minutes is stated on the switch). After the breakdown I switched the heated grips off.
4. I don't have any more electronic accessories, except for a accessories connector

**DTC0000312**

I am going to buy myself a multimeter and starting cables this afternoon (some of the things I didn't thought would be necessary on the trip...) and measure the battery, which is charging right now. I have just printed out the Electrex fault finding guide, and will start with that tomorrow or on Monday when the battery is fully charged

I am thinking that it can be one off the following reasons for the problem.
1. Faulty Battery (unlikely since it is new).
2. Faulty VR (possible)
3. Faulty Alternator (never heard of an alternator going bad, so I don't know)
4. Something (heated grips? or else?) is drawing a lot of current...

I have done some more testing today and it looks like it is the battery that is bad. I charged it over the night and put it on the bike this morning. Nothing happened. No power at all. After checking some cables I connected a friends car battery to mine. With this connection the power is back and the bike starts. However as soon as I remove the connection to the car battery the voltage over the mc battery drops to 3-4V. If I remove the mc battery and just use the car battery everything is fine. Including the VR which measures 14-14.5V at rpm from 1500 to 6000 in this mode. Another thing I noticed is that when I try to charge the mc battery the voltage rises to 14.8V, but the current is only 5mA, when it should be 500mA. Well as far as I can tell it is the battery, but why is it already toasted? It is only 10 days old. Did I just get a bad battery or is there something else that is ruining it? Tomorrow I'll see if I can get hold of a new battery. I'll check back then to report.

Finally: All motorbike shops are closed on Mondays for some reason, but I found a Battery at a auto accessories shop. I have put it on charge now and YES it takes a charge. It charged 0.4A when I started, and was after 2 hours down at 0.36A or so. I'll charge it until I leave for Geneva tomorrow. In Geneva I'll spend a week visiting a friend and do some daytrips around Switzerland. I'll keep a close look at the Voltage in the next few days. The lesson learned I guess is to install a voltmeter on the bike. I do that when I return home. Perhaps it could be mentioned in the Battery FAQ, that it happens that batteries are bad when one buys them and can fail pretty quickly... Another thing one can have in mind when one doesn't have an multimeter is that the charger (at least mine) gets hot when it is charging successfully. That way one doesn't have to measure the current to find out. I checked the new battery today after riding 300Km yesterday on highways through Switzerland to Geneva (where I am going to spend the weekend). The ride was good and I didn't experience any problems with the battery. The DCV measures today 14.3-14.4V, which I think is good (I have flayed the VR before). *Regards, Spakur #1117, Icelander in Malmo, Sweden, 1995 Classic Red R650 with 65.000+ KM*

- I've seen new batteries which would not take a charge. Get a statement from a local dealer or service shop that your battery IS bad so you can collect the money from the seller. Hey its probably the least hassle thing to go wrong in the electrical department. Just make sure before heading for remote parts that everything is OK. Good luck and good trip! *echo, F650CS Dakar, Camden, New Jersey.*

- After you put the New Battery back in CHECK the Voltage again. IF The VR went bad that MAY have been the reason for a toasted battery. Just so you don't get stuck in the next town with another dead battery! btw echo's right. I hade TWO batteries that didn't take a charge. Filled them up and put them on a charger and 12 & 24 hours later DEAD!. No Charge. The 3rd one worked *Kristian#562*

**Pop! Smoke! Dead Dakar! - (battery area - anybody had it happen?)**

- Sounds like it might be the same issue several Inmates have had of the wiring harness wearing through. *Marty #436*

- Not to throw out the proverbial red herring, but on the Blackbird that phenomenon was spelled v-o-l-t-a-g-e r-e-g-u-l-a-t-o-r, as in FRIED. *Sadisor #1444*

- Have you checked your battery drain tube to make sure it hasn't come off and let acid dribble onto the harness? That will do it and has on several bikes. You may have to pull off the snorkel and maybe some radiator shrouds to see it. *bg #1002*

- Solution. Or, maybe it's just a loose battery connection. I've seen that happen on trucks, when you hit the starter everything goes dead. Tighten up the terminals, and everything works fine again. Something easy to check first, anyways. And, when your in there, you can look for any inappropriate melting... *dmemt #1464*

DTC0000313

**Is it possible for a brand new battery to go bad, or might there be another reason like a short somewhere?**

- Yes to both. *Marty #436*

- Connect a multimeter set to 20 volts DC scale, across the positive and negative terminals of the battery, you should see about 12.5 volts or so. Next, turn on the ignition and recheck voltage.....it will drop maybe to about 12 volts. Press starter button, the voltage reading will drop to about 11 to 11.5 volts WHILE cranking. IF the voltage reading goes down a mineshaft, then you have a bad battery, if not then you have a possible wiring/switch/solenoid problem. *jack*

**My bike is dead (no headlight, brakelight etc), but a multimeter shows the battery is good.**

- Remove the wires from the terminals, clean the battery terminals and wire terminals until they shine. Take a look at the level of electrolyte in the battery and if it is not between the lines add DISTILLED WATER. Reassemble and try ignition again.

  If it still won't start, get a meter. Set the meter to read voltage. Read the voltage on the battery, ignition OFF. If it says less than 11 volts, you may have a dead or bad battery. First try putting it on a charger for several hours. Repeat this test. If it is STILL below 11V, you have a BAD battery. Replace it. (They're about $25 at Sam's Club or WalMart. Check the FAQ.) Otherwise...

  Turn the ignition on and read the meter again with it on. If you lost three or more volts, you have a BAD battery. Replace it. *Flash #412*

- Solution: I pulled my battery and confirmed that it was low on water. Instead of filling it, I took it to my local dealer and had them check it out. The guy tested the battery and he also was getting a reading on his meter. So, the battery had enough juice to register a charge, but not enough to start the bike. *bektbee* [Ed Note: This most likely would have been identified in the above answer]

- See also the Hard Starting and Poor Running FAQ

**What are the normal voltages of the battery?**

- This depends on many different things. For example, if you do a lot of short trips with heated grips and high beams on, then your voltage will be lower. Do you leave the bike on a battery **tender**? What sort of battery do you have? etc...

  Generally to measure the battery voltage correctly, you should not check it immediately after riding. Give it a few hours for the battery to reach room temperature. The voltage reading will depend on many factors, so check it regularly so you know what is normal. Keep records, so when it does change you know there is something wrong]

  When the bike is running (rev the engine to 3000rpm, turn off all accessories) you should see about 14.5 volts at the battery. Take the bike for a 10 minute ride and then check the voltage again. A drop in voltage, or high voltage could indicate a failed VR. *Based on comments from Richard #230, mark #403*

  (See the VR FAQ)

**Battery life when riding short distances?**

- The life of your battery depends on several factors including its charge state, how often you recharge it, and what accessories you use. If you are riding lots of short distances the battery may not have enough time to recharge. You have several options: try using fewer accessories (turn off your fog lights and microwave five minutes before arrival at your destination) or better yet ride the bike on longer trips. Failing that you could try keeping your bike on a battery **tender** each night.

  See also Battery Life

DTC0000314

See also Battery Life.

**Can a battery tender "boil off" a wet cell battery?**

- I hooked up my wet cell one night and it started to gurgle almost right away. I didn't think much of it and opted to rely on the float feature to turn off the tender when the battery reached an optimal charge. I guess it never did. In the morning, the charge light was lit but it wasn't gurgling. I thought, "OK, maybe the light is broken. I'll check it after the Mardi Gras Rally."

  I fired up the bike and flogged it for a couple hundred miles to just north of Lake Ponchartrain. I ran my aux lights the whole way (oh, and my Scott's oil filter, too. There's no relevance there but I thought it really important for you to know). I shut the bike off and fell asleep at the Crack House on Lake Datgurlnee sunbeeds. In the morning, my bike wouldn't start. I peeled the hide off my bike and checked the battery. It was bone dry. *NothingClever #1441*

**What would cause a battery to bulge?**

- (for a conventional wet cell battery) Only two things I know of that will "bulge" a cell, freezing or frying. My guess is the cell is shot. Do you use a tender? They are great for covering up bad cells... for awhile. I'd also suggest you consider an AGM battery upgrade. No acid spills and more capacity. *dmemt #1464*

- (for an AGM) Just replaced my AGM battery (in a Classic, 2.5 years old) - while I was doing my service, I saw the telltale sign of a bolt covered with that white powdery stuff caused by leaking battery acid. Sorry - when they get a bulged case that cracks, they "seep". What caused it to bulge? Got me... typical voltage regulator overvoltage (common to Classics - see VR FLAY in FAQs) or a combination of high mile days across the Great Plains in 100F+ weather in conjunction with the location nearly atop the muffler pipe? *Marty #1436*

**Do I need to do the Flay to keep my new battery in good condition?**

- See the Voltage Rectifier FAQ and Flaying the VR FAQ.

**Can I remove my Battery while the bike is running?**

- There is a long and detailed discussion on this thread, however the short answer is NO, it is not a good idea and could lead to all sorts of damage to your bikes electrical system. In otherwords - if you choose to disconnect your battery while your bike is running, do so at your own risk!

**GS clock reads funny when inserting a new battery?**

- If you GS clock reads funny when you insert a new battery, check the voltage on the new battery. It is probably low.

**GETTING HOME WITH A DEAD BATTERY**

See Can I Push Start a GS first.

- I talked to a local dealer here in Geneva and he stated that if the battery is dead on a GS, it isn't possible to get back home. This he said was because of the F.I. The classic will however get you home. Is this correct? Regards, *Spakur #1117, Icelander in Malmo, Sweden, 1995 Classic Red R650 with 65.000+ KM*

- I believe that statement may be true, Spakur. My understanding is that BMW FI computers must be supplied with a certain level of voltage or they will go on strike. If the voltage into the computer is either too high or too low, the thing shuts down to protect its small brain - leaving you to push, if you want to get down the road. I am not sure if the Classic can run with a completely flat battery. My experience with my Honda Nighthawk (which certainly is no more

DTC0000315

get down the road  I am not sure if the Classic can run with a completely flat battery. My experience with my Honda Nighthawk (which certainly is no more hi-tech than the Classic) is that when the battery dies, the bike will not start without being jump started from an outside source. Push starting will not get it going. Once started, it will keep running as long as you keep the revs up. Let them fall to near idle and the engine dies, leaving you stranded again. However, if the failure was due to a fried VR, you might be risking some of the bike's electrical components by running it that way, as the high voltage may fry something. *Richard #230: 1997 Funduro, 2002 R1150R, 2002 Yamaha YZ1, 1993 Honda CB750 - Pacifica, CA, USA*

- My vote is the dealer is wrong. Wrong in the sense that the engine should start with a jump and run on the current produced by the alternator. That's what it does even if the battery is good. You cant start the engine by bumping it into gear on a coast, but you can jump it. You cant roll start my ST1100 with a dead battery either and its carburetted. Why? There must be some exciting current flowing through the coils for the alternator to produce electricity. That may also be the case on the GS. echo. *F650GS Dakar, Camden, New Jersey.*

- **There must be some exciting current flowing through the coils for the alternator to produce electricity.** Nope. Unlike alternators with excited fields, our alternator has permanent magnets. You move any wire (circuit) through a magnetic field and you get current flow. Excited-field alternators are MUCH more efficient than permanent magnets ones. The VR is used to control the current to the field. Essentially, you turn OFF an excited field alternator when you don't NEED the power. Permanent magnet alternators run full blast all the time. Burning gasoline to produce electricity you have no capability or intention of using which then MUST be turned into heat that must be dissipated is NOT the most efficient use of fossil fuels. Permanent magnet alternators are cheaper to BUILD. Excited field alternators are cheaper to RUN. *Flash 412 (CO)*

## BATTERY LIFE

- If your battery is more than 3 years old, you might find a newer battery a bit more tolerant of overcharging, even if the old battery is perfectly good. *Todd #389*

- The battery of my F650 "Classic" lasted at 7 and half years. Batteries have a life time and the minimum is about 2 years. *Rede*

- I mistakenly unpacked my battery and filled it with acid, before I realized that the battery in my bike just had loose connections. I have been charging it for the past year, waiting for the original 6-year old battery to expire, but it just won't die. *Richard #230, Pacifica, CA*

- Mine is 30 months old, 13k miles. *NormJ #473 Seattle*

- PS the OEM battery lasted 25 months and 45,000 miles +, I would have expected the OEM to last longer since I rode the bike a lot and kept the battery charged. *davemishalof, Inmate # 717 - '01 F650GS*

- Like Richard, I am still running the original battery on my 97 with no flaying or mods of any kind. I think the secret is that I commute 40km. every day, year round when there is no ice on the roads. Letting them sit around unused seems to kill them. I also have never let the water (distilled) get low. I admit that this is the longest I've ever had a battery last and still work like new. (now I've tempted the gods -next time I hit the starter button you know what's going to happen) *Mcguiver, 16 Oct 2002*

- I can't brag about my original Japanese-made battery anymore. It bit the dust this weekend, after going 6 years and 30,000 miles. I should have knocked on wood last week when I again told someone how long my battery was lasting. Anyone want to bet that its American-made replacement won't last that long? *Richard #230*

- Never brag about stuff---it immediately results in whatever you've been bragging about going "belly up " Oh Bummer! I just bragged about my beautiful mother in law

- Battery died at young age. Yup, this tragedy happened right here among us. At the <mark>tender</mark> age of 2 years and 2 months (roughly speaking) and 14500 miles, my battery went out without any warning. For the record / FAQ / other people to keep in mind
  1. There was no warning whatsoever, the battery went flat during an attempt to start the bike. Previous starts showed no problem (no slow cranking, weak lights, etc). During that last attempt, it cranked for a split second, then the lights on the "dash" went dim. After that no more cranking.
  2. Jumper cables hooked up to the battery -> Could start the bike and it runs fine as long as the jumper cables are connected. Disconnect the jumper

DTC0000316

- [illegible] cables (even with engine revs ~4k) and the engne dies immediately
  3. The voltage was very low (ignition off - ~9V, ignition on - ~4V).
  4. Dealer claims the battery did not accept any charge at all (which I believe)
  5. Some of the cells were low on fluid, even though I had topped it off just about 500 miles ago.
  6. Having the battery replaced by the dealer is very expensive. I really suspected something else because of 1), 2) and 5) and thought everything would be covered under warranty. So if you have the same symptoms, check the battery first.

  *its_xls, 2001 F650 GSA – San Jose, CA.*

- This was probably a case of a battery that was not constructed properly at the factory. Some Yuasa batteries have been noted for having weak connections between the cells. When they break, they do so suddenly and one of the cells fail to take a charge, while the others get overcharged and then fail too. Hopefully your next battery will not have this problem. One of the new "maintenance-free" batteries may be the way to go for a replacement. I haven't heard about any similar problems with sealed batteries - yet. *Richard #230: 1997 Pundura*

- Same thing happened to me. *Steve#417(in.us)*

- About your battery problem I've experienced nearly the exact same thing, and I actually ended up several thousands of km from home with a wrecked battery as well as a toasted generator. >"The water level is at the high mark" < The above may have been your problem.
  1. At first the level is at max without any bubbles in a cold battery.
  2. Then the battery warms up and bubbles appear due to charging, this makes the acid level rise.
  3. Finally acid exits the cells and if the drain is jammed for instance, acid will interconnect some cells, causing a short circuit.
  This short circuit will lower the battery voltage and fool the regulator not to limit the charge, which will be brutal enough to eventually kill any remaining cells. *Spakur*

- At first I was about to tell you that the cells are sealed from each other BUT, with the common vent system they are not. I will investigate and test this with a battery I have, where the one of the pole connections are damaged. (I had planned to repair it as a spare, but it is more valuable as a test item. The ventilation hose on my GS was pinched and absolutely blocked when the bike was new). Thanks for the hint! *haakon#626 (Norway,12-1999-F650GS)*

- I still think that motorcycle batteries are sort of delicate and can be damaged by a sharp hit that might break an internal connection that was not welded properly at the factory. Goldwing-sized Yuasa batteries are infamous for this kind sudden of failure. *Richard #230.*

- Most modern street motorcycles will not run without the battery. The battery is like a dam placed over a river. During the winter it keeps the lowlands from flooding and during the summer it provides water that would not be there otherwise. Think of low rpms as the summer and high rpms as the winter. Most bikes will run at high rpm without the battery, but will stall immediately when the revs drop. Keeping the engine running without a battery, or with a dead battery installed, will likely burn up the VR quickly, melt the alternator wiring and burn out more than one electrical component due to high voltage - if run for very long without a working battery. *Richard #230*

- Hadn't checked the fluid level in my classic since mid winter (original Yuasa '00), so after this morning's ride I pulled the side cover to take a peek. There were no signs of battery problems and other of life's problems had me somewhat neglectful for the last few months. I consider myself lucky after finding the front cell dry (bone) and the other five under half full. I topped each to max and plugged in the BT. Within 10 minutes the green light started flashing indicting 80% charge and it's been flashing now for about seven hours. Hopefully, by morning it will be steady green indicting full charge. Sometimes we get away with being un-attending. The only thing I can think of is that the daily use of the Bat **Tender** kept it from crapping out. I thought they die without fluid. Guess not always. With a dry cell and the others very low, it was still STRONG. I guess they are making better products these days with newer technology and serious competition that was not there 20 years ago. Yup! Steady green. Amazing. Thanks Deltran. I'd like to see the day when a maintainer comes with the bike (built in chip or something) and those lights are in the dash. I have a hydrometer and WILL check it. I'm really PO'd at myself for not checking it in four months. How stupid! In low light I just put a flashlight to the side of the battery. Helps a lot to read the fluid level. *Art884 No. NJ, LT - SE - GSA.*

- I had that same thing happen a couple of times. I actually checked once and all the cells were less than half full. I'm amazed that the thing lasted as long as it did. I just replaced it this year ('99-'03) For those reasons I decided to go with the original Yuasa, just wish time and necessity hadn't force me to pay for [illegible]

DTC0000317

the BMW box at the dealer. Same here, in fact the first time I discovered it that low was the day following riding w/DHP and Jimmy Lewis when, because of the instruction nature of it; I had stopped and restarted my bike at least 50 times. Never missed a beat! *David#476, '99 F650, R60/S, K75RTA, Las Vegas.*

- You can't depend upon the Battery **Tender's** green light. The battery could still be on its way out. You can have a good voltage reading, but little capacity in the battery. Use a hydrometer on your fully charged battery. If you see any readings that show a difference between the specific gravity of the cells (such as all cells fully charged, but one only half charged), start thinking about investing in a new battery. The old one is on its way out and will expire within the next few months. Play it safe and replace it when you get a chance. It is very likely that the cell that was dry is damaged and will place a strain on the rest of the battery cells and your charging system. *Richard #230*

- Funny I had the same thing happen this past week. *My F650 was barely turning over with the electric start, was considering buying a new battery but instead invested in a bottle of distilled water and learned how to take my battery out. A little water went a long way, it now cranks with a second or two every time I start. I just hope it lasts... can't believe I was looking into buying a $70 battery when all I needed was a little water! Thank you FAQ's! Mike-GeekSupreme*

- A recent discussion on batteries that appeared on the IBMWR List indicates that premature failure of sealed AGM and Gel Cell batteries is not all that unusual. According to one of the List's frequent techie contributors Tom Cutter, AGM and Gel Cell batteries are designed for maintaining a moderate charge and begin to get stressed when higher starting voltages are required. From what I recall of the discussion, the connections between the battery cells can often burn like a fusible link when higher (starting) voltages are required.

  According to Tom, while touring the Panasonic factory that was making sealed batteries, he learned that there are no quality control standards for the fabrication of the metal linkage between cells. This would seem to indicate that the longevity of AGM and Gel Cell batteries is a hit and miss proposition, with some dying early in their life and others lasting for a number of years. As an example, the stock BMW AGM battery in my '04 R1150 GS died at just over 2 years and 60K miles of use. I have recently installed a Westco AGM battery in my '97 F650. I am hoping that by changing to a new battery every 2 years, I will at least reduce the possibility of ending up with a dead battery at night, in the rain in Bullet Hole, Wyoming *BoomerGary #1605*

## EDTA

### What on earth is EDTA?

Pb is the symbol for lead on the periodic table. Your battery gets a certain amount of lead in its plates when it is new. Some of that dissolves into solution when you pour in the acid. Some of it turns into lead sulphate when things are not working quite right. (Adding EDTA prevents that.) If you allow the extra liquid to boil off the lead stays in the battery. The liquid does not actually boil in that it never gets that hot. It DOES electrolyze into hydrogen and oxygen and the vapours go away. Anyway, if the lead stays in the battery, you haven't lost anything when the level draws down except for water, which you happily add back in (in the form of DISTILLED water). Removing electrolyte is not a good idea. There is Pb (lead) dissolved in the electrolyte and you'll diminish the capacity of your battery by removing it. The battery on the F boils off electrolyte fast enough that it won't be overfilled for long.

The EDTA somehow keeps lead sulfate from forming (or keeps it soluble). The lead sulfate is formed from the lead + the sulfuric acid in the battery. Lead sulfate is insoluble in the electrolyte, and sinks to the bottom of the cell when it flakes off. When the pile of lead sulfate gets big enough, it bridges the gap between the plates, and you get a dead cell. If it doesn't flake off, it reduces the effective surface area of the cell, slowly reducing its capacity.

EDTA works by binding divalent cations (lead in this case) therefore inhibiting the formation of lead compounds. For already formed lead sulphate  the reverse reaction is probably enhanced (not sure). Tetrasodium-EDTA is relatively water soluble compared to disodium EDTA. If you dissolve it in water first you can then add it to battery electrolyte which is approx 4M sulfuric acid. I don't know how long it stays in solution. If you dump the powder straight into the battery very little will go into solution. If the 'powder dumping' approach yields results it suggests that very little is actually needed. As per Google, In general, use one tablespoon per cell in a golf cart battery such as a Trojan T-105. There are approx. 40 tablespoons in one pound. *George#384*

See http://www.deathstar.org/~flash/edta.html for a heap more information on EDTA.

DTC0000318

**EDTA - a Critical Voice (long) - from OyvindSn, Norway**
I posted a question regarding EDTA as a battery preserving agent on a boat-related newsgroup some time ago. A gentleman by the name of Frank Wentzel replied:
(For the entire discussion, go to EDTA - a Battery Preserving Agent? http://media5.hypernet.com/~dick/ubb/Forum1/HTML/003423.html)

I spent over 20 years in the battery industry, starting at the Exide battery research center in Yardley Pennsylvania. Battery additives and rejuvenators have been a hot item as long as batteries have been in existence.

Sulfation is the most-often mentioned failure mode that these additives are supposed to correct. The problem is that the formation of lead sulfate is the normal manner in which a battery delivers its energy. The active materials in a charged battery are PbO2 (lead dioxide), with a valence of +4, in the positive plate and a porous form of lead called sponge lead, with a valence of 0, in the negative. On discharge the active material of both plates becomes lead sulfate (PbSO4) with a valence of +2. On charging the lead sulfate is converted back into the respective active material. Both the PbO2 and Pb on the plates are conductive, the lead sulfate discharge product is essentially non-conductive. As long as the crystals of lead sulfate formed during discharge are very small, their proximity to conductive portions of the plate permits them to be converted back to active forms. Destructive sulfation occurs when the PbSO4 crystals become larger and more difficult or impossible to be converted back into active material.

This occurs through a phenomenon called Ostwald Ripening. OR causes crystals to become larger over time. The best way you can see this would be to take a small jar of water and add sugar till no more will dissolve and then add another spoonful or two. At first when you stir it the powder in the bottom will swirl around easily. By the end of the day a crust will form on top of the sugar so the powder will no longer swirl. In a few days you will see crystals growing. Over time they may get to be a quarter inch or more in size. In your battery the PbSO4 crystals will be quite a bit smaller, but if you were to take apart a sulfated battery and dry the plates you would see them sparkle as light bounced off the crystal faces.

This sulfation is essentially irreversible. Battery manufacturers have tried to combat it since the beginning of the last century. Besides tying up active material the, sulfation also consumes the sulfuric acid electrolyte. As the battery degrades the acid concentration drops and the internal resistance of the battery goes up. This rise in internal resistance further limits the power output needed to start your vehicle. Most battery additives act to decrease the internal resistance which means that, for a limited time, you can more efficiently access the remaining power in the battery. Depending on the application (initial condition of the battery, power requirements, temperature, etc.) you may get anywhere from a week to several months of additional use out of your weakened battery.

One of my first jobs when I joined Exide in 1969, was to analyze a new battery additive called POW'R. When I complete the analysis I discussed the results with one of the Old Timers who had been designing batteries for over 40 years. The major ingredient was magnesium sulfate (MgSO4) otherwise known as Epsom salt. He said Epsom salt was the old standby for additive charlatans. It gave a quick reduction in internal resistance but could do nothing to renew an ailing battery. There was enough cobalt (Co) in the additive to give it a blue color. My friend said that cobalt would reduce the voltage required to charge the battery which might help if the car's charging system was weak. The downside was cobalt also causes the battery to self-discharge more rapidly and accelerates corrosion of the positive grid. There was nothing else of any value (?) in the stuff. At the time it sold for £7 a bottle (maybe $30 adjusted for today's inflation).

At that time I told him that a lot of people thought it was possible to make a really long life battery but that the battery companies didn't do it because they wanted to keep sales up. He said there were 5 major companies. The company that could find a way to make a demonstrably better battery (for a price) could blow the others out of the market. If you could dominate the market why would you sit on the idea? He said that he could make me a 15-year car battery The only problem was it would cost five times as much as current batteries and weight 250 pounds.

As to EDTA in batteries, it will increase conductivity of the electrolyte, which may give you a brief reprieve as noted above. In addition, it may increase battery capacity for a time. As a salt of an organic acid EDTA will again become an organic acid when placed in the battery. Organic acids readily attack the metallic lead of the positive grid structure. A small amount of organic acid can consume a large amount of lead grid because the reaction recycles the acid back to its original form to continue the attack. The corroded grid material will be able to withstand a few charge-discharge cycles but will fail fairly quickly. Over time (dependent on depth of discharge, frequency of use and temperature) the positive grid will corrode through and the battery will fail.

In other words, a battery that is close to failure might be brought back for a limited amount of time. That will give the battery a chance to finally fail just when you need it most! If the battery is known to be weak, it is best to replace it as soon as possible rather than having you won't be in the middle of a serious situation.

DTC0000319

need it most! If the battery is known to be weak, it is best to replace it as soon as possible rather than hoping you won't be in the middle of a serious situation when it does fail. The only valid use I can see for battery additives would be to have some Epsom salt in your tool kit so that you can try to get one last start out of a bad battery when caught unaware.

**Feedback:**

Epsom Salt. The FAQ (battery section) mentions that it is a good idea to bring in a long trip some Epsom salt with you in case the battery dies. It seems that adding the salt to the electrolyte can give you some extra life in case of an emergency. Since the salt is cheap, has multiple uses and can be found in any CVS/Walgreens/Osco, I was thinking to add a small ziplock with some salt to my spares. Any experience with that ? Which quantity should I add to each cell ? What's the chance I'll end up in jail if a cop finds me with a small ziplock full of white crystals? . My idea is not to rely on the magic properties of the salts, BUT a small ziplock takes no space in the tool bag. My assumption is that IF I am stuck in the middle of nowhere and the couple of grams of salt I have in my tool bag can give me an extra kick to get to the next gas station. Why I shouldn't try using them ? Thanks *Giovanni '97 F650, Waltham, MA.*

- I doubt very much that this works. If the battery goes bad you want a NEW working battery on a trip so you don't get stuck in the middle of no where. Since you should be able to get s jump start if your battery is toast and that should get you to a new battery source I see no reason to add Epsom salt or carry same...sounds like a good way to have an explosion! But it would be interesting as a experiment at home with a known dead battery *F650GS Dakar, Camden, New Jersey.*

- Let's see if a PhD in chemistry can help...not likely, but I'll take a stab at it. BTW, I've never heard of this fix it. The acid used in wet cell batteries is sulfuric ($H_2SO_4$), while Epsom's salts is magnesium sulfate ($MgSO_4$)...sorry, don't know how to put in subscripts. Anyway, if the battery was dry, and not just low on water (and therefore much more concentrated sulfuric acid), one could add water and Epsom's to get the active electrolyte, sulfate, nearly correct (the Mg is not good in this respect) and then if you could push start, in principle you could get the battery to charge. Don't know how well it would work in the face of lots of Mg, but I guess it's possible. However, if the battery was merely low on "water", I'd never add the Epsom's, but rather just add deionised water (to prevent the addition of undesirable ions like sodium, magnesium, etc). OK, there's my attempt. I can draw a mess of equations, but too difficult on this mode of communication. *Cheers, Greg '02 F650GSA, Norfolk, VA*

**Note:** In some states / countries, the adding of epsom salt (or for that matter, other additives) to batteries may be illegal. Ensure you follow the manufacturers instructions and all appropriate laws. But this was common sense right?

## EXTERNAL BATTERY LINKS

- JC Whitney
- Battery Mart
- Battery Web
- Cantect (for Canadians)
- Westco Battery
- Deka Batteries
- http://www.windsun.com/Batteries/Battery_FAQ.htm

---

*Order will grow out of confusion... Winter*

DTC0000320

# DX-275D



autofthings.com/trickle-charger-vs-battery-tender/

Home → Blog → Tool & Equipment → Trickle Charger Vs Battery Tender (Battery Maintainer): What Are The

# Trickle Charger Vs Battery Tender (Battery Maintainer): What Are The Differences?

There may be times where you aren't going to drive your vehicle for awhile, and if that is the case, then the battery might go dead.

For example, if you have a classic car that you don't drive in the winter, then the battery might die by next spring if you do not keep it charged.

There is another maintenance to do with car that are going to set beside keeping the battery charged, but that is for a different article.

Here we will cover the options you have for keeping a battery charged and which one is better. The two options that will be covered is **a battery tender (or battery maintainer) vs a trickle charger.**

After reading this, you will know the difference and which one you should use.



U.S. District Court
Middle District of Florida

**DEFENDANT'S EXHIBIT**

Exhibit Number: **DX275D**

Case Number:
    6:19-cv-00308-CEM-LRH

v.

Date Identified:

Date Admitted:

# Battery Tender (battery maintainer)

A **battery tender** hooks to the battery like a pair of jumper cables would. It is a box with a few controls on it and some cables coming out.

You hook the jumper cable like cables to the battery and then plug the box into the wall. The battery tender then converts the AC power from the wall into the type of power that your car battery needs.

The good thing is battery tenders are known as **smart**. This means that they are programmed to be able to tell how much power is inside of the battery.

When the battery does not meet a specific lowness, then the battery tender will not charge it. If the battery falls below the required point while the battery tender is still hooked up, then it will start to charge again.

This is nice because you **don't have to worry about overcharging issues** which we will talk about later.

**Bonus:** If you want to have a smart charger for fully charged battery, this is the best battery tender for car.



# Trickle Charger

**A trickle charger** is similar to a battery tender. For the most part, they can look a lot alike. A trickle charger still plugs into the wall and converts the AC power into power usable by the battery.

It also hooks to the battery in the same fashion with jumper cable like cords. The trickle charger though is **not smart**.

It continually applies a small charge to the battery. This means that even once the battery is fully charged it will still keep charging it.

A trickle charger applies its power to the battery at a slower rate than a battery tender. This means that it takes them longer to get the battery fully charged.

This can be a good thing if you are just plugging it in overnight, but not useful if you want to use it to keep a battery charged for extended periods.

A trickle charger though is **cheaper** than a battery tender though, and a trickle charger has an excellent alternative use that we will talk about farther.



*A solar trickle charger*



*A solar trickle charger*

# What Happens if Overcharge Car Battery?

So why is it essential to not overcharge your car battery? Well, if a car battery gets overcharged a lot of negative things can happen.

First, a fire could occur. This is because if a battery gets overcharged, it will start getting hot and could explode. This is an extreme thing but is a possibility, and if it happens, then you will lose your car, garage, and a lot of other things.

Another thing that happens to a car battery when it gets overcharged is it causes it to not hold a charge as well. The battery becomes dependent on being on a charger.

This means that the battery will die more frequently and you will need to replace it if you don't want to deal with it needing to be charged all the time.

Lastly, even if the battery does not catch on fire, it can still crack or bust to the point that it leaks chemicals on the surrounding parts if it gets overcharged.

These chemicals are very corrosive and would ruin anything they touch. Also, a battery that bust has to be replaced.

Due to all these reasons, it is a good idea not to overcharge your battery. That is why for the long term you want a smart battery charger.



# Use of Trickle Charger

There, however, is an excellent area where a trickle charger comes in handy, and that is **if you have a parasitic drain that you can't find**.

A parasitic drain is when something is drawing power from the battery when it is off and causing it to die. Finding electrical issues can be time-consuming for a car, but if you know you have one, then **you can use a trickle charger each night to keep your car charged in the morning**.

This is because it will release a slow charge to your battery, that should be enough to counteract the drain that is occurring on it. That way you don't have to worry about jumping your car every morning.

Another time where trickle chargers may come in handy is if **you have an older battery**. As a battery gets older, it might start losing power with cold temperatures.

This means if you live in an area that gets cold and you find your battery is dead or low a lot the morning after a cold night, that it is being drained.

To prevent this, you can use a trickle charger on nights that you know it will be cold while your car is parked in the garage.

Then you just have to unhook it in the morning, and you are ready to go about your day without having to jump your car.

Shop Related Products

   

Battery Tender 021-0123
Battery Tender Junior 1...

Battery Tender Plus 021-
0128, 1.25 Amp Batter...

Deltran Battery Tender
Junior 12 Volt 3-Pack 02...

NOCO Genius G750
6V/12V 750mA Advanced...

$20.31 $30.04 prime

$44.98 prime

$72.95 prime

$29.95 $33.54 prime



## Conclusion

Trickle chargers and battery tenders both have their uses. Trickle chargers are good for if you want to leave your car hooked up overnight or for short periods, but since they don't monitor how charged, the battery is they can overcharge the battery.

A battery tender, on the other hand, is smart and will not overcharge the battery. We have given the reason why overcharging is bad on your battery, so that is why battery tenders are the way to go if you are going to keep the battery on a charger for a long term.

Also, battery tenders charge faster, so if you need a quick charge, then they are the way to go as well. Now though you know the difference between a battery tender and trickle charger, so you can figure out which one is right for you and your needs.

| Ryan Harvey | Tool & Equipment |

Click Here to Leave a Comment Below            0 comments

https://autofthings.com/trickle-charger-vs-battery-tender/

Accessed on January 16, 2019.

# DX-275E



ALL PRODUCTS   SPECIAL OFFERS   AUTOMOTIVE   MARINE   OUTDOOR POWER EQUIPMENT   TIPS & TOOLS   ABOUT US

    VIEW ALL BRANDS ▼

‹ BACK TO BLOG

BLOG / AUTOMOTIVE CARE

SHARE

# WHEN TO USE A BATTERY TENDER OR MAINTAINER

Every type of vehicle needs power to start the engine and operate any electronics, and it derives that power from the battery. Just starting the car on a regular basis can keep the battery charged, so it should come as no surprise that a car that the owner rarely drives — such as **a vehicle in storage** — may end up with a battery problem. Fortunately, this issue is avoidable, as battery tenders can keep any car battery charged at all times. Here's how battery tenders work.



## BATTERY TENDER VS BATTERY CHARGER

A lot of people aren't sure what makes a battery tender — which is also called a battery maintainer — different from a charger. The main detail to remember is that a battery charger typically sends a constant charge to the battery, with no regard to whether it actually needs to continue being charged. This means it's possible to overcharge the battery with a charger — which can result in damage to the battery.

On the other hand, a battery tender can sense how much of a charge the battery needs, so it slowly sends a trickle charge to it over a period of several hours. It stops sending a charge once the battery is full. The result is that a battery tender won't overcharge the battery like a charger might, which can help extend the life of the battery overall.

### CATEGORIES

Automotive Care

Boat Care

Cool Rides Online®

Indoor and Outdoor Living

Lifestyle

Powersports and Recreation

Press Releases

Small Engine Care



U.S. District Court
Middle District of Florida
**DEFENDANT'S EXHIBIT**
Exhibit Number: **DX275E**
Case Number:
6:19-cv-00308-CEM-LRH

v.

Date Identified:
Date Admitted:



## THE BEST TIME TO USE A BATTERY TENDER

Clearly, the main advantage of battery tenders is that they won't overcharge the vehicle's battery. This makes them perfect for keeping car batteries charged up while **the vehicle is in storage**. After all, leaving a battery charger connected to a car for months will overcharge the battery, but leaving a battery tender connected for that long is fine because charging will simply stop once the battery is full. This way, car owners can be sure their battery will be fully charged and ready to start the car even after spending months in storage.

Whether you're about to put your car in storage or have noticed some **signs of a bad battery in your vehicle,** it may be time to give your car the extra attention it needs.

---

## LEAVE A REPLY

Enter your comment here...

**14 Comments**

**Ann Barberini** | Jan 2, 2019 at 1:54pm

I have a 2000 cadillac eldorado since August, 2018, twice the battery has been completely dead after leaving it overnight.

Mechanic did diagnostics, said something is draining the battery when car is off but couldn't find it.

Could I use a battery maintainer every night instead of paying lots of money for someone to find out what's draining battery?

**Reply**

> **Customer Support** | Jan 25, 2019 at 1:57pm
>
> Hi, Ann. A good quality battery trickle charger (or maintainer) can be used every day.
>
> However, if the battery is losing its charge faster that then tender can keep it up – due to
>
> battery failure or something overly draining it, this will not help. Perhaps further tests

battery failure or something overly draining it, this will not help. Perhaps further tests conducted by certified mechanic may be useful to see what is actually causing this issue may be the next best step.

**Reply**

**Jowell** | Jan 27, 2019 at 10:16pm

my car is parked outside and most of the time here in winnipeg canada the temp is as low as -30C will a battery tender still worked in these temp. thanks

**Reply**

> **Dude** | Apr 19, 2019 at 2:08pm
>
> Use a battery warmer
>
> **Reply**

**TONY** | Apr 28, 2019 at 1:28pm

THANK YOU FOR SUCH A STRAIGHT FORWARD AND EASY TO UNDERSTAND EXPLANATION.

**Reply**

**Ms. Avril Haynes** | May 9, 2019 at 11:04am

i have a 2007 Audi A6, i go away for 5 months and when i return to s florida, the battery is dead, i have bought 3 new batteries in 3 yrs from audi service and now they want me to buy another battery plus a battery maintainer, can you give me comment on this, i plan to take this up with Audi headquarters, because the service i got here in WPB was horrible and misleading, i will go out and buy a battery maintainer, can you please help me with this problem, i would be forever grateful, thanks

**Reply**

> **Customer Support** | Jun 7, 2019 at 8:13am
>
> Hello, in this particular situation it might be best to consult with a professional and expert in this specific area. If you have any other questions please contact our Consumer Support Team at **producttechsupport@goldeagle.com.**
>
> **Reply**

> **99Hawk (@blackhawk8001)** | Jun 14, 2019 at 7:37pm
>
> if your car will sit for months without use, its best to simply disconnect the battery
>
> **Reply**

> > **Demetrios Christopher** | Sep 9, 2019 at 4:20pm
> >
> > If you do that to many cars (especially Audis), expect an expensive trip to the dealership to recode some of the components in your car. Ironically, that list includes the battery itself! 😊 It's important to connect a memory saver when disconnecting the battery from an Audi (even for necessary car repairs).
> >
> > When replacing batteries on cars like Audis and BMWs (which have "intelligent battery management"), it's important to use fully-charged batteries (trickle-charge them with a battery tender until at 100%), then

DX275E_3

swap the batteries out while using a memory saver to prevent your electronics from forgetting important information (and I'm not talking about radio presets!). I don't know why Audi made it so complicated but it's all necessary.

**Reply**

**dominodoggy** | Oct 15, 2019 at 7:00pm

Check to see if the vehicle has a fuse labeled as "IOD" or ignition-off draw. If you store the vehicle without pulling this fuse, it will drain the battery. Today's vehicles typically draw power from the battery constantly, for computers, entertainment systems, all those bells'n'whistles. This relies on the vehicle being started and driven regularly so the battery can keep up with the demand. When stored, the battery is fairly quickly depleted.

This may help but batteries are physical mechanical things and need maintenance, replacement, and often just die if not properly maintained.

**Reply**

**Gene Cox** | Jul 21, 2019 at 2:38pm

My jump starter shows 12+ volts, but it is only a surface charge — it will not start my car. A load test drops the voltqage to zero. If I replace the agm battery in the jumper, can I use a tender/maintainer to keep the jumper at the ready?

**Reply**

**Ashley** | Sep 6, 2019 at 12:57pm

I thought that it was interesting when you said that one thing to consider when you are needing to charge your car battery is to use a battery maintainer instead of a standard battery charger since the maintainer will be sure not to overcharge your car battery and damage it. I have been thinking about getting a new car but I have been worried that I would charge it incorrectly and cause internal damage. I would be sure to purchase a battery maintainer so that I wouldn't have to worry about damage or extra expense.

**Reply**

**T Nelson** | Oct 24, 2019 at 11:46am

I do maintenance for a local fire department. they have a vehicle that has modems and computers along with flash light battery chargers that require staying powered up all the time. they equal almost 2 amps of draw. I have tried a battery maintainer that will charge at 5amps then float. Once the battery drops back down the maintainer will not start charging again it times out. Do you have a recommendation for at tender that will work in this application. Thank you.

**Reply**

**Genesis Bult** | Oct 29, 2019 at 7:13am

Hi. There are many battery tenders that would fit this situation such as the Schumacher and Battery Tender brands, which can be readily found at most automotive and online retailers. Hope that helps!

**Reply**



# DX-275I



U.S. District Court
Middle District of Florida

**DEFENDANT'S EXHIBIT**

Exhibit Number: **DX275I**

Case Number:
    6:19-cv-00308-CEM-LRH

v.

Date Identified:

Date Admitted:

**Top The Best**

AUTOMOTIVE   BEAUTY   ELECTRONICS   HEALTH & PERSONAL CARE   HOME & GARDENING   MORE

As an Amazon Associate, we may earn an affiliate commission when you buy through qualifying links on our site.

Home » Automotive » **Top 10 Best Battery Tenders in 2019**

# Top 10 Best Battery Tenders in 2019

Last Updated September 18, 2019 By Andrew Liu

f Share | P 10 | Tweet | in 0 | 0

Here are the top 10 best battery tenders in 2019. Learn how to choose the right battery charger/maintainer and then explore the top products.

## Best Battery Tenders in 2019

Remember these details to narrow down your options. And, don't forget to check out this list of the top 10 best **battery tenders** in 2019.

| # | Preview | Product | | Price | |
|---|---------|---------|---|-------|---|
| 1 | | Battery Tender 12 Volt Junior Automatic Battery Charger | | $25.50 √Prime | View on Amazon |
| 2 | | Battery Tender Plus 12V, 1.25A Battery Charger | | $42.94 √Prime | View on Amazon |
| 3 | | Battery Tender 4-Bank 12V, 1.25A Battery Charger | | $133.59 √Prime | View on Amazon |
| 4 | | BLACK+DECKER BM3B Fully Automatic 6V/12V Battery Charger/Maintainer with Cable Clamps | | $16.16 √Prime | View on Amazon |
| 5 | | Deltran Battery Tender Junior 12 Volt 3-Pack 021-0123(x3) | | $72.49 √Prime | View on Amazon |
| 6 | | NOCO Genius G1100 6V/12V 1.1 Amp Battery Charger and Maintainer | | $39.95 √Prime | View on Amazon |
| 7 | | Mroinge MBC016 6V / 12V 1A Fully Automatic trickle Battery Charger/maintainer for Automotive Vehicle... | | $17.95 √Prime | View on Amazon |
| 8 | | Schumacher SC1319 1.5A 6/12V Fully Automatic Battery Maintainer | | $30.76 √Prime | View on Amazon |
| 9 | | Mroinge 12V 2A Lead Acid/Lithium(LiFePO4) Automatic Trickle Battery Charger Smart Battery Maintainer... | | $20.99 √Prime | View on Amazon |
| 10 | | Battery Tender 12V, 5A Weatherproof Battery Charger | | $99.99 √Prime | View on Amazon |

Last update on 2019-11-11 / Affiliate links / Price / Images from Amazon Product Advertising API

Table of Contents ☰

## 10. CTEK (56-158) MULTI US 3300 12 Volt Fully Automatic 4 Step Battery Charger



Check price on Amazon

First is a fully automatic 4-step battery charger. Here is what you need to know:

- Water and dust resistant design
- Floating mode to prevent overcharging
- Automatically tests battery condition
- Maintains and charges batteries
- Delivers 12-volts

This battery charger and maintainer is easy to operate. It takes care of everything, as it's a fully automatic charger. It comes equipped with a 7-foot cord, clamps, and O-rings. This is designed for 12V batteries but is suitable for larger batteries.

Honestly, the only disadvantage is the price. This is just as effective as the other battery chargers, but it's available at twice the average price. Depending on the latest sale, you might get a better deal, so it's still worth considering.

## 9. KeyLine Chargers KC-125-MPXP 12V 1.25 Amp Automatic Mini Pro-XP



Check price on Amazon

This next battery tender is designed to quickly charge your 12V batteries. You'll also get these advantages from this battery charger:

- 12V battery maintainer and conditioner
- 5-stage charging program
- Suitable for use with lead-acid, sealed, gel, and AGM batteries
- Standard 110-volt input
- Delivers 1.25-amps
- Reverse polarity protection

For versatility, ease of use, and efficiency, this is a great battery charger. It includes a complete 5-stage charging program. It also has 3 status LED lights, over voltage protection, and a waterproof design. And, you get a money back, satisfaction guarantee, along with a 5-year warranty.

This tender has plenty of wonderful features, yet it's not the top option. This is due to a few small disadvantages. The cord is only about 6-feet in length. This isn't a major problem, as you can add an extension cord, but there are battery chargers with long cords. Also, it isn't the most affordable option. Overall, it's a quality charger, but you should still compare it to the other battery chargers.

## 8. Schumacher SE-1-12S-CA Fully Automatic Onboard Battery Charger



DX275I_2



Here is a fully automatic battery charger. It delivers 1.5-amps of power and features reverse polarity protection. Learn more:

- LED indicator for power on and charged
- Turns on and off automatically as needed – fully automated
- Safely charge your 6V and 12V batteries
- Includes mounting brackets and hardware

This is a simple battery tender with basic features. It doesn't include multiple charge modes, but it can safely charge your small batteries. As a bonus, it comes equipped with mounting brackets and hardware. This allows you to mount the charger to the wall in your garage. Basically, this is a simple plug-in trickle charger with standard safety features – including the reverse polarity protection.

One drawback is that this charge won't maintain your battery. It's just a charger. Also, the charger can be inconsistent with its charging power. Though, for the price, you can't expect too much. If you just need a basic charger and don't want to spend too much, this is a decent choice.

## 7. Morange MBC010 12V/1A Smart Battery Charger



Yet another 12-volt charger, this option might meet your needs. Here is a closer look at the details:

- Automatic charge cycle
- Spark proof with reverse polarity protection
- 3-step charging program – constant current, constant voltage, and floating charge
- LED light indicates the stage of the charge
- 1-year warranty

You can easily connect this charger to your vehicle battery with the included O-ring terminals and battery clips. It uses a complete 3-step charging program, which includes a floating charge mode. This is the mode that prevents overcharging. Another benefit is the price tag. This is an inexpensive option. But, don't let the price fool you. It's still a reliable battery charger.

Though, there are also some disadvantages. This charger won't deliver enough power for larger batteries. Also, the cord length is 6.6-feet, which is a little shorter than some of the other options. Again, the low price should help balance some of these drawbacks. Overall, this is a decent little battery tender – for 12V batteries.

## 6. NOCO Genius G1100 GV/12V 1.1A UltraSafe Smart Battery Charger





**🛒 Check price on Amazon**

This next battery charger looks complicated. But, it is relatively easy to operate. This battery charger also provides the following:

- Charge fully drained batteries
- Microcontroller technology
- Streamlined, spark proof design
- Monitors battery activity
- LED indicators

This battery tender is suitable for all types of automotive, marine, sport, or lawn equipment battery. It includes advanced microcontroller technology to ensure proper charging. And, it can help charge your batteries at up to twice the speed of other battery chargers. The design is compact and spark-proof.

Some people have had problems getting this charger to charge a fully drained battery. This could be due to user error, as others haven't had this problem. Though, there is one known drawback. This charger won't work below freezing. Also, this model only provides 1.1-amps of power, which is enough for 12V or smaller batteries. If 1.1-amps isn't enough power, this battery tender is available in multiple sizes. You can get a 0.75, 1.1, 3.5, 7.2, 15, or 26-amp battery charger with the same features.

## 5. PeleusTech Battery Charger 12V Portable UltraSafe Smart Charger



**🛒 Check price on Amazon**

Up next is a 12V battery charger with an uncomplicated design. You will also get these benefits:

- LED indicator light to show charging status
- Easy to use – plug and play
- Charge or maintain your batteries
- Includes float mode
- Maximum voltage of 14.8-volts

With this simple battery tender, you can maintain or charge your 2V batteries. This includes AGM, gel, SLA, or FLA 12-volt batteries. It also has a LED indicator. The float mode is included to protect your battery from overcharging.

There are a couple of disadvantages. First, this charger doesn't include reverse polarity protection. You will need to make sure that you clip the clamps correctly – red is positive and black is negative. Also, it isn't the most reliable battery charger. Some people have had issues with charge time. Another issue is that the charger plugs directly into the wall socket and contains clamps with a 3-foot cord. Typically, the charger is a separate unit from the plug. But, some of these issues are countered by the cheap price. This charger is incredibly inexpensive. The bottom line is that this is the most economical choice for keeping your batteries charged.

## 4. Deltran Battery Tender Junior 12 Volt 3-Pack



🛒 Check price on Amazon

Deltran is the most highly-rated brand of battery tenders. This charger is suitable for 12V batteries. Check out the other features of this battery tender:

- Includes a 3-step charging program – bulk, charge, and float mode
- Automatic charging – switches to float mode after fully charged
- You get 3 battery tenders in this package
- 12-foot cord
- 2 color LED lights for indicating the stage of the charge

This is another battery charger that is easy to operate. You can use it for charging or maintaining your 12V batteries. This includes the AGM, flooded, or sealed batteries. It's a high-quality product and it will help you increase the service life of your battery. Though, the best benefit is that you get 3 chargers in this pack at one low price.

It's hard to find anything wrong with this charger. While it won't charge larger batteries, it is great for 12V batteries. In the end, it's easy to use and you get 3 chargers so that you can keep multiple batteries charged.

## 3. Black & Decker BM3B 6V and 12V Battery Charger



🛒 Check price on Amazon

Black & Decker is a reliable company. They produce numerous power tools and equipment, including this battery charger. Here are the top details and advantages:

- Charges 6V and 12V batteries
- Comes with battery clips for connecting to a vehicle battery
- High-frequency smart charging technology
- Float mode monitoring
- Built-in mounting bracket

This battery charger delivers 1.5 amps of power to 6V or 12V batteries. It also includes reverse polarity protection. You might also like the included battery clamps, O-rings, and DC plug for connecting to a variety of battery types.

Overall, most people don't have any complaints about this battery tender. It's not extra fancy or complicated. It simply gets the job done. The only potential issue is the length of the cord. It is short, but you can also add an extension cord.

2. Extreme Max 1229-4000 Battery Buddy Intelligent 6V / 12V Battery Charger

## 2. Extreme Max 1229.4000 Battery Buddy Intelligent 6V / 12V Battery Charger



**🛒 Check price on Amazon**

The Extreme Max is another battery charger designed for use with 6V or 12V batteries. It's suitable for charging the battery for your ATV, motorcycle, or boat. And, you get the following features:

- 4-step charging program– initialization, bulk, charge, and float mode
- 1-year warranty
- 110-volt plug
- Easy to use design

This battery charger is easy to use and works great with 6V or 12V batteries. It also works with a standard electric outlet and has an 8-foot cord. Other features include a waterproof design and a single LED status indicator.

One issue with this battery charger is that it won't charge batteries with a voltage below 3-volts. Also, it appears that some of these chargers die within a few weeks of use. Though, this isn't always the case. Luckily, it is backed by a 1-year warranty. The bottom line is that this battery tender is incredibly affordable and fully capable of charging your 6V or 12V battery. But, if you want to guarantee the reliability of the charger, then check out the next entry.

## 1. Battery Tender 021-0123 Battery Tender Junior 12V Battery Charger



**🛒 Check price on Amazon**

Here is the top choice. It's lightweight, versatile, and easy to use. Designed for 12-volt batteries, it offers the following features:

- 0.75-amps
- 5-year warranty
- 4-step charging program – initialization, bulk, charge, and float mode
- Automatic charge cycle switches to float mode after charging the battery
- 2 color LED lights to indicate the charging process
- Spark proof
- 12-foot cord

This is one of the easiest battery chargers to use. It's perfectly suited for charging all 12-volt batteries. This includes lead-acid, flooded, or sealed batteries. It also has reversed hookup protection. This means that the charger checks the connection before delivering power. Another cool feature is the smart microcontroller. The best battery tenders have these microcontrollers, which are used to ensure the correct power is delivered to the battery.

The only drawback is the size. This charger isn't suitable for larger batteries, such as an SUV or truck battery. With most mid-sized cars and sedans, it can be used for maintenance, but not for charging. Though, for 12-volt batteries, it is the best combination of value, quality, and ease of use.

## How to Find the Right Battery Tender

With the right battery tender, you can increase the service life of the battery for your car, truck, motorcycle, or other equipment or vehicles. It's an uncomplicated way to maintain 6V, 8V, or 12V batteries.

But, there is a major difference between a cheap battery tender and a quality product.

A quality battery tender will provide proper charge control. This helps eliminate the chances of frying your battery. To find the right battery tender, review these details:

- Multiple battery charging
- Multiple charging modes
- Override switch or button
- Peak amps (charge current)
- Direct wall plug-in
- Battery tester
- Price
- Warranty

First, consider the benefits of multiple battery charging or multiple charging modes. These features can help you get more out of your battery tender. For example, you want to maintain multiple batteries without needing to purchase additional chargers.

Some chargers are equipped with an override switch. This allows you to manually charge the battery. Other features include whether it comes with a standard 120-volt plug and the length of the cord.

The peak amps determine how quickly the charger can charge a dead battery. For example, a standard auto battery is 50 amp hours. With a 10-amp battery tender, this should take about 6 hours to charge.

Finally, check for a warranty. If you plan on using your battery tender regularly, you don't want it to stop working within a few months. Most chargers come with a 1 to 5-year warranty.

## Conclusion

Before choosing your battery tender, remember to compare all the top 10 best battery tenders in 2019 - and don't forget to purchase a charger that is large enough to meet your needs.



Related Posts:
- Top 10 Best Battery Operated Fans in 2019
- Top 10 Best Vacuum Cleaners Under $200 in 2019
- Top 10 Best Baby Shampoos For Sensitive Skins in 2019
- Top 10 Best Sport Watches For Men in 2019
- Top 10 Best Walking Shoes for Men in 2019

## Leave a Reply

Your email address will not be published. Required fields are marked *

Comment

This site uses Akismet to reduce spam. Learn how your comment data is processed.

**RECENTLY REVIEWED POSTS**

Amazon Prime Day 2019

Top 10 Best Electric Knife Sharpeners In 2019

Top 10 Best Electric Air Fryers in 2019

Top 10 Best Webcams for Small Business In 2019

Top 10 Best Electric Lawn Mowers in 2019

Top 10 Best Photocopy Machines For Small Business in 2019

Top 10 Best Traction Cleats For Snow And Ice in 2019

Top 10 Best Dog Sunglasses in 2019

Top 10 Best Patio Umbrella Stands in 2019

Top 10 Best Cycling Glasses in 2019

**TAGS**

Appetite Suppressants Apple Watch Bluetooth Sound Bars Body Fat Scales Camera Car Seat Organizer Cases Christmas Gifts Coffee Maker Computer Desks e-Book Readers Electric Grills Electric Lawn Mowers Electric Mosquito Traps Fisheye Len Gardening Glove Hand Soap Honey Extractor IPhone 6s Plus Laptop Bags LED Rechargeable Lanterns lensatic compasses Massage Maternity Bras Noise Canceling Headphones Organic Body Wash Popcorn Makers Rechargeable Batteries School Bags Screen Protector Screen Protectors Seductive Perfumes for Men Seductive Perfumes for Women shoes for nurses Smart two wheels Soccer Cleats Stun Guns Sunglasses For Men Sunglasses For Women Training Shoes Vacuum Cleaners Valentine Gift Ideas for him Walking Shoes Wireless Access Points Yoga Pant

**SEARCH FOR A PRODUCT**

Search this website

SCHOLARSHIP PROGRAM    ABOUT US    PRIVACY POLICY    CONTACT US    DISCLAIMER    FACEBOOK    GOOGLE+

© COPYRIGHT 2014 - 2019 TOPTENTHEBEST · ALL RIGHTS RESERVED ·

DMCA PROTECTED

2:10:30 PM 11/11/2019                                       URL: https://www.toptenthebest.com/top-10-best-battery-tenders/

# DX-275L



https://www.optimabatteries.com/en-us/support/maintenance-storage/battery-maintainer-battery-tender

Accessed on January 16, 2019.



## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court by using the Court's Appellate PACER system, which will automatically send a notice of electronic filing to all counsel of record.

I further certify that on March 19, 2025, I caused a copy of the Non-Confidential version of the foregoing Appendix to be electronically served on all counsel of record.

I further certify that on March 19, 2025, two copies of the Non-Confidential version of the foregoing were dispatched via third-party commercial carrier to the following:

David J. Smith, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, NW
Atlanta, GA 30303

Respectfully submitted,

/s/ Gregory A. Castanias

*Counsel for Defendant-Appellant*