No. 24-13590

IN THE

# United States Court of Appeals for the Eleventh Circuit

———————————————

DELTONA TRANSFORMER CORPORATION,

*Plaintiff-Appellee,*

*v.*

THE NOCO COMPANY,

*Defendant-Appellant.*

———————————————

On Appeal from the U.S. District Court for the Middle District of Florida,
Case No. 6:19-cv-00308-CEM (Hon. Carlos E. Mendoza)

———————————————

**BRIEF OF 31 INTELLECTUAL PROPERTY AND MEDIA LAW
PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF APPELLANT AND
REVERSAL**

———————————————

Phillip R. Malone
Nina K. Srejovic
JUELSGAARD INTELLECTUAL PROPERTY
 AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT
 STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650)-725-6369
Fax: 650-723-4426
*Counsel for Amici Curiae*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

*Amici* Intellectual Property and Media Law Professors, by and through undersigned counsel, and pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Eleventh Circuit Rule 26.1-1(a)(3), hereby notify the Court that the Certificate of Interested Persons filed by Appellant The NOCO Company (Dkt.6) is correct and complete, with the following additions:

1. Carrier, Michael A. (Professor, Rutgers Law School): *Amicus Curiae*

2. Catanzaro, Zachary (Professor, St. Thomas University, Benjamin L. Crump College of Law): *Amicus Curiae*

3. Diamond, Shari Seidman (Professor, Northwestern University Pritzker School of Law): *Amicus Curiae*

4. Dobbs, Ashley R. (Professor, University of Richmond School of Law): *Amicus Curiae*

5. Dogan, Stacey (Professor, Boston University School of Law): *Amicus Curiae*

6. Farley, Christine Haight (Professor, American University Washington College of Law): *Amicus Curiae*

7. Gebhard-Koenigstein, August (Certified Law Student, Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic)

8. Ghosh, Shubha (Professor, Syracuse University College of Law): *Amicus Curiae*

i

9.  Gibson, James (Professor, University of Richmond School of Law): *Amicus Curiae*

10. Goldman, Eric (Professor, Santa Clara University School of Law): *Amicus Curiae*

11. Heymann, Laura A. (Professor, William & Mary Law School): *Amicus Curiae*

12. Hsieh, Timothy T. (Professor, Oklahoma City University School of Law): *Amicus Curiae*

13. Johnson, Eric E. (Professor, University of Oklahoma College of Law): *Amicus Curiae*

14. Lantagne, Stacey M. (Professor, Western New England University School of Law): *Amicus Curiae*

15. Lemley, Mark A. (Professor, Stanford Law School): *Amicus Curiae*

16. Levine, David S. (Professor, Elon University School of Law): *Amicus Curiae*

17. Li, Selina (Certified Law Student, Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic)

18. Liebesman, Yvette Joy (Professor, Saint Louis University School of Law): *Amicus Curiae*

19. Lobel, Orly (Professor, University of San Diego School of Law): *Amicus Curiae*

20. Love, Brian J. (Professor, Santa Clara University School of Law): *Amicus Curiae*

21. Malone, Phillip (Counsel of Record for *Amici*)

22. Mendoza, Carlos E. (U.S. District Judge)

23. McKenna, Mark P. (Professor, UCLA School of Law): *Amicus Curiae*

24. Miers, Jess (Professor, University of Akron School of Law): *Amicus Curiae*

25. Moffat, Viva R. (Professor, University of Denver Sturm College of Law): *Amicus Curiae*

26. Ochoa, Tyler T. (Professor, Santa Clara University School of Law): *Amicus Curiae*

27. Perzanowski, Aaron (Professor, University of Michigan Law School): *Amicus Curiae*

28. Ramsay, Lisa (Professor, University of San Diego School of Law): *Amicus Curiae*

29. Reid, Amanda (Professor, University of North Carolina at Chapel Hill): *Amicus Curiae*

30. Rosenblatt, Betsy (Professor, Case Western Reserve University School of Law): *Amicus Curiae*

31. Said, Zahr K. (Professor, Santa Clara University School of Law): *Amicus Curiae*

32. Silbey, Jessica (Professor, Boston University School of Law): *Amicus Curiae*

33. Sprigman, Christopher (Professor, NYU School of Law): *Amicus Curiae*

34. Srejovic, Nina (Counsel of Record for *Amici*)

35. Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic

36. Tang, Xiyin (Professor, UCLA School of Law): *Amicus Curiae*

37. Tushnet, Rebecca (Professor, Harvard Law School): *Amicus Curiae*

38. Zhou, Jina (Certified Law Student, Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* state that they have no parent corporation and that no publicly held corporation holds 10 percent or more of their stock.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES ............................................................ vi

INTEREST OF *AMICI CURIAE* .....................................................1

STATEMENT OF THE ISSUES........................................................2

SUMMARY OF ARGUMENT ........................................................2

ARGUMENT ...............................................................................4

I.    Bidding on a Competitor's Trademark as a Keyword, by Itself, Is Not Infringing Conduct.................................................................4

    A.    Competitive keyword advertising does not fall within the "heartland" of trademark law because keywords do not serve a source-identifying purpose....................................................................5

    B.    Competitive keyword advertising is unlikely to confuse consumers about the source of goods and services...........................................7

    C.    "Initial interest confusion" is not a viable theory of trademark infringement and is not implicated by competitive keyword advertising. 14

II. Competitive Keyword Advertising Informs Consumers, Reduces Their Search Costs, and Fosters Competition. ...................................................17

CONCLUSION............................................................................21

CERTIFICATE OF COMPLIANCE....................................................22

CERTIFICATE OF SERVICE ..........................................................23

APPENDIX ............................................................................. A1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. JAND, Inc.,*
   119 F.4th 234 (2d Cir. 2024) ................................................................8, 11, 12

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
   722 F.3d 1229 (10th Cir. 2013) ..................................................................8, 13

*Abitron Austria GmbH v. Hetronic Int'l, Inc.,*
   600 U.S. 412 (2023).........................................................................................5

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's
   Found. of Am., Inc.,*
   307 F. Supp. 3d 260 (S.D.N.Y. 2018) ...........................................................7, 8

*Bates v. State Bar of Ariz.,*
   433 U.S. 350 (1977)........................................................................................17

*Dewberry Grp. v. Dewberry Eng'rs, Inc.,*
   No. 23-900, slip op. (U.S. Feb. 26, 2025).......................................................5

*Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC,*
   369 F.3d 1197 (11th Cir. 2004) ......................................................................10

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.,*
   830 F.3d 1242 (11th Cir. 2016) ......................................................................10

*Frehling Enters., Inc. v. Int'l Select Grp., Inc.,*
   192 F.3d 1330 (11th Cir. 1999) ......................................................................10

*Hearts on Fire Co. v. Blue Nile, Inc.,*
   603 F. Supp. 2d 274, 289 (D. Mass. 2009) .....................................................9

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.,*
   456 F.3d 1270 (11th Cir. 2006) ......................................................................20

*Jack Daniel's Props. v. VIP Prods. LLC,*
   599 U.S. 140 (2023)..............................................................................4, 5, 6, 7

vi

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC,
 119 F.4th 711 (9th Cir. 2024) ..........................................................5, 8, 11, 13, 18

Lerner & Rowe PC v. Brown Engstrand & Shely LLC,
 673 F. Supp. 3d 1017 (D. Ariz) ...........................................................................18

*Network Automation v. Advanced Sys. Concepts,
 638 F.3d 1137 (9th Cir. 2011) ...................................................................9, 11, 16

Opinion, In re 1-800 Contacts, Inc.,
 Dkt. No. 9372 (FTC Nov. 7, 2018), rev'd on other grounds, 1
 F.4th 102 (2d Cir. 2021) ................................................................................18, 19

Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.,
 496 F.3d 1231 (11th Cir. 2007) ...............................................................................6

SSP Agric. Equip., Inc. v. Orchard-Rite Ltd.,
 592 F.2d 1096 (9th Cir. 1979) ........................................................................17, 18

Suntree Techs., Inc. v. Ecosense Int'l, Inc.,
 693 F.3d 1338 (11th Cir. 2012) .............................................................................14

U.S. Pat. & Trademark Off. v. Booking.com B. V.,
 591 U.S. 549 (2020)..................................................................................................5

Welding Servs., Inc. v. Forman,
 509 F.3d 1351 (11th Cir. 2007) ..........................................................................9, 10

Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.,
 833 F.2d 1484 (11th Cir. 1987) .............................................................................10

**Statutes**

15 U.S.C. § 1114(a)(1).............................................................................................5, 6

15 U.S.C. § 1115(b)(4)................................................................................................20

15 U.S.C. § 1127 ..........................................................................................................6

**Other Authorities**

3 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.) ....................15

4 McCarthy on Trademarks and Unfair Competition § 25A:7 (5th ed.) .................8

Connie D. Nichols, *Initial Interest Confusion "Internet Troika" Abandoned? A Critical Look at Initial Interest Confusion as Applied Online*, 17 Vand. J. Ent. & Tech. L. 883 (2020)...................................15

David J. Franklyn & David A. Hyman, *Trademarks As Search Engine Keywords: Much Ado About Something?*, 26 Harv. J. L. & Tech. 481 (2013)..........................................................................................14

Eric Goldman, *Brand Spillovers*, 22 Harv. J. L. & Tech. 382 (2009) ..............12, 17

*Eric Goldman, *Deregulating Relevancy in Internet Trademark Law*, 54 Emory L. J. 507 (2005)...........................................................13, 14, 16, 21

Eric Goldman, *Second Circuit Tells Trademark Owners to Stop Suing Over Competitive Keyword Advertising–1-800 Contacts v. Warby Parker*, Tech. & Mktg. L. Blog (Oct. 9, 2024), https://perma.cc/6EMW-ALA3 .........................................................13

Giuseppe Colangelo, *Competing Through Keyword Advertising*, 16 J. Comp. L. & Econ. 306 (2020) ............................................................19

Glynn S. Lunney, Jr., *Trademarks and the Internet: The United States' Experience*, 97 Trademark Rep. 931 (2007)..........................................15

Graeme B. Dinwoodie & Mark D. Janis, *Confusion Over Use: Contextualism in Trademark Law*, 92 Iowa L. Rev. 1597, 1636 (2007)............................................................................................7

Jennifer E. Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 Cardozo L. Rev. 105 (2005).......................17

Stacey Dogan & Jessica Silbey, *Jack Daniel's and the Unfulfilled Promise of Trademark Use*, 42 Cardozo Arts & Ent. L.J. 705 (2024)............................................................................................6, 7

Stacey L. Dogan & Mark A. Lemley, *Trademarks and Consumer Search Costs on the Internet*, 41 Houston L. Rev. 777 (2004) ...................17, 19

## INTEREST OF *AMICI CURIAE*

*Amici* are 31 professors of intellectual property and media law at universities throughout the United States.[1] *Amici* regularly write and teach about trademark law and intellectual property law generally.[2] *Amici* have no personal or financial interest in the outcome of this case. They share a professional interest in ensuring that trademark law develops in a way that serves the public interest by protecting consumers from confusion while promoting vigorous, truthful competition in the marketplace.[3]

---

[1] Counsel for Appellant has consented to the filing of this brief; counsel for appellee opposes the filing. *Amici* are simultaneously filing a motion for leave to file this brief pursuant to FRAP Rule 29(a) and (b) and 11th Circuit Rule 29-1. Neither the parties nor their counsel have authored this brief in whole or in part, and neither they nor any other person or entity other than *amici* and their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] A list of the *amici curiae* law professors and their institutional affiliations, for identification purposes only, is provided in the Appendix.

[3] *Amici* wish to thank Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic Certified Law Students August Gebhard-Koenigstein, Selina Li, and Jina Zhou for their substantial assistance in drafting this brief.

## STATEMENT OF THE ISSUES

**I.**    Can an advertiser infringe a competitor's trademark by placing an ad through competitive keyword bidding without also using the mark in ad text?

**II.**    Are ads placed through competitive keyword bidding that do not also contain a competitor's trademark likely to confuse consumers?

**III.**    Is initial interest confusion a viable theory of trademark infringement in the context of keyword advertising?

## SUMMARY OF ARGUMENT

Keyword advertising allows advertisers to bid on "keyword" terms or phrases and then display ads when those keywords are entered as search queries by consumers. In *competitive* keyword advertising, the advertiser bids on a competitor's trade name and/or trademark(s) as a keyword. Competitive keyword advertising is a valuable method of marketing to potential customers, providing consumers with helpful information about their purchasing options and thereby increasing competition in the marketplace. Far from infringing the rights of trademark holders, competitive keyword advertising serves trademark law's goals of reducing consumer search costs and helping markets function. For these reasons, federal appellate and district courts across the country have reached a clear consensus that competitive keyword advertising is legally permissible.

2

Despite this robust consensus, the District Court imposed liability based at least in part on Appellee's claims at trial regarding what Appellee called NOCO's "excessive keyword bid[ding]" on Appellee's trademark "battery tender" (and the term "tender") and the subsequently triggered ads, which Amazon labeled as "sponsored." In 37 of these ads, NOCO prominently displayed its own "NOCO" trademark but did not use Appellee's marks anywhere in the ad text.

Competitive keyword advertising, on its own, cannot infringe another's mark. It does not implicate what the Supreme Court has called the "heartland" of trademark law and time and again deemed trademark's core concern: *confusion as to source*. By bidding on a competitor's mark as a keyword the advertiser does not designate the source of its own goods. And, in fact, this sort of bidding may not even satisfy the threshold infringement requirement of a "*use* in commerce," as it involves no display or presentation of a mark whatsoever.

Moreover, competitive keyword advertising is unlikely to confuse consumers—about product source or otherwise. In the search advertising context, the relevant point of comparison for the similarity of the marks is the paid advertisement's appearance on the result page, not the keyword entered as a search term. If the advertisement does not use the trademark in the ad copy, and there is no other suggestion that the advertised goods or services are related to the owner of the trademark, there can be no confusion as to their source. If the claim is that a

3

trademark used in ad text may cause confusion, it is the ad text that would cause the confusion, not the mere presence of the keyword-triggered ad.

The theory of initial interest confusion—that even a clearly marked advertisement can constitute infringement because it draws consumers away—is a doubtful one in most circumstances. In keyword advertising, many consumers want and *expect* to see competitive ads upon entering a trademark as a search keyword. This Court has never adopted the initial interest confusion doctrine and should not do so here, where the remedy for any consumer momentarily confused by an ad is simple: hit the "back" button on their browser.

In this case, NOCO's so-called "excessive keyword bid[ding]" did not infringe Appellee's trademark. The District Court's imposition of liability for that competitive keyword advertising was error.

## **<u>ARGUMENT</u>**

## I.    **Bidding on a Competitor's Trademark as a Keyword, by Itself, Is Not Infringing Conduct.**

Trademark law does not give a trademark owner an absolute right to preclude others from referencing the trademark. Rather, trademark rights exist to protect against the "cardinal sin" of trademark law: consumer confusion about the source of goods and services stemming from the defendant's branding of its own products. *Jack Daniel's Props. v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023); *see also*

*Dewberry Grp. v. Dewberry Eng'rs, Inc.*, No. 23-900, slip op. at 2 (U.S. Feb. 26, 2025) (describing the purpose of trademarks as "prevent[ing] consumers from being confused about which company is providing a product or service."). A competitor's use of a trademark "does not infringe [the] mark unless it is likely to confuse consumers." *U.S. Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 562 (2020). And where the defendant does not use a trademark to brand its own products, the core concerns of trademark law are not implicated. *Jack Daniel's*, 599 U.S. at 157.

**A.    Competitive keyword advertising does not fall within the "heartland" of trademark law because keywords do not serve a source-identifying purpose.**

Advertisers' keyword bids fall outside of what the Supreme Court has recognized as the "heartland" of trademark law. *See Jack Daniel's*, 599 U.S. at 145. They do not "designate the source of [the keyword advertiser's] goods. . . ." *Id.* Indeed, there is a strong case that keyword bids do not meet the threshold "use in commerce" requirement under the Lanham Act. *See* 15 U.S.C. § 1114(a)(1); *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 430 (2023) (Jackson, J., concurring) (defining a 'use in commerce' as occurring "wherever the mark serves its source-identifying function."); *see also Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 727 (9th Cir. 2024) (Desai, J., concurring) (urging the

5

Ninth Circuit to "reconsider whether keyword bidding and purchasing constitutes a 'use in commerce' under the Lanham Act.").

The "first step of a trademark infringement action is to demonstrate an unauthorized 'use' of the plaintiff's mark in commerce," *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1242 (11th Cir. 2007). This Court has concluded that "[i]n order for a mark to be 'use[d] in commerce' the mark must be 'placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto.'" *Id.* (quoting 15 U.S.C. § 1127). Because the act of bidding on keywords involves no display or presentation to consumers of a mark whatsoever, much less a use of the mark to brand an advertiser's own goods, such activity cannot constitute "use in commerce" under the Lanham Act.

If a keyword bid does not constitute such a use, cases in which an advertiser simply bids on a trademark as a keyword should be dismissed without the need to proceed to the likelihood of confusion analysis. The Supreme Court has suggested that it is unnecessary and probably unwise to proceed to a full multifactor likelihood of confusion test in cases where the trademark is not used *as a trademark. See Jack Daniel's*, 599 U.S. at 143 (referring to protection from confusion about source as trademark law's "primary mission" and noting that such confusion is "most likely to arise when someone uses another's trademark as a trademark."); *see also* Stacey

6

Dogan & Jessica Silbey, *Jack Daniel's and the Unfulfilled Promise of Trademark Use*, 42 Cardozo Arts & Ent. L.J. 705, 716 (2024) ("[W]e think the proper interpretation of *Jack Daniel's* would limit 'trademark use' (and thus the application of the likelihood of confusion standard) to situations in which a defendant is using the mark in a way that would give it a possible claim to trademark rights of its own.").

*Amici* have different views about the meaning of "use in commerce," but all agree that, either way, keyword bidding simply does not "implicate[] the core concerns of trademark law." *Jack Daniel's*, 599 U.S. at 157 (quoting Graeme B. Dinwoodie & Mark D. Janis, *Confusion Over Use: Contextualism in Trademark Law*, 92 Iowa L. Rev. 1597, 1636 (2007)). An advertiser that purchases the ability to have its advertisements displayed in response to consumer searches for a competitor's trademark is not branding any goods or services with the trademark or holding its goods or services out as coming from the trademark owner.

**B.      Competitive keyword advertising is unlikely to confuse consumers about the source of goods and services.**

Court of appeals and district court decisions in other circuits reflect a consensus that likelihood of confusion cannot be found from a defendant's competitive keyword advertising alone. "Virtually no court has held that, on its own, a defendant's purchase of a plaintiff's mark as a keyword term is sufficient for liability." *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's*

7

*Found. of Am., Inc.*, 307 F. Supp. 3d 260, 284 (S.D.N.Y. 2018) (citations omitted). McCarthy's treatise confirms the consensus: "Courts almost always find no likelihood of confusion if all that [the] defendant has done is use another's mark as a keyword to trigger an ad for defendant in which the other's trademark does not appear." 4 McCarthy on Trademarks and Unfair Competition § 25A:7 (5th ed.) (collecting cases).

Both the Second and Ninth Circuits have recently reiterated this consensus view. The Second Circuit held that "the mere act of purchasing a competitor's trademarks in the context of keyword search advertising does not constitute trademark infringement." *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 239 (2d Cir. 2024). And the Ninth Circuit affirmed a district court's grant of summary judgment for the defendant in a case where the defendant engaged in competitive keyword advertising but did not display the plaintiff's mark in its advertisements. *Lerner & Rowe*, 119 F.4th at 717.

When assessing likelihood of confusion, cases in which the defendant engages *only* in competitive keyword advertising are "readily distinguishable" from those in which the defendant "use[s] its competitor's trademarks on its websites" or in ad text. *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1245 (10th Cir. 2013). The "labeling and appearance" of advertisements and the context surrounding their display are "critical factor[s]" in finding no likelihood of confusion in competitive

keyword advertising cases. *Id.* (quoting *Network Automation v. Advanced Sys. Concepts*, 638 F.3d 1137, 1154 (9th Cir. 2011)). Likelihood of confusion in keyword advertising cases "will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." *Network Automation*, 638 F.3d at 1153 (quoting *Hearts on Fire Co. v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 289 (D. Mass. 2009)).

Understandably, courts consistently find no infringement in competitive keyword advertising cases because the application of any circuit's likelihood of confusion test to a keyword advertising case strongly favors the defendant. This Court uses a seven-factor test to assess likelihood of confusion, *see, e.g., Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007), and this test's application in the keyword advertising context would lead to the same outcomes reached by the courts in the cases above. The factors considered are:

"(1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public."

9

*Id*.

This Court considers "all seven factors to ensure that the determination is made in light of the totality of the circumstances." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1207 (11th Cir. 2004) (quoting *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488-89 (11th Cir. 1987)). However, a finding that the relevant displayed marks are overwhelmingly dissimilar has been dispositive in favor of the defendant, even if all other factors support the plaintiff. *See Dippin' Dots*, 369 F.3d at 1208 (finding that, despite the remaining six factors weighing in favor of the plaintiff, "no reasonable jury could find that the two logos are confusingly similar because the lack of visual similarity between the two designs is overwhelming"). Of the remaining factors, actual consumer confusion "is, of course, the best evidence of a likelihood of confusion." *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1264 (11th Cir. 2016) (citing *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999))[4]. Given that the similarity of the marks and actual confusion factors overwhelmingly weigh in favor of the defendant in competitive keyword advertising

---

[4] In *Frehling*, this Court stated that it was "undisputed" that evidence of actual confusion was the best evidence of a likelihood of confusion.

10

cases, the remaining likelihood of confusion factors would not lead to a different result.

**Similarity of the Marks:** When a trademark is solely used as a keyword, the relevant comparison is between the trademark and the paid advertisement's appearance on the search results page, *not* the keyword. Indeed, if the comparison were between the trademark and the keyword, similarity would exist by definition. The alleged risk of confusion in the keyword advertising context is that "while using [plaintiff's] mark to search for information about its product, a consumer might be confused by a results page that shows a competitor's advertisement on the same screen, when that *advertisement* does not clearly identify the source or its product." *Network Automation*, 638 F.3d at 1149 (emphasis added).

In this case, the 37 ads in the first category described in NOCO's opening brief, Appellant's Br. 10-12, are instances where the trademark is used for competitive keyword advertising and not in the text of the advertisement; therefore, the similarity of the marks factor should reflect "what consumers 'encountered in the marketplace,'" not what Amazon's algorithm "uses to churn out search results." *Lerner & Rowe*, 119 F.4th at 726 (citation omitted); *see also JAND*, 119 F.4th at 250-51 (when considering the similarity of the marks factor in keyword advertising cases, the plaintiff's mark should be compared to the mark the defendant "used 'after the

search results … [we]re displayed to the consumer' (i.e., [the defendant's] own mark)") (citation omitted).

It follows that if the plaintiff's mark is not displayed in the text of the advertisement, the fact that it was used to help place the advertisement does not mean that the defendant's mark and the plaintiff's mark are similar, any more than a retailer stocking Pepsi next to Coke on a grocery store shelf would mean that those trademarks are similar. Eric Goldman, *Brand Spillovers*, 22 Harv. J. L. & Tech. 382, 410 (2009) (noting that retailers do not commit trademark infringement when placing competitive options with distinguishable brands on the same store shelf because consumers understand the relative relationship between the two products). In the keyword advertising context, where "the advertiser's ad copy displays its own brand," consumers are presented with "information about competing brands among which they can select, just like the side-by-side retail shelf presentation of competing brands." *Id*.

The similarity of the marks factor should always favor the defendant in a competitive keyword advertising case when the mark is not used in the text of the ad that was displayed as a result of the search. *See JAND*, 119 F.4th at 255 (finding "the dissimilarity of marks factor . . . dispositive" in affirming the defendant's motion for judgment on the pleadings in a case where the plaintiff failed to allege that the defendant had used its marks anywhere outside of the competitive keyword

advertising context); *Lens.com*, 722 F.3d at 1256 (affirming "summary judgment on all claims of infringement based on keyword use that did not result in ads displaying [plaintiff's] mark *in their text*.") (emphasis added); *see also* Eric Goldman, *Second Circuit Tells Trademark Owners to Stop Suing Over Competitive Keyword Advertising–1-800 Contacts v. Warby Parker*, Tech. & Mktg. L. Blog (Oct. 9, 2024), https://perma.cc/6EMW-ALA3. In this case, then, any NOCO advertisement that did not include "battery tender" in its text would not confuse consumers.

**Actual Confusion:** Appellee's claims that NOCO's "excessive keyword bid[ding]" caused actual consumer confusion—supported at trial by only a few messages not directly linked to the Amazon ads—stands in marked contrast to the reality of consumers' online search experience. *See* Appellant's Br. 39-40 (discussing Appellee's lack of evidence showing actual confusion); *see also Lerner & Rowe*, 119 F.4th at 730 (Desai, J., concurring) ("The familiarity of sponsored ads to those navigating internet platforms makes the likelihood of confusion inquiry difficult, if not impossible, to satisfy.").

"[I]t is improper to assume that [when a consumer] us[es] a trademarked keyword [] the searcher wanted to find the trademark owner." Eric Goldman, *Deregulating Relevancy in Internet Trademark Law*, 54 Emory L. J. 507, 566 (2005); *see also Lerner & Rowe*, 119 F.4th at 730 (Desai, J., concurring) ("Consumers likely understand that, even when they search for a trademarked term, the sponsored results

13

may not be associated with that trademark."). In one study, a majority of the consumers surveyed said that when they use a trademark as a search query, they expect to find products other than "products bearing that brand name." David J. Franklyn & David A. Hyman, *Trademarks As Search Engine Keywords: Much Ado About Something?*, 26 Harv. J. L. & Tech. 481, 518 (2013). A substantial proportion of consumers even *intend* to see information about "similar products from other brands." *Id.* at 517. A consumer who searches for "battery tender" hoping to find results that would help them identify and evaluate competitors in the product category would incur greater search costs if they received results solely containing information on products bearing the "battery tender" trademark.

## C.  "Initial interest confusion" is not a viable theory of trademark infringement and is not implicated by competitive keyword advertising.

This Court has not ruled on whether initial interest confusion ("IIC") is an actionable theory of trademark infringement, as some other circuits have done. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.,* 693 F.3d 1338, 1347 (11th Cir. 2012). It should not adopt IIC in this case.  In the context of keyword advertising, IIC wrongly enables a finding of trademark infringement when companies merely "make[] associative or referential uses of a trademark." Goldman, *Deregulating Relevancy*, *supra*, at 565.

To begin with, courts do not have a clear conception of what constitutes IIC. Under an IIC theory, companies can be found liable for trademark infringement if their activities foster "confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion." 3 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed). But there is no consensus on what specific company activities, consumer behaviors, and harms are encompassed within such a definition. When the doctrine was in its heyday during the 1990s, many rulings relied on poor judicial understanding of technology during the internet's infancy. Glynn S. Lunney, Jr., *Trademarks and the Internet: The United States' Experience*, 97 Trademark Rep. 931, 935 (2007). Since then, many courts have been inconsistent in their interpretation of IIC's scope. Connie D. Nichols*, Initial Interest Confusion "Internet Troika" Abandoned? A Critical Look at Initial Interest Confusion as Applied Online,* 17 Vand. J. Ent. & Tech. L. 883, 883 (2020). But these fact-sensitive and often inconsistent rulings are an unhelpful guide for companies hoping to understand if their use of competitive keyword advertising constitutes trademark infringement.

Even if there are some contexts in which IIC theory is applicable, competitive keyword advertising is not one. The Ninth Circuit has recognized that "it would be wrong to expand the initial interest confusion theory of infringement beyond the

15

realm of the misleading and deceptive to the context of legitimate comparative and contextual advertising." *Network Automation*, 638 F.3d at 1148.

Consumers are not deceived by competitive keyword advertising. IIC, when applied to keyword bidding cases, relies "on multiple mistaken and empirically unsupported assumptions about searcher behavior." Goldman, *Deregulating Relevancy*, *supra,* at 565. After more than thirty years, users of search engines today typically understand their search results. They can tell the difference between organic search results and advertising and may use competitor ads to better understand their purchase options, rather than being misled or confused about whether these ads are from the trademark owners. *Id*. at 566-67. In fact, as the record in this case demonstrates, when companies bid on competitor keywords, the bidding companies' product brand names are generally plainly visible on the resulting ads that appear on platforms like Amazon. Appellant's Br. 11; s*ee, e.g*., DX-520 at 5. Any momentary confusion that might result is easily dispelled by clicking "back" once the user realizes they are not at the site they were looking for.

Bidding on competitor's keywords while clearly labeling advertisements with one's own marks is fundamentally different than engaging in "misleading" or "deceptive" advertising practices. If the former conduct could cause "initial interest confusion," then it is easy to imagine, for example, claims being brought against makers of generic medicines that purchase shelf space in a pharmacy next to a brand-

name good. The social costs of imposing liability in these sorts of scenarios would be substantial. *See* Goldman, *Brand Spillovers*, *supra*, 382-83 (finding that "brand spillovers" in the brick-and-mortar retail context are an integral marketing practice that create positive externalities for customers, competitors, and retailers).

To the contrary, consumers conducting searches benefit from increased options and the ability to make a more informed choice. When IIC is applied to competitive keyword advertising, it prevents an "efficient operation of competitive markets" and precludes "the public's ability to choose between reasonably-priced products." Jennifer E. Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 Cardozo L. Rev. 105, 129 (2005).

## II.   Competitive Keyword Advertising Informs Consumers, Reduces Their Search Costs, and Fosters Competition.

"[A]dvertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 (1977). Competitive advertising is the "desired norm." *Id*. at 377 n. 35. And competitors have "an affirmative right to use others' trademarks to capture public attention and attempt to divert it to their own products," so long as they "do not mislead people into presuming some kind of affiliation between themselves and the trademark holder." Stacey L. Dogan & Mark A. Lemley, *Trademarks and Consumer Search Costs on the Internet*, 41 Houston L. Rev. 777, 796 (2004); *see also SSP Agric. Equip., Inc. v. Orchard-Rite Ltd.*, 592

F.2d 1096, 1103 (9th Cir. 1979) ("The use of a competitor's trademark for purposes of comparative advertising is not trademark infringement 'so long as it does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused. . . .'") (citation omitted).

Competitive keyword advertising facilitates the socially desirable and competition-enhancing purposes of advertising. Misapplying trademark law to limit such advertising would thwart these legitimate purposes. Competitive keyword advertising lets consumers spend less time searching for and finding what they are seeking; it makes them more informed; and consumers benefit from lower prices and higher product quality as a result of increased competition in the marketplace.

Competitive keyword advertising helps to inform consumers about other competitive alternatives and enables them to compare different product offerings. *See Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 673 F. Supp. 3d 1017, 1035 (D. Ariz), aff'd sub nom. *Lerner & Rowe*, 119 F.4th (likening the functionality of competitive keyword advertising to a retail sales person "informing the consumer of alternatives."); *see also* Opinion, *In re* 1-*800 Contacts, Inc.*, Dkt. No. 9372, (FTC Nov. 7, 2018), *rev'd on other grounds*, 1 F.4th 102 (2d Cir. 2021) ("When information is withheld from consumers, it frustrates their ability to compare the prices and offerings of competitors."). Competitive keyword advertising thereby serves key goals of trademark protection: "promot[ing] fair competition through

18

increasing transparency in the marketplace and reducing consumer search costs." Giuseppe Colangelo, *Competing Through Keyword Advertising*, 16 J. Comp. L. & Econ. 306, 312 (2020). Conversely, empirical evidence shows that restrictions on comparative advertising harm consumers by increasing search costs, product prices, and the likelihood of poorer product quality. *See e.g.,* Opinion, *In re 1-800 Contacts, Inc.*, Dkt. No. 9372, at 21 ("Consistent with the economic literature, over the past 40 years, the Commission has repeatedly found that advertising restrictions harm competition and consumers.").

In addition to informing consumers, "trademark law. . . aims to promote rigorous, truthful competition in the marketplace." Dogan & Lemley, *Search Costs*, *supra,* at 788. And for businesses, attempting to win over customers through increased brand exposure and visibility is a key component of such competition. Bidding on a competitor's trademark as a keyword serves this function by allowing companies to more readily expose potential customers to their products and to compete for those customers.

Just as competitive keyword advertising is both non-infringing and beneficial to consumers and competition, the use of a trademarked term in ad text can also be non-infringing and beneficial when it constitutes fair use. This is true for a second category of 24 ads, *see* DX-308A–DX-308X; PX-51; PX-230, described in Appellant's brief, where the terms "tender" and "battery tender" appeared in ad text

alongside NOCO's name and product (but with no other mention of Deltona). Appellant's Br. 12-14. Federal trademark law allows an advertiser to use a competitor's mark *descriptively*, to describe the advertiser's own competing product, if the trademarked term is descriptive in nature. *See Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citation omitted); *see also* 15 U.S.C. § 1115(b)(4) (creating a safe harbor from infringement when descriptive terms are used not as a mark but in their ordinary meaning to describe a third party's goods and services).

To the extent that "Battery Tender" describes a product that "tends" batteries, trademark law does and should not bar its good faith use to describe an advertiser's own goods or services, rather than to brand its own goods.[5] And if the term is generic, referring to a general class of "battery tending" products, it cannot be protected by trademark law at all. Consumers looking for such products should be able to find them.

Trademark owners should not be able to prevent competitors from providing—and consumers from accessing—valuable information by attempting to monopolize the use of terms over which the law does not grant them exclusive rights.

---

[5] *See, e.g.,* DX-308M ("Save on safe and trusted battery tenders."); DX-308N; DX-308K; DX-308I; DX-308L ("More Than Just a Battery Tender – Zero overcharge."); DX-308P ("The most advanced battery tender for any vehicle.").

Consumers "should be able to pick the search terms they want, and search providers should be able to use those search terms to deliver the most helpful content to [consumers]." Goldman, *Deregulating Relevancy*, *supra*, at 510. Trademark law does not and should not prevent this socially beneficial dynamic.

## CONCLUSION

Competitive keyword advertising, without more, should not be considered trademark infringement. Keywords are not used for source-identifying purposes, nor do they cause confusion when consumers see sponsored advertising. Competitive keyword advertising fosters positive externalities for consumers and competition. The District Court's conclusion that competitive keyword bidding constitutes infringement should be reversed.

Dated: March 19, 2025                    Respectfully submitted,

                                  _____/s/Phillip R. Malone/_____

                                  Phillip R. Malone
                                  Juelsgaard Intellectual Property and
                                     Innovation Clinic
                                  Mills Legal Clinic at Stanford Law School
                                  559 Nathan Abbott Way
                                  Stanford, CA 94305
                                  Telephone: (650) 725-6369
                                  Fax: (650)-723-4426

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B), 28.1(e)(2), and 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 4704 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 19, 2025

        /s/Phillip R. Malone/

Phillip R. Malone
Counsel for *Amici Curiae*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2025, I caused the foregoing Brief of 31 Intellectual Property and Media Law Professors as *Amici Curiae* in Support of Appellant and Reversal to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using CM/ECF, which will automatically send email notification of such filing to all counsel of record.


Dated: March 19, 2025

/s/Phillip R. Malone
Phillip R. Malone
Counsel for *Amici Curiae*

## APPENDIX

*Amici curiae* law professors are listed below. Affiliation is provided for identification purposes only, and the brief does not reflect the views of the listed institutions.

**Professor Michael A. Carrier**
Rutgers Law School

**Professor Zachary Catanzaro**
St. Thomas University, Benjamin L. Crump College of Law

**Professor Shari Seidman Diamond**
Northwestern University Pritzker School of Law

**Professor Ashley R. Dobbs**
University of Richmond School of Law

**Professor Stacey Dogan**
Boston University School of Law

**Professor Shubha Ghosh**
Syracuse University College of Law

**Professor James Gibson**
University of Richmond School of Law

**Professor Eric Goldman**
Santa Clara University School of Law

**Professor Christine Haight Farley**
American University Washington College of Law

**Professor Laura A. Heymann**
William & Mary Law School

**Professor Timothy T. Hsieh**
Oklahoma City University School of Law

**Professor Eric E. Johnson**
University of Oklahoma College of Law

**Professor Stacey M. Lantagne**
Western New England University School of Law

**Professor Mark A. Lemley**
Stanford Law School

**Professor David S. Levine**
Elon University School of Law

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Orly Lobel**
University of San Diego School of Law

**Professor Brian J. Love**
Santa Clara University School of Law

**Professor Mark P. McKenna**
UCLA School of Law

**Professor Jess Miers**
University of Akron School of Law

**Professor Viva R. Moffat**
University of Denver Sturm College of Law

**Professor Tyler T. Ochoa**
Santa Clara University School of Law

**Professor Aaron Perzanowski**
University of Michigan Law School

**Professor Lisa Ramsay**
University of San Diego School of Law

**Professor Amanda Reid**
University of North Carolina at Chapel Hill

**Professor Betsy Rosenblatt**
Case Western Reserve University School of Law

**Professor Zahr K. Said**
Santa Clara University School of Law

**Professor Jessica Silbey**
Boston University School of Law

**Professor Christopher Sprigman**
NYU School of Law

**Professor Xiyin Tang**
UCLA School of Law

**Professor Rebecca Tushnet**
Harvard Law School