No. 24-13590

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

DELTONA TRANSFORMER CORPORATION,

*Plaintiff-Appellee*,

*v.*

THE NOCO COMPANY,

*Defendant-Appellant*.

On Appeal From The United States District Court
For The Middle District Of Florida
No. 6:19-cv-308 (Hon. Carlos E. Mendoza)

# DEFENDANT-APPELLANT'S PETITION FOR PANEL REHEARING AND REHEARING EN BANC

PATRICK J. FUSTER
MATT AIDAN GETZ
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

HELGI C. WALKER
JONATHAN C. BOND
*Counsel of Record*
M. CHRISTIAN TALLEY
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
JBond@gibsondunn.com

*Counsel for Defendant-Appellant The NOCO Company*

*Deltona Transformer Corporation* v. *The NOCO Company*, No. 24-13590

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1(a), Defendant-Appellant The NOCO Company hereby certifies that the Certificate of Interested Persons and Corporate Disclosure Statement contained in its opening and reply briefs remains complete and accurate, except for the following new interested persons:

1. Bond, Jonathan C., *Counsel for Defendant-Appellant*
2. Fuster, Patrick J., *Counsel for Defendant-Appellant*
3. Getz, Matt Aidan, *Counsel for Defendant-Appellant*
4. Talley, M. Christian, *Counsel for Defendant-Appellant*
5. Walker, Helgi C., *Counsel for Defendant-Appellant*

Dated: August 25, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Jonathan C. Bond*
Jonathan C. Bond

*Counsel for Defendant-Appellant*
*The NOCO Company*

## STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves a question of exceptional importance: whether the Lanham Act prohibits attempting to persuade consumers that a trademark is generic.

I further express a belief, based on a reasoned and studied professional judgment, that the panel decision conflicts with authoritative decisions of other courts of appeals: *Freecycle Network, Inc.* v. *Oey*, 505 F.3d 898 (9th Cir. 2007), and *Ty Inc.* v. *Perryman*, 306 F.3d 509 (7th Cir. 2002).

Dated: August 25, 2026

GIBSON, DUNN & CRUTCHER LLP

By: *__/s/ Jonathan C. Bond______*
Jonathan C. Bond

*Counsel for Defendant-Appellant*
*The NOCO Company*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 40 STATEMENT ........................................1

BACKGROUND ...........................................................................................3

REASONS FOR GRANTING THE PETITION ............................................7

I. The En Banc Court Should Reconsider The Panel's Holding That Encouraging Generic Use Of A Trademark Is Infringement ........................................................7

II. At Minimum, The Panel Should Clarify That The Remand For A New Trial On Damages Includes The Award Of Punitive Damages......................................................13

CONCLUSION.........................................................................................20

CERTIFICATE OF COMPLIANCE ............................................................21

CERTIFICATE OF SERVICE.....................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ash* v. *Tyson Foods, Inc.*,
664 F.3d 883 (11th Cir. 2011) .......... 14

*Beard* v. *Wexford Health Sources, Inc.*,
900 F.3d 951 (7th Cir. 2018) .......... 16

*Emergency Recovery, Inc.* v. *Hufnagle*,
77 F.4th 1317 (11th Cir. 2023) .......... 14

*Engle* v. *Liggett Group, Inc.*,
945 So. 2d 1246 (Fla. 2006) .......... 15

*Freecycle Network, Inc.* v. *Oey*,
505 F.3d 898 (9th Cir. 2007) .......... 2, 11-13

*Fury Imports, Inc.* v. *Shakespeare Co.*,
554 F.2d 1376 (5th Cir. 1977) .......... 16, 17

*Gasoline Products Co.* v. *Champlin Refining Co.*,
283 U.S. 494 (1931) .......... 14

*Gasperini* v. *Center for Humanities, Inc.*,
518 U.S. 415 (1996) .......... 15

*Hutchinson* v. *Stuckey*,
952 F.2d 1418 (D.C. Cir. 1992) .......... 17

*Jack Daniel's Properties, Inc.* v. *VIP Products LLC*,
599 U.S. 140 (2023) .......... 1, 8, 9, 12

*Odom* v. *R.J. Reynolds Tobacco Co.*,
254 So. 3d 268 (Fla. 2018) .......... 15

*Pine* v. *City of West Palm Beach*,
762 F.3d 1262 (11th Cir. 2014) .......... 13

*Poullard* v. *Turner*,
298 F.3d 421 (5th Cir. 2002) ........ 17

*R.J. Reynolds Tobacco Co.* v. *Webb*,
93 So. 3d 331 (Fla. Dist. Ct. App. 2012) ........ 15

*Sasaki* v. *Class*,
92 F.3d 232 (4th Cir. 1996) ........ 17

*State Farm Mutual Automobile Insurance Co.* v. *Campbell*,
538 U.S. 408 (2003) ........ 18

*Ty Inc.* v. *Perryman*,
306 F.3d 509 (7th Cir. 2002) ........ 2, 10-13

*Williams* v. *First Advantage LNS Screening Solutions Inc.*,
947 F.3d 735 (11th Cir. 2020) ........ 18

**Constitutional Provisions**

U.S. Const. Amend. I ........ 1, 2, 8

U.S. Const. Amend. XIV, § 1, cl. 3 ........ 15

**Statutes**

15 U.S.C. § 1114 ........ 4

15 U.S.C. § 1117 ........ 15

15 U.S.C. § 1125 ........ 4, 11

Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. §§ 501.201-501.213 ........ 5, 6, 7, 18

Fla. Stat. § 768.73 ........ 19

**Rules**

Fed. R. App. P. 40 ........ 1

## INTRODUCTION AND RULE 40 STATEMENT

The Lanham Act targets a particular kind of consumer confusion: uncertainty about the *source* of a good or service. The Act does not prohibit statements that confuse consumers about *trademark law*. Yet the panel's decision in this case conflates the two—and creates a circuit conflict. After concluding that plaintiff Deltona Transformer Corporation's "Battery Tender" mark was not generic, the panel held that defendant The NOCO Company infringed that mark by (as relevant) attempting to persuade third parties that the phrase "battery tender" is a generic term for a type of battery charger. That decision improperly severs trademark infringement from source confusion, sets the Lanham Act on a collision course with the First Amendment, and puts this Circuit in conflict with two others. The panel's erroneous reading of the Act warrants en banc review.

Source identification is the Lanham Act's lodestar. A "trademark is not a trademark unless it identifies a product's source." *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U.S. 140, 146 (2023). Use of a trademark thus is not infringement unless it undermines that function by creating a likely impression that products belong to the trademark holder. *Id.* at 147. Two other circuits accordingly have held that the Lanham Act

does not prohibit "the use of a trademarked term in its generic sense" to describe a class of goods or services. *Freecycle Network, Inc.* v. *Oey*, 505 F.3d 898, 906 (9th Cir. 2007) (citing *Ty Inc.* v. *Perryman*, 306 F.3d 509, 513-514 (7th Cir. 2002)). But the panel here held the opposite: It concluded that NOCO's statements "that 'battery tender' was a generic term" violated the Lanham Act, even when NOCO distinguished its chargers from Deltona's "'specific brand'" of "'Battery Tender.'" Op. 28-29 (citation omitted).

The panel's expansion of trademark infringement beyond source confusion sets the Lanham Act down a constitutionally perilous path. When limited to source confusion, trademark law typically poses no serious First Amendment concerns. But "forbid[ding] commercial uses that accelerate the transition from trademarks (brand names) to generic names (product names)" would allow courts to stunt the normal development of the English language. *Ty*, 306 F.3d at 513. Nothing in the Act suggests (much less clearly states) that Congress wished to push the outer limits of free speech.

The panel's misreading of the Act made a material difference here. The holding that NOCO infringed Deltona's marks in urging that the marks are generic was the only basis on which the panel affirmed a $12 million

disgorgement award. NOCO should not be forced to pay millions based on speech that Congress did not and could not prohibit.

At the very least, the panel should clarify the scope of the new trial it ordered on damages. Although the panel affirmed on liability, it recognized that several of Deltona's theories tried to the jury cannot support damages and that the jury's lump-sum verdict did not distinguish among them. It accordingly remanded for a "new trial on damages," full stop. Op. 43. That mandate is properly read to require retrial on compensatory *and* punitive damages. That is the settled rule for unqualified remands, and it is essential here because federal and state law limit any punitive-damages award based on the amount of compensatory damages. But any uncertainty or dispute on the remand's scope could result in wasteful proceedings, even another appeal. The panel can avoid that outcome by clarifying now that its remand requires a new trial on compensatory and punitive damages.

## BACKGROUND

1. NOCO, a family company founded in 1914 and based in Glenwillow, Ohio, designs and distributes premium battery chargers, battery jump starters, battery packs, and other battery-related goods. Doc. 401, at 67:17-20, 68:10-69:5. NOCO and Deltona's subsidiary, Deltran, each sell

battery chargers designed to keep batteries charged (but not overcharged). Op. 1-2. Deltona began to market its products in the early 1990s as "Battery Tenders." Op. 3. It registered that name as a trademark in 2008 and registered "Deltran Battery Tender" in 2013. Op. 4. In 2009, NOCO began to sell similar chargers that maintain a consistent charge. *Ibid.*

Deltona alleged that, starting in 2014, NOCO used the term "battery tender" in connection with its products. Op. 4. Deltona complained about four categories of conduct: (1) NOCO's practice of "keyword bidding" on Amazon, *i.e.*, paying Amazon to display NOCO ads when consumers search for "battery tender"; (2) use of the terms "tender" or "battery tender" in certain Amazon ads; (3) inclusion of "battery tender" in Amazon product descriptions; and (4) references to "battery tenders" in NOCO's communications with customers and marketing firms. Op. 5-6. NOCO eventually petitioned the Patent and Trademark Office to cancel Deltona's "Battery Tender" and "Deltran Battery Tender" marks as generic. Op. 5.

2. That proceeding was suspended after Deltona sued NOCO. Op. 5-6. Deltona alleged: (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(3) common-law trademark infringement; and (4) unfair competition under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Op. 9. Deltona's complaint did not plead a false-advertising claim under Section 43(a)(1)(B) of the Lanham Act, but the district court instructed the jury on that theory as well. Op. 33-35.

The jury returned a verdict for Deltona "on all counts," finding that its marks were protected under the Lanham Act and that NOCO's conduct created a likelihood of confusion as to the source of NOCO's chargers. Op. 2, 9. The jury awarded Deltona $1.3 million in actual damages and $5.75 million in punitive damages. Op. 10.

The district court then held a bench trial on equitable relief. Op. 10. It enjoined NOCO from using certain words (*e.g.*, "Battery Tender" or "Tender") in its marketing and ordered NOCO to disgorge $12,135,943.70 in profits from 2014 to 2020. *Ibid.*

3. On appeal, the panel affirmed in part, reversed in part, and remanded for a new trial on damages.

The panel affirmed liability for trademark infringement but rejected one of Deltona's core infringement theories. Op. 11-30. It held that a reasonable jury could find that "battery tender" is a protectable mark rather

than a generic term for a charger that maintains battery levels without overcharging. Op. 11-19. And the panel held that a reasonable jury could find that NOCO infringed Deltona's marks. Op. 30. But the panel rejected Deltona's central "keyword bidding" theory, holding that keyword bidding that "occurs 'behind the scenes'" cannot cause confusion about the source of NOCO's chargers. Op. 21-24. So the panel affirmed the finding of likelihood of confusion only on other grounds: a few ads NOCO ran on Amazon, Op. 24-25; product descriptions on Amazon during a limited period, Op. 25-28; and NOCO's efforts to persuade marketing firms and consumers that "battery tender" generically describes a *type* (not just brand) of charger, Op. 28-29.

The panel held that the district court committed legal errors as to two of Deltona's other claims. First, the panel explained that the only damages available under FDUTPA are for lost sales, which Deltona did not attempt to prove. Op. 31-32. Second, the panel concluded that the district court erred in submitting Deltona's false-advertising theory to the jury because Deltona did not plead that theory in its complaint and NOCO "didn't impliedly consent to trial" on it. Op. 33-37. The panel thus reversed as to the false-advertising theory. Op. 37.

The panel affirmed the district court's equitable remedies. Op. 37-41. NOCO argued "that any disgorgement should be limited to profits directly traceable to NOCO's use of Deltona's marks on Amazon." Op. 38. The panel rejected that argument based on one of Deltona's infringement theories: that NOCO violated trademark law by "actively communicating to consumers and external partners that Deltona's marks were generic." *Ibid.* The panel also upheld the injunction. Op. 39-41.

Finally, the panel held that the errors tainted the jury's findings on damages. Op. 41-43. The jury awarded a "lump sum" of $1.3 million in actual damages on a verdict form that did not differentiate claims or theories. Op. 42-43; see Doc. 315, at 4. Because the panel could not tell whether the jury improperly awarded damages for false advertising, for keyword bidding, or under FDUTPA, the panel vacated and remanded "for a new trial on damages." Op. 43.

## REASONS FOR GRANTING THE PETITION

### I. The En Banc Court Should Reconsider The Panel's Holding That Encouraging Generic Use Of A Trademark Is Infringement

The panel's holding that the Lanham Act prohibits attempts to persuade consumers that a mark is generic is wrong and warrants further review. That decision distorts the source-confusion standard for trademark

infringement. And it creates a conflict with the Seventh and Ninth Circuits, puts the Lanham Act at odds with the First Amendment, and skewed the panel's analysis of remedies here.

A. The "'keystone'" inquiry for trademark infringement is whether "the defendant's use" of a mark is likely to cause "confusion 'about the source of a product or service.'" *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U.S. 140, 147 (2023) (citations omitted). That was the *sole* basis on which the jury found trademark infringement: NOCO's use of Deltona's marks was "likely to cause confusion among consumers" about whether "NOCO's goods come from, are affiliated with, are approved by, or are sponsored by Deltona." Doc. 314, at 15 (jury instruction); see Doc. 315, at 3-5 (verdict form).

At times, the panel recognized that Deltona's trademark claims hinged on proof of source confusion. The panel correctly explained that keyword bidding, which could lead NOCO's ads to appear when a consumer searches for "battery tender," does not confuse consumers into believing NOCO products are "Deltona's own offering." Op. 22. But the panel then jettisoned the source-confusion test in discussing NOCO's attempts to per-

suade others "that 'battery tender' was a generic term" for a charger that maintains battery levels without overcharging. Op. 29. That was error.

Efforts to persuade consumers that a mark generally describes a class of goods or services do not create a likelihood of *source* confusion. A defendant's efforts to persuade others that a mark is generic and refers to a class of product might cause confusion about the metes and bounds of trademark law. But such statements cannot create the kind of confusion that matters by making consumers "think that one producer's products *are another's*." *Jack Daniel's*, 599 U.S. at 157 (emphasis added).

Several statements the panel highlighted as "evidence" that NOCO "sow[ed] confusion," Op. 28, prove the point:

- a statement by NOCO's president, Jonathan Nook, to a marketing firm that "battery tender" is "'a generic word now,'" Op. 6 (citation omitted);
- an email from Mr. Nook to a customer stating, "We understand Battery Tender is a well known brand, but most customers usually refer to the function (battery tender meaning a trickle charger), [rather] than the actual brand," Op. 6 (citation omitted); and
- a chat message from a NOCO sales representative distinguishing "Battery Tender [as] a specific brand" from "'a battery tender' [as] a maintainer for your batteries to keep them from losing charge while they're connected to the battery," Op. 7 (citation omitted).

Those statements cannot possibly have led consumers to believe that NOCO's chargers were *Deltona* chargers. The clear message of each statement was that NOCO is *not* affiliated with Battery Tender but simply sells the same type of charger, and that the term "battery tender" broadly denotes that type. NOCO Opening Br. 40; NOCO Reply Br. 14.

B. The panel's contrary holding conflicts with decisions of the Seventh and Ninth Circuits recognizing that attempts to persuade consumers that a mark is generic are not trademark infringement.

In *Ty Inc.* v. *Perryman*, 306 F.3d 509 (7th Cir. 2002), the Seventh Circuit rejected the argument that the Lanham Act "forbid[s] commercial uses" of a mark "that accelerate the transition from trademarks (brand names) to generic names (product names)." *Id.* at 513. Ty—the maker of Beanie Babies—had sued a reseller who used "Beanies" as a shorthand for stuffed animals while "disclaim[ing] any affiliation with Ty." *Id.* at 510-511. The Seventh Circuit held that "uses of [a] mark that, while not confusing, threaten to *render the mark generic*" are *not* actionable as trademark dilution. *Id.* at 514 (emphasis added). Because trademark infringement requires proof of source confusion, the reseller violated the Lanham Act only

to the extent she labeled non-Ty products as "Other Beanies" on her website, creating confusion as to who *made* those stuffed animals. *Ibid.*

In *Freecycle Network, Inc.* v. *Oey*, 505 F.3d 898 (9th Cir. 2007), the Ninth Circuit likewise held that the Lanham Act does not "prevent an individual from expressing an opinion that a mark should be considered generic or from encouraging others to use the mark in its generic sense." *Id.* at 906. The case concerned a former employee (Oey) of a nonprofit (The Freecycle Network, or TFN) who publicly argued that "freecycle" had become a generic term for "the act of recycling goods for free via the Internet." *Id.* at 900-901.

The Ninth Circuit vacated an injunction preventing Oey from making that claim, on two alternative grounds. First, it held that Oey's statements, unlike NOCO's here, "likely did not constitute a 'use in commerce'" of the mark because he had no "competing service." *Freecycle*, 505 F.3d at 903 (quoting 15 U.S.C. § 1125(a)(1)). Second, the court held that, "even if" Oey's statements could be understood as a "commercial use" of TFN's mark, "such use was *not* likely to cause confusion, mistake, or deceive anyone" about a connection with TFN. *Ibid.* (emphasis added). Oey "simply expressed an opinion that TFN lacked trademark rights in the term

'freecycle' and encouraged like-minded individuals to continue to use the term in its generic sense." *Ibid.*

In reaching that conclusion, the Ninth Circuit expressly aligned itself with the Seventh Circuit. It agreed that the Lanham Act does not "preven[t] the use of a trademarked term in its generic sense." *Freecycle*, 505 F.3d at 906 (citing *Ty*, 306 F.3d at 513-514). Statements like those in *Freecycle*, the court held, are merely nonactionable "legal opinion" that a mark is generic. *Id.* at 904. The panel's contrary conclusion that encouraging generic use of a mark infringes the mark cannot be squared with either *Ty* or *Freecycle*.

C. The panel's decision represents a serious intrusion on free speech. "'[T]rademark law generally prevails over the First Amendment' when 'another trademark (or a confusingly similar mark) is used without permission' as a means of '*source identification*.'" *Jack Daniel's*, 599 U.S. at 159 (emphasis added; citation omitted). But efforts to silence generic uses of marks or to express a legal opinion about them, which pose no risk of source confusion, have no historical pedigree. Instead, they impede "the addition to ordinary language" that occurs as trademarks—such as aspirin, escalator, thermos, or yo-yo—become associated with products rather than

brands. *Freecycle*, 505 F.3d at 905-906 (quoting *Ty*, 306 F.3d at 514). This Court should avoid those "serious constitutional problems" by keeping trademark law confined to its traditional scope. *Pine* v. *City of West Palm Beach*, 762 F.3d 1262, 1270-1271 (11th Cir. 2014).

D. Correcting the panel's error would have important consequences for the remedies available here. NOCO argued that disgorgement should be limited to sales on Amazon. NOCO Opening Br. 59-62. The panel rejected that limitation, and affirmed the district court's decision to sweep in all sales in the relevant period, only because it improperly treated NOCO's statements "to consumers and external partners that Deltona's marks were generic" as infringing those marks. Op. 38. Correcting that legal error would substantially reduce the disgorgement award. It would ensure that the jury on remand does not award damages for lawfully encouraging generic uses.

## II. At Minimum, The Panel Should Clarify That The Remand For A New Trial On Damages Includes The Award Of Punitive Damages

The panel should also clarify the scope of the remand on damages. The panel decision's decretal language—remanding "for a new trial on damages," Op. 43—is properly read to require retrial as to both compensatory *and* punitive damages. Circuit precedent and Florida law *require* that

result. But potential confusion or disagreement about the remand's scope could result in unnecessary litigation in the district court and potentially a second appeal. The panel can avoid all that by making explicit that the damages retrial on remand encompasses punitive damages.

A. The best reading of the mandate is that the panel remanded for a new trial on *all* damages, including punitive damages. Remands presumptively are plenary unless specifically narrowed. *Ash* v. *Tyson Foods, Inc.*, 664 F.3d 883, 891-892 (11th Cir. 2011). The remand here was unqualified: "[W]e VACATE and REMAND for a new trial on damages." Op. 43 (formatting omitted). Nothing in the decision "expressly or by necessary implication" limits the new trial to compensatory damages. *Emergency Recovery, Inc.* v. *Hufnagle*, 77 F.4th 1317, 1329 (11th Cir. 2023) (citation omitted). The mandate thus means what it says: A new trial must occur on damages—compensatory and punitive.

That straightforward reading accords with the principles governing new trials. Federal procedural law forbids a "partial new trial" unless "the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co.* v. *Champlin Refining Co.*, 283 U.S. 494, 500 (1931). And because the only

basis for punitive damages here is state law (Florida common-law trademark infringement), whether punitive damages are "distinct and separable" (*ibid.*) from compensatory damages is governed by state law. *Gasperini* v. *Center for Humanities, Inc.*, 518 U.S. 415, 430 & n.12 (1996); see 15 U.S.C. § 1117(a) (barring "penalt[ies]" for Lanham Act infringement).

Under Florida law, a punitive-damages award cannot stand if the underlying compensatory-damages award is vacated. In *Engle* v. *Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006), the Florida Supreme Court held that "the amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awardable, if any, so that the relationship between the two may be reviewed for reasonableness" under the Due Process Clause. *Id.* at 1265; see *R.J. Reynolds Tobacco Co.* v. *Webb*, 93 So. 3d 331, 339-340 (Fla. Dist. Ct. App. 2012) (collecting cases). Florida law automatically requires a new trial on punitive damages once compensatory damages are vacated—regardless of whether punitive damages were "separately challenged." *Odom* v. *R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 271 n.3 (Fla. 2018).

The panel's passing statement that NOCO did not "challenge the punitive-damages award on appeal," Op. 10 n.3, is thus irrelevant to the

scope of the damages retrial. Whether NOCO challenged on appeal the original punitive-damages award is immaterial because the question is the *effect* of the panel's vacatur of the compensatory-damages award on the limits of any punitive-damages award. That issue did not and could not arise prior to the panel's decision. But it must be addressed now: Because the permissibility of any punitive-damages award depends on any compensatory damages awarded on remand, the punitive-damages award must be redetermined as well.

Federal precedent reinforces that sensible result. In *Fury Imports, Inc.* v. *Shakespeare Co.*, 554 F.2d 1376 (5th Cir. 1977), binding on this Court, the Fifth Circuit held that a new trial on liability and actual damages required a new trial on punitive damages because the plaintiff would be "entitled to no punitive damages unless the jury finds for it on liability *and* awards some actual damages." *Id.* at 1389 (emphasis added). Other circuits routinely require a new trial on punitive damages when vacating compensatory damages (even when also affirming liability). For example, the Seventh Circuit holds that "both compensatory and punitive damages * * * must be considered jointly" in any new trial because they "are correlated." *Beard* v. *Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (2018). The D.C.

Circuit agrees that, "when a new trial is ordered on actual damages, the question of punitive damages should also be retried." *Hutchinson* v. *Stuckey*, 952 F.2d 1418, 1422 (1992); see also *Poullard* v. *Turner*, 298 F.3d 421, 424 (5th Cir. 2002) (same). The Fourth Circuit too "remand[s] the punitive damages award for a new trial along with the compensatory damages award" because the amount of punitive damages is "inextricably entwined with the compensatory damages award." *Sasaki* v. *Class*, 92 F.3d 232, 238 n.2 (1996).

B. Confirming that the damages retrial includes punitive damages is essential to ensure that any punitive-damages award in this case is substantively valid. Any punitive-damages award based on new compensatory damages must comply with the limits of permissible liability theories the panel upheld, the Constitution, and Florida statutes. Only a retrial that encompasses punitive damages can assure such compliance.

First, a new trial encompassing punitive damages is needed to ensure that NOCO is not punished for *conduct or harms* that the panel held cannot support liability at all. The district court instructed the jury in considering punitive damages to assess "the nature, extent, and degree of misconduct and related circumstances" in an undifferentiated manner. Doc. 316, at 2.

The jury awarded $5,750,000 in punitive damages without apportioning among liability theories. Doc. 317, at 1. But the panel held that NOCO cannot be liable based on Deltona's keyword-bidding, FDUTPA consequential-harms, or false-advertising theories. Op. 43. Those theories cannot support any punitive-damages award, either. The jury should be instructed to determine any new punitive award in light of the limits the panel drew.

Second, constitutional limits on punitive damages depend on the *amount* of any new compensatory-damages award. This Court has described "a ratio greater than 4:1 between punitive damages and compensatory damages" as "close to the line of constitutional impropriety," and "a lesser ratio as low as 1:1 may reach the outer limits" of due process if "the plaintiff has received a substantial compensatory damages award." *Williams* v. *First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 754-755 (11th Cir. 2020); see *State Farm Mutual Automobile Insurance Co.* v. *Campbell*, 538 U.S. 408, 425 (2003). The proper ratio necessarily must be assessed based on any *revised* compensatory award.

Third, any new punitive award must comport with *state law*. Florida law independently caps punitive damages unless the jury finds "that at the time of injury the defendant had a specific intent to harm the claimant" and

"that the defendant's conduct did in fact harm the claimant." Fla. Stat. § 768.73(1)(c). If there are *no* compensatory damages, the maximum punitive-damages award is $500,000. *Id.* § 768.73(1)(A)(2). So the punitive-damages award here must be revisited in light of any new compensatory award to ensure compliance with those state-law limitations.

C. Now is the time, and panel rehearing is the proper vehicle, to clear up any potential misconceptions about the new damages trial's scope. The panel is best positioned to clarify its own mandate and ensure consistency with applicable precedent. If the district court erroneously limits the new trial to compensatory damages, the parties and court could expend substantial resources on an improperly confined retrial. NOCO could then be forced to take another appeal, and the parties' and district court's efforts on remand would be rendered a waste if this Court then directs *another* new damages trial. Judicial efficiency strongly favors confirming the scope of the new trial on damages now.

## CONCLUSION

The Court should grant panel rehearing or rehearing en banc.

Dated: August 25, 2026

Respectfully submitted.

*/s/ Jonathan C. Bond*

PATRICK J. FUSTER
MATT AIDAN GETZ
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

HELGI C. WALKER
JONATHAN C. BOND
*Counsel of Record*
M. CHRISTIAN TALLEY
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
JBond@gibsondunn.com

*Counsel for Defendant-Appellant The NOCO Company*

## CERTIFICATE OF COMPLIANCE

This petition complies with the word limit of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,891 words, excluding the portions exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This petition also complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Expanded font.

Dated: August 25, 2026

GIBSON, DUNN & CRUTCHER LLP

By: *<u>/s/ Jonathan C. Bond</u>*
Jonathan C. Bond

*Counsel for Defendant-Appellant*
*The NOCO Company*

## CERTIFICATE OF SERVICE

I certify that on August 25, 2026, I electronically filed this petition with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: August 25, 2026

GIBSON, DUNN & CRUTCHER LLP

By: *__/s/ Jonathan C. Bond__*
Jonathan C. Bond

*Counsel for Defendant-Appellant*
*The NOCO Company*

**FOR PUBLICATION**

In the
# United States Court of Appeals
For the Eleventh Circuit

---

No. 24-13590

---

DELTONA TRANSFORMER CORPORATION,

*Plaintiff-Appellee,*

*versus*

THE NOCO COMPANY,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cv-00308-CEM-LHP

---

Before NEWSOM, LAGOA, and KIDD, Circuit Judges.

NEWSOM, Circuit Judge:

Deltona Transformer Corporation makes and sells specialized vehicle-battery chargers called "battery tenders." A battery tender "tends" the vehicle's battery, so to speak, by (1) charging it

until it's fully charged and then (2) maintaining a full charge—importantly, without overcharging (and thus degrading) the battery. Deltona owns the federally registered trademarks "Battery Tender" and "Deltran Battery Tender."

The NOCO Company makes similar chargers. Beginning in 2014, NOCO began advertising and promoting its own products as "battery tenders." After sending several cease-and-desist letters, Deltona sued NOCO for trademark infringement and unfair competition under both state and federal law. A jury found for Deltona on all counts, and further concluded that NOCO had engaged in false advertising in violation of federal law. The district court ordered NOCO to disgorge its profits and permanently enjoined the company from using Deltona's marks.

NOCO now asks us to reverse the district court's denial of its motions for judgment as a matter of law and for a new trial, both of which challenged the jury's verdicts regarding the trademarks' protectability, infringement, unfair competition under state law, and damages. NOCO also asks us to reverse the district court's denial of its motion for judgment as a matter of law challenging the jury's verdict regarding false advertising, a claim that it says wasn't properly pleaded or tried and therefore didn't merit a jury instruction. Finally, NOCO seeks to vacate the district court's disgorgement order and permanent injunction. After careful consideration, and with the benefit of oral argument, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for a new trial on damages.

# I

## A

Deltona began making battery-maintaining chargers in the early 1990s. At the time, most vehicle-battery chargers didn't know when to stop; "[t]hey would continue to provide power to a battery until *after* it was fully charged." Trial Tr. vol. 1, May 17, 2021, at 144, Dkt. No. 399 (emphasis added). As explained by Deltona's co-founder and CEO, Michael Prelec, Sr., "[Y]ou either set a timer or just [] plugged it in and let it go until you smelled it get hot." *Id.* at 184–85. Prelec testified that Deltona developed a "smart" battery charger that would stop when it "recognize[d]" the battery was full. *Id.* at 144. "This design," he said, "saved a lot of batteries from being overcharged and prolonged the life and the quality of the battery." *Id.*

Prelec further explained that his father, also a co-founder, named these products "Battery Tenders" as an homage of sorts to his experience in World War II. As a Merchant Marine captain, Prelec's father manned small boats called "tenders," which ferried supplies and wounded soldiers between land and larger ships that couldn't dock in shallow waters. Just as the tenders took care of—or "tended"—larger ships, the battery tender, Prelec's father believed, took care of—"tended"—batteries.

To develop a reputation and build goodwill in its early years, Deltona attended consumer and industry trade shows, advertised on TV and in magazines, and sponsored teams in car races and boats on fishing shows. Deltona also made private-label battery

tenders for Harley-Davidson and maintained "co-branding relationships" with other partners, pursuant to which it placed its Battery Tender logo next to those of Lotus, Lexus, and AAA on its products. Deltona has owned the federally registered trademarks "Battery Tender" since 2008 and "Deltran Battery Tender" since 2013.[1]

By 2014, Deltona was selling more than a million battery tenders a year, and it was considered an established brand in the battery-charging industry and community, especially in powersports. Prelec testified that, as a result of Deltona's promotional efforts, "people started calling [him] Mr. Battery Tender." *Id.* at 196.

NOCO also makes battery-related products. In 2009, it entered the battery-charger market by acquiring a company called Advance Fishing Technologies. Like Deltona's battery tenders, NOCO's products both charge the vehicle's battery and maintain its charge—again, without overcharging.

Deltona alleged that, beginning in 2014, NOCO began promoting its own chargers as "battery tenders," thereby infringing Deltona's marks. NOCO's allegedly infringing conduct can be grouped into four categories: (1) bidding on Deltona's marks as "keywords" and using them to trigger NOCO's ads in Amazon

[1] These trademarks also include their respective lowercase variants. Deltran is a former Deltona subsidiary that has since been spun off but continues to handle Deltona's marketing.

search results; (2) using the term "battery tender" in the text of its own Amazon ads; (3) incorporating the term "battery tender" in its product descriptions on Amazon; and (4) holding out its chargers as "battery tenders" in communications with marketing firms and customers.

First, Deltona alleged that NOCO engaged in "excessive . . . keyword bidding" by paying Amazon to display NOCO's ads when a consumer searched for "battery tender" or similar terms. *See* Br. of Appellee at 10. Deltona claimed that NOCO's conduct "influenced purchasing decisions for large retailers, small stores, and consumers" and that it could even have "affect[ed] consumer choices in retail stores." *Id.* at 11.

Second, Deltona alleged that NOCO infringed its marks by using the terms "battery tender" and "tender" in the text of its own Amazon ads. For example: "More Than Just A Tender. The Ultimate Charger"; "The most advanced battery tender for any vehicle"; "More than just a Battery Tender—zero overcharge"; and "The Winter Battery Tender with Zero Overcharge." Pl.'s Ex. 61A, Dkt. No. 318–38; Pl.'s Ex. 61D, Dkt. No. 318–40; Pl.'s Ex. 222A, Dkt. No. 318–152; Pl.'s Ex. 61F, Dkt. No. 318–42. Deltona sent NOCO a cease-and-desist letter each time it encountered such an ad, and each time, NOCO took it down. Following the fourth such letter, NOCO formally petitioned the Patent and Trademark Office to cancel Deltona's "Battery Tender" and "Deltran Battery Tender" marks. Those consolidated proceedings, before the Trademark Trial and Appeal Board, have been suspended pending

USCA11 Case: 24-13590 Document: 76-1 Date Filed: 08/04/2026 Page: 6 of 44



the decision of this case. *The NOCO Co. v. Deltona Transformer Corp.*, Opp. No. 91251463, Doc. 10 (T.T.A.B. Jan. 27, 2021).

Third, Deltona alleged that NOCO included the term "battery tender" in some of its chargers' product descriptions on Amazon—namely, those promoted close to Prime Day, a once-a-year sales event available to Amazon Prime members. By doing so, Deltona argued, NOCO "dr[o]ve traffic to [NOCO's] products" without having to pay for keywords, which were "much more expensive" on Prime Day. Dist. Ct. Order, Sept. 29, 2023, at 8, Dkt. No. 423 (citing Trial Tr. vol. 3, May 19, 2021, at 38, Dkt. No. 343).

Finally, Deltona alleged that NOCO expressly referred to its own products as "battery tenders" in communications with marketing firms and consumers—even "correcting" those who thought "battery tender" referred to a particular brand. For instance:

- In 2014, NOCO President Jonathan Nook asked a digital marketing firm to purchase a list of keywords. His list included "battery tender," next to which he asserted "it[']s a generic word now." Def.'s Ex. 19 at 1, Dkt. No. 319–3.
- An email drafted by Nook and sent by a NOCO sales manager to a potential customer said, "We understand Battery Tender is a well known brand, but most customers usually refer to the function (battery tender meaning a trickle charger), than the actual brand." Def.'s Ex. 81, Dkt. No. 319–7; Def.'s Ex. 82, Dkt. No. 319–8.

- An email from another sales manager referred to a NOCO charger as a battery tender, stating, "You now have pricing for the G1100 battery tender." Pl.'s Ex. 132, Dkt. No. 318–90.
- In a support chat on NOCO's website, a sales rep insisted that the company's products were battery tenders and that the term "battery tender" didn't refer specifically to a competitor's brand: "Battery Tender is a specific brand, but 'a battery tender' is a maintainer for your batteries to keep them from losing charge while they're connected to the battery." Pl.'s Ex. 138, Dkt. No. 318–94.
- NOCO's Vice President of Sales testified that he and his team frequently referred to NOCO's products as "battery tenders" when communicating with customers, despite his awareness that the term was trademarked. Trial Tr. vol. 4, May 20, 2021, at 125, Dkt. No. 400.

Deltona insisted that NOCO's conduct was intentional—that NOCO knew "battery tender" was a protected mark but nevertheless tried to mislead consumers to believe that NOCO's chargers *were* battery tenders. For support, Deltona pointed to an internal message in which, shortly after NOCO received the second cease-and-desist letter, a company employee said, "We cannot use Battery Tender in our messaging as it will cause a legal issue, trademark infringement." Pl.'s Ex. 192, Dkt. No. 318–120.

Deltona also argued that NOCO deliberately chose ads that would infringe Deltona's marks. In support of that contention,

Deltona pointed to a virtual brainstorming session regarding Amazon ad slogans, in which NOCO employees Nicole Brown and Erin McCullar anticipated Deltona's reaction to NOCO's use of its marks:

> Brown: I picture J[onathan Nook] wanting us to refer to Battery Tender in the messaging just like we have for the current ad messaging.
>
> . . .
>
> Brown: The Winter Battery Tender with Zero Overcharge.
>
> McCullar: I like that one because it's kind of passive aggressive [😂][2]
>
> Brown: It's really passive aggressive [😭] I envision them sending us a nasty note like, ummm excuse me?!?!
>
> McCullar: [🤣]

Pl.'s Ex. 134 at 6–7, Dkt. No. 318–92 (citation modified). As it turned out, Brown's proposed "Winter Battery Tender" slogan ended up in a NOCO ad that—again—the company took down

[2] The documents in the record converted the emojis to their shortcodes (*e.g.*, :joy: or :rolling on the floor laughing:). For clarity, we have replaced the shortcodes with the actual emojis to reflect the exchange as it presumably appeared between the NOCO employees.

after Deltona sent a cease-and-desist letter. *See* Pl.'s Ex. 61F, Dkt. No. 318–42.

Deltona proffered evidence that NOCO's infringement confused consumers. For instance, the director of advertising at Deltran, a former Deltona subsidiary that was spun off but still handles Deltona's marketing, testified that one of its customer-service agents spoke to a consumer who had initially reached out to NOCO and was "very confused" when one of its employees "referr[ed] to [NOCO's] products as a battery tender charger." Trial Tr. vol. 2, May 18, 2021, at 61, Dkt. No. 341. Similarly, an email exchange in the record shows that a retailer considering whether to stock a new line of battery tenders reached out to NOCO with an inquiry about *Deltona*'s product.

**B**

Perhaps recognizing that its cease-and-desist letters weren't working, Deltona sued NOCO for (1) trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, (2) unfair competition and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (3) common-law trademark infringement, and (4) unfair competition under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA).

At trial, the jury returned a verdict for Deltona on all counts, finding by a preponderance of the evidence that Deltona's marks ("Battery Tender" and "Deltran Battery Tender") were protected under § 32 of the Lanham Act, that NOCO's use of those terms caused a likelihood of confusion, that NOCO engaged in false

advertising in violation of § 43(a) of the Lanham Act, and that Deltona was entitled to actual damages of $1.3 million. The jury also found by clear and convincing evidence that NOCO had committed intentional misconduct or gross negligence, entitling Deltona to punitive damages of $5.75 million. The district court thereafter denied NOCO's motions for judgment as a matter of law on trademark infringement, FDUTPA, and actual damages.[3]

The district court then held a bench trial to address Deltona's request for equitable relief. The court ordered NOCO to disgorge profits in the amount of $12,135,943.70 and issued a permanent injunction. The injunction prohibited NOCO from "selling, marketing, advertising, [or] promoting" its products using the terms "Battery Tender," "Deltran Battery Tender," "Deltran," or "Tender." Although "Tender" is not a protected mark, the court found it necessary to enjoin NOCO from using that term, in particular, because "[t]here was abundant evidence that [the company's] use of 'tender' on its own was done in a way that caused customer confusion and infringed [Deltona's] Marks." Dist. Ct. Order, Sept. 29, 2023, at 24–25, Dkt. No. 423. The district court exempted from the injunction's coverage both keyword purchases and comparative advertising—*i.e.*, advertising that clearly compares alternative

[3] NOCO doesn't challenge the punitive-damages award on appeal.

brands.[4] NOCO filed post-judgment motions challenging the injunction, which the district court denied.

On appeal, NOCO contends that it is entitled to judgment as a matter of law (or failing that, a new trial) on the grounds (1) that Deltona's marks are "generic," and thus not protected, (2) that NOCO's conduct didn't constitute trademark infringement, (3) that NOCO's conduct didn't amount to unfair competition under FDUTPA, and (4) that actual damages aren't warranted. NOCO also contends (5) that the district court erred in instructing the jury on false advertising because, it says, Deltona hadn't properly pleaded or tried that claim, and (6) that the court abused its discretion in requiring disgorgement and issuing a permanent injunction. We'll address each issue in turn, with the exception that we'll save actual damages for last.

**II**

We first consider whether the district court erred in denying NOCO's JMOL motion or abused its discretion in denying NOCO's motion for a new trial—both of which argued that the

[4] The Federal Trade Commission defines "comparative advertising" as "advertising that compares alternative brands on objectively measurable attributes or price, and identifies the alternative brand by name, illustration or other distinctive information." 16 C.F.R. § 14.15(b) n.1.

terms "battery tender" and "Deltran battery tender" are "generic," and thus not protectable.[5]

Marks are classified by their distinctiveness along a spectrum: A mark can be (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Importantly here, a generic term can't be a valid trademark. *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980). A term is generic if it "names a 'class' of goods or services, rather than any particular feature or exemplification of the class." *U.S.P.T.O. v. Booking.com*, 591 U.S. 549, 556 (2020). Put another way, a generic term is "the term by which the product or service is commonly known." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007) (emphasis omitted). The terms "welding services" and "liquor store" are illustrative. *Id.* at 1359 (holding that "welding services" referred "to the kind of services it

[5] "We review the denial of a motion for judgment as a matter of law *de novo*, applying the same standard as the district court." *Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1343 (11th Cir. 2003). JMOL is warranted when no "legally sufficient evidentiary basis" allows a "reasonable jury to find" for the nonmoving party. *Rossbach v. City of Miami*, 371 F.3d 1354, 1356 (11th Cir. 2004); *see* Fed. R. Civ. P. 50(a). We view the evidence and draw inferences in the light most favorable to the nonmoving party. *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 813 (11th Cir. 2015).

We review the denial of a new trial for abuse of discretion. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002). A new trial is warranted if "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (citations omitted).

and its competitors provide"); *Frehling Enters. v. Int'l Select Grp.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (liquor store). A term can be generic in relation to some things but not to others: "Ivory," for instance, is generic in relation to elephant tusks but "arbitrary"—and thus protectable—as applied to soap. *Soweco*, 617 F.2d at 1183. Significantly for our purposes, a term that isn't inherently generic can *become* generic over time. *See, e.g.*, *Haughton Elevator Co. v. Seeberger*, 85 U.S.P.Q. 80 (1950) (holding that while the term "escalator" was initially protected, it had become generic); *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577 (2d Cir. 1963) (same for "thermos"); *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y. 1921) (L. Hand, J.) (same for "aspirin"); *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655 (7th Cir. 1965) (holding that, if not generic originally, "yo-yo" had become generic); *DuPont Cellophane Co. v. Waxed Prods. Co.*, 85 F.2d 75 (2d Cir. 1936) (same for "cellophane").

"Descriptive" marks are presumptively invalid; they are protectable only if they acquire "secondary meaning." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 949 (11th Cir. 2023). A descriptive mark is one that "describe[s] a characteristic or quality of an article or service." *Frehling Enters.*, 192 F.3d at 1335. So, for instance, a "vision center" denotes an office or business dedicated to assessing and treating vision-related issues. *FCOA*, 57 F.4th at 949. The distinction between descriptive and generic marks is subtle and "necessarily one of degree." *Soweco*, 617 F.2d at 1184.

Unlike a generic mark, which is unprotectable as a matter of law, a descriptive mark *can* qualify for trademark protection if it acquires a "secondary meaning." *FCOA*, 57 F.4th at 949. A mark has a secondary meaning "when consumers view [it] as synonymous with the mark holder's goods or services," *id.*, such that "the primary significance of the term in the minds of the [consuming] public is not the product but the *producer*," *Knights Armament Co. v. Optical Sys. Tech.*, 654 F.3d 1179, 1188 (11th Cir. 2011) (quoting *Welding Servs., Inc.*, 509 F.3d at 1358) (emphasis added). Whether a mark has acquired a secondary meaning depends on several factors: "(1) the length and manner of its use; (2) the nature of advertising and promotion; (3) the efforts made by the user of the mark to promote a conscious connection in the public's mind between the name and the user's product or business; and (4) the extent to which the public actually identifies the name with the user's product or venture." *Id.* at 1189 (citation omitted). "American Airlines" is an example of a descriptive mark that has acquired a secondary meaning: Though it "could theoretically refer to any airline based in North or South America," one particular company has invested sufficient "time and effort" that the term "now calls to mind a specific airline." *FCOA*, 57 F.4th at 949.

"Suggestive," "arbitrary," and "fanciful" marks are the most distinctive and are generally protectable. As the moniker indicates, suggestive marks only "suggest characteristics of the goods and services"; understanding them "require[s] an effort of the imagination by the consumer." *Id.* So, for example, the word "'penguin' would be suggestive of refrigerators" by evoking a sense of freezing

temperatures. *See id.* Likewise, "City Bank . . . *suggests* a modern or urban bank" and doesn't just "describe a class of banking services or a characteristic of banking services." *Citibank, N.A. v. Citibanc Grp.*, 724 F.2d 1540, 1545 (11th Cir. 1984). Arbitrary and fanciful marks "bear[] no logical relationship to the product[s] or service[s]" they represent; they're just random terms—think "Kodak" for cameras and "Xerox" for photocopiers. *Welding Servs., Inc.*, 509 F.3d at 1357; *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 n.5 (11th Cir. 1985).

NOCO contends that the term "battery tender" is generic and thus unprotectable. It first argues that "battery tender" is *inherently* generic—that the term has always simply referred to "a kind of battery-charging device . . . that 'tends' a battery while in disuse." Br. of Appellant at 26. Relying on a consumer survey that its expert conducted, NOCO alternatively asserts that, at the very least, "battery tender" *became* generic by 2020. Reply Br. of Appellant at 5. Neither argument persuades us.

**A**

Deltona's marks are not inherently generic. That's so for two reasons: (1) They are federally registered with the Patent and Trademark Office, which clothes them with at least presumptive validity; and (2) they are more properly characterized as (at least) descriptive marks that have acquired secondary meaning.

For starters, federal registration constitutes "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1057(b). That means registration presumptively demonstrates both the

"owner's ownership of the mark" and his "exclusive right" to use it in commerce as specified by the registration certificate. *Matal v. Tam*, 582 U.S. 218, 226–27 (2017). Deltona has owned the federally registered trademarks "Battery Tender" since 2008 and "Deltran Battery Tender" since 2013—both for "battery charger[s]" "for use in [the] marine industry, motorcycles, automotive, or in any vehicle or application using lead acid or gel batteries." "Battery Tender" Registration Certification, Pl.'s Ex. 1, Dkt. No. 318–1; "Deltran Battery Tender" Registration Certificate, Pl.'s Ex. 2, Dkt. No. 318–2. The fact of registration puts a heavy thumb on the scale against genericness.

Registration aside, the term "battery tender" is best characterized as (at least) descriptive. The term itself entails some level of abstraction—"tend[]" is more a metaphorical than literal description of what a battery tender does, which is to preserve the battery by maintaining its charge. That makes "battery tender" more like "vision center"—which might sell glasses and contact lenses but doesn't literally sell "vision"—than, say, "liquor store"—which is nothing more than a store that sells liquor. Indeed, the term "battery tender" might even be suggestive; it "suggest[s] characteristics of the good[]" and seems to require at least some "effort of the imagination" to understand how the product works. *See FCOA*, 57 F.4th at 949. Supporting the descriptiveness (or suggestiveness) of the term "battery tender" is the fact that Deltona's co-founder "made it up" based on his experience in World War II. Trial Tr. vol. 1, May 17, 2021, at 201, Dkt. No. 399; *id.* at 185 ("We were the first ones to develop th[e Battery Tender] name."). So as a matter

of historical fact, it's not accurate to say that "battery tender" referred from the very beginning simply to "a *kind* of battery-charging device," as NOCO contends. Br. of Appellant at 26 (emphasis added).

Because the term "battery tender" is at least descriptive, the mark is valid so long as it has acquired a secondary meaning. A reasonable jury could find that it has. Deltona has used the term for at least 30 years—since the early 1990s. Initially, Deltona invested in the brand by attending annual consumer and industry trade shows, advertising on TV and in magazines, and sponsoring race teams and fishing boats. Deltona's co-branding relationships affiliated it with well-known companies like Lotus, Lexus, and AAA. The "time and effort" Deltona put into building goodwill and a brand reputation seem to have paid off. *See FCOA*, 57 F.4th at 949. By 2014, the brand had already received significant renown as an established brand within the industry and community, particularly in the powersports market, and people recognized Deltona's co-founder and CEO as "Mr. Battery Tender." Trial Tr. vol. 1, May 17, 2021, at 196, Dkt. No. 399.

Accordingly, we hold that the term "battery tender" is not inherently generic, but rather, is at least descriptive, and it has acquired a secondary meaning associating it with Deltona. Particularly in light of Deltona's marks' federally registered status, we hold that there was sufficient evidence to support the jury's determination that those marks are valid.

**B**

There is also sufficient evidence to support the jury's determination that the term "battery tender" hadn't become generic by 2020. That occurs if a registered mark's "primary significance . . . to the relevant public" becomes "the generic name" of a good or service. 15 U.S.C. § 1064(3).

To determine whether a mark has become generic, courts have considered "consumer surveys, dictionaries, newspapers and other publications," as well as the mark's use both by the plaintiff and by others in the trade. *Royal Crown Co. v. Coca-Cola*, 892 F.3d 1358, 1370 (Fed. Cir. 2018). To show that "battery tender" became generic, NOCO proffered a consumer survey conducted by its expert in which 78% of 558 respondents reported that they believed that "Battery Tender [was] a type of product" rather than a reference to a particular brand. Br. of Appellant at 26.

Even if NOCO's survey was credible evidence of the term's genericness, it wasn't conclusive. The jury was free to reject it—and in fact seems to have done so. After all, Deltona had challenged the survey's methodology on the ground that it included people who might simply have been "exposed" to battery tenders "from shopping near [them]" when walking through an automotive store or department. Trial Tr. vol. 6, May 24, 2021, at 178, Dkt. No. 402; *see* Br. of Appellee at 21. The sampled population, Deltona contended, was overinclusive; that kind of exposure alone didn't make someone part of the "relevant public" because it didn't mean that he or she had purchased or were interested in purchasing battery

tenders. To be sure, NOCO defended the survey, asserting that its respondents represented the "relevant public"; they were "exposed" to battery tenders *because* they were prospective purchasers of battery tenders. But a jury could reasonably have credited Deltona's critique and thus rejected the results of NOCO's survey and, with it, NOCO's argument that the term "battery tender" became generic over time.[6]

* * *

For the foregoing reasons, we hold that there is sufficient evidence to support the jury's determination that Deltona's marks weren't and aren't generic. The district court therefore didn't err in denying NOCO's JMOL and new-trial motions on the issue of genericness.

**III**

We next address whether the district court erred in denying NOCO's JMOL and new-trial motions on the issue of trademark infringement under the Lanham Act and Florida common law. Because the analysis is the same for both claims, we will analyze them together. *See Suntree Techs. v. Ecosense Int'l*, 693 F.3d 1338, 1345 (11th Cir. 2012).

[6] Under our precedent, Deltona wasn't required to produce its own survey to rebut NOCO's. *See, e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 140 (11th Cir. 2022) (citing *Frehling Enters.*, 192 F.3d at 1341 n.5); *PlayNation Play Sys. v. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019).

To state a trademark-infringement claim, "a plaintiff must demonstrate (1) that it owns a valid mark with priority, and (2) that the defendant's mark is likely to cause consumer confusion with the plaintiff's mark." *FCOA*, 57 F.4th at 946; *see also* 15 U.S.C. § 1114(1). As just explained, Deltona presented sufficient evidence to establish the marks' validity, thereby satisfying the first element.

The second element entails two steps. "At step one, the court considers several factors which can provide circumstantial evidence of likelihood of confusion." *Id.* at 947. These include (1) the strength of the infringed mark, (2) the similarity of the infringed and infringing marks, (3) the similarity of the goods and services the marks represent, (4) the similarity of the parties' trade channels and customers, (5) the similarity of the parties' advertising media, (6) the infringer's intent to misappropriate the mark owner's goodwill, and (7) the existence and extent of actual confusion among the consuming public. *Id.* (citing *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.* (*FIU*), 830 F.3d 1242, 1255 (11th Cir. 2016)). The weight given to each factor "varies with the circumstances of the case." *Suntree Techs.*, 693 F.3d at 1346. "At step two, the court weighs each of the relevant circumstantial facts—independently and then together—to determine whether . . . likelihood of confusion[] can reasonably be inferred." *FCOA*, 57 F.4th at 947.

Deltona contends that NOCO infringed its marks by engaging in a "broad[], systematic attack on the Battery Tender brand across multiple channels." Br. of Appellee at 27. In particular, Deltona alleges that NOCO engaged in the following conduct: (1) It

"excessively" bid on keywords including the term "battery tender" and its variants to boost its ads' placement in Amazon search results; (2) it used the term "battery tender" in the text of its Amazon ads; (3) it used "battery tender" in its product descriptions on Amazon; and (4) it held out its own chargers as "battery tenders" in communications with marketing firms and consumers. We'll consider NOCO's contentions in turn.

**A**

Deltona claims that NOCO engaged in "excessive . . . keyword bidding" when it aggressively purchased Deltona's marks as keywords so that consumers searching for "battery tenders" on Amazon would see NOCO ads. Br. of Appellee at 10. Whether keyword bidding can constitute trademark infringement is a question of first impression in this Court. The district court thought that it might. *See* Dist. Ct. Order, Sept. 29, 2023, at 22, Dkt. No. 423 ("It is not clear under Eleventh Circuit law that merely purchasing keywords—*without some other evidence of consumer confusion*—is sufficient to constitute trademark infringement." (emphasis added)). We now hold, to the contrary, that it doesn't.

Keyword bidding doesn't constitute trademark infringement for a simple reason: It's not "likely to cause consumer confusion with the plaintiff's mark." *FCOA*, 57 F.4th at 946. And it's unlikely to cause consumer confusion with the plaintiff's mark for an equally straightforward reason: The use of the plaintiff's mark for keyword-bidding purposes occurs "behind the scenes," so to speak. Consumers don't—indeed, can't—*see* the plaintiff's mark—all

that's visible here is a NOCO ad. We agree with the Ninth Circuit that, in a case like this, likelihood of confusion "turn[s] on what the consumer s[ees] on the screen and reasonably believe[s], given the context." *Network Automation v. Advanced Sys. Concepts*, 638 F.3d 1137, 1153 (9th Cir. 2011). A consumer who sees a NOCO-sponsored ad, whether or not driven by keyword bidding, may well recognize the promoted NOCO product as an alternative to consider, but he's unlikely for that reason alone to mistake it for Deltona's own offering. Accordingly, confusion here depends on whether Deltona's mark is visible in NOCO's ad, not whether an ad that does *not* display or otherwise reference Deltona's mark might have been (invisibly) triggered by the mark's behind-the-scenes use as a keyword.

To be sure, ads driven by keyword bidding might *distract* consumers, but they're not likely to *confuse* them. NOCO's bidding practices may well result in its own ads showing up alongside Deltona's in search results for "battery tenders." (After all, that's *why* NOCO paid for the keywords.) But so long as NOCO's ads don't hold that company out as selling "battery tenders," consumers aren't likely to be confused—just potentially overwhelmed by the presence of alternative products. The situation the consumer would face is akin to the one he would confront if he walked into a corner store looking for Coke and encountered Pepsi next to it on the shelf. *See* Eric Goldman, *Brand Spillovers*, 22 Harv. J.L. & Tech. 381, 410 (2009). Or if he asked a salesperson at an electronics store about a Dell laptop and received a question in response: "Dell laptops are great, but have you looked at the new Lenovo?" [2]

McCarthy on Trademarks & Unfair Competition § 25A:8 (5th ed.) (cleaned up). In all these cases, the consumer is distracted, but not confused about what the alternative represents—"information about competing brands among which [she] can select." Goldman, *supra*, at 410. And that's true whether the marketplace is a brick-and-mortar store or an online platform. *See id.*

In holding that keyword bidding can't constitute trademark infringement, we join the unanimous consensus of our sister circuits. *See, e.g.*, *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 239 (2d Cir. 2024) (holding that "the mere act of purchasing a competitor's trademarks in the context of keyword search advertising does not constitute trademark infringement"); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (holding that the use of keywords, "divorced from the text of the resulting ads, could not result in a likelihood of confusion"); *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 719 (9th Cir. 2024) (observing that "in the keyword advertising context," "the owner of the mark must demonstrate likely confusion, not mere diversion"); *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428 (5th Cir. 2021) ("[I]n the context of internet searches and search-engine advertising in particular, the critical issue is whether this is consumer confusion. Distraction is insufficient.").

Put simply, NOCO's keyword bidding on Deltona's marks doesn't constitute infringement because consumers don't see it. Instead, "what consumers encountered in the marketplace" were the resulting ads, *Lerner & Rowe*, 119 F.4th at 726 (citation modified),

which weren't unlawful, at least so long as they didn't use Deltona's marks—*i.e.*, hold themselves out as selling Deltona's products. Accordingly, to the extent that the damages award in this case is predicated on NOCO's keyword-bidding practices—the record includes 37 NOCO ads that were displayed as a result of that company's keyword purchases but didn't themselves display Deltona's marks—it must be reduced.

**B**

Second, and more conventionally, Deltona contends that NOCO infringed its marks by using the term "battery tender" *in the text* of NOCO's own Amazon ads. For instance, NOCO's ads said things like "More Than Just A Tender. The Ultimate Charger," "The most advanced battery tender for any vehicle," "More than just a Battery Tender – zero overcharge," and "The Winter Battery Tender with Zero Overcharge." Pl.'s Ex. 61A, Dkt. No. 318–38; Pl.'s Ex. 61D, Dkt. No. 318–40; Pl.'s Ex. 222A, Dkt. No. 318–152; Pl.'s Ex. 61F, Dkt. No. 318–42.

This is wheelhouse trademark infringement; NOCO's conduct was likely to mislead consumers into thinking that it sold "battery tenders." NOCO insists that its ads weren't confusing because Amazon marked them as "sponsored" and customers would therefore recognize them as ads. Even so, the sponsored ads' *content* effectively stated that NOCO sold battery tenders, which it doesn't—only Deltona does. (Recall that we've already held that there is sufficient evidence to support the jury's determination that Deltona's "battery tender" mark is valid. *See supra* at 19.) NOCO's

ads were likely to mislead consumers into thinking that its products were battery tenders when, in fact, they weren't.

Further evidence indicates that NOCO's use of Deltona's marks in its ads' text was knowing and intentional. Amid the flurry of cease-and-desist letters, NOCO employees acknowledged that the company "c[ould] not use Battery Tender in [its] messaging as it will cause a legal issue, trademark infringement." Pl.'s Ex. 192, Dkt. No. 318–120. And while brainstorming the slogan, "The Winter Battery Tender with Zero Overcharge," NOCO employees openly discussed their company's president's desire to "refer to Battery Tender in the messaging." Pl.'s Ex. 134 at 6–7, Dkt. No. 318–92 ("I picture J[onathan Nook] wanting us to refer to Battery Tender in the messaging just like we have for the current ad messaging." (citation modified)). And indeed, the employees greenlighted the slogan precisely *because* it used Deltona's mark. *Id.* ("I like that one because it's kind of passive aggressive [😂]. "). A reasonable jury could find that the evidence reflects NOCO's intent to "misappropriate [Deltona's] good will." *FCOA*, 57 F.4th at 947.

**C**

Third, Deltona alleges that NOCO used the term "battery tender" in its chargers' product descriptions on Amazon leading up to Prime Day. To be clear, using the term in product descriptions is different from using it in the ads' main text. Product descriptions are "below the line," so to speak, and in smaller print—they are meant to inform a diligent customer rather than grab his attention. As a result, consumers are probably less likely to focus on them in

the way they do the ads. Even so, the district court found that by using the term "battery tender" in its product descriptions, NOCO sought to "drive traffic to [its] products"—namely, by increasing the likelihood that someone searching the internet for a "battery tender" might land on a NOCO offering—even while saving the company money that it would otherwise spend purchasing keywords, which are "much more expensive" during Prime Day season. Dist. Ct. Order, Sept. 29, 2023, at 8, Dkt. No. 423. NOCO's use of "battery tender" in its product descriptions, the district court concluded, could be seen as misdirecting consumers' trust in Deltona's brand to NOCO's products by passing off its own chargers as battery tenders—and thereby misappropriating goodwill that Deltona had established through its time and effort. *Cf.* Trial Tr. vol. 3, May 19, 2021, at 162, Dkt. No. 343 ("[NOCO was] using [the Deltona] brand to be able to sell their product."). Because we view the record in the light most favorable to the nonmoving party on appeal from a denial of a JMOL motion, *see supra* at 12 n.5, we accept the district court's characterization of the evidence for purposes of our analysis. We think it clear that a reasonable jury could find that the product descriptions were part of an effort to misappropriate Deltona's goodwill and confuse consumers. *See FCOA*, 57 F.4th at 947.

NOCO contends that it didn't commit trademark infringement because Deltona offered no evidence that "any consumer would—or did—scroll down the page to see 'battery tender' in the product description and become confused about the source of the product" on offer. Br. of Appellant at 39. In so doing, NOCO

deploys a variant of the argument that it (as it turns out, successfully) made regarding keyword bidding. In particular, NOCO says, because Deltona didn't prove that any consumer was likely to actually *read* the term "battery tender" in NOCO's product descriptions, it couldn't show that the product descriptions were the basis of any consumer confusion.

But using the term "battery tender" in product descriptions is different from purchasing it as a keyword in at least two fundamental respects. First, a product description is (our term) "on the page." Even if less conspicuous or prominent than the ad's main text, it isn't entirely invisible to the consumer's eye in the way that a behind-the-scenes keyword is. The fact is that a webpage featuring one of NOCO's chargers said, in so many words, that it *was* a "battery tender." And second, whereas bidding on the term "battery tender" as a keyword would trigger a "sponsored" ad that would alert a consumer that the displayed product wasn't Deltona's, using that term in a product description wouldn't. *See* Trial Tr. vol. 3, May 19, 2021, at 45, 70, Dkt. No. 343.

The bottom line: Even if consumers didn't actually read NOCO's product descriptions, NOCO impermissibly held itself out in those descriptions as a seller of battery tenders, rather than a provider of *alternatives* to battery tenders, as it did, for instance, when using a keyword-bidding strategy to drive traffic to its own products. The inclusion of "battery tender" in the description automatically not only affected Amazon search results but also drove shoppers searching for Deltona's battery tenders to NOCO chargers

without alerting them in any way—through a "sponsored" tag or otherwise—that they weren't *really* looking at battery tenders.

**D**

Finally, Deltona contends that NOCO held out its products as "battery tenders" in communications with marketing firms and consumers. The evidence supports the conclusion that, from the top down, NOCO actively tried to sow confusion about what a battery tender is. NOCO's president, Nook, specifically told the company's marketing firm that "battery tender" had become "a generic word." Def.'s Ex. 19 at 1, Dkt. No. 319–3. In the same vein, a sales manager, advised by Nook, emailed a prospective customer that the term "[b]attery [t]ender . . . usually refer[s] to the function . . . than the actual brand." Def.'s Ex. 81, Dkt. No. 319–7; Def.'s Ex. 82, Dkt. No. 319–8. So too, when asked whether "Battery Tender" was a different brand, a NOCO support-chat employee insisted that a "battery tender" was fundamentally a product: "Battery Tender is a specific brand, but 'a battery tender' is a maintainer for your batteries . . . ." Pl.'s Ex. 138, Dkt. No. 318–94. Another sales manager referred to a specific NOCO product as a type of "battery tender." Pl.'s Ex. 132, Dkt. No. 318–90. And indeed, NOCO's Vice President of Sales admitted that he and his team frequently referred to NOCO's products as "battery tenders" in communications with customers despite knowing the term was trademarked. Trial Tr. vol. 4, May 20, 2021, at 125, Dkt. No. 400.

A reasonable jury certainly could have concluded that these explicit statements to customers—that "battery tender" was a generic term—were likely to confuse them.

* * *

To briefly recap, the factors that bear on likelihood of confusion are (1) the strength of the infringed mark, (2) the similarity of the infringed and infringing marks, (3) the similarity of the goods and services the marks represent, (4) the similarity of the parties' trade channels and customers, (5) the similarity of the parties' advertising media, (6) the infringer's intent to misappropriate the infringed party's goodwill, and (7) the existence and extent of actual confusion among the consuming public. *FCOA*, 57 F.4th at 947.

A reasonable jury could have found that, with one arguable exception, the *FCOA* factors support the conclusion that NOCO's conduct was likely to cause confusion. With respect to Factor (1), the strength of Deltona's marks, it's true that if the term "battery tender" is merely descriptive, then it's less distinctive than marks that are suggestive, arbitrary, or fanciful. But the presence of each of the remaining factors substantially increased the likelihood of consumer confusion. As for Factor (2), the infringed and infringing marks are the same; as we've explained, NOCO used Deltona's protectable mark in the text of NOCO's Amazon ads, in Amazon product descriptions, and in communications with consumers and marketing firms. Factor (3): Deltona's and NOCO's products are similar—both sell battery-maintaining chargers for use in vehicles. Factors (4) and (5): The companies' trade channels, customers, and

advertising media are also similar—both rely heavily on Amazon to sell and advertise their products to people in the market for battery-maintaining chargers. Factor (6): NOCO intended to misappropriate Deltona's goodwill; NOCO deliberately used "battery tender" in the text of its ads and in Amazon product descriptions, and actively misinformed customers that "battery tender" was generic. And Factor (7): Actual confusion is apparent from (a) a retailer mistakenly sending an inquiry about Deltona's products to NOCO, (b) the experience of a Deltona customer who became puzzled when talking to a NOCO employee who referred to NOCO's products as "battery tenders," and (c) a virtual conversation on NOCO's website in which a sales rep told a putative customer that the term "battery tender" didn't refer specifically to a particular brand but, rather, was a general term that included NOCO's products.

Putting it all together, a jury could weigh the *FCOA* factors and reasonably conclude that NOCO's conduct—keyword bidding aside—was likely to cause consumer confusion. *See FCOA*, 57 F.4th at 947. Accordingly, we hold that the evidence is sufficient to support the jury's determination that NOCO infringed Deltona's marks. The district court therefore did not err in denying NOCO's JMOL and new-trial motions on the issue of trademark infringement.

**IV**

We next consider whether the district court erred in denying NOCO's JMOL and new-trial motions challenging the jury's

determination that the company violated the Florida Deceptive and Unfair Trade Practices Act.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). FDUTPA violations can be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition"—including, as relevant here, the Lanham Act. *Id.* § 501.203(3)(c). Therefore, NOCO's liability under § 43(a) of the Lanham Act, which prohibits unfair competition and false designation of origin, 15 U.S.C. § 1125(a), likewise gives rise to a FDUTPA violation. *See Suntree Techs.*, 693 F.3d at 1345 ("The legal standards we apply to [the FDUTPA] claim are the same as those we have applied under section 43(a) of the Lanham Act." (citation modified)).

But the question of remedies remains. While declaratory and injunctive relief are available to "anyone aggrieved" by a FDUTPA violation, Fla. Stat. § 501.211(1), monetary relief in the form of actual damages is available only to a "person who has suffered a loss as a result of a violation of this part," *id.* § 501.211(2). Florida law generally defines actual damages as "the difference in the market value of the product or service in the condition in which it *was* delivered and its market value in the condition in which it *should have been* delivered." *Stuart Roofing, Inc. v. Thomas*, 372 So. 3d 298, 300 (Fla. Dist. Ct. App. 2023) (emphasis added).

To make its damages case, Deltona points to "harm to its reputation or goodwill" that it says resulted from NOCO's infringing conduct and consumer confusion. Br. of Appellant at 23. But those sorts of injuries give rise not to actual damages but rather to *consequential* damages, which are "not compensable under section 501.211(2)." *Stewart Agency v. Arrigo Enters.*, 266 So. 3d 207, 214 (Fla. Dist. Ct. App. 2019); *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008) (same). Unlike actual damages, consequential damages are indirect losses arising from a defendant's allegedly illegal conduct. Deltona's theory is that consumer confusion harms its reputation and goodwill, which in turn causes consumers to buy NOCO's chargers rather than its own battery tenders. But Deltona hasn't alleged that consumer confusion *directly* caused it to lose battery-tender sales. Accordingly, Deltona can't recoup damages for NOCO's FDUTPA violation. *Cf., e.g.*, *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. Dist. Ct. App. 2012) (refusing damages but granting injunctive relief under FDUTPA where a competitor's deceptive misrepresentations could create consumer confusion and loss of goodwill); *Pepsico, Inc. v. Distribuidora La Matagalpa, Inc.*, 510 F. Supp. 2d 1110, 1116 (S.D. Fla. 2007) (same for trademark infringement).

Even though Deltona proved a FDUTPA violation, it didn't seek actual damages. Accordingly, it is entitled to injunctive relief but not to monetary relief.

## V

We must also decide whether the district court erred when it instructed the jury on false advertising under the Lanham Act.[7]

Section 43(a) of the Lanham Act provides "two distinct bases of liability": (1) unfair competition or false designation of origin under § 43(a)(1)(A); and (2) false advertising under § 43(a)(1)(B). *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014); 15 U.S.C. § 1125(a)(1)(A) (unfair competition and false designation of origin); *id.* § 1125(a)(1)(B) (false advertising). Section 43(a)(1)(A) effectively codifies a slightly broader version of trademark infringement than § 32, prohibiting a term's use in commerce—regardless of whether it's registered as a mark—if it's "likely to cause confusion" or "deceive" as to the "origin, sponsorship, or approval of [one's] goods." *Id.* § 1125(a)(1)(A). Section 43(a)(1)(B), by contrast, prohibits false advertising, or misrepresentations as to the "nature, characteristics, . . . or geographic origin" of goods or services. *Id.* § 1125(a)(1)(B).

To evaluate the propriety of the district court's jury instruction on false advertising, we first examine the complaint to determine whether Deltona pleaded a false-advertising claim. If not, we must then assess the trial proceedings to determine whether NOCO consented to trial of a false-advertising claim.

---

[7] We "review jury instructions de novo to determine whether they misstate the law or mislead the jury." *Teel v. Lozada*, 99 F.4th 1273, 1279 (11th Cir. 2024).

Deltona's complaint alleged unfair competition and false designation of origin under the Lanham Act. *See* Compl. ¶¶ 65–71. And the entirety of the complaint's relevant section made allegations to that effect. For starters, that section was titled "Federal False Designation of Origin and Unfair Competition"—which for all intents and purposes tracks the language of § 43(a)(1)(A). *Id.* And beyond the label, that portion of the complaint made the following substantive allegations:

- NOCO's use of Deltona's marks "is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of [NOCO's] products, and is likely to cause consumers to believe, contrary to fact, that [NOCO's] products are sold, authorized, endorsed, or sponsored by [Deltona], or that [NOCO] is in some way affiliated with or sponsored by [Deltona]." *Id.* ¶ 66.

- NOCO's use of Deltona's marks "constitutes use of a false designation of origin and misleading description and representation of fact." *Id.* ¶ 67.

- NOCO's "conduct is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of [NOCO] with [Deltona]." *Id.* ¶ 68.

- NOCO's "conduct constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." *Id.* ¶ 69.

The district court thought the phrase "misleading description and representation of fact," *id.* ¶ 67, when read in conjunction with the complaint's "numerous allegations involving advertisements" and its generic citation to § 43(a)—rather than § 43(a)(1)(A), in particular—warranted a separate jury instruction on false advertising under § 43(a)(1)(B). *See* Trial Tr. vol. 6, May 24, 2021, at 9, Dkt. No. 402.

We disagree. We hold that Deltona failed to adequately plead false advertising. Given the context—not just the count's label but also the surrounding allegations—the complaint's assertion that NOCO's use of Deltona's marks constituted "misleading description and representation of fact" is more properly understood as a reference to the unfair competition and false designation of origin prohibited by § 43(a)(1)(A)—*i.e.*, as a contention that NOCO's conduct was likely "to deceive . . . as to the origin, sponsorship, or approval of [its] goods." 15 U.S.C. § 1125(a)(1)(A). And Deltona's generic reference to § 43(a), rather than subparagraph (a)(1)(A), doesn't move the needle—even if a little imprecise, Deltona didn't by that citation signify an intent to establish a separate "bas[i]s of liability." *Lexmark Int'l, Inc.*, 572 U.S. at 122. We therefore disagree with the district court's conclusion that Deltona's complaint "undoubtedly" put NOCO on "notice of [a] false advertisement claim." Trial Tr. vol. 6, May 24, 2021, at 9, Dkt. No. 402.

It's true, as Deltona asserts, that an issue not raised in the complaint can be treated as having been presented—and thus, for our purposes, the proper subject of a jury instruction—if it is "tried

by the parties' express or implied consent." Fed. R. Civ. P. 15(b)(2). But NOCO neither expressly nor impliedly consented to trying a false-advertising claim. Implied consent exists if "the parties recognized that an issue not presented by the pleadings entered the case at trial." *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1339 (11th Cir. 2020). Accordingly, consent can be inferred if evidence relevant to an unpleaded issue is introduced without objection. *Wesco Mfg. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487 (11th Cir. 1987). But the "introduction of evidence arguably relevant to *pleaded* issues cannot serve to give a party fair notice that new issues are entering the case." *Id.* (emphasis added). While Deltona offered evidence that could have supported an unpleaded false-advertising claim—such as NOCO using "battery tender" in the text of its Amazon ads and thus misrepresenting its own products as Deltona's—that evidence wasn't specific to false advertising; rather, it could just as well have supported the properly pleaded unfair-competition claim. NOCO therefore didn't impliedly consent to trial of a false-advertising claim. And because the false-advertising claim wasn't properly before the jury, the district court erred in giving a jury instruction on that theory.

Instruction-based errors are subject to reversal when, "put in context," there is a "substantial and ineradicable doubt" whether the jury was properly guided. *Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1191 (11th Cir. 1995); *Luxottica Grp. S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1311 (11th Cir. 2019). The false-advertising instruction here gives rise to such a doubt; it directed jurors to

adjudicate a claim that was neither pleaded nor properly tried. We thus reverse the district court's judgment on false advertising.

## VI

Next up, equitable remedies—whether the district court abused its discretion in requiring disgorgement of NOCO's profits and issuing a permanent injunction.[8]

### A

Disgorgement is appropriate when "(1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *PlayNation Play Sys.*, 924 F.3d at 1170. We needn't proceed beyond the first trigger because NOCO's own internal communications confirm that its conduct was willful and deliberate. Again, despite acknowledging that it "c[ould not] use Battery Tender in [its] messaging," NOCO continued to do so in its Amazon ads, Amazon product descriptions, and sales practices. And NOCO employees believed that the company's president "want[ed] [them] to refer to Battery Tender in the messaging" and specifically chose one sales slogan because it used Deltona's marks. The district court's finding that the "evidence of willful infringement is abundant" was not clearly erroneous. Disgorgement is appropriate.

---

[8] We review the district court's decision in both respects for abuse of discretion, *CNA Fin. Corp. v. Brown*, 162 F.3d 1334, 1337 (11th Cir. 1998), and any subsidiary factual determinations for clear error, *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

NOCO separately challenges the *amount* of the district court's disgorgement award. The court calculated the award by estimating NOCO's battery-charger profits during the period in which the jury concluded it had engaged in infringement, from December 2014 to March 2020. Because it didn't have precise monthly numbers, the court (1) averaged monthly sales in 2014 to derive an estimate for December 2014, (2) added up sales for 2015, 2016, 2017, 2018, and 2019, and then (3) divided sales for the first six months of 2020 to derive an estimate for January to March of that year. Finally, to the estimated sales numbers, the court applied NOCO's profit margin—as confirmed by the company's president—to reach the final amount of $12,135,943.70.

NOCO contends (1) that any disgorgement should be limited to profits directly traceable to NOCO's use of Deltona's marks on Amazon, (2) that Deltona had unclean hands because it also engaged in keyword bidding, and (3) that principles of equity preclude disgorgement because Deltona had stated that the matter was "closed" following its first cease-and-desist letter. None of NOCO's arguments is availing.

First, NOCO's illegal conduct extended beyond its Amazon buys—it also included actively communicating to consumers and external partners that Deltona's marks were generic. Second, and relatedly, that conduct went beyond keyword bidding—which, for reasons explained, doesn't constitute trademark infringement—to include the use of Deltona's marks in the text of its ads and product descriptions, and, again, misleading communications with

consumers. Finally, equitable estoppel doesn't apply here because Deltona had "closed" the matter only because it believed that NOCO had stopped infringing its marks. When NOCO continued to infringe, Deltona followed up with more letters and, eventually, this lawsuit. The district court thus acted within its discretion in ordering NOCO to disgorge $12,135,943.70.

**B**

The district court also broadly and permanently enjoined NOCO from "selling, marketing, advertising, promoting, or authorizing any third party to sell, market, advertise, or promote [its] products, including without limitation, its battery chargers, jump starters, and battery-related products, with or using the terms 'Battery Tender,' 'Deltran Battery Tender,' 'Deltran,' or 'Tender'"—in any font, any case (upper or lower), and any number (singular or plural). Dist. Ct. Order, Sept. 29, 2023, at 26–27, Dkt. No. 423. NOCO challenges both the injunction's imposition and scope.

In the trademark context, courts have the authority "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116(a). To obtain an injunction, a plaintiff must show (1) that it is suffering irreparable injury, (2) that legal remedies like monetary damages are inadequate, (3) that the balance of hardships warrant equitable relief, and (4) that the public interest wouldn't be disserved by the issuance of an injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In contesting the issuance of the injunction, NOCO contends that Deltona hasn't satisfied the irreparable-injury element because it isn't suffering any ongoing harm. We disagree. As an initial matter, we've previously held that "infringement by its nature causes irreparable harm." *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989). And even though NOCO seems to have ceased its misconduct, the record shows that it has, after brief interludes, repeatedly returned to infringing Deltona's marks. The district court found that that NOCO's "[v]oluntary cessation" didn't alleviate the risk of "further infringement in the future." Dist. Ct. Order, Sept. 29, 2023, at 19, Dkt. No. 423. That finding is not clearly erroneous.

NOCO separately objects to the injunction's scope. In particular, NOCO asserts that because the term "tender" isn't trademarked, its use can't constitute trademark infringement—and therefore, the argument goes, can't properly be enjoined. NOCO's argument isn't without some force. After all, courts may not issue overbroad injunctions: Even if "this field of the law does not yield an easily-separable crop of guidelines," an injunction can't "lop[] off a considerable amount of wheat with its chaff." *B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1269 (5th Cir. 1971). We have held, however, that an injunction "can be therapeutic as well as protective." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1548 (11th Cir. 1986). "In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Id.*

The injunction here prohibits NOCO from using the word "tender" in the selling, marketing, advertising, or promotion of its products "without limitation." Dist. Ct. Order, Sept. 29, 2023, at 26–27, Dkt. No. 423. That's pretty broad. At the same time, though, omitting "tender" from the injunction would have left NOCO a loophole. Recall, for instance, that one of the challenged Amazon ads reads, "More Than Just A Tender. The Ultimate Charger." Though it didn't use the term "battery tender" expressly, there's no question that its slogan referred to battery tenders, and that it was just as likely to confuse consumers as slogans that were more explicit.

If the district court hadn't enjoined the use of the word "tender," NOCO could have continued running the "More Than Just A Tender" ad and others like it—and thereby confused consumers in the very manner that trademark law is designed to prevent. In crafting its injunction, the district court recognized and addressed precisely that possibility: "Defendant has made abundantly clear by its previous behavior that if it is given any loophole, it will use it to infringe. Thus, [the term 'tender'] will be included in the permanent injunction." *Id.* at 25. We hold that the district court acted within its discretion in crafting the permanent injunction as it did.

**VII**

One final issue: Did the district court err in denying NOCO's JMOL and new-trial motions challenging the jury's decision awarding Deltona $1.3 million in actual damages?

Damages for trademark infringement under the Lanham Act may include "any damages sustained by the plaintiff." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008); *see also* 15 U.S.C. § 1117. The category of "damages sustained by the plaintiff" includes "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts," such as harm to the business's reputation or goodwill. *Aronowitz*, 513 F.3d at 1241. Here, the $1.3 million award was for damage to Deltona's reputation and goodwill. *See* Dist. Ct. Order, Mar. 30, 2022, at 7, Dkt. No. 410.

NOCO first asserts that Deltona wasn't entitled to *any* damages—because, it says, even though Deltona technically owns the marks, it licenses them to Deltran. Deltran is a former subsidiary of Deltona that has since split off into a separate company, and it handles Deltona's distribution, operations, and advertising. Because, NOCO argues, Deltona is just an "intellectual-property holding company having one captive customer"—*i.e.*, Deltran—Deltona doesn't have any relevant reputation that could have been harmed. Br. of Appellant at 48. Respectfully, that doesn't follow. Harm to the reputation and goodwill of marks that Deltona owns surely also harms the reputation and goodwill of Deltona itself. The reason, we think, is that Deltona's value is closely tied to the value of its assets, which include its intellectual property.

NOCO is on firmer footing in challenging the amount of the damages award. On its verdict form, the jury awarded a lump sum of $1.3 million without parsing the damages claim by claim. So far

as we can tell, the $1.3 million covers Deltona's claims for (1) trademark infringement under § 32 of the Lanham Act, (2) trademark infringement under Florida common law, (3) unfair competition and false designation of origin under § 43(a)(1)(A) of the Lanham Act, (4) violation of FDUTPA, and (5) false advertising under § 43(a)(1)(B) of the Lanham Act.

In this opinion, we have held (1) that keyword bidding doesn't constitute trademark infringement, (2) that Deltona's damages award under FDUTPA cannot stand, and (3) that the district court erred in instructing the jury on Deltona's false-advertising claim, which was neither properly pleaded nor tried. Because we can't determine the extent to which the $1.3 million damages award reflects liability for any of those claims or theories, we vacate the damages award and remand for a new trial on damages.

**VIII**

To recap: We hold that a reasonable jury could find that Deltona's marks are protected, that NOCO engaged in trademark infringement, and (separately) that NOCO violated FDUTPA. Accordingly, we **AFFIRM** the district court's denial of NOCO's JMOL and new-trial motions challenging the jury's verdicts on those issues. We also **AFFIRM** the district court's disgorgement order and its permanent injunction. We hold that the district court erred in instructing the jury on NOCO's false-advertising claim and **REVERSE** the jury's verdict on that issue. Finally, we **VACATE** and **REMAND** for a new trial on damages consistent with this opinion—in particular, our holdings that keyword bidding doesn't

constitute trademark infringement, that Deltona's FDUTPA damages award cannot stand, and that Deltona's false-advertising claim wasn't properly pleaded or tried.